UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JAY BRADSHAW,

                          Plaintiff,

              v.                                              9:19-CV-0428
                                                              (BKS/TWD)

DONALD G. UHLER, et al.,

                          Defendants.

_____

APPEARANCES:

JAY BRADSHAW
08-A-3654
Plaintiff, pro se
Upstate Correctional Facility
P.O. Box 2001
Malone, NY 12953


BRENDA K. SANNES
United States District Judge

## DECISION and ORDER

## I.     INTRODUCTION

The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Jay

Bradshaw asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an

application to proceed in forma pauperis ("IFP"), and a motion for preliminary injunctive relief.

Dkt. No. 1 ("Compl."); Dkt. No. 6 ("IFP Application"); Dkt. No. 4 ("Preliminary Injunction

Motion").[1]  Plaintiff, who is incarcerated at Upstate Correctional Facility ("Upstate C.F."), has

_____

[1]   Plaintiff's initial application to proceed IFP was denied as incomplete and the action was
administratively closed.  Dkt. No. 4.  Plaintiff then re-filed his IFP Application, and this action was re-opened.
Dkt. Nos. 6, 7.

not paid the filing fee for this action.

## II.     IFP STATUS

Where a plaintiff seeks leave to proceed IFP, the Court must determine whether the

plaintiff has demonstrated sufficient economic need to proceed without prepaying, in full, the

Court's filing fee of four hundred dollars ($400.00).[2]   The Court must also determine whether

the "three strikes" provision of 28 U.S.C. § 1915(g) ("Section 1915(g)") bars the plaintiff from

proceeding IFP and without prepayment of the filing fee.[3]   More specifically, Section 1915(g)

provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment
> in a civil action or proceeding under this section if the prisoner has,
> on 3 or more prior occasions, while incarcerated or detained in any
> facility, brought an action or appeal in a court of the United States
> that was dismissed on the grounds that it is frivolous, malicious, or
> fails to state a claim upon which relief may be granted, unless the
> prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).   If the plaintiff is indigent and not barred by Section 1915(g), the Court

must consider the sufficiency of the claims stated in the complaint in accordance with 28

U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

In this case, plaintiff has demonstrated economic need and has filed the inmate

authorization form required in the Northern District of New York.   *See* Dkt. Nos. 3, 6.   Thus,

---

[2]   "28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged."   *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).   "Although an indigent, incarcerated individual need not prepay the filing fee . . . at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts."   *Id.* (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

[3]   The manifest intent of Congress in enacting Section 1915(g) was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates.   *Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007).   The question of whether a prior dismissal is a "strike" is a matter of statutory interpretation and, as such, is a question for the court to determine as a matter of law.   *Tafari*, 473 F.3d at 442-43.

the Court must determine whether the "three strikes" rule of Section 1915(g) bars plaintiff from proceeding with this action IFP.

> **A.    Determination of "Strikes"**

Plaintiff is a frequent litigator, having commenced, in addition to this action, at least twelve other civil actions in the district courts in the Second Circuit since 2008.  *See* U.S. Party/Case Index <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl > (last visited May 7, 2019).  The following is a list of those actions: (1) *Bradshaw v. McQueen*, No. 08-CV-5518 (S.D.N.Y. filed June 18, 2008); (2) *Bradshaw v. Officer Banks*, No. 09-CV-0966 (S.D.N.Y. filed Feb. 4, 2009); (3) *Bradshaw v. Brown*, No. 13-CV-4308 (E.D.N.Y. filed July 31, 2013); (4) *Bradshaw v. The City of New York*, No. 15-CV-2166 (E.D.N.Y. filed Apr. 13, 2015); (5) *Bradshaw v. The City of New York*, No. 15-CV-4638 (S.D.N.Y. filed June 10, 2015); (6) *Bradshaw v. The City of New York*, No. 15-CV-5481 (S.D.N.Y. filed July 10, 2015); (7) *Bradshaw v. The City of New York*, No. 15-CV-7074 (S.D.N.Y. filed Sept. 8, 2015); (8) *Bradshaw v. The City of New York*, No. 15-CV-8252 (S.D.N.Y. filed Oct. 20, 2015); (9) *Bradshaw v. The City of New York*, No. 15-CV-9031 (S.D.N.Y. Nov. 17, 2015); (10) *Bradshaw v. The City of New York*, No. 17-CV-1199 (S.D.N.Y. filed Feb. 16, 2017); (11) *Bradshaw v. The City of New York*, No. 17-CV-1168 (E.D.N.Y. filed Feb. 27, 2017); and (12) *Bradshaw v. The City of New York*, No. 18-CV-8215 (S.D.N.Y. filed Sept. 7, 2018).

Upon review of these actions, the Court finds that, as of the date that plaintiff commenced this action, he had acquired at least four "strikes."

Plaintiff acquired his first "strike" on February 11, 2010, in *Bradshaw v. McQueen*, No. 08-CV-5518 (S.D.N.Y. filed June 18, 2008) ("*Bradshaw v. McQueen*"), when that case was

dismissed by the Honorable Barbara S. Jones for failure to state a claim upon which relief may be granted.  *See id.*, Dkt. No. 32 (granting motion for judgment on the pleadings).[4]

Plaintiff acquired his second "strike" on May 18, 2017, in *Bradshaw v. Brown*, No. 13-CV-4308 (E.D.N.Y. filed July 31, 2013) ("*Bradshaw v. Brown*"), when the United States Court of Appeals for the Second Circuit issued a Mandate dismissing plaintiff's appeal of the Memorandum and Order issued by the Honorable William F. Kuntz, II, which granted defendants' motion for summary judgment, converted from a motion to dismiss, and dismissed the complaint in its entirety.  *Id.*, Dkt. Nos. 49, 52.[5]  In the Mandate, the Second Circuit expressly stated that the appeal lacked "an arguable basis either in law or in fact[,]" and cited *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), and 28 U.S.C. § 1915(e).  *Id.*, Dkt. No. 52.[6]

Plaintiff acquired his third "strike" on August 22, 2017, in *Bradshaw v. The City of New York*, No. 15-CV-2166 (E.D.N.Y. filed Apr. 13, 2015) ("*Bradshaw v. The City of New York*"),

---

[4] As the Honorable Gary L. Sharpe noted in *Ifill v. Evans*, No. 10-CV-1474, 2012 U.S. Dist. LEXIS 197343 (N.D.N.Y. Feb. 13, 2012), orders granting motions for judgment on the pleadings constitute "strikes" because "[i]n analyzing Rule 12(c) motions, . . . courts utilize the same standard applicable to Rule 12(b)(6) motions."  *Id.* at *3; *see also Burgess v. Conway*, 631 F. Supp. 2d 280, 281-82 (W.D.N.Y. 2009) (counting as a "strike" a dismissal of a complaint on a motion for judgment on the pleadings "since the fatal defect in that action was not merely 'technical' or procedural in nature, and could not have been remedied by the plaintiff").

[5] The Court need not and will not decide whether the Memorandum and Order issued by the Honorable William F. Kuntz, II dismissing the complaint constitutes a separate "strike."  *But see Dove v. City of Binghamton*, No. 3:14-CV-627 (MAD/DEP), 2014 WL 5308152, at *2 (N.D.N.Y. Oct. 16, 2014) (counting as a "strike" a case that was dismissed through both a summary judgment motion, as well as a motion to dismiss, because the dismissal order "made clear that Plaintiff's underlying claims were without merit"); *Blakely v. Wards*, 738 F.3d 607, 611-12 (4th Cir. 2013) (en banc) (holding that, "in keeping with Section 1915(g)'s plain language, a summary judgment dismissal stating on its face that the dismissed action was frivolous, malicious, or failed to state a claim counts as a strike for purposes of the PLRA's three-strikes provision").

[6] In *Neitzke*, the Supreme Court noted that "a complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact."  *See* 490 U.S. at 325. A dismissal of an appeal as frivolous counts as its own strike.  *See Chavis v. Chappius*, 618 F.3d 162, 168 (2d Cir. 2010); *Bernier v. Koenigsmann*, No. 15-CV-209, 2017 WL 603217, at *4 (W.D.N.Y. Feb. 15, 2017).

when the Honorable William F. Kuntz, II issued a Decision and Order granting defendants' motion to dismiss the complaint for failure to state a claim upon which relief may be granted. *Id*., Dkt. No. 58.

Plaintiff acquired his fourth "strike" on November 16, 2018, in *Bradshaw v. The City of New York*, when the United States Court of Appeals for the Second Circuit issued a Mandate dismissing plaintiff's appeal of the Decision and Order issued by the Honorable William F. Kuntz, II, finding that it lacked "an arguable basis either in law or in fact[,]" and citing *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), and 28 U.S.C. § 1915(e).   *Id*., Dkt. No. 62.

Because plaintiff acquired at least four "strikes" prior to commencing this action in April 2019, plaintiff's IFP Application must be denied unless it appears that the "imminent danger" exception to the "three strikes" rule set forth in Section 1915(g) is applicable to this action.

**B.     Applicability of the "Imminent Danger" Exception**

The "imminent danger" exception protects a prison inmate exposed to potential serious physical injury from the consequences of his earlier mistakes in filing frivolous litigation.  Generally speaking, the allegations relevant to this inquiry "are those in which [plaintiff] describes physical injury, threats of violence, and deprivation of medical treatment." *Chavis v. Chappius*, 618 F.3d 162, 165 (2d Cir. 2010).  The Second Circuit has described the nature of the Court's inquiry regarding imminent danger as follows: "although the feared physical injury must be serious, we should not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question, while [s]eparate PLRA provisions are directed at screening out meritless

5

suits early on." *Id*. at 169-70 (*quoting Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007)) (internal quotation marks omitted).

"[F]or a prisoner to qualify for the imminent danger exception, the danger must be present when he files his complaint – in other words, a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009); *see also Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007). In addition, "§ 1915(g) allows a three-strikes litigant to proceed [IFP] only when there exists an adequate nexus between the claims he seeks to pursue and the imminent danger he alleges." *Pettus*, 554 F.3d at 296. In deciding whether such a nexus exists, the Second Circuit has instructed the courts to consider "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is fairly traceable to unlawful conduct asserted in the complaint, and (2) whether a favorable judicial outcome would redress that injury." *Id*. at 298-99.

Plaintiff asserts throughout his complaint that he has been the victim of several inmates attacks since September 2018, with the most recent attack allegedly occurring on March 14, 2019. Compl. at 2-9. Plaintiff alleges that the attacks have been "orchestrated" by various corrections officials named as defendants, who have repeatedly disregarded substantial risks of harm to plaintiff. *Id.* Plaintiff further alleges that he is at risk of continued harm if he is placed in a double-bunk cell, and was informed on March 29, 2019 – seven days before he signed the complaint – that "he will be put back in a double-bunk cell as soon as possible." *Id.* at 10.

Construing the complaint with the leniency that must be afforded a pro se litigant,

*Lucas v. Miles*, 84 F.3d 532, 535 (2d Cir. 1996), plaintiff has sufficiently alleged that he was "under imminent danger of serious physical injury" when he signed his complaint on April 5, 2019.  Accordingly, plaintiff is granted leave to commence this action IFP.

The Court notes that this is a preliminary finding which defendants are entitled to refute in future filings.  Thus, plaintiff's IFP status will be revoked if, as the case progresses, it is determined that he did not face "imminent danger" when he commenced this action or is otherwise not entitled to proceed IFP.

## III.   INITIAL REVIEW OF THE COMPLAINT

### A.   Governing Legal Standard

Having found that plaintiff meets the financial criteria for commencing this action IFP, and because he seeks relief from officers and employees of governmental entities, the Court must now consider the sufficiency of the allegations set forth in his complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "(2) . . . the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. §1915(e). Similarly, Section 1915A directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is

7

immune from such relief."  28 U.S.C. § 1915A; *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that Sections 1915(e) and 1915A are available to evaluate prisoner pro se complaints).

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure.  Rule 8 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable."  *Hudson v. Artuz*, No. 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*. (citing *Twombly*, 550 U.S. at 555).  Thus,

8

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Thus, although the court has the duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the court also has a responsibility to determine whether plaintiff may properly proceed with this action.

### B.    Summary of the Complaint

Plaintiff asserts allegations of wrongdoing that occurred while he was incarcerated at Upstate C.F.  The following facts are set forth as alleged by plaintiff in his complaint.

On September 28, 2018, at approximately 5:30 p.m., defendant Corrections Officer N. Locke and defendant Corrections Officer John Doe #1 ("C.O. John Doe #1") placed "Inmate J[,]" who had just attacked another inmate in a double-bunk cell, in a cell with plaintiff. Compl. at 2.  Defendants Locke and C.O. John Doe #1 then "remain[ed] in front of the cell for about five (5) minutes[.]"  *Id.*  Defendant Corrections Sergeant John Doe #1 ("Sergeant John Doe #1") and defendant Deputy Superintendent for Security P. Woodruff approved Inmate J's placement in a double-bunk cell with plaintiff even though they knew that Inmate J was a member of the "Patrias," a Dominican gang, and plaintiff had been "labeled a snitch by the Patrias[.]"  *Id.* at 3.

9

While in the cell with plaintiff, Inmate J stated that defendant Locke told him, "You can get him[,]" in reference to plaintiff.  Compl. at 2.  "Inmates in the ajoining [sic] cells also urged Inmate J to attack plaintiff[,]" and referred to plaintiff as a "snitch" and a "rapo[.]"  *Id.*

At approximately 6 p.m., Inmate J stopped defendant Corrections Officer Lincoln during his round and stated, "I do not want to remain in the cell with [plaintiff] and I want to see the sergeant to be moved, or I will attack him . . . ."  Compl. at 2.  Defendant Lincoln responded, "Do what you want to do."  *Id.*

At approximately 6:30 p.m., Inmate J stopped defendant Lincoln again during his round and stated, "if I am not moved or do not see a sergeant by your next round I am going to beat him . . . up."  Compl. at 2.  Defendant Lincoln responded, "Do what you have to do[,]" and walked away.  *Id.*

At approximately 7 p.m., Inmate J stopped defendant Lincoln once again and stated, "Where is the sergeant[?] You not moving me[?]"  Compl. at 2.  Inmate J then proceeded to attack plaintiff.  *Id.*

On October 2, 2018, defendant Corrections Sergeant Fletcher "directed several officers to forcefully bring Inmate Burton in the cell with plaintiff."  Compl. at 3.  Defendants Fletcher and Woodruff approved Inmate Burton's placement in a cell with plaintiff even though they knew that Inmate Burton was a member of the "Bloods" gang and plaintiff "was labeled a snitch by the Bloods[.]"  *Id.* at 4.

"While in the cell, Inmate Burton made repeated threats to defendant Fletcher (and officers) that he will 'snap plaintiff's neck,'" and further assault plaintiff once his (Inmate Burton's) arm healed.  *Id.*  Defendant Fletcher responded, "I know," then "laughed as he

10

walked away."  Compl. at 3.  Inmates in the adjoining cells also urged Inmate Burton to attack plaintiff.  *Id.*

On October 5, 2018, between the hours of 2 a.m. and 8 a.m., Inmate Burton "repeatedly attacked plaintiff."  Compl. at 3.  Defendant Corrections Officer John Doe #2 ("C.O. John Doe #2"), who was "the tour 10-6 gallery officer, knew that plaintiff was attacked but failed to intervene or . . . report the incident."  *Id.*  Defendant Corrections Officer John Doe #3 ("C.O. John Doe #3") and defendant Corrections Officer John Doe #4 ("C.O. John Doe #4"), who were the mail officers that collected mail at approximately 6 a.m., also "knew that plaintiff was attacked but failed to intervene, or . . . report the incident."  *Id.*  Defendant C.O. John Doe #3 and defendant Corrections Officer John Doe #5 ("C.O. John Doe #5") served plaintiff food at approximately 7:30 a.m., and "collected the food trays and gave out supplies at about 8 a.m.  *Id.*  Through these activities, these officials also "knew that plaintiff was attacked but failed to intervene, or . . . report the incident."  *Id.*

At approximately 9:30 a.m., plaintiff was removed from his cell for a "legal call."  Compl. at 4.  "Plaintiff informed his attorney that he had been repeatedly attacked by Inmate Burton," and that officials failed to intervene, report the incident, or seek medical assistance for him.  *Id.*  Thereafter, plaintiff's attorney called the facility, and plaintiff was subsequently seen by medical for his injuries.  *Id.*

On October 9, 2018, at approximately 8 a.m., defendant Fletcher "threatened to have plaintiff assaulted by his officers, and Inmate J , . . . by putting plaintiff with him in [a] cell."  Compl. at 4.  Plaintiff refused to exit his cell without speaking to a more senior corrections official.  *Id.*  Thereafter, a corrections lieutenant arrived at plaintiff's cell, and plaintiff informed

11

this official about defendant Fletcher's threat.  *Id.*  The lieutenant assured plaintiff of his safety and relocated him to a different cell.  *Id.*  However, the exchange with defendant Fletcher placed plaintiff "in extreme fear for his safety."  *Id.* at 5.

On the morning of January 8, 2019, plaintiff was in a double-bunk cell with Inmate Holbdy, who was not gang affiliated.  Compl. at 5.  At approximately 7:30 a.m., defendant Fletcher encountered plaintiff and stated, "I am giving you a new bunky, . . . he will handle you."  *Id.*

On January 9, 2019, "at the direction of defendant Fletcher, defendant [Corrections Officer] Trombley and another officer took plaintiff out of [his] cell [ ] under the pretense of a cell search[.]"  Compl. at. 5.  When plaintiff was returned to his cell, Inmate Wright was present in place of Inmate Holbdy.  *Id.*  Defendants Fletcher and Woodruff approved Inmate Wright's placement in a cell with plaintiff even though they knew that Inmate Wright was a member of the "Bloods" gang and plaintiff "was labeled a snitch by the Bloods[.]"  *Id.* at 6.

Inmate Wright informed plaintiff that he "works for defendant Fletcher to get extra trays by beating up any bunkies he wants and do[es] not get in trouble for it."  Compl. at 5.  Thereafter, Inmate Wright was given an extra lunch tray by defendant Trombley.  *Id.*

Plaintiff informed Corrections Lieutenant Eddy (not a party) about defendant Fletcher's actions, including that he encouraged Inmate Wright to attack him.  Compl. at 5.  Lieutenant Eddy mocked plaintiff and walked away from plaintiff's cell with defendant Fletcher.  *Id.*

On January 10, 2019, between 9 a.m. and 11 a.m., Inmate Wright repeatedly attacked plaintiff and "threatened to cut him with a scalpel" if plaintiff did not have oral sex with him.  Compl. at 5.  Plaintiff complied with Inmate Wright's demand.  *Id.*  Plaintiff notified defendant

12

Corrections Officer Healy, defendant Corrections Officer Jeffries, defendant Corrections Officer John Doe #6 ("C.O. John Doe #6"), and defendant Trombley about the assaults when they made rounds between 9 a.m. and 11 a.m., yet each official failed to intervene.  *Id.*

At 11 a.m., when lunch was served, plaintiff prevented the feeding slot to his cell from closing because defendant Trombley and defendant Corrections Officer R. St. Mary were ignoring plaintiff's injuries and requests for medical treatment and a meeting with "the sergeant."  Compl. at 6.  Defendant St. Mary "report[ed] to the sergeant that plaintiff refuse[d] to close the slot" without mentioning his injuries or the attack.  *Id.*

Plaintiff was subsequently taken to medical and then referred to an outside hospital for further evaluation.  Compl. at 6.  At the hospital, plaintiff informed the doctor who initially examined him about the attack, and the doctor "made [plaintiff's] complaint known."  *Id.*

On February 21, 2019, defendant Woodruff advised defendant Fletcher that plaintiff "keep[s] filing grievances."  Compl. at 6.  Defendant Fletcher approached plaintiff's cell and asked plaintiff whether he wanted to move to a double-bunk cell because he continues to file grievances.  *Id.*  Plaintiff then stated his belief that defendant Fletcher wanted someone to attack him, and "orchestrated" the "last attacks against [him]."  *Id.*  Defendant Fletcher responded, "This is good talk[.]"  *Id.*

On February 25, 2019, "a sergeant informed plaintiff that defendant[s] Fletcher and P. Woodruff . . . approved him to move [to] a double-bunk cell."  Compl. at 7.  Plaintiff requested protective custody due to fear for his safety.  *Id.*

The next day, defendant Fletcher directed plaintiff to be removed from his cell under the pretense of a cell search.  Compl. at 7.  Once plaintiff was out of his cell, defendant

13

Fletcher "order[ed] the officers to use force to compel plaintiff into a double-bunk cell." *Id.* Plaintiff again requested protective custody out of fear for his safety, but defendant Fletcher denied the request, then stated, "Don't worry, your bunky is over 200 pounds." *Id.*

Thereafter, plaintiff entered a cell with "Inmate P," his new cellmate. Compl. at 7. "Inmate P repeatedly made numerous threats to defendant Fletcher (and officers) that if plaintiff is not moved out [of] the cell he will be attacked." *Id.* Inmate P was in the special housing unit for attacking another inmate with the same criminal charges as plaintiff. *Id.* Defendants Fletcher and Woodruff approved Inmate P's placement in a cell with plaintiff even though they knew that Inmate P was 240 pounds, and plaintiff was 160 pounds, which is "against the facility's policy on weight criteria for two inmates in a double-bunk cell[,]" and plaintiff had sought protective custody. *Id.*

On March 5, 2019, plaintiff was removed from his cell for a "legal call[.]" Compl. at 8. When plaintiff returned to his cell, Inmate P was "replaced with Inmate E[.]" *Id.* Defendants Woodruff and Corrections Sergeant John Doe #3 ("Sergeant John Doe #3") approved Inmate E's placement in a cell with plaintiff even though they knew that Inmate E was a member of the "Patrias" gang and plaintiff had been "labeled a snitch by the Patria and . . . requested protective custody[.]" *Id.*

Inmate E immediately asked plaintiff about his criminal charges and requested to see plaintiff's "legal papers for his criminal case." Compl. at 8. Inmates in the adjoining cells urged Inmate E to attack plaintiff, calling him a "snitch" and a "rapo." *Id.* Inmate E then attacked plaintiff, causing him to suffer a bruise on the left side of his chest and chest pains. *Id.*

14

On March 11, 2019, at approximately 8:30 p.m., defendant Fletcher directed officers to bring Inmate Cobb into plaintiff's cell.  Compl. at 8.  Defendants Fletcher and Woodruff approved Inmate Cobb's placement in a cell with plaintiff even though they knew that Inmate Cobb was a member of the "Bloods" gang and plaintiff had been "labeled a snitch by the Bloods and . . . requested protective custody[.]"  *Id.* at 9.

While in the cell, Inmate Cobb informed plaintiff that "he has agreed to work for defendant Fletcher for extra food and when he get[s] his sneaker[s] from State Shop the ball will start rolling."  Compl. at 8.  Two days later, after Inmate Cobb received his property, he "threatened to cut plaintiff with his weapon if plaintiff did not turn around and pull down his pants."  *Id.* at 8-9.  Inmate Cobb then sexually assaulted plaintiff in the cell.  *Id.* at 9.

On March 14, 2019, between 9 a.m. and 10 a.m., Inmate Cobb sexually assaulted plaintiff for a second time.  Compl. at 9.  Between noon and 1 p.m., Inmate Cobb sexually assaulted plaintiff for a third time.  *Id.*

On March 15, 2019, at approximately 9 a.m., plaintiff was removed from his cell for a disciplinary hearing.  Compl. at 9.  Plaintiff informed the hearing officer (not a party), as well defendant Gallagher and defendant Corrections Officer Welch that he had been sexually assaulted and needed medical treatment.  *Id.*[7]  Plaintiff was ignored.  *Id.*

Instead, defendant Welch "yanked plaintiff to the floor," and he, along with defendant

---

[7] Plaintiff has not named "Gallagher" as a defendant in either the caption or "Parties" section of his complaint.  *See* Compl. at 1-2.  Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties."  Fed. R. Civ. P. 10(a).  Ordinarily, a party not named in the caption of the complaint will not be considered a party to the action.  *See, e.g., Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (the failure to name a party in the caption makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").  However, based on plaintiff having referred to "Gallagher" as a defendant in both the "Facts" section of the complaint and "Third Cause of Action," plaintiff's failure to list "Gallagher" as a defendant in the caption appears to have been in error.  For the sake of efficiency, the Court therefore directs the Clerk to add "Gallagher" as a defendant.

Gallagher, "dragged plaintiff . . . across the floor back to the cell about half a football feild [sic] away and banged plaintiff's head . . . on the gate in the process."  Compl. at 9. Thereafter, plaintiff was brought to medical where he informed a nurse that he had been sexually assaulted.  *Id.*  Plaintiff was subsequently sent to an outside hospital.  *Id.*

On March 29, 2019, during plaintiff's disciplinary hearing, defendant Woodruff stated that plaintiff would "be put back in a double-bunk cell as soon as possible."  Compl. at 10.

In addition to naming the aforementioned individuals as defendants, plaintiff names the Superintendent of Upstate C.F., Donald G. Uhler, as a defendant based on allegations that before each alleged assault plaintiff experienced, he was "on notice of the reckless conduct of the officers and the sergeant by a number of complaints and grievances," yet "failed to take disciplinary action against them or otherwise . . . control their behavior." Compl. at 3-9.  Plaintiff also names Corrections Sergeant John Doe #2 as a defendant, but the complaint does not contain any factual allegations about him.  *See generally*, Compl.

Liberally construed, the following claims are asserted in the complaint against the named defendants in their individual and official capacities: (1) a First Amendment retaliation claim against defendant Fletcher; (2) Eighth Amendment failure-to-protect claims against all of the named defendants; (3) Eighth Amendment failure-to-intervene claims against all of the named defendants; (4) Eighth Amendment excessive force claims against defendants Gallagher and Welch; and (5) Fourteenth Amendment equal protection claims against all of the named defendants.

Plaintiff seeks an award of money damages as well as injunctive relief.  Compl. at 10-13.  For a complete statement of plaintiff's claims and the facts he relies on in support of those claims, reference is made to the complaint.

C.     **Analysis**

Plaintiff seeks relief pursuant to Section 1983, which establishes a cause of action for

"'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws'

of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990)); *see also*

*Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995)

(McAvoy, C.J.) (finding that "[Section] 1983 is the vehicle by which individuals may seek

redress for alleged violations of their constitutional rights"). "Section 1983 itself creates no

substantive rights, [but] . . . only a procedure for redress for the deprivation of rights

established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

"It is well settled that, in order to establish a defendant's individual liability in a suit

brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement

in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138

(2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between

the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263,

2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260,

263 (2d Cir. 1986)) (other citation omitted). If the defendant is a supervisory official, a mere

"linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the

doctrine of respondeat superior) is insufficient to show his or her personal involvement in that

unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v.*

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.

### 1. Eleventh Amendment Immunity

The Eleventh Amendment has long been construed as barring a citizen from bringing

a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan*, 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York*, No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996).

The Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron*, 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does

18

not permit suit [under Section 1983] for money damages against state officials in their official capacities.")

Accordingly, to the extent that plaintiff seeks monetary damages under Section 1983 against any defendant in his official capacity, such claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment.[8]

### 2. Corrections Sergeant John Doe #2

As noted, plaintiff names Corrections Sergeant John Doe #2 as a defendant, but the complaint does not contain any factual allegations about him.  *See generally*, Compl. "Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, No. 9:06-CV-889 (GTS/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) (citing *Gonzalez v. City of New York*, No. 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998)); *see also Crown v. Wagenstein*, No. 96-CV-3895, 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

Accordingly, Corrections Sergeant John Doe #2 is dismissed as a defendant.

---

[8] In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official for an ongoing violation of law or the Constitution.  Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective."  *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

### 3. First Amendment Retaliation Claim

Courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).  To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492).  The filing of a prison grievance is a constitutionally protected activity for the purpose of meeting the first prong of the retaliation test.  *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir. 1988) (same).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that a response to plaintiff's retaliation claim against defendant Fletcher is warranted.  In so ruling, the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

### 4. Eighth Amendment Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the

hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This includes punishments that "involve the unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

The prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency."  *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).  While "a de minimis use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated."  *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases – not whether a certain quantum of injury was sustained.").

The prohibition against cruel and unusual punishment also imposes on law enforcement officials, including prison officials, "an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers."  *Cicio v. Lamora*, No. 9:08-CV-0431 (GLS/DEP), 2010 WL 1063875, at *8 (N.D.N.Y. Feb. 24,

2010) (a corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation); *see also Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in [Section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).  "To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use . . . of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force."  *Evans v. Murphy*, No. 12-CV-365, 2014 WL 4437771, at *9 (W.D.N.Y. Mar. 13, 2014) (citing *Curley*, 268 F.3d at 72).

Similarly, prison officials may be held liable under Section 1983 for failing to protect an inmate from conditions posing a substantial risk of serious harm.  *See Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  In order to establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety.  *Id*. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837.  "Neither mere negligence nor a prison guard's mere failure to act reasonably is enough to state an Eighth Amendment deliberate indifference claim."  *Sawyer v. New York State Depat. of Corr. Servs*., No. 11-CV-0152, 2015 WL 6644112, at *7

22

(W.D.N.Y. June 30, 2015) (citing *Garcia v. Witkowski*, 988 F. Supp. 2d 360, 361 (W.D.N.Y. 2013)), *report and recommendation adopted in pertinent part by* 2015 WL 6641471 (W.D.N.Y. Oct. 28, 2015); *Shell v. Brun*, 585 F. Supp. 2d 465, 469-70 (W.D.N.Y. 2008) ("In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety. Mere negligence (for example if a prison guard should know of a risk but does not) is not enough . . . .").

### (a) Defendants Welch and Gallagher

Plaintiff alleges that on March 15, 2019, one day after he was sexually assaulted by Inmate Cobb, he informed defendants Gallagher and Welch about what happened.  Compl. at 9.  Plaintiff further alleges that, in response, he was assaulted by these officials.  *Id*.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff*, 537 F.3d at 191, the Court finds that a response to plaintiff's excessive force and failure-to-intervene claims asserted against these defendants is warranted.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff's failure-to-protect claims against these defendants because the complaint lacks any allegations which plausibly suggest that, at the time plaintiff spoke with defendants Gallagher and Welch, he remained at a substantial risk of serious harm.  In addition, there are no allegations in the complaint that plaintiff was returned to a double-bunk cell with Inmate Cobb after his exchange with defendants Gallagher and Welch.  Thus, plaintiff's failure-to-protect claims

23

against defendants Gallagher and Welch are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### (b) Remaining Defendants Other Than Superintendent Uhler

Although plaintiff has expressly asserted failure-to-intervene and failure-to-protect claims against each defendant, the complaint is devoid of any allegations which plausibly suggest that the alleged use of excessive force by defendants Welch and Gallagher was witnessed by any other named defendant.  Moreover, with respect to the alleged use-of-force incidents involving other inmates, the complaint similarly lacks allegations which plausibly suggest that any named defendant was present while an assault was ongoing, and had a realistic opportunity to intervene to prevent further harm.  Thus, the Court believes plaintiff's claims against defendants Locke, C.O. John Doe #1, C.O. John Doe #2, C.O. John Doe #3, C.O. John Doe #4, C.O. John Doe #5, C.O. John Doe #6, Lincoln, Fletcher, Sergeant John Doe #1, Sergeant John Doe #3, Trombley, St. Mary, Healy, Jeffries, Welch, and Woodruff are more appropriately categorized as failure-to-protect claims than failure-to-intervene claims.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that a response to plaintiff's failure-to-protect claims against these defendants is warranted.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### (c) Defendant Uhler

Prior to the Supreme Court's decision in *Iqbal*, the Second Circuit held that

supervisory personnel may be considered "personally involved" under five different circumstances.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  In particular, supervisors can be found personally involved if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon*, 58 F.3d at 873 (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

In *Iqbal*, however, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  The Court noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue."  *Id.*  There, the alleged constitutional violation was discrimination based on race, religion, or national origin in violation of the First and Fifth Amendments.  *Id.* at 668-69.  For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose."  *Id.* at 677.  The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability.  *Id.* at 677.

In this Circuit, "*Iqbal* has engendered conflict . . . about the continued vitality of the supervisory liability test set forth in *Colon,*" *Reynolds v. Barrett*, 685 F.3d 205 n.14 (2d Cir.

25

2012), and the Second Circuit has not resolved the conflict.  *See, e.g., Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, . . . 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.'" (quoting *Grullon v. New Haven*, 720 F.3d 133, 139 (2d Cir. 2013))).

Recently, this Court had occasion to consider the impact of *Iqbal* on the supervisor liability/personal involvement test set forth in *Colon.  See Montanez v. City of Syracuse*, No. 16-CV-0550, 2019 WL 315058 (N.D.N.Y. Jan. 25, 2019).  In that case, the Court concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.'"  *Id.* at 18 (citing *Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (quoting *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010)); *see also Marom v. City of N.Y.*, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009).  Because plaintiff's Eighth Amendment claims do not require a showing of discriminatory intent and are based, instead, on whether defendants acted with deliberate indifference to the plaintiff's health and safety, the Court will apply the *Colon* factors to plaintiff's supervisory liability claim against defendant Uhler.

In so doing, the Court notes that plaintiff does not allege that defendant Uhler directly participated in any alleged constitutional violation, or failed to act on information indicating that an assault was occurring.  Rather, he alleges that defendant Uhler was aware of "reckless conduct of the officers and the sergeant by a number of complaints and

26

grievances," yet "failed to take disciplinary action against them or otherwise . . . control their behavior." Compl. at 3-9. These allegations of personal involvement are entirely conclusory, and fail to plausibly suggest defendant Uhler's awareness of an ongoing constitutional violation. Plaintiff does not allege, for example, when he (or some other inmate) wrote grievances or complaints to defendant Uhler regarding the behavior of any of the other named defendants, or what was stated in any such grievance or complaint.

"Vague and conclusory allegations that a supervisor failed to train or properly monitor the actions of subordinate employees[,]" such as the allegations in plaintiff's complaint, "will not suffice to establish the requisite personal involvement and support a finding of liability." *White v. Fischer*, No. 9:09-CV-0240 (DNH/DEP), 2010 WL 624081, at *6 (N.D.N.Y. Feb. 18, 2010); *see also Nash v. McGinnis*, 585 F. Supp. 2d 455, 460 (W.D.N.Y. 2008) ("Although plaintiff need not plead facts in great detail, the formulaic allegation that [the Superintendent] was aware of the alleged violations and did nothing to stop them from occurring, without some factual allegations to explain the basis for that conclusion, is insufficient to render it plausible that [the Superintendent] was personally involved in the alleged constitutional deprivations."); *Diaz v. Burns*, No. 6:10-CV-6595, 2013 WL 5951866, at *5 (W.D.N.Y. Nov. 6, 2013) ("Essentially Plaintiff is asking the Court to hold that the filing of grievances is sufficient to put a supervisory official on notice that the grievant will be subjected to unconstitutional conduct at the hands of his or her staff members. The Court agrees with Defendants that Plaintiff has not sufficiently alleged personal involvement by Commissioner Fischer and Superintendent Kirkpatrick in any of the asserted constitutional violations."); *Martin v. Patterson*, No. 9:09-CV-1372 (LEK/ATB), 2010 WL 3033796, at *3 (N.D.N.Y. July 16, 2010) ("Plaintiff's conclusory allegations that defendants failed to properly train staff and investigate

27

the matter, and that current policy condones excessive force, is not enough to establish that defendant Carlsen (or any defendant) was aware of any history of excessive force toward plaintiff or at Ulster in general."), *report and recommendation adopted by* 2010 WL 3033809 (N.D.N.Y. Aug. 3, 2010).

Moreover, the law is well-settled that if an "official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008); *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001) ("[A] 'failure to remedy' theory of liability is not available with respect to discrete and completed violations."); *Purdie v. Graham*, No. 9:09-CV-971 (GTS/ATB), 2011 WL 941283, at *4 (N.D.N.Y. Jan. 19, 2011) ("With respect to the alleged assault, plaintiff can not show the personal involvement of Superintendent Graham based upon his failure to remedy a known wrong or adequately supervise his staff, based on a single incident of alleged excessive force."), *report and recommendation adopted by* 2011 WL 940469 (N.D.N.Y. Mar. 16, 2011).

Accordingly, plaintiff's Eighth Amendment claims against defendant Uhler are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 5. Equal Protection Claims

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr*., 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective

treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).  To state a viable Equal Protection claim, a plaintiff generally must allege "purposeful discrimination . . . directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995).  In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Here, plaintiff alleges that the defendants "failed to protect [him from harm by others] because of his national origin, and/or race[.]"  Compl. at 12.  Although plaintiff does not identify the basis for his equal protection claim, the complaint lacks any allegations which plausibly suggest that any of the named defendants engaged in purposeful discrimination against other inmates of the same race or national origin as plaintiff.  Moreover, assuming that plaintiff has intended to assert an equal protection claim under a "class of one" theory, the complaint is devoid of any allegations which plausibly suggest that plaintiff was ever intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment.  In fact, the complaint fails to identify any individuals treated differently than plaintiff under a similar situation.  Instead, insofar as the complaint can be construed to allege a claim for discriminatory treatment, the allegations are entirely conclusory, which is not enough to survive sua sponte review.  *See Iqbal*, 556 U.S. at 678 (concluding that a pleading that only "tenders naked assertions devoid of further factual

29

enhancement" will not survive sua sponte review) (internal quotations and alterations omitted); *Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Clyburn v. Shields*, 33 Fed. App'x 552, 555 (2d Cir. 2002) ("[C]laims of race-based discrimination under the Equal Protection Clause . . . require that intentional discrimination be alleged in a non-conclusory fashion."); *Thomas v. Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause.").

Accordingly, plaintiff's equal protection claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

## IV.    PRELIMINARY INJUNCTION MOTION

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood  of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)).  However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher.  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)).  A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts*., 598 F.3d at 35 n.4) (internal quotation marks omitted)); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim).  The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order.  *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008).  The district court has wide discretion in determining whether to grant preliminary injunctive relief.  *Moore v. Consol. Edison Co. of New York, Inc*., 409 F.3d 506, 510 (2d Cir. 2005).

Plaintiff's request for injunctive relief seeks an order directing defendants (and others) to designate plaintiff as a "single cell status" inmate, keep him confined in a single cell while he remains at Upstate C.F., and transfer him to a facility where SHU inmates are confined to a single cell.  *See* Preliminary Injunction Motion at 1.

With respect to plaintiff's request that he be transferred to another facility, it is DOCCS, and not this Court, that determines where plaintiff will be housed during his period of incarceration.  *See Meachum v. Fano*, 427 U.S. 215, 229 (1976) (stating that "[t]he federal courts do not sit to supervise state prisons, the administration of which is [of] acute interest to

the States") (citations omitted); *Olim v. Wakinekona*, 461 U.S. 238, 248-49 (1983) (stating that inmates have no right to be confined in a particular state or particular prison within a given state); *Montayne v. Haymes*, 427 U.S. 236, 243 (1976) (holding that New York state prisoners have no right to incarceration at a particular prison facility).  It is well-established that DOCCS has "broad leeway in deciding where to house the inmates under its protective care."  *McFadden v. Solfaro*, Nos. 95-CV-1148, 95-CV-3790, 1998 WL 199923, at *10 (S.D.N.Y. Apr. 23, 1998).

With that said, upon review of the file in this matter, the Court finds that a response to plaintiff's Preliminary Injunction Motion must be filed by the surviving defendants.[9]  The Court directs these defendants, or their counsel, to respond to plaintiff's Preliminary Injunction Motion (Dkt. No. 4) within thirty (30) days of the date of service of the summons and complaint upon any defendant.  After a defendant has filed a response to the motion, the Clerk shall return this file to the Court for further review.

**V.     CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's application for leave to proceed IFP (Dkt. No. 6) is **GRANTED** in accordance with 28 U.S.C. § 1915(g) because plaintiff has made a preliminary showing that he is entitled to the "imminent danger" exception; and it is further

**ORDERED** that the Clerk provide the Superintendent of the facility designated by plaintiff as his current location with a copy of plaintiff's inmate authorization form (Dkt. No. 3), and notify the official that this action has been filed and that plaintiff is required to pay to the

---

[9]  The Court takes no position on the ultimate merits of plaintiff's motion for preliminary injunctive relief at this time.

Northern District of New York the statutory filing fee of $350 in installments, over time,

pursuant to 28 U.S.C. § 1915; and it is further

    **ORDERED** that the Clerk shall provide a copy of plaintiff's inmate authorization form

(Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

    **ORDERED** that the Clerk shall amend the docket to add "Gallagher" as a defendant;

and it is further

    **ORDERED** that the following claims survive initial review and require a response: (1)

plaintiff's First Amendment retaliation claim against defendant Fletcher; (2) plaintiff's Eighth

Amendment excessive force and failure-to-intervene claims against defendants Welch and

Gallagher; and (3) plaintiff's Eighth Amendment failure-to-protect claims against defendants

Locke, C.O. John Doe #1, C.O. John Doe #2, C.O. John Doe #3, C.O. John Doe #4, C.O.

John Doe #5, C.O. John Doe #6, Lincoln, Fletcher, Sergeant John Doe #1, Sergeant John

Doe #3, Trombley, St. Mary, Healy, Jeffries, Welch, and Woodruff; and it is further

    **ORDERED** that plaintiff's Section 1983 claims for money damages against the named

defendants in their official capacities are **DISMISSED with prejudice** pursuant to 28 U.S.C.

§ 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment;[10] and it is

further

    **ORDERED** that all remaining claims are **DISMISSED without prejudice** pursuant to

28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which

---

[10]  Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action.  *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999).  However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Pucci v. Brown*, 423 Fed. App'x 77, 78 (2d Cir. 2011).  Because these claims are barred by the Eleventh Amendment, leave to amend would be futile.

relief may be granted;[11] and it is further

**ORDERED** that the Clerk terminate Corrections Sergeant John Doe #2 and Donald Uhler as defendants in this action; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon defendants Locke, Lincoln, Fletcher, Trombley, St. Mary, Healy, Jeffries, Welch, Gallagher, Welch, and Woodruff.[12]  The Clerk shall forward a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that plaintiff take reasonable steps to ascertain the identity of the "Doe" defendants, and when identified, seek to amend the complaint to add the individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED** that a response to the complaint be filed by defendants Locke, Lincoln, Fletcher, Trombley, St. Mary, Healy, Jeffries, Welch, Gallagher, Welch, and Woodruff, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that a response to plaintiff's motion for preliminary injunctive relief (Dkt. No. 4) be filed by defendants Locke, Lincoln, Fletcher, Trombley, St. Mary, Healy, Jeffries,

---

[11]  Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint.  Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised.  Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.  Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

[12]  Summonses will not issue for the "Doe" defendants because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

Welch, Gallagher, Welch, and Woodruff, or their counsel, within thirty (30) days of the date of service of the summons and complaint on any defendant; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367.  Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action.  All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court.  **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

Dated: May 9, 2019
Syracuse, NY

Brenda K. Sannes
Brenda K. Sannes
U.S. District Judge

2014 WL 3858398
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shariff ABBAS, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 10–CV–0141S.
|
Signed Aug. 1, 2014.

**Attorneys and Law Firms**

Shariff Abbas, Flushing, NY, pro se.

**DECISION and ORDER**

WILLIAM M. SKRETNY, Chief Judge.

### INTRODUCTION

**\*1** Plaintiff Shariff Abbas commenced this *pro se* action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., and other federal laws, alleging violation of his rights while detained at the Buffalo Federal Detention Facility ("BFDF") in Batavia, the Albany County Jail and the Perry County Correctional Center ("PCCC") in Uniontown, Alabama. Currently before the Court for review pursuant to 28 U.S.C. § 1915(e)(2)(B) is plaintiff's amended complaint [1], submitted in response to the Court's Order filed on August 16, 2013 ("August 16 Order") (Docket No. 6), which reviewed plaintiff's original complaint (Docket No. 4), dismissed several of the claims asserted therein, and granted plaintiff leave to file an amended complaint. For the reasons set forth below, plaintiff's FTCA claims against the United States related to his treatment at the BFDF may proceed and his remaining claims will be dismissed.

### DISCUSSION

A. *Bivens Claims*

The August 16 Order directed, *inter alia*, that plaintiff's FTCA claims stemming from his detention at the Albany County Jail and the PCCC be dismissed; that plaintiff be granted leave to file an amended complaint adding *Bivens* [2] or other federal claims against individual deportation officers and other personnel at BFDF who he alleges violated his rights; and that in the even he failed to timely file an amended complaint as directed, the Court would issue an Order directing service of the complaint upon the United States as the sole defendant to his medical malpractice claims brought under the FTCA. (Docket No. 5).

The August 16 Order noted that in addition to his FTCA claims, plaintiffs original complaint asserted a variety of violations of his constitutional rights by individual deportation officers and other personnel during his periods of detention at BFDF and that these claims would be actionable against individual defendants under the *Bivens* doctrine, which allows a plaintiff to pursue constitutional claims against federal officials in their individual capacities for actions taken under color of federal law. *See Lombardi v. Whitman,* 485 F.3d 73, 78 (2d Cir.2007) ("[W]here an individual 'has been deprived of a constitutional right by a federal agent acting under color of federal authority,' the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity, provided that Congress has not forbidden such an action and that the situation presents 'no special factors counseling hesitation in the absence of affirmative action by Congress.' ") (internal citations omitted) (*quoting Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006). The Court determined, however, that the *Bivens* claims could not proceed because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in the caption of the complaint, as required by Rule 10(a) of the Federal Rules of Civil Procedure:

**\*2** The Court cannot allow such *Bivens* claims to proceed, however, because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in the caption of the complaint. Rule 10 of the Federal Rules of Civil Procedure provides that "[t]he title of the complaint must name all the parties" Fed.R.Civ.P. 10(a). Therefore, a party that is not named in the caption of a complaint or amended complaint is not a party to the action.

Abbas v. U.S., Not Reported in F.Supp.3d (2014)
Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 37 of 220
2014 WL 3858398

(August 16 Order at 16) (citations omitted). The Court proceeded to note that plaintiff's failure to name in the caption of the complaint the individual defendants against whom he wished to assert *Bivens* claims would make it infeasible for the Court to determine which of the individual custody officers mentioned in the body of the complaint should be deemed to be defendants to such claims, given the often ambiguous nature of his reference to such individuals. (*Id.* at 16–17). The Court therefore concluded that "[t]he way to remedy plaintiff's failure to name as defendants in the caption of his complaint those individuals against whom he may seek to assert *Bivens* claims, as suggested by the allegations set forth in the body of the complaint, is to afford him leave to file an amended complaint which conforms to the requirements of Rule 10(a)." (*Id.* at 17) (citations omitted). "Accordingly, plaintiff will be afforded the opportunity to file, as directed below, an amended complaint in which he shall name in the caption of the complaint, each of the individuals against whom he intends to assert a *Bivens* claim or claims, in a manner that conforms to the requirements of Rules 8(a) and 10(a) of the Federal Rules of Civil Procedure." (*Id.*).

The Court accordingly directed, in the Conclusion of the August 16 Order, that plaintiff be given leave to file an amended complaint conforming to the requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, and the Court again explicitly advised plaintiff of his duty to list all defendants in the caption of the complaint:

> Plaintiff is reminded, as explained above, that if he wishes to assert *Bivens* or other claims against defendants other than the United States in the amended complaint, *he must name those individuals in the caption of the amended complaint* and set forth specific allegations with respect to how those individuals violated his rights.

(*Id.* at 21). (emphasis added).

While plaintiff's amended complaint contains allegations that would support *Bivens* claims (*see* Amended

Complaint, ¶¶ 17–42 *passim* ),[3] it does not name in the caption of the complaint any individuals against whom plaintiff is seeking to assert *Bivens* clams, nor does the section of the complaint captioned "PARTIES" list any individual defendants. While plaintiff does, in the section of the amended complaint captioned "CONCLUSION", set forth a list of "Federal Employees from (BFDF) Health Division" (Amended Complaint ¶ 57), which includes individuals mentioned elsewhere in the amended complaint in connection with plaintiff's allegations that would be relevant to *Bivens* claims, the individuals named therein are not listed as defendants in the caption of the amended complaint or in plaintiff's recital of the parties to this action at the beginning of the amended complaint; as noted *supra*, plaintiff lists only one defendant-the United States-in the complaint caption and in his recital of the parties. Moreover, plaintiff's statement of relief sought at the end of the amended complaint (captioned "PRAYER") demands judgment "against *the defendant.*" (*Id.* at p. 16) (emphasis added).[4]

**\*3** The Court's duty to construe liberally the pleadings of *pro se* litigants does not absolve *pro se* litigants from the duty to comply with the requirements of the Federal Rules of Civil Procedure and court orders issued pursuant to those rules. *See, e.g., Caidor v. Onondaga County,* 517 F.3d 601, 605 (2d Cir.2008) (noting that *pro se* litigants are required to familiarize themselves with procedural rules and comply with such rules); *McDonald v. Head Criminal Court Supervisor Officer,* 850 F.2d 121, 124 (2d Cir.1988) ("[W]hile *pro se* litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including *pro ses,* have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions."). As discussed *supra,* this Court's previous order explained to plaintiff the requirement of Rule 10(a) that all defendants to an action be named and identified as such in the caption to the complaint, and the Court afforded him the opportunity to cure the defect in his initial complaint by filing an amended complaint naming all defendants. Plaintiff has inexplicably failed to comply with the Court's order and the requirement of Rule 10(a). Accordingly, to the extent that plaintiff seeks to bring *Bivens* claims against individual Custody Officers and other BFDF officials, *see* Amended Complaint, ¶ 58 ("Plaintiff want [sic] this Court to bring Justice against Federal Agency Employees who Violate constitutional law against Plaintiff's rights"), such claims must be

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 38 of 220

dismissed in light of his failure to name those individuals as defendants in the caption of the amended complaint. *See, e.g., Ferdik v. Bonzelet,* 963 F.2d 1258, 1262–63 (9th Cir.1992) (dismissing action for refusal to comply with court orders to name defendants in the caption as required by Rule 10(a)).

Moreover, as explained in the August 16 Order (pp. 14–15), constitutional claims under *Bivens* cannot be brought against the only defendant named in the complaint, the United States. *See Robinson v. United States Bur. Of Prisons,* 244 F.Supp.2d 57, 66 (N.D.N.Y.2003) ("[A] *Bivens* action may not be maintained against the United States.") (citing *Washington v. DEA,* 183 F.3d 868, 872 n. 8 (8th Cir.1999). Nor can constitutional claims be asserted against the United States under the FTCA. *See Washington,* 183 F.3d at 873; *Russ v. United States,* 62 F.3d 201, 204 (7th Cir.1995) ("[C]onstitutional wrongs cannot be remedied through the FTCA,") (citing *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1001–02, 127 L.Ed.2d 308(1994)).

Plaintiff having thus having failed to name a proper defendant to his *Bivens* claims, the Court concludes that his *Bivens* claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief can be granted.

### B. *Treaty Claims*

The Conclusion section of the amended complaint invokes, as a basis for relief against defendant United States not raised in plaintiffs original complaint, treaties to which the United States is a signatory. Specifically, the amended complaint states "At such time and places the United States violates International Laws as A[sic] result the United States are not in compliance with Refugee Convention Requirements or The United Nations Convention against Torture Prohibitions." (Amended Complaint, § 57). It is well established that the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, ("CAT") does not give rise to a private right of action. *Renkel v. United States,* 456 F.3d 640, 644 (6th Cir.2006) ("As the Articles [of CAT] are not self-executing, they do not create private rights of action; therefore, any private lawsuit seeking to enforce the United States' obligations under the Convention must be based on domestic law."); *Wolinski v, Junious,* 2012 U.S. Dist. LEXIS 65889, at *18–19,2012 WL 1657576 (E.D.Cal. May 10, 2012) ("The CAT does not give rise to a private right of action because it is not self-executing.) (citing *Akhtar v. Reno,* 123 F.Supp.2d 191, 196 (S.D.N.Y.2000),

**\*4** The United Nations Convention Relating to the Status of Refugees, adopted July 28, 1951, art. 26, 19 U.S.T. 6259, 6576, 189 U.N.T.S. 150, 172 ("Refugee Convention") likewise does not create a private right of action. *United States v. Casaran–Rivas,* 311 Fed. Appx. 269, 272 (11th Cir.2009) (unpublished) ("[A]rgument that the indictment violated the refugee Convention and CAT Treaty is without merit, as the Refuge[e] Convention and CAT Treaty are not self-executing, or subject to relevant legislation, and, therefore, do not confer upon aliens a private right of action to allege a violation of their terms."); *Reyes–Sanchez v. Ashcroft,* 261 F.Supp.2d 276, 288–89 (S.D.N.Y.2003) ("Because the Refugee Convention is not self-executing, it does not create individual rights.").

Accordingly, plaintiff's claims against the United States under CAT and Refugee Convention are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief may be granted.

### C. *FTCA Claims*

The medical malpractice-related claims under the FTCA asserted by plaintiff in the amended complaint and stemming from his detention at BFDF may go forward against defendant United States. [5]

### ORDER

IT IS HEREBY ORDERED, that plaintiff's *Bivens* claims are dismissed with prejudice;

FURTHER, that plaintiff's claims under CAT and the Refugee Convention are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to complete, on plaintiff's behalf, and to issue, a summons for service of process on defendant United States of America;

FURTHER, the Clerk of the Court is directed to send copies of the Summons, Amended Complaint, [6] and this

Order by certified mail to the following, pursuant to Rule 4(i) of the Federal Rules of Civil Procedure:

• Attorney General of the United States, Main Justice Building, 10th and Constitution Avenues N.W., Washington, DC 20530;

• Civil Process Clerk, United States Attorney for the Western District of New York, United States Attorney's Office, USAO/WDNY, 138 Delaware Avenue, Buffalo, New York 14202.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 3858398

Footnotes

1    Plaintiff's amended complaint is accompanied by two voluminous bound volumes of exhibits captioned "Exhibit's [sic] Part 1", containing a Table of Contents and exhibits 1–18 and "Exhibit Part 2", containing a Table of Contents and exhibits 19–40. Given the voluminous nature of the exhibits, numbering hundreds of pages, and the manner in which they are bound, which would make scanning them very difficult, the Court has not required the Clerk's Office to scan them into the court's electronic filing system. They will instead be maintained in paper form in a separate file in the Clerk's Office. *See* note to Docket No. 6.

2    *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

3    Plaintiff divides his claims into two sections of the amended complaint, namely "Medical Malpractice" (Amended Complaint, p. 3–5, ¶¶ 8–16), which contains allegations supportive of his FTCA claims, and "U.S. D.H.S.-ICE Federal Agency and Custody Officers Abuses" (*Id.* at p. 5–14, ¶¶ 17–56), which contains allegations supportive of his *Bivens* constitutional claims. The Court notes, however, that a number of the allegations set forth in the "Federal Agency and Custody Officers Abuses" section of the complaint are relevant to his FTCA malpractice claims. *See, e.g.,* Amended Complaint, ¶ 21.

4    Plaintiff's failure to include in the caption of the amended complaint the names of any defendants against whom he is asserting *Bivens* claims is not the only instance of his disregard of the Court's directives regarding the form and content of his amended complaint. The August 16 Order noted that many of the *Bivens* claims that plaintiff's allegations would support against individuals identified in the body of the complaint appeared to be barred by the statute of limitations. August 16 Order at 18. The Court accordingly directed as follows:

    In the amended complaint that plaintiff will be given leave to file, as provided below, in which he must demonstrate either that his *Bivens* claims stemming from his incarceration at BFDF are timely or, if any such Bivens claims are untimely, he must allege facts demonstrating why equitable tolling should be applied to the statute of limitations periods for such claims.

    (August 16 Order at 19). As noted *supra,* the August 16 Order provided that plaintiff would be given leave to file an amended complaint with respect to his *Bivens* claims, and plaintiff was further advised, in this regard, "that he should address the timeliness of any *Bivens* claims that he asserts in the amended complaint and any argument as to why the limitations period applicable to such claims should be equitably tolled." (August 16 Order at 21). However, plaintiff's amended complaint does not address the timeliness issue or offer any basis for equitable tolling of the limitations period. Given the Court's dismissal herein of the *Bivens* claims based upon plaintiff's failure to identify the defendants against whom he seeks to assert such claims, the Court need not further address the timeliness issue.

    Plaintiff further disregarded the August 16 Order to the extent that he reasserts claims stemming from his detention at the Albany County Jail from February 21, 2006–March 21, 2006, and the Perry County Correctional Center ("PCCC") in Uniontown Alabama from August 5, 2006–February 9, 2007. (Amended Complaint at ¶¶ 14, 15, 28–40). The August 16 Order dismissed the claims stemming from plaintiff's incarceration at those facilities pursuant to 28 U.S.C. § 1406(a) for improper venue. (August 16 Order at 13–14). Those claims remain dismissed.

5    As explained in the August 16 Order, plaintiff's allegations of medical malpractice and the failure to properly treat his serious medical condition are clearly cognizable under the FTCA when asserted against the United States. (August 16 Order at 6).

6    As explained in n. 1, *supra,* plaintiff's voluminous exhibits to the amended complaint are maintained in paper form in a separate file folder in the Clerk's Office.

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 857528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard AUSTIN, Plaintiff,
v.
Brian PAPPAS, John Does, Yonkers
Police Commissioner Charles C. Coles,
Westchester County, Defendants.

No. 04-CV-7263 (KMK)(LMS).
|
March 31, 2008.

**Attorneys and Law Firms**

Mr. Richard Austin, Stormville, NY, pro se.

Rory Carleton McCormick, Esq., Corporation Counsel,
City of Yonkers, Yonkers, NY, for Defendants.

*ORDER ADOPTING REPORT
& RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1** Richard Austin ("Plaintiff") filed this suit pursuant
to 42 U.S .C. § 1983 ("Section 1983") against Yonkers
Police Officer Brian Pappas ("Defendant Pappas"),
several John Doe Yonkers Police Officers ("John Doe
Defendants"), former Yonkers Police Commissioner
Charles C. Cola ("Defendant Cola") (whose name is
misspelled in Plaintiff's Complaint as Charles C. Coles),
and Westchester County (collectively, "Defendants"),
alleging violations of Plaintiff's civil rights under the
First, Fourth, Fifth, Eighth, and Fourteenth Amendments
of the United States Constitution, along with various
supplemental state law claims.[1] (Compl.¶¶ 17, 19.)
Plaintiff alleged that these violations occurred when
Defendants failed to protect Plaintiff from Franklyn
Kelley, a private individual who physically attacked
Plaintiff during the course of Plaintiff's May 16, 2003
arrest. (*Id.* ¶ 10.) Plaintiff alleged that Defendant Pappas
and the John Doe Defendants handcuffed him and pinned
him to the ground while Franklyn Kelley repeatedly
kicked and punched Plaintiff in the face. (*Id.* ("The officers
did nothing to protect the plaintiff from this vicious

assault, even though plaintiff was helpless and in their
custody [.]").) Defendants moved for summary judgment,
and this Motion was referred by Judge McMahon to Chief
Magistrate Judge Lisa M. Smith for review pursuant to 28
U.S.C. § 636(b)(1). On August 2, 2007, Magistrate Judge
Smith issued a thorough Report and Recommendation
("R & R"), concluding that this Court should grant
Defendants' Motion for Summary Judgment on the
ground that Plaintiff has failed to demonstrate that there
exists a genuine issue of material fact as to whether his
constitutional rights were violated. Plaintiff was advised
of his right to file objections to the R & R, but he did not
do so.

A district court reviewing a report and recommendation
" 'may accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge.' " *Donahue v. Global Home Loans & Fin., Inc.,* No.
05-CV-8362, 2007 WL 831816, at \*1 (S.D.N.Y. Mar. 15,
2007) (quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C.
§ 636(b)(1) and Rule 72(b) of the Federal Rules of Civil
Procedure, parties may submit objections to a magistrate
judge's report and recommendation. The objections must
be "specific" and "written," and must be made "within 10
days after being served with a copy of the recommended
disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. §
636(b)(1).

Where a party does not submit an objection, " 'a district
court need only satisfy itself that there is no clear error
on the face of the record.' " *Donahue,* 2007 WL 831816,
at \*1 (quoting *Nelson v. Smith,* 618 F.Supp. 1186, 1189
(S.D.N.Y.1985)). In addition, a party's failure to object
waives that party's right to challenge the report and
recommendation on appeal. *See Fed. Deposit Ins. Corp.
v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995) ("Our
rule is that 'failure to object timely to a magistrate's report
operates as a waiver of any further judicial review of the
magistrate's decision.' " (quoting *Small v. Sec'y of Health
and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989))).

**\*2** Here, Plaintiff has not filed objections to the R
& R. Accordingly, the Court has reviewed the R & R
for clear error only. In so doing, the Court adopts the
conclusion reached in the R & R that Defendants' Motion
for Summary Judgment should be granted, but the Court
does so in part on different grounds than those relied on
in the R & R.

First, the Court agrees with Magistrate Judge Smith that Defendants' noncompliance with Local Civil Rule 56.2 should be overlooked because any prejudice resulting from noncompliance was cured by the following: (i) Magistrate Judge Smith advised Plaintiff of the nature of summary judgment during a March 23, 2007 conference; and (ii) Magistrate Judge Smith annexed a Rule 56.2 notice to the R & R, a document to which Plaintiff was free to file objections. *See Narumanchi v. Foster,* No. 02-CV-6553, 2006 WL 2844184, at *2 (E.D.N.Y. Sept. 29, 2006) (refusing to deny defendant's motion for summary judgment based on failure of defendant to comply with Local Civil Rule 56.2 because "[a]ny prejudice to *pro se* plaintiffs [was] cured" by court's actions).

As expressed in the R & R, though Plaintiff did not file any opposition to Defendants' Motion for Summary Judgment, Defendants were still required to meet their burden of demonstrating to the Court that "no material issue of fact remains for trial." *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001). The Court finds no clear error in Magistrate Judge Smith's determination that Defendants satisfied this burden.

With respect to Defendants Pappas and Cola, the Court finds that Plaintiff has failed to offer any evidence demonstrating that they were personally involved in the alleged violation of Plaintiff's constitutional rights. The " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

> '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising

subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.'

*Id.* at 127 (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *accord Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Schiller v. City of New York,* No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); *Fair v.. Weibur,* No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986); *see also Fair,* 2006 WL 2801999, at *4 (citing *Bass* ).

**\*3** In support of their Motion for Summary Judgment, Defendants submitted evidence that Defendant Pappas did not directly participate in the arrest of Plaintiff, but he instead arrested Plaintiff's accomplice. For example, on April 8, 2004, at a hearing before the Honorable Richard A. Molea of the Westchester County Court, Defendant Pappas testified that he remained with Plaintiff's accomplice while other officers arrested Plaintiff. (Defs.' Affirmation in Supp., Ex. J, 50-51.) Further, in response to interrogatories served on him by Plaintiff, Defendant Pappas stated that he "did not observe what transpired during the course of plaintiff's arrest." (*Id.,* Ex. L.) Finally, Defendants offer a police report indicating that "Pappas was detaining [Plaintiff's accomplice] in the garage area, as additional units arrived and placed [Plaintiff] into custody." (*Id.,* Ex. C.)

Plaintiff has failed to offer any evidence refuting Defendant Pappas' version of events. In other words, Plaintiff has offered no evidence demonstrating that Defendant Pappas was actually one of the officers who arrested him and allegedly pinned him to the ground while Kelley assaulted him. In fact, during his deposition testimony, Plaintiff admitted that he was not sure whether Defendant Pappas was one of the police officers who arrested him, and that the reason Defendant Pappas was named as a defendant in the present suit was because Plaintiff had seen his name on Plaintiff's felony complaint. (*Id.,* Ex. G, 32-35.) As such, the unrefuted evidence

before the Court demonstrates that Defendant Pappas was not one of the officers directly involved in Plaintiff's arrest. Plaintiff therefore has failed to satisfy a prerequisite to liability under Section 1983-namely that Defendant Pappas had personal involvement in the alleged violation of Plaintiff's constitutional rights. *See Back,* 365 F.3d at 122. Thus, Plaintiff's claim against Defendant Pappas must be dismissed.

Plaintiff alleged that Defendant Cola, Yonkers Police Commissioner at the time of Plaintiff's 2003 arrest, violated Plaintiff's constitutional rights by "authoriz[ing], tolerat[ing], as institutionalized practices, and ratif[ying] the misconduct [of Defendant Pappas and John Doe Defendants]." (Compl.¶ 14.) More specifically, Plaintiff charges Defendant Cola with failure to properly: (1) discipline subordinate officers; (2) take adequate precautions in hiring subordinate officers; (3) report criminal acts by police personnel to the Westchester County District Attorney; and (4) establish a system for dealing with complaints about police misconduct. (*Id.*) Plaintiff does not assert that Defendant Cola directly participated in the violation of his constitutional rights; instead, Plaintiff urges the Court to find Defendant Cola liable under Section 1983 based on his role as supervisor of Defendant Pappas and the John Doe Defendants.

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut,* 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.; Fair,* 2006 WL 2801999, at *4.

**\*4** Plaintiff has failed to provide the Court with any evidence from which a reasonable jury could conclude that Defendant Cola was personally involved in the alleged violation of Plaintiff's constitutional rights. Plaintiff has offered no evidence demonstrating that Defendant Cola was aware of and failed to remedy constitutional violations by subordinate officers, or that he acted in a grossly negligent or deliberately indifferent manner in supervising or training subordinate officers. There is also no evidence in the record to support a theory that Defendant Cola created a policy or custom that fostered and led to the alleged violation of Plaintiff's

rights. *See Hayut,* 352 F.3d at 754 (finding as fatal to plaintiff's Section 1983 claim the fact that there existed "no evidence that, after becoming aware of the alleged harassment, any of the [supervisory officials] failed to respond or remedy the situation, that any of these [supervisory officials] created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the alleged harasser's] conduct"); *Harris v. City of New York,* No. 01-CV-6927, 2003 WL 554745, at *6 (S.D.N.Y. Feb. 26, 2003) ("[P]laintiff has put forth no evidence pointing to defendant ['s] personal involvement in plaintiff's alleged deprivation of rights .... Plaintiff's conclusory allegations regarding defendant['s] alleged supervisory role, without more, cannot withstand summary judgment."). Further, nothing in the record, even drawing all inferences in Plaintiff's favor, suggests any tangible connection between Defendant Cola's training or supervision of subordinate officers and the alleged violation of Plaintiff's rights. In fact, the record contains no evidence with regard to Defendant Cola whatsoever. Without such evidence, no reasonable jury could conclude that Defendant Cola had personal involvement in the alleged violation of Plaintiff's constitutional rights, which means that Plaintiff has failed to satisfy a prerequisite to Section 1983 liability, and therefore that Defendant Cola is entitled to summary judgment in his favor. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) ("After an opportunity for discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

In sum, the Court finds that Plaintiff has failed to establish the personal involvement of Defendants Pappas and Cola in the alleged violation of his rights. For reasons set forth more fully in the R & R, the Court also dismisses the Complaint as to the John Doe Defendants because Plaintiff's time limit to amend the Complaint in order to substitute in named defendants has lapsed. Therefore, the Court finds it unnecessary to reach the question of whether Plaintiff has adequately established an underlying violation of his constitutional rights. Finally, having determined that no cognizable federal claims exist, the Court will follow Magistrate Judge Smith's recommendation in declining to exercise jurisdiction over the state law claims.

**\*5** Accordingly, it is hereby:

ORDERED that the Report and Recommendation dated August 2, 2007, is ADOPTED on the grounds set forth in this Order; and it is further

ORDERED that Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to terminate Defendant's Motion (Dkt. No. 28), and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 857528

Footnotes

1   On August 8, 2005, Plaintiff's claim against Westchester County was dismissed by the Honorable Gerald E. Lynch, to whom this case was initially assigned. On February 28, 2006, the case was transferred to White Plains and reassigned to Judge Colleen McMahon. The case was reassigned to the undersigned on August 6, 2007.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 603217
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Jean BERNIER, 29463-054, Plaintiff,
v.
KOENIGSMANN et al., Defendants.

15-CV-209A
|
Signed 02/15/2017

**Attorneys and Law Firms**

Jean Bernier, White Deer, PA, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

**Decision and Order and Report and Recommendation**

HONORABLE HUGH B. SCOTT, UNITED STATES MAGISTRATE JUDGE

## I. INTRODUCTION AND BACKGROUND

**\*1** Plaintiff Jean Bernier ("Bernier")[1] has accused a number of corrections officers and medical providers across four different prisons of retaliating against his grievances, denying him due process in disciplinary hearings, and refusing him various medical treatments for Hepatitis C. In his complaint filed on March 6, 2015 (Dkt. No. 1), Bernier claims multiple violations of his federal constitutional rights by way of 42 U.S.C. § 1983, including violations of due process and deliberate indifference to medical needs.

The parties currently have several motions pending. Some of the defendants have filed motions to sever accusations against them (Dkt. Nos. 16, 39, 41) because they work at prisons located in the Northern District of New York and because the accusations against them occurred there and should be transferred there. Bernier opposes severance and transfer based on chronology: His transfers from one prison to another led to disruptions in medical and administrative arrangements established at the prior prison, which in turn spawned the alleged violations. Bernier has filed motions for leave to amend his complaint (Dkt. Nos. 25, 28) to add factual details

that allegedly occurred after the commencement of this case. Contained within the parties' motion papers is what the Court will consider an additional motion from defendants to revoke Bernier's *in forma pauperis* ("IFP") status. (Dkt. No. 29 at 5.) The Court (Curtin, *J.*) granted Bernier IFP status on May 21, 2015. (Dkt. No. 5 at 6.) Defendants now seek revocation on the basis that Bernier received dispositions in three prior cases that constitute "strikes" under 28 U.S.C. § 1915(g). Bernier acknowledges the prior cases and their dispositions. In opposition to revocation, Bernier instead takes two steps. First, with respect to one of his prior cases, Bernier raises the following legal question: Suppose that a court screens a prisoner complaint, lets at least some part of it survive, and grants IFP status. Suppose later that some portion of the surviving claims are transferred to another district, which then dismisses the transferred portion for failure to state a claim. Should the dismissal of the transferred, previously screened portion of the complaint count as a strike under Section 1915(g)? (*See* Dkt. No. 34 at 3–4.) Alternatively, Bernier asserts that the denial of the treatment that he seeks for Hepatitis C places him in imminent danger and allows him to maintain his case here, even if he has three strikes. (*Id.* at 5.)

**\*2** The Hon. Richard J. Arcara has referred this case to this Court under 28 U.S.C. § 636(b). (Dkt. No. 37.) The Court has deemed all of the pending motions submitted on papers under Rule 78(b) the Federal Rules of Civil Procedure ("FRCP"). For the reasons below, the Court grants defendants' non-dispositive motions in part to sever the majority of Bernier's claims and to transfer them to the United States District Court for the Northern District of New York. The Court then recommends[2] granting defendants' motion to revoke Bernier's IFP status for the claims that will remain in this District.

## II. DISCUSSION

### A. Severance and Transfer

The Court will begin with defendants' motions for severance and transfer since, as will become apparent below, they will affect defendants' motion to revoke Bernier's IFP status. Motions for severance and transfer are non-dispositive. *See Romano v. Levitt*, No. 15CV518A, 2017 WL 193502, at *4 (W.D.N.Y. Jan. 18, 2017) (citations omitted); *Grand River Enter. Six Nations, Ltd. v. Pryor*, No. 02 CIV. 5068 JFK DFE, 2008

Bernier v. Koenigsmann, Not Reported in Fed. Supp. (2017)
Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 46 of 220
2017 WL 603217

WL 3166657, at *1 (S.D.N.Y. Aug. 4, 2008) (citations omitted).

FRCP 21 and 28 U.S.C. § 1404(a) allow courts to sever claims and to transfer actions if doing so serves the interests of justice and convenience. *See* FRCP 21 ("Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."); 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."). "The decision whether to sever a party or claim from an action is within the broad discretion of the district court. In deciding whether severance is appropriate, courts generally consider: (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the severable issues require the testimony of different witnesses and different documentary proof; (3) whether the party opposing the severance will be prejudiced if it is granted; and (4) whether the party requesting the severance will be prejudiced if it is not granted.... For venue purposes, public officials reside in the district in which they perform their official duties." *Reid v. Nuttall*, No. 08-CV-0870A(SR), 2010 WL 2025477, at *10 (W.D.N.Y. Mar. 11, 2010), *report and recommendation adopted*, No. 08-CV-870A, 2010 WL 2025458 (W.D.N.Y. May 20, 2010) (internal quotation marks and citations omitted). "Severance requires the presence of only one of these conditions." *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97 CIV. 0607 (PKL), 2000 WL 423517, at *2 (S.D.N.Y. Apr. 19, 2000) (citations omitted). "The burden lies with the moving party to demonstrate that severance is needed to avoid prejudice or confusion and to promote the ends of justice." *Bey v. City of New York*, No. 99 CIV 3873(LMM), 2009 WL 1911742, at *1 (S.D.N.Y. June 30, 2009) (citing *Lewis*).

**\*3** Here, the Court agrees with defendants that severance and transfer are necessary. Bernier's complaint alleges retaliation and due process violations against two defendants who worked at the Elmira Correctional Facility ("Elmira") in this District: the defendants who are captioned as Hearing Officer Lepkowski and ORC Sweet. (Dkt. No. 1 at 3–5.) Whatever improper conduct might have occurred at Elmira has nothing to do with other due process violations that allegedly occurred at a disciplinary hearing at the Cayuga Correctional Facility ("Cayuga"), located in the Northern District of New York. (Dkt. No. 1 at 5–7.) The only apparent connection between Elmira and Cayuga is that, according to Bernier, a certain single cell order that had been written at Elmira was not continued at Cayuga. The decision not to continue the order, though, would have occurred at Cayuga, not Elmira. The Elmira order in itself does not affect the events, witnesses, and evidence that lie exclusively at Cayuga. *See, e.g., Giraldi v. Bd. of Parole*, No. 03 CIV.6552 DAB AJP, 2004 WL 1059513, at *1 (S.D.N.Y. May 12, 2004) (collecting cases that ordered transfer based on the location of witnesses and evidence). Separately, Bernier alleges in his deliberate-indifference claim that a treatment regimen started during his time at the Southport Correctional Facility ("Southport") in this District was discontinued, without explanation, upon transfer to the Auburn Correctional Facility ("Auburn") in the Northern District. (Dkt. No. 1 at 7–8.) Bernier indirectly concedes that his deliberate-indifference claim lies exclusively at Auburn; the deliberate-indifference claim in his proposed amended complaint carries the main heading, "Auburn C.F." (Dkt. No. 20 at 12.) Whether Auburn followed appropriate treatment regimens has nothing to do with retaliation and due process at Elmira; Auburn would have made its own independent decision not to follow those regimens. *Cf., e.g., Pettus v. Wright*, No. 04-CV-6203L, 2007 WL 148755, at *3 (W.D.N.Y. Jan. 11, 2007) (denying leave to amend to add unrelated claims about conditions of confinement to existing claims about deliberate indifference). Any retaliation that Bernier wants to allege that he suffered at Auburn also would be limited to that location. (Dkt. No. 1 at 9–10.) The independent nature of the decisions made at Cayuga and Auburn would not change with Bernier's attempt, in his proposed amended complaint, to add Southport and its officials as an intermediate prison transfer that links all of the prisons chronologically.

Accordingly, the Court grants defendants' motions for severance and transfer in part to transfer to the Northern District of New York the following portions of Bernier's complaint: paragraphs 29 through 58; paragraphs 61 through 66; and all of the relief requests except those portions of requests D and E that refer to defendants Sweet and Lepkowski. To the extent that defendants seek extensions of pretrial deadlines (*see, e.g.*, Dkt. No. 39-1 at 9) or other relief, the Court denies the motions without

Bernier v. Koenigsmann, Not Reported in Fed. Supp. (2017)

2017 WL 603217

prejudice to renew as needed in the Northern District. The Court also denies Bernier's motions to amend without prejudice to renew in the Northern District if he sees a need to do so.

### B. Motion to Revoke Bernier's IFP Status for Remaining Claims

The Court next will address defendants' motion to revoke Bernier's IFP status. With severance and transfer having been granted above, the Court will assess the motion only for the Elmira claims that will remain in this District. *See Guillory v. Boll*, No. 9:12-CV-1771 FJS/ DEP, 2014 WL 4715872, at *3 (N.D.N.Y. Sept. 22, 2014) (assessing IFP status for the portions of a complaint that remained after transfer); *see also Pettus v. Oakes*, No. 09-CV-6263CJS, 2009 WL 2392025, at *2 (W.D.N.Y. Aug. 3, 2009) (discussing the relationship between severance and transfer and IFP status).

Section 1915 of Title 28 contains a provision that removes the benefits of IFP status from prisoners who repeatedly file cases that do not survive initial screenings on the merits. "In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g). When defendants challenge a prisoner's IFP status, they bear an initial burden of producing sufficient documentation —docket entries, copies of decisions, or other records— to confirm that the prisoner has filed at least three prior cases that meet the criteria in Section 1915(g). *See Green v. Morse*, No. 00-CV-6533-CJS, 2006 WL 2128609, at *3 (W.D.N.Y. May 26, 2006) (citing *Andrews v. King*, 398 F.3d 1113, 1120 (9th Cir. 2005)). "Once the defendants have met this initial burden, the burden then shifts to the prisoner, who must attempt to rebut the defendants' showing by explaining why a prior dismissal should not count as a strike." *Andrews*, 398 F.3d at 1120. Courts can apply the three-strike provision retroactively. *See McFadden v. Parpan*, 16 F. Supp. 2d 246, 247 (E.D.N.Y. 1998). Prisoners who cannot make a sufficient rebuttal can keep their IFP status only if they make a sufficient showing of imminent danger of serious physical injury.

**\*4** Here, defendants have brought several of Bernier's prior cases to the Court's attention. In *Watson v. Carver-Jordan*, No. 11 CIV. 2415 WHP, 2011 WL 6202899 (S.D.N.Y. Dec. 13, 2011), Bernier had a retaliatory transfer claim dismissed with prejudice under FRCP 12(c), which uses the same standard for legal insufficiency as FRCP 12(b)(6). Bernier objects that this case should not count as a strike because, prior to transfer to the Southern District of New York, it had been one claim in a different case that he had filed in this District. [3] The Court disagrees. The whole point of severance and transfer is to identify claims that were improperly lumped together with unrelated claims that should have been brought in their own separate cases in the first place. *See Spencer, White & Prentis Inc. of Connecticut v. Pfizer Inc.*, 498 F.2d 358, 361 (2d Cir. 1974) (recognizing that "a claim or counterclaim properly severed from another by virtue of Rule 21 may be ... proceeded with separately") (ellipsis in original) (internal quotation marks and citations omitted); *see also* 9A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 2387 (3d ed. and 2016 Supp.) ("[S]evered claims become entirely independent actions to be tried, and judgment entered thereon, independently."). Bernier might protest that his experience with the severance and transfer of the claim to the Southern District left him with a "bad taste" (Dkt. No. 34 at 4), but he cannot relitigate a decision over five years ago to transfer from a different proceeding. The transfer to the Southern District happened, his accusations of retaliatory transfer against corrections officers in the Southern District became a distinct "action" for purposes of Section 1915(g), and that action was dismissed in its entirety. Finding otherwise would encourage prisoners to file omnibus lawsuits in the district where part of the case is most likely to survive, since any subsequent transfers and dismissals would carry no penalty. *See, e.g., Tafari v. Hues*, 539 F. Supp. 2d 694, 702 (S.D.N.Y. 2008) (recognizing that Section 1915(g) serves "the purpose of deterring frivolous litigation"). The Court thus will count *Carver-Jordan* as a strike.

Next, the Court will consider the appeal that Bernier filed in *Carver-Jordan*. Bernier appealed the dismissal of his retaliatory transfer claim in the Southern District. On July 5, 2012, the Second Circuit dismissed the appeal because it lacked an arguable basis in law or fact. (Dkt. No. 29-1 at 13.) "[A] complaint, containing as it does both factual allegations and legal conclusions, is frivolous where it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A dismissal

Bernier v. Koenigsmann, Not Reported in Fed. Supp. (2017)

2017 WL 603217

of an appeal as frivolous counts as its own strike. *See Chavis v. Chappius*, 618 F.3d 162, 168 (2d Cir. 2010). Therefore, Bernier's appeal in *Carver-Jordan* counts as a second strike.

In a similar way, the Court will consider an appeal that Bernier filed in a case from the Northern District of New York. In *Watson v. Wright*, No. 9:08-CV-62 NAM/ ATB, 2011 WL 4528931 (N.D.N.Y. Sept. 28, 2011), the court granted summary judgment to the defendants on a claim of deliberate indifference to Bernier's medical needs pertaining to Hepatitis C. Bernier appealed, but the Second Circuit dismissed the appeal because it lacked an arguable basis in law or fact. (Dkt. No. 29-1 at 15.) For the same reasons discussed in the preceding paragraph, this unsuccessful appeal will count as a third strike.

Since Bernier does have three strikes against him under Section 1915(g), the Court would have to recommend IFP revocation unless Bernier qualified for the imminent-danger exception. "An imminent danger is not one that has dissipated by the time a complaint is filed; rather it must be one existing at the time the complaint is filed. But, although the feared physical injury must be serious, we should not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question...." *Chavis v. Chappius*, 618 F.3d 162, 169 (2d Cir. 2010) (internal quotation and editorial marks and citations omitted). Although courts assessing imminent danger should not make an overly detailed inquiry, they are allowed to look at information outside the four corners of a complaint. *See Abreu v. Lira*, No. 9:12-CV-1385 NAM/DEP, 2014 WL 4966911, at *2 (N.D.N.Y. Sept. 30, 2014).

 **\*5** Here, Bernier has placed no information about serious physical injury or imminence within his Elmira claims. Bernier possibly can preserve his IFP status in the Northern District based on his deliberate-indifference claim, *see Ibrahim v. D.C.*, 463 F.3d 3, 6–7 (D.C. Cir. 2006) (citations omitted); *Green v. Venettozzi*, No. 14-CV-1215 (BKS/CFH), 2016 WL 6902545, at *3 (N.D.N.Y. Oct. 31, 2016) (collecting cases and noting that "Courts in this Circuit and others have held that claims of denial of healthcare to an inmate suffering from a chronic disease, such as diabetes, satisfy the imminent danger exception."), *report and recommendation adopted*, No. 914CV1215BKSCFH, 2016 WL 6902180 (N.D.N.Y. Nov. 23, 2016), but the Northern District will make that determination. With the Elmira claims ineligible for the imminent-danger exception, the Court recommends revoking Bernier's IFP status for what will remain of this case in this District. The Court recommends further that Bernier have 60 days to pay the filing fee for this case or his complaint will be dismissed without further order of the Court. *See Flemming v. Santamore*, No. 915CV00457MADATB, 2016 WL 3221844, at *3 (N.D.N.Y. June 10, 2016) (60 days to pay filing fee to avoid dismissal without further order); *Partee v. Connolly*, No. 08 CIV. 4007 (NRB), 2009 WL 1788375, at *4 (S.D.N.Y. June 23, 2009) (dismissal without prejudice to reinstatement if plaintiff paid the required filing fee within 60 days).

## III. CONCLUSION

For all of the foregoing reasons, the Court grants defendants' motions (Dkt. Nos. 16, 39, 41) in part to sever the following portions of Bernier's complaint and to transfer those portions to the Northern District of New York: paragraphs 29 through 58; paragraphs 61 through 66; and all of the relief requests except those portions of requests D and E that refer to defendants Sweet and Lepkowski. The Court denies those motions in all other respects but without prejudice. The Court also denies Bernier's motions to amend (Dkt. Nos. 25, 28) without prejudice to renew in the Northern District.

For the claims in Bernier's complaint that will remain in this District, the Court respectfully recommends granting defendants' motion (Dkt. No. 29 at 5) to revoke Bernier's IFP status. The Court recommends further that Bernier have 60 days to pay the filing fee for this case or his complaint will be dismissed without further order of the Court.

## IV. OBJECTIONS

A copy of this combined Decision and Order / Report and Recommendation will be sent, on the date below, to counsel for defendants by electronic filing on the date below; the Court will mail on the date below a hard copy of this writing to Bernier, via first-class mail. Any objections to the dispositive recommendations must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); FRCP 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of

Bernier v. Koenigsmann, Not Reported in Fed. Supp. (2017)

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 49 of 220

2017 WL 603217

the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 603217

Footnotes

1    Bernier began this case under the name Charles Watson. Bernier requested and received permission to change his
     name in the caption. (Dkt. Nos. 15, 17, 21, 22.) The proposed amended complaint (Dkt. No. 20) nonetheless reverted to
     "Charles Watson" as the plaintiff. Bernier has stated that "Jean-Gabriel Bernier" is his birth name (Dkt. No. 28 at 2), but
     the Court has no confirmation of that assertion, and the record otherwise is not clear as to the origin of the name "Charles
     Watson." In any event, the Court notes Bernier's name change only for the sake of the record; it does not appear to have
     any impact on the issues that the parties have presented.

2    The Second Circuit appears not to have addressed whether a revocation of IFP status counts as a dispositive order.
     Other Courts of Appeals that have addressed the issue regard either a denial or a revocation of IFP status as dispositive.
     *See Hunter v. Roventini*, 617 Fed.Appx. 225, 226 (4th Cir. 2015) (unpublished decision); *Lister v. Dep't of Treasury*, 408
     F.3d 1309, 1312 (10th Cir. 2005); *Vogel v. U.S. Office Prods. Co.*, 258 F.3d 509, 515 (6th Cir. 2001); *Tripati v. Rison*,
     847 F.2d 548, 548 (9th Cir. 1988). In an abundance of caution, therefore, the Court has prepared its analysis as a Report
     and Recommendation.

3    For the sake of the record, the retaliatory transfer claim in *Carver-Jordan* was severed from *Bernier v. Moffit*, Case No.
     08-CV-960 (W.D.N.Y.). *Moffit* went to trial on one claim of deliberate indifference to Bernier's Hepatitis C symptoms at
     Lakeview Shock Incarceration Correctional Facility in this District. The jury found for Bernier on October 24, 2016 and
     awarded $12,500 in compensatory damages. (Case No. 08-CV-960, Dkt. No. 347.) Bernier has made no showing that his
     success on a medical-indifference claim against one defendant at one facility in this District somehow offsets or nullifies
     his inability to state a cognizable claim of retaliation against a different defendant at a different facility in a different district.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES,
United States District Judge,

## I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

## II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) ("Compl."), at 3).

The action was originally commenced against two defendants—Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

## III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or

proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

• In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

• In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM) (DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

• In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

• Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM) (DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM) (DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009).[4]

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only

suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) *and White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury, or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

**IV.** *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

**V.** *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

Footnotes

1   At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

2   Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

3   It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

4    Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

5    Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

*Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 1063875
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Terry CICIO, Plaintiff,
v.
R. LAMORA, R. Scott, R. MacWilliams,
K. Crossett, E. Facteau, C.O. Demers,
R. Woods, R. Gill, Defendants.

Civ. Action No. 9:08–CV–431 (GLS/DEP).
|
Feb. 24, 2010.

West KeySummary

1   **Federal Civil Procedure**
👉 Civil Rights Cases in General

Genuine issue of material fact existed as
to whether corrections officer repeatedly hit
the inmate after the inmate was subdued
and thus summary judgment was precluded
on the inmate's excessive force claim. The
inmate alleged in his complaint, testified
under oath at his deposition, and stated in
a sworn affidavit that the corrections officer
punched him unnecessarily in the head many
times during the inmate's cell extraction.
Although the cell extraction was supposed to
be videotaped, the video was never recorded.
Despite the fact that the inmate's injuries were
slight and were at least indirectly brought
about by his own action of refusing handcuffs,
there were credibility issues to be determined.
U.S.C.A. Const.Amend. 8.

Cases that cite this headnote

**Attorneys and Law Firms**

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, C. Harris Dague, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

 **\*1**  Plaintiff Terry Cicio, a New York State prison inmate
who is proceeding *pro se* and *in forma pauperis,* has
commenced this action pursuant to 42 U.S.C. § 1983,
alleging deprivation of his civil rights. In his complaint
Cicio, who refused multiple orders from prison officials
to exit his cell in order to effectuate a transfer to another
location, complains that in the course of the ensuing cell
extraction, during which he was removed through the use
of force, one of the corrections officers who participated
exerted excessive force causing him to suffer injuries, while
the others involved failed to intervene, all in violation
of the Eighth Amendment's protection against cruel and
unusual punishment. As relief for the violation, plaintiff
seeks the recovery of compensatory and punitive damages
from defendants.

Currently pending before the court is defendants' motion
for summary judgment seeking dismissal of plaintiff's
complaint. In their motion defendants challenge the legal
sufficiency of plaintiff's excessive force and failure to
intervene claims and additionally assert their entitlement
to Eleventh Amendment immunity from suit in their
official capacities and good faith qualified immunity from
suit as individuals. Because a reasonable factfinder could
conclude from the record now before the court that more
force than necessary to subdue and remove Cicio from
his cell was applied maliciously and sadistically by prison
officials, I am constrained to recommend that defendants'
motion be denied, except as to plaintiff's claims against
defendant Woods and those against defendants in their
official capacities, which are subject to dismissal.

I. *BACKGROUND* [1]

Plaintiff is a prison inmate entrusted to the care
and custody of the New York State Department of
Correctional Services ("DOCS"). *See generally* Complaint
(Dkt. No. 1); *see also* Dague Decl. (Dkt. No. 35–16) ¶
3 and Exh. A (Dkt. No. 35–17). At the times relevant
to his claims, plaintiff was designated to the Upstate

Correctional Facility ("Upstate"), located in Malone, New York. [2] *Id.*

The events giving rise to the claims in this action were set in motion on December 27, 2007, when plaintiff refused to return a razor given to him by prison officials to permit him to shave. Dague Decl. (Dkt. No. 35–16) Exh. B (Dkt. No. 35–18) (Transcript of Deposition of Terry Cicio, conducted on March 12, 2009, hereinafter cited as "Cicio Dep. Tr.") at pp. 29–30; Gill Aff. (Dkt. No. 35–4) ¶ 5 and Exh. A (Dkt. No. 35–5). According to Cicio, he purposefully withheld the razor in order to prompt a transfer out of the gallery on which his cell was located to another area. Cicio Dep. Tr. at pp. 27–28.

Inmates at Upstate are assigned cells based upon a written protocol designated as the Progressive Inmate Movement System, or "PIMS", intended to provide incentive and encourage behavioral adjustment for SHU inmates. *See* Dague Decl. (Dkt. No. 35–16) ¶ 8. Under the PIMS, there are three designated categories of SHU cells; level three affords the most desirable conditions, while PIMS level one inmates enjoy the least privileges. *Id.; see also* Cicio Dep. Tr. at p. 27. At the time of plaintiff's refusal of surrender his razor, he was assigned to a PMS level three cell. Cicio Dep. Tr. at p. 27.

**\*2** On December 27, 2007, following the razor incident, plaintiff was informed that he would be relocated to a PIMS level one cell. Cicio Dep. Tr. at p. 31; Gill Aff. (Dkt. No. 35–4) ¶ 7 and Exh. B (Dkt. No. 35–6). To effectuate the move, prison officials instructed the plaintiff to place his back to the cell door and his hands through the feed up slot in order to permit the application of hand restraints. Gill Aff. (Dkt. No. 35–4) ¶ 8. Plaintiff refused that order as well as several subsequent directives to voluntarily exit his cell. *Id.* at ¶ 9 and Exh. A. Attempts were made to convince plaintiff to reconsider his refusal; those efforts included interventions by clergy and guidance staff at the facility. *Id.* When those measures proved unsuccessful, orders were given to prepare a cell extraction team. Gill Aff. (Dkt. No. 35–4) ¶ 10.

At 2:30 p.m. on that day Corrections Lieutenant Andrew Lamora issued a final order directing plaintiff to exit his cell, warning that if he persisted in his refusal force would be applied to carry out his removal. Gill Aff. (Dkt. No. 35–4) ¶¶ 11–12; Lamora Aff. (Dkt. No. 35–8) ¶¶ 8–10; *see also* Complaint (Dkt. No. 1) Statement of Facts ¶

4. Despite that last directive, plaintiff refused to obey defendant Lamora's command. Lamora Aff. (Dkt. No. 35–8) ¶ 9.

Following established facility protocol, prison officials took the first step toward conducting a forcible extraction by administering two one-second bursts of a chemical aerosol into plaintiff's cell, followed by another request for voluntary compliance. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–13 and Exhs. A (Dkt. No. 34–5) and B (Dkt. No. 34–6); Lamora Aff. (Dkt. No. 35–8) ¶ 11. The process was repeated at two minute intervals on four more occasions; each time, corrections officers offered plaintiff the opportunity to comply with their orders before administering another dose. Gill Aff. (Dkt. No. 35–4) ¶¶ 12–14.

When the use of chemicals failed to convince Cicio to exit his cell, the cell extraction team that had been assembled, including Corrections Officers Richard Scott, Richard MacWiliams, Kurt Crossett and Christopher Demers, entered the cell. Gill Aff. (Dkt. No. 35–4) ¶ 17 and Exhs. A (Dkt. No. 35–5) and B (Dkt. No. 35–6); Lamora Aff. (Dkt. No. 35–8) ¶ 15. To accomplish the forced extraction each of those individuals was assigned a specific task. Lamora Aff. (Dkt. No. 35–8) ¶ 16. Corrections Officer Scott was designated to be the first to enter the cell and, through use of a shield, was tasked with attempting to bring Cicio to the ground and assist with the application of handcuffs. *Id.* Corrections Officer MacWilliams' assigned role was to control plaintiff's arms and to assist in the take down and application of handcuffs. *Id.* Corrections Officer Demers was assigned to control Cicio's right leg and assist in the take down and application of ankle restraints, and Corrections Officer Crossett was similarly designated as the person responsible for control of plaintiff's left leg, assisting in the take down, and application of ankle restraints. *Id.* The cell extraction, which proceeded in accordance with this protocol, was successfully completed in approximately two minutes or less. Gill Aff. (Dkt. No. 35–4) ¶ 20; Lamora Aff. (Dkt. No. 35–8) ¶ 18; Scott Aff. (Dkt. No. 35–7) ¶ 13; Demers Aff. (Dkt. No. 35–12) ¶ 13; Crossett Aff. (Dkt. No. 35–10) ¶ 13; Facteau Aff. (Dkt. No. 35–11) ¶ 12.

**\*3** Also in accordance with the established protocol, Corrections Officer Eric Facteau was assigned to record the cell extraction using a hand-held camera. Facteau Aff. (Dkt. No. 35–11) ¶¶ 5–6. Unfortunately, however, while

Corrections Officer Facteau attempted to videotape the process he later discovered the tape was defective, and none of the cell extraction was recorded. *Id.* at ¶¶ 9, 14.

Following the cell extraction, plaintiff was taken to a decontamination area where his clothes were removed and traces of the chemical aerosol were eliminated. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5). Plaintiff was thereafter brought to a holding cell to be medically examined and photographed. *Id.*

During the course of the cell extraction both plaintiff and two of the participating corrections officers suffered injuries. Plaintiff described his injuries as including a scratch to the right side of his face less than an inch long, a contusion above his left eye, a bruise on his left shoulder "the size of a quarter or a little bigger[, n]othing major", and a bruise to the back of his shoulder. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; Cicio Dep. Tr. at pp. 48–52. A medical report prepared following the examination notes the following with regard to plaintiff's injuries:

> Inmate has small abraised/red area to rt. upper/lateral aspect of chest. Has small contused area to left lateral aspect of forehead, has small eccymotic area to rt. lateral aspect of shoulder. No life threatening injuries. No blood present. Alert and oriented. No signs of distress. No treatment necessary.

Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6). Following the incident plaintiff stated to medical staff that he was "fine" and did not wish to receive treatment. *Id.; see also* Cicio Dep. Tr. at pp. 75–76. During the cell extraction Corrections Officer MacWilliams suffered injury to his right wrist, and Corrections Officer Scott injured his right hip; no other staff members involved reported any injuries. Gill Aff. (Dkt. No. 35–4) Exh. A (Dkt. No. 35–5).

For the most part, the foregoing facts are not disputed by the plaintiff. He does, however, contend that during the course of the extraction he was "repeatedly punched" by Corrections Officer MacWiliams, who asked "you want to play?" Complaint (Dkt. No. 1) Statement of Facts ¶

5; Cicio Dep. Tr. at pp. 46–47; Cicio Aff. (Dkt. No. 36) ¶¶ 10, 12. Plaintiff further alleges that while the other members of the cell extraction team, including Sergeant R. Gill and Lieutenant R. Lamora, "had ample time to curb the abuse" he suffered, they stood by without intervening. *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on May 7, 2008. Dkt. No. 1. Named as defendants in Cicio's complaint are Robert Woods, the superintendent at Upstate; Corrections Lieutenant Randy Lamora; Corrections Sergeant Robert Gill; and Corrections Officers Richard Scott, Richard MacWilliams, Kirk Crossett, Eric Facteau, and Christopher Demers. Plaintiff's complaint asserts a single cause of action, alleging violation of his Eighth Amendment right against cruel and unusual punishment.

**\*4** Following joinder of issue and completion of pretrial discovery, defendants moved on August 6, 2009 for summary judgment dismissing plaintiff's complaint. Dkt. No. 35. In their motion, defendants argue that plaintiff's excessive force and failure to intervene claims are lacking in merit, that his claims against the defendants in their official capacities are barred by the Eleventh Amendment, and that in any event they are entitled to qualified immunity from suit against them for damages as individuals. *Id.* Plaintiff has since responded in opposition defendants' motion,[3] Dkt. No. 36, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509– 10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford*

*v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620– 21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998).[4] The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Excessive Force*

Plaintiff's complaint asserts a cause of action brought under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 998–999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom ., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7–8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. —— U.S. – – – –, —— S.Ct. ——, —— L.Ed.2d – – – –, 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

**\*6** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting Hudson, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated .... This is true whether or not significant

injury is evident.' " *Wright,* 554 F.3d at 268–69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"). Where a prisoner's allegations and evidentiary proffers, if credited, could reasonably allow a rational factfinder to find that corrections officers used force maliciously and sadistically, however, summary judgment dismissing an excessive use of force claim is inappropriate. *Wright,* 554 F.3d at 269 (citing *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the ... incident with [that officer] indicated only a slight injury")) (other citations omitted).

**\*7** In this case, although the injuries sustained by Cicio as a result of the incident in question were admittedly slight and at least indirectly brought about by his own actions, because the governing law requires that the evidence be viewed in the light most favorable to the non-moving party, I am compelled to conclude that issues of fact preclude the entry of judgment as a matter of law in favor of the defendants. Plaintiff has alleged in his complaint, testified under oath at his deposition, and stated in a sworn affidavit that defendant MacWilliams punched him unnecessarily in the head several times during the cell extraction. Complaint (Dkt. No. 1) Statement of Facts ¶ 5; Cicio Dep. Tr. at pp. 52–55; Cicio Aff. (Dkt. No. 36) ¶ 10. According to Cicio, when the defendants entered the cell and hit him with a shield he immediately dropped to the floor. Cicio Dep. Tr. at p. 64. At that point, plaintiff asserts, he could no longer resist because the corrections officers involved had his arms pinned, and could have easily handcuffed him. *Id.* Instead, plaintiff claims, "[MacWilliams] just kept hitting me. He hit me several times.... When I say maliciously and sadistically when he tells me that, when he's asking me if I want to play, he's hitting me. That means he's doing it for his own purpose...." *Id.* at pp. 52, 53–54. One could argue further that from the lack of a videotape recording of

2010 WL 1063875

the relevant events, despite orders to Corrections Officer Facteau to follow the established protocol and record the cell extraction, a reasonable factfinder could infer that excessive force was applied during the incident and that a videotape of the events would have disclosed the punches thrown by defendant MacWilliams.

Without question, the evidentiary support for plaintiff's claim is far from overwhelming. Plaintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. MacWilliams Aff. (Dkt. No. 35–9) ¶ 13. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. Additional evidence tending to contradict plaintiff's allegations includes the fact that it took two minutes or less for the corrections officers to perform the cell extraction and the reports of medical examinations conducted of the plaintiff shortly after the incident as well as the photographs of plaintiff's face, both revealing that he sustained only a slight bruise, *see* Gill Aff. (Dkt. No. 35–4) Exh. B (Dkt. No. 35–6), an injury that would also be fully consistent with what would be expected to result when corrections officers must take a resisting inmate to the floor for the purpose of administering arm and leg restraints.[5] Moreover, during his deposition, plaintiff acknowledged that the photographs accurately depict the full extent of the injuries suffered during the cell extraction. Cicio Dep. Tr. at 80–81.

**\*8** Plaintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact. *Griffin,* 193 F.3d at 91 ("Although appellant's excessive force claim is weak and his evidence extremely thin, dismissal of the excessive force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him."). I view of the foregoing, I am obligated to recommend that defendants' motion be denied as to plaintiff's excessive use of force claim.

C. *Failure To Intervene*

In addition to asserting that defendant MacWilliams beat him excessively, plaintiff alleges that the various other defendants observed the incident but stood by without intervening on his behalf .[6] Defendants contend that plaintiff's failure to intervene claim similarly lacks merit.

A corrections worker who, though not participating, is present while an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. See *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. See *Mowry v. Noone,* No. 02–CV–6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).[7] In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. See *Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

**\*9** Although defendants deny that MacWilliams struck plaintiff, I have already determined that material questions of fact exist with respect to this issue. As to the co-defendants, plaintiff testified that "they had plenty of time during the whole incident to actually stop [MacWilliams] from assaulting [him]." Cicio Dep. Tr. at p. 52. Once again, though the evidence in plaintiff's favor is weak, I find that questions of fact preclude summary judgment with respect to plaintiff's failure to

intervene claim and therefore recommend that this portion defendants' motion also be denied.

### D. *Eleventh Amendment*
To the extent that damages are sought against them in their official capacities, defendants' motion also seeks dismissal of those claims on the basis of the protection afforded under of the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057–58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and to state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest. *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *Kentucky v. Graham,* 473 U.S. 159, 166–67, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

It is unclear from plaintiff's complaint whether he has sued defendants in their individual or official capacities, or both. Insofar as plaintiff's damage claims against the defendants are brought against them in their official government-employee capacity they are the equivalent of claims against the State of New York, and they are subject to dismissal under the Eleventh Amendment state-employee exception. *Daisernia v. State of New York,* 582 F.Supp. 792, 798–99 (N.D.N.Y.1984) (McCurn, J.). I, therefore, recommend dismissal of plaintiff's damage claims against the defendants in their official capacities.

### E. *Qualified Immunity*
In their motion defendants also rely on the doctrine of qualified immunity, arguing that because their actions were reasonable under the circumstances they are immune from suit and plaintiff's complaint should be dismissed.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

**\*10** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[8] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[9] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[10] *Pearson,* 555 U.S. at——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a

constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*11** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Undeniably, the right of a prison inmate to be free from excessive use of force has long been established. *Russo v. City of Bridgeport,* 479 F.3d 196, 212 (2d Cir.), *cert. denied,* 552 U.S. 818, 128 S.Ct. 109, 169 L.Ed.2d 24 (2007). Since I have already determined that, if credited, plaintiff's testimony could support a jury finding that defendants acted intentionally to harm him, it follows that a rational trier of fact could also conclude that defendants' conduct was not objectively reasonable under the circumstances. *See id.; see also Dallio v. Santamore,* No. 9:06–CV–1154, 2010 WL 125774, at *14 (N.D.N.Y. Jan.7, 2010) (Suddaby, J. and Homer, M.J.) ("As to [plaintiff's] excessive force and failure to intervene claims, it was clearly established by the incident on November 10, 2003 that inmates had an Eighth Amendment right to be free from excessive force and a failure to intervene. Thus, accepting all of [plaintiff's] allegations about the incident as true, qualified immunity cannot be granted ... since a reasonable person in their position at the time would or should have known that the use of excessive force was a constitutional violation."). As a result, I have determined that material questions of fact exist on the issue of whether defendants are entitled to qualified immunity from suit and therefore recommend that this portion of defendants' motion also be denied.

## IV. *SUMMARY AND RECOMMENDATION*

Given the circumstances leading up to the forcible extraction of Cicio from his cell, it is doubtful that he will be viewed by a jury as a particularly sympathetic plaintiff. Plaintiff placed his own safety as well as that of others in jeopardy by refusing a lawful order to exit his cell, admittedly knowing that his actions would result in the use of force to remove him. Plaintiff's refusal to obey prison officials' commands, however, though plainly indefensible, did not provide corrections officers with a license to exact retribution by needlessly punching him after he was subdued and no longer resisting, as he has alleged. Whether Officer MacWilliams did, in fact, needlessly punch the plaintiff raises a question of credibility given the conflicting accounts now before the court. I am therefore compelled to conclude that the existence material questions of fact preclude the court from granting defendants' motion for summary judgment with respect to plaintiff's excessive use of force and failure to intervene claims and on the issue of qualified immunity. Because defendants are immune from suit in their official capacities, however, and plaintiff

has adduced no evidence that defendant Woods was personally involved in the offending conduct, defendants' motion dismissing plaintiff's damage claims against them in their official capacities and all claims against defendant Woods should be granted. Accordingly, it is hereby respectfully

**\*12** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED to the extent that plaintiff's claims against defendants in their official capacities and those against defendant Woods be DISMISSED but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 1063875

### Footnotes

1    In light of the procedural posture of this case, the following recitation is from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 128, 137 (2d Cir.2003). It should be noted that while most of the pertinent facts are undisputed, defendants sharply contest plaintiff's allegation that he was unnecessarily punched by defendant MacWilliams during the forcible removal from his cell.

2    Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at \*4 n. 11 (S.D.N.Y. Sept. 12, 2002).

3    Plaintiff opposes defendants' motion and, alternatively, requests that he be granted a continuance so that he may pursue additional discovery. In particular, plaintiff seeks discovery regarding the facility's alleged refusal to allow plaintiff to view the DOCS directives regarding use of force, video procedures, chemical agents, and cell extractions. As an initial matter, I note that the deadline for completion of discovery expired on March 13, 2009, Dkt. No. 28, several months before defendants filed their pending motion, and plaintiff has shown no reason why he did not timely pursue the discovery now requested. In any event, as will be seen, none of the information now sought by plaintiff would impact my recommendation regarding the defendants' motion, especially considering that nearly all of the material facts are undisputed by the plaintiff.

4    With their motion defendants properly filed a statement of materials facts alleged not to be in dispute, as required under Northern District of New York Local Rule 7.1(a)(3). Dkt. No. 35–2. Under that rule when filing papers in opposition to defendants' motion plaintiff was required to submit a response mirroring defendants' Local Rule 7.1(a)(3) Statement and either admitting or denying each of the assertions contained within it in matching numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). In light of plaintiff's failure to provide such a statement, the court could deem the assertions set forth in defendants' Local Rule 7.1(a)(3) Statement, including to the effect that defendant MacWilliams did not punch him as alleged, *see* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 35–2) ¶¶ 34–35, to have been admitted by him. *Id.; see, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In deference to his *pro se* status, and given that he has actively opposed defendants' motion and contested the claim that defendant MacWilliams did not strike him, though without minimizing the importance of Local Rule 7.1(a) (3), I recommend against deeming plaintiff to have admitted the facts set forth in defendants' statement.

5    Not insignificantly, during his deposition plaintiff acknowledged his realization that his refusal to obey a direct order to leave his cell would result in the use of force to accomplish that end. *See* Cicio Dep. Tr. at p. 37. This evidence could provide some support for a finding that defendants' acted reasonably.

6    Superintendent Wood has submitted an affidavit indicating that he was not present during the course of the incident, and plaintiff has offered no evidence to the contrary. *See* Woods Decl. (Dkt. No. 35–13) ¶ 7. Under these circumstances, defendant Woods is entitled to dismissal of plaintiff's claims against him on the independent basis of his lack of personal

involvement in the constitutional violation alleged. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor).

7   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

8   In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

9   In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

10   Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. at ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, —— (1991) (per curiam)).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   10

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,
v.
Harry C. BUFFARDI, Sheriff; Schenectady
County Jail; Cheryl Clark, M.D.;
Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

### DECISION and ORDER

LAWRENCE E. KAHN, U.S. District Judge.

 **\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin

J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New* York, No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy," they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

 **\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order.[1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

Footnotes

1    Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

---

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 118169
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lakim CROWN, Plaintiff,

v.

Warden WAGENSTEIN; Parker T. # 10639 of
Emergency Response Unit, et al., Defendants.

No. 96 CIV. 3895(MGC).
|
March 16, 1998.

**Attorneys and Law Firms**

Lakim Crown, Brooklyn, for Plaintiff, Pro Se.

Paul A. Crotty, Esq., Corporation Counsel of the City
of New York, Attorney for Defendants Wangenstein and
Parker, New York, By Renee R. Nebens, Esq.

OPINION AND ORDER

CEDARBAUM, J.

**\*1** This is an action for damages brought by a pro
se plaintiff pursuant to 42 U.S.C. § 1983. Defendant
Wangenstein moves, pursuant to Fed.R.Civ.P. 12(b)(6),
to dismiss the complaint for failure to state a claim upon
which relief can be granted against him in either his
personal or official capacity. For the reasons discussed
below, defendant's motion is granted.

The complaint alleges that on November 28, 1995, while
plaintiff was incarcerated at New York City's Otis Bantum
Correctional Center ("OBCC"), plaintiff was assaulted
by a number of correction officers. (Compl. at 3–4). As
a result, plaintiff alleges that he sustained injuries to
his head, neck, back, and right leg. (Compl. at 4). In
addition to the officers involved in the assault, plaintiff
sues Wangenstein, the warden of OBCC at the time of the
alleged assault.

Discussion

A motion to dismiss for failure to state a claim must be
granted if, when viewed in the light most favorable to

the plaintiff and when all allegations of the complaint are
accepted as true, it appears beyond doubt that the plaintiff
can prove no set of facts in support of the claim which
would entitle him to relief. *Bolt Electric, Inc. v. City of
New York,* 53 F.3d 465, 469 (2d Cir.1995). In addition,
a complaint and supporting papers prepared by a pro se
plaintiff must be read liberally and interpreted to "raise
the strongest arguments they suggest." *Soto v. Walker,* 44
F.3d 169, 173 (2d Cir.1995).

When an individual defendant is sued under § 1983,
that defendant's personal involvement in the alleged
constitutional deprivation is a prerequisite to an award
of damages. *See Wright v.. Smith,* 21 F.3d 496, 501
(2d Cir.1994). For a claim under § 1983, a complaint
sufficiently alleges personal involvement of a supervisory
official if it alleges one of the following: (a) direct
participation in the alleged wrong; (b) failure to remedy a
violation after receiving notice of it; (c) creation of a policy
or custom under which unconstitutional practices occur;
or (d) grossly negligent management of subordinates who
cause the constitutional violation. *See Black v. Coughlin,*
76 F.3d 72, 74 (2d Cir.1996).

A § 1983 claim against a municipal official in his official
capacity is treated as a claim against the municipality
itself. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct.
873, 83 L.Ed.2d 878 (1985). Section 1983 imposes liability
on municipalities only when the action that is alleged to be
unconstitutional implements or executes an official policy
or custom. *See Monell v. Department of Social Services,*
436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611
(1978).

From the complaint, it is unclear whether Wangenstein is
being sued in his personal or official capacity. However,
pro se complaints, if possible, should be construed as
asserting both claims. *Jackson v. Dinkins,* 1995 WL
657075 at \*1 (S.D.N.Y. Nov.8, 1995)(citing *Frank v. Relin,*
1 F.3d 1317, 1326 (2d Cir.)("a plaintiff who has not
clearly identified in her complaint the capacity in which
the defendant is sued should not have the complaint
automatically construed as focusing on one capacity to the
exclusion of the other"), *cert. denied,* 510 U.S. 1012, 114
S.Ct. 604, 126 L.Ed.2d 569 (1993)).

**\*2** The complaint does allege an assault by certain
members of the OBCC Emergency Response Unit.
(Compl. at 3–4). It alleges that while the plaintiff was

**Crown v. Wangenstein, Not Reported in F.Supp. (1998)**

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 67 of 220

1998 WL 118169

making a telephone call, members of the Emergency Response Unit entered housing area 1N and defendant Parker verbally harassed the plaintiff, and with the assistance of other members of the Emergency Response Unit, assaulted him. (Compl. at 3–4). However, the complaint does not allege the personal involvement of Warden Wangenstein. The complaint mentions Warden Wangenstein only in the caption, and fails to allege any act or omission by Wangenstein. *See Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)(Edelstein, J.) (finding mere inclusion of warden's name in a complaint insufficient to allege personal involvement).

As for Warden Wangenstein's liability in his official capacity, the complaint fails to allege a municipal policy or custom that defendant was executing, or that such a policy or custom caused the alleged violation of the plaintiff's constitutional rights, as required by *Monell.* The absence of any such allegation prevents a finding of liability for defendant Wangenstein in his official capacity. *See Monell,* 436 U.S. at 694.

### Conclusion

Because the complaint fails to state a claim against Warden Wangenstein upon which relief can be granted, the motion to dismiss defendant Wangenstein is granted.

SO ORDERED

**All Citations**

Not Reported in F.Supp., 1998 WL 118169

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Dawkins v. State, Not Reported in F.Supp. (1996)

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 68 of 220

1996 WL 156764

1996 WL 156764
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Emon DAWKINS, Plaintiff,

v.

The STATE OF NEW YORK, Trooper Antone
R. Irwin of the New York State Police and The
New York State Police Department, Defendants.

No. 93-CV-1298 (RSP/GJD).
|
March 28, 1996.

**Attorneys and Law Firms**

Emon Dawkins, Liverpool, New York, Plaintiff, Pro Se.

Dennis C. Vacco, Attorney General of the State of New York, Syracuse, New York, for Defendants; G. Robert McAllister, Assistant Attorney General, of counsel.

*MEMORANDUM, DECISION AND ORDER*

POOLER, District Judge.

INTRODUCTION

**\*1** On June 13, 1992, defendant New York State police officer Antone R. Irwin ("Trooper Irwin") stopped and ticketed plaintiff Emon Dawkins for speeding on the New York State Thruway. Dawkins pled not guilty and elected trial in the Town Court of Dewitt, New York. When Dawkins appeared for trial, he received an additional ticket [1] for driving an unregistered vehicle. The Town Court found Dawkins not guilty of both charges. Dawkins then filed this lawsuit claiming that Trooper Irwin (1) stopped him without probable cause and on racial grounds, and (2) issued the unregistered vehicle citation in retaliation for electing trial on the speeding charge. Dawkins alleges that his Fourth, Sixth, Eighth, and Fourteenth Amendment rights have been violated and seeks redress under 42 U.S.C. §§ 1983 and 1985. Defendants all move for summary judgment pursuant to Fed. R. Civ. P. 56, arguing that Dawkins' claims are barred by the Eleventh Amendment to the United States Constitution.

Because I find that the Eleventh Amendment provides immunity for some defendants on some claims, I grant in part and deny in part, defendants' motion for summary judgment.

DISCUSSION

I. Summary Judgment Standard
Summary judgment is granted when viewing the evidence in a light most favorable to the nonmovant, the court determines that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456 (1992). A party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant satisfies this initial burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of fact exists. *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir. 1993). The nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative and must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986). In short, the nonmovant must demonstrate to the court that issues of fact exist that must be decided by a factfinder, because "they may reasonably be decided in favor of either party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2nd Cir. 1990).

II. Pro Se Plaintiff
Because Dawkins is a *pro se* plaintiff, his complaint must be construed liberally and should be dismissed only "if it appears beyond doubt that [he] can prove no set of facts in support of his claim which would entitle him to relief." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976) (quotations omitted).

III. Defendants New York State and the New York State Police Department
It is well settled that "[a]bsent a waiver on the part of the state, or a valid congressional override, the eleventh amendment prohibits federal courts from entertaining suits by private parties against the states." *Farid v. Smith,* 850 F.2d 917, 920-21 (2d Cir. 1988) (citing *Kentucky v.*

**Dawkins v. State, Not Reported in F.Supp. (1996)**

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 69 of 220

1996 WL 156764

*Graham,* 473 U.S. 159 (1985)). When Congress enacted Sections 1983 and 1985, it did not abrogate the state's Eleventh Amendment immunity. *United States v. City of Yonkers,* 880 F. Supp 212, 231 (S.D.N.Y. 1995) (citing *Quern v. Jordan,* 440 U.S. 332 (1979). Because New York State has Eleventh Amendment immunity from suit, Dawkins' claims against defendant New York State are dismissed.

**\*2** It is equally well established that the "Eleventh Amendment's containment of federal judicial power is not restricted to actions where the state is a named defendant, but extends further to those actions where liability, if imposed, must be paid from the state fisc." *New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 134 (2d Cir. 1995). For Eleventh Amendment purposes, governmental entities of a state that are considered "arms of the state" receive Eleventh Amendment immunity. *Will v. Michigan Dep't of Police,* 491 U.S. 58, 70 (1989). Because defendant New York State Police Department is a division of the executive department of New York State, Dawkins claims against the department are dismissed. *See* N.Y.Exec.Law § 210 (McKinney 1993); *Komlosi v. New York State OMRDD,* 64 F.3d 810 (2d Cir. 1995) (holding that OMRDD is an arm of the state and thus cannot be sued under §1983); *see also Oliver Schools, Inc. v. Foley,* 930 F.2d 248, 252 (2d Cir. 1991).

Moreover, New York State and the New York State Police Department are not "person[s]" within the meaning of Sections 1983 and 1985. *See Howlett v. Rose,* 496 U.S. 356, 365 (1990); *see also, Thompson v. State of New York,* 487 F. Supp. 212, 228 (N.D.N.Y. 1979, Munson, J.) (holding that the State of New York and the New York State Police Department are not "persons" for purposes of the threshold requirement of a cause of action under § 1985).

Because defendants New York State and the New York State Police Department (1) have not consented either expressly or impliedly to permit this suit to proceed in federal court and (2) are not "persons" within the meaning of the relevant statutes, I dismiss the claims against these two defendants. [2]

IV. Defendant Antone R. Irwin

  *A. Section 1985*

Section 1985(3) makes it illegal "[i]f two or more persons ... conspire ... for the purposes of depriving .. any person or class of persons of the equal protection of the laws." 42 U.S.C. § 1985(3). Trooper Irwin is the only person named or mentioned in Dawkins' complaint. Because Dawkins fails to offer any support for his claim that two or more persons conspired to deny him his rights, I must dismiss his Section 1985 claim against Trooper Irwin.

  *B. Section 1983*

A Section 1983 claim requires that Dawkins prove that (1) Trooper Irwin deprived him of a federal right and (2) Trooper Irwin acted under color of state law. *Gomez v. Toledo,* 446 U.S. 635, 640 (1980).

In his motion for summary judgment, Trooper Irwin spends great energy arguing that a cause of action alleging only that, "harm from official capacity acts is barred by the Eleventh Amendment." McAllister Aff., at ¶ 5. Trooper Irwin is only partially correct.

A suit against Trooper Irwin in his official capacity, is a suit against the state and he is "entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993). Therefore, Dawkins' Section 1983 claim made against Trooper Irwin in his official capacity is dismissed.

**\*3** However, a claim against Trooper Irwin in his individual capacity, even when performing official acts, is not afforded Eleventh Amendment protection. *Id.* [3] Although Dawkins' complaint is silent concerning the capacity in which he sues Trooper Irwin, his failure to specify the capacity does not justify an outright dismissal of his claim. *Oliver Schools,* 930 F.2d at 252; *see also Kentucky,* 473 U.S. at 167 n. 14, (1985) (indicating that "in many cases the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both" and "[t]he course of proceedings ... will indicate the nature of the liability sought to be imposed." (citations and internal quotations omitted)). [4]

During oral argument Dawkins stated that his claims against Trooper Irwin are in both his individual and official capacity. Therefore, I accept that Dawkins intends to proceed against Trooper Irwin in his individual capacity and find that the Eleventh Amendment does not protect Trooper Irwin from Dawkins' individual capacity

Dawkins v. State, Not Reported in F.Supp. (1996)

1996 WL 156764

claims. *Farid,* 850 F.2d at 921 (2d Cir. 1988) (holding that "[t]he eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."(quoting *Kentucky,* 473 U.S. at 166-67)).

Defendants' reliance on *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89 (1984), is misplaced. *Pennhurst* stands for the proposition that the Eleventh Amendment prohibits federal courts from ordering state officials to conform their conduct to state law. *Id.* at 121 (holding that "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment.").

*Pennhurst* bars state claims against state officials in their official capacities. Dawkins claims that his federal constitutional rights were violated by a state employee acting under color of state law in his individual capacity. *Pennhurst* is not applicable. *See Farid,* 850 F.2d at 921 (holding that "the [Supreme Court] has consistently held that the eleventh amendment does not protect state officials from personal liability when their actions violate federal law, even though state law purports to require such actions.").

Dawkins' Section 1983 claim against Trooper Irwin in his individual capacity is not barred by the Eleventh Amendment.

### 2. Qualified Immunity

Trooper Irwin also argues that "without a showing of a violation of a clearly established right and affirmative proof of some *ultra vires* conduct ... an individual capacity action cannot be maintained." Def.'s Mem. at 6. Although Irwin makes this statement in support of his Eleventh Amendment argument, it could also be read as a claim of qualified immunity. The doctrine of qualified immunity protects public employees in their individual capacities. *Hafer,* 502 U.S. at 31. Qualified immunity "shields government officials from liability for damages on account of their performance of discretionary official functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rodriguez v. Phillips,* 66 F.3d 470, 475 (2d Cir 1995) (citations and internal quotations omitted). The standard governing the use of a qualified immunity defense "has evolved

into one of objective reasonableness, designed to 'permit the resolution of many insubstantial claims on summary judgment.'" *Robison v. Via,* 821 F.2d 913, 920 (2d Cir. 1987) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

**\*4** However, qualified immunity is an affirmative defense which the individual defendant must plead. The Supreme Court has held that there is "no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith." *Gomez,* 446 U.S. at 640. Rather, "[i]t is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Id.*

Even if I read Trooper Irwin's answer liberally to include a qualified immunity defense, he fails in this motion to establish that "it was objectively reasonable for [him] to believe that his acts did not violate [Dawkins] rights." *Robison,* 821 F.2d at 921 (2d Cir. 1987).[5]

According to Dawkins he was (1) stopped by officer Irwin while driving at a legal rate of speed, (2) asked to produce his drivers license, vehicle registration, thruway toll card and proof of insurance, (3) ticketed for speeding, and (4) advised, but not ticketed, for an expired vehicle registration. Trooper Irwin had possession of the documents for a total of five minutes. After leaving the scene, Dawkins noticed that the speeding ticket misstated the correct time of day and listed his rate of speed at sixty-eight miles per hour as opposed to Trooper Irwin's oral representation that Dawkins was traveling at fifty-eight miles per hour. At trial, Trooper Irwin issued Dawkins a ticket for driving an unregistered vehicle. Found innocent on both charges, Dawkins alleges that Trooper Irwin (1) illegally stopped and detained him based on race and without probable cause, and (2) ticketed him for the unregistered vehicle in retaliation for electing trial. Compl. at II(c).

In his answer and in his memorandum of law in support of his motion for summary judgment, Trooper Irwin fails to provide any evidence concerning his underlying basis for stopping Dawkins. Nor does he offer any justification for ticketing Dawkins for an unregistered vehicle three months after the initial stop. The record before me does not contain an affidavit or affirmation from Trooper Irwin giving his version of the incident. Moreover, lacking any evidence to the contrary, I accept as true, Dawkins'

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 71 of 220

Dawkins v. State, Not Reported in F.Supp. (1996)

1996 WL 156764

statement that he was driving at a legal rate of speed, received a second ticket in retaliation for electing trial, and was found innocent of both offenses. [6]

Defendant has done nothing to refute Dawkins' claims. Because Trooper Irwin fails to offer any support concerning the objective reasonableness of stopping Dawkins, ticketing him, and then ticketing him again three months after the initial stop, I deny his motion for summary judgment. [7]

CONCLUSION

For the foregoing reasons I (1) GRANT defendants motion for summary judgment on behalf of defendants State of New York State and the New York State Police Department, (2) GRANT defendant Antone R. Irwin's motion for summary judgement with respect to claims as they relate to acts in his official capacity, (3) GRANT defendant Antone R. Irwin's motion for summary judgment with respect to the Section 1985 claim, and (4) DENY defendant Irwin's motion for summary judgement with respect to claims against him in his personal capacity under Section 1983.

**\*5**  IT IS SO ORDERED

All Citations

Not Reported in F.Supp., 1996 WL 156764

Footnotes

1   Defendants contend that Trooper Irwin gave Dawkins the additional ticket at the time of the initial stop. Defs.' Answer at ¶ 2.

2   In his responsive papers, Dawkins requests "declaratory or injunctive relief based on the State of New York policies and statutes of New York Civil Practice Law § 50-a, and Public Office (sic) Law § 89(2)(b) and the use thereof." Pl.'s Mem. at 2. However, attempts to secure prospective relief requiring state officials to comply with state law, as opposed to federal law, is barred by the Eleventh Amendment. *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 103-106 (1984) Therefore, Dawkins' new claim for prospective relief cannot be sustained and is barred by the Eleventh Amendment.

3   "*Will* itself makes clear that the distinction between official-capacity suits and personal-capacity suits is more than a mere pleading device. State officers sued for damages in their official capacity are not persons for purposes of the suit because they assume the identity of the government that employs them. By contrast, officers sued in their personal capacity come to court as individuals... the Eleventh Amendment does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983." *Hafer v. Melo,* 502 U.S. 21, 27, 31 (1991) (citations and internal quotations omitted).

4   Notwithstanding Dawkins' failure to make clear his intention to state a claim against Trooper Irwin individually, Defendants' memorandum of law acknowledges a cause of action against Trooper Irwin in his individual capacity. Def.'s Mem. at 4.

5   For the purposes of discussing qualified immunity I will read defendants' answer liberally. However, it is not clear from defendants' answer that they have preserved the right to raise a qualified immunity defense. If leave to amend the answer is requested, it might well be granted. *See, Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir. 1984).

6   In his complaint, Dawkins alleges violations to his Fourth, Sixth, Eighth, and Fourteenth Amendment Rights. Because defendants focus their motion for summary judgment on their affirmative defenses, I do not *sua sponte* consider the merits of Dawkins' claims. However, I note that, "an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth and Fourteenth Amendments." *U.S. v. Scopo,* 19 F.3d 777, 781 (2d Cir. 1994) (quoting *U.S. v. Hassan El,* 5 F.3d 726, 729 (4th Cir.1993). Accordingly, Trooper Irwin's stop of Dawkins, "must be justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." Id. (citations omitted). Probable cause exist when the police reasonably believe that "an offense has been or is being committed." Id. (citing *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1077 (1988). "When an officer observes a traffic offense--however minor--he has probable cause to stop the driver of the vehicle." Id. at 782 (quoting *United States v. Cummins,* 920 F.2d 498, 500 (8th Cir.1990)).

7   In order to prevail on a qualified immunity defense, the defendant must show either (1) "it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution"; (2) "it was not clear at the time of the acts at issue that an exception did not permit those acts"; or (3) "it was objectively reasonable for [Trooper Irwin] to believe that his acts did not violate [Dawkins] rights. *Robison,* 821 F.2d at 920-21.

**Dawkins v. State, Not Reported in F.Supp. (1996)**

1996 WL 156764

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

⚑ KeyCite Yellow Flag - Negative Treatment
Disagreed With by Jamison v. Fischer, S.D.N.Y., September 27, 2012

2011 WL 1842294
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Felix DELGADO, Plaintiff,
v.
Norman R. BEZIO et al., Defendants.

No. 09 Civ. 6899(LTS).
|
May 9, 2011.

### MEMORANDUM ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Felix Delgado ("Delgado" or "Plaintiff"), proceeding *pro se,* asserts he was deprived of due process of the law when he was tried and adjudged guilty in a prison disciplinary hearing for attempting to acquire a parole officer's home address. He alleges, among other things, that he was given insufficient notice of the critical facts of the accusation against him, was found guilty without sufficient evidentiary support and was not informed or evidence the hearing officer relied upon in reaching his conclusion. Delgado further alleges tna he was held in special housing unit confinement for 125 days in conditions that constituted a deprivation of liberty and cruel and unusual punishment.

Delgado filed these allegations in an Amended Complaint made pursuant to 42 U.S.C. § 1983 against the Director of Special Housing and Inmate Disciplinary Program for the New York State Department of Correctional Services, Norman R. Bezio ("Bezio"); Acting Director of Special Housing and Inmate Disciplinary Program, Albert Prack ("Prack"); Superintendent of Otisville Correctional Facility, Catherine Cook ("Cook"); Deputy Superintendent of Administration of Otisville Correctional Facility, Steven Brandow ("Brandow"); Captain for Otisville Correctional Facility, Charles Weeden ("Weeden"); Sergeant at Otisville Correctional Facility, Charles Howerter ("Howerter"); and Inmate Records Coordinator I at Otisville Correctional

Facility, Joan M. Pauley ("Pauley" and, collectively, "Defendants") in their official and individual capacities.

Defendants filed the instant motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the Plaintiff has not opposed the motion. This Court herein reviews the merits of the motion to determine whether the movants have carried their burden. *See McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal.") The Court has considered carefully the parties' submissions and, for the following reasons, the Defendants' motion is granted in part and denied in part.

### BACKGROUND

The following facts are drawn from the Amended Complaint unless otherwise indicated. [1] On October 24, 2007, Delgado was moved from the general prison population into the Special Housing Unit ("SHU") and given notice that he would be tried in a Tier III disciplinary hearing. The Inmate Misbehavior Report, which constituted Delgado's notice of the charge against him, read in pertinent part, as follows:

2) Location of Incident[:] Bld. 17 Hearing Room. Incident Date[:] 10/22/07. Incident Time[:] Approx 6:15 p.m.

3) Rule Violation(s) [:] 113.26 Inmates shall not solicit personal identifying information of department employees.

4) Description of Incident[:] On above date and time I Sgt. Howerter recieved [sic] confidential information that inmate Delgado 93A0549 has been attempting to acquire the home address of SR. Parole Officer Cassel.

**\*2** (Compl.Ex.I.) The date and time written in section 2 as the "Incident Date" and "Incident Time" are the only indications of date and time found in the report. The language in section 4 indicates that the date and time listed refer to the date and time when Howerter interviewed Foley and not, in fact, the date of the alleged misconduct-that is, they do not refer to the date

2011 WL 1842294

and time when Delgado is alleged to have violated rule 113.26 by attempting to acquire Parole Officer Cassel's home address. The Inmate Misbehavior Report was signed by defendants Howerter and Weeden. (*Id.*)

Delgado's prison disciplinary hearing was held on October 26 and November 2, 2007. Delgado selected Counselor Candelaria "to assist him with gathering evidence and information for his defense" prior to the hearing. (Am.Compl.¶ 29.) At the hearing, Delgado denied the charged behavior, arguing that it would not have been in his interests to jeopardize his parole prospects and that he had no reason to seek his parole officer's home address. Parole officer Cassel testified that Delgado had not spoken with him since approximately June of the prior year. Delgado asked that the attorney who had been handling his parole matters, Cheryl Kates ("Kates"), be permitted to testify, but this request was denied on the grounds that Kates "can provide no relevant testimony related to [the] incident in question." (Compl.Ex. M.) The confidential informant who had accused Plaintiff was an inmate named John Foley. Foley did not testify at the hearing, confidentially or otherwise, and Plaintiff was not informed of Foley's identity until after the hearing. Plaintiff was also not informed that Foley had originally told prison officials that a single, unnamed inmate was trying to acquire parole officer Cassel's address and that, when interviewed by Howerter, Foley said that two inmates, Delgado and someone named Peretti, were both seeking Cassel's address.

Delgado was found guilty and sentenced to six months in SHU with 30 days suspended and "loss of package, loss of commissary, [and] loss of phone" privileges. In rendering this disposition, defendant Brandow, the hearing officer, described the evidence he had relied upon as follows:

> I find you guilty. The reason why I find you guilty, okay, first[ ] let's see, confidential information which was established during the investigation, various documents, listen to me now, related to the confidential investigation, corroborated charges with the misbehavior report. That's why I came to my decision.

(*Id.*) Delgado asked Brandow whether he had "conducted a[n] independent assessment of this confidential source or whoever it was that provided confidential information." (Compl. Ex. L p14.) Brandow responded that he had "reviewed all the documents and came to a conclusion from [Delgado's] testimony, from the confidential informant's testimony, and the confidential informant's to-froms." (*Id.* p15.) Delgado was given a copy of the hearing disposition on November 2, 2007. Under the heading "Statement of Evidence Relied Upon," it stated in its entirety:

> **\*3** [The] evidence relied upon was confidential information which was established during an investigation. Various documents relating to the confidential investigation corroborate charges within the misbehavior report written by Sgt. Howerter.

(Compl.Ex.P–1.) Under the heading "Reasons for Disposition," it stated in its entirety:

> This disposition is intended to dissuade this inmate for [sic] acting in this manner in the future and to punish him for this unacceptable behavior. This type of behavior will not be tolerated and this disposition should serve as a future deterrent to inmate population.

(*Id.*)

For six weeks following the entry of disposition, Kates attempted to get a copy of the record of the disciplinary hearing and to have Delgado's SHU sentence reversed or reduced. After receiving the hearing record, she submitted a 23–page legal memorandum on Delgado's behalf, citing to the hearing transcript and applicable law, dated December 11, 2007. The sentence was summarily affirmed by defendant Cook on November 23, 2007, by defendant Prack on December 14, 2007, and by defendant Bezio

on January 28, 2008. Delgado was released from SHU in February 2008.

*Conditions of Delgado's Confinement*
Delgado served 125 days at the Southport Correctional Facility, a maximum security facility exclusively for SHU inmates. In his Complaint, Delgado alleges he was "stripped of all personal property, including nutritional foods, cosmetics, and clothing, as well as blankets to keep warm." During the "severe winter season," he was deprived of warm clothing and personal blankets; heat in his cell was kept at a minimum, and at night officers would open the windows, which inmates were unable to close. On most days, Delgado was locked in his cell 23 of the 24 hours and was given one hour to exercise in a steel metal cage. He was escorted in metal restraints when moving to and from his cell and the exercise cage. He was allowed only two showers and one visit each week. Once a month, he was allowed to receive cosmetics and stationery from the commissary but was denied any other commissary privileges. He was not permitted to receive packages except books by mail. These allegations are taken as true for the purposes of this motion practice. Upon release from SHU, Delgado was transferred to the Wende Correctional Facility, also a maximum security facility.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). In the case of a *pro se* litigant, the Court reads pleadings leniently and construes them to raise "the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). While this guidance applies with particular force when a *pro se* plaintiff's civil rights are at issue, *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), the pleadings still must contain factual allegations that raise a "right to relief above the speculative level." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 555 (2007)).

*Claims Against Defendants in their Official Capacities*
**\*4** A state official is entitled to Eleventh Amendment sovereign immunity to the extent that state official is sued in his or her official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989); *see also Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005). "The Eleventh Amendment, through the doctrine of sovereign immunity, bars suits in federal court against a state absent a waiver of immunity or congressional legislation specifically overriding immunity." *Robinson v. Fischer,* No. 09 Civ. 8882, 2010 WL 5376204 (S.D.N.Y. Dec. 29, 2010) (citing *Pennhurst State Sch. & Hospital v. Halderman,* 465 U.S. 89, 99 (1984)). New York State has not consented to § 1983 suits in federal court. *Mamot v. Board of Regents,* 367 F. App'x 191, 192 (2d Cir.2010). Plaintiff's claims against Defendants in their official capacities will, accordingly, be dismissed on sovereign immunity grounds.

*Fourteenth Amendment Due Process Claim*
Plaintiff asserts he was denied due process because: (1) he did not receive adequate notice of the critical facts of the accusation against him; (2) he was improperly denied the opportunity to call a certain witness; (3) he was founding guilty without a sufficient evidentiary basis and without the facts supporting the finding being disclosed to him; (4) he was denied effective assistance of counsel; and (5) he was denied a copy of his hearing transcript in adequate time to prepare a meaningful appeal.

*Plaintiff's Liberty Interest*
To proceed on a due process claim, a plaintiff must plead sufficient facts to show the deprivation of a liberty interest without due process of law. *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009). "Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id* . (citation omitted). When assessing whether confinement constitutes an "atypical and significant hardship," courts take into account the duration and the conditions of the confinement. *Id.* at 606 (citation omitted). There is no

bright line rule but, generally, a period of confinement in SHU lasting fewer than 101 days does not by itself amount to atypical and significant hardship, while confinement in SHU for 305 days or more has been found to be "atypical and significant without any further aggravating conditions." *Id.* at 606 (citation omitted). A confinement lasting 125 to 288 days is "relatively long and thus necessitat[es] specific articulation of factual finding." *Sims v.. Artuz,* 230 F.3d 14, 23 (2d Cir.2000), cited in *Dawkins,* 646 F.Supp.2d at 606. Delgado was confined in SHU for 125 days, and he has alleged additional facts that could support a finding of atypical and significant hardship. He has therefore pleaded sufficiently that he suffered the deprivation of a protected liberty interest.

*Inadequate Notice*

**\*5** "Due process requires that, in a prison disciplinary hearing resulting in the imposition of solitary confinement, an inmate must be afforded advance written notice of the charges against him ...." *Dawkins v. Gonyea,* 646 F.Supp.2d at 608. Notice should provide enough information to enable the inmate to prepare a defense. *Id.* Further, "notice should include information about the date, place, and manner of the alleged misconduct" where possible. *Id.* An inmate has "a heightened need for adequate notice" when "the majority of the evidence presented against him [i]s not made available to him." *Id.*

In *Dawkins v. Gonyea,* inmate Dawkins was served a misbehavior report identifying him as "one of two inmates responsible for distributing a large amount of heroin throughout the facility." 646 F.Supp.2d at 602. On the misbehavior report, "the incident date and time recorded [we]re the date and time [a] confidential informant conveyed information to the officers, not the date and time Dawkins actually participated in the alleged violations." *Id.* at 608. The report did not identify any "sites within the facility where Dawkins allegedly engaged in the charged conduct." *Id.* at 609. Furthermore, the report failed to specify the particulars of the incident of misbehavior involved and it failed to identify the other inmate involved in the alleged misconduct. *Id.* The court held that "a report lacking one of the categories of information about the violation ... the date and time, the place the inmate is alleged to have participated, the manner in which it was perpetrated, the identity of any other persons involved, and the roles the participants played" might still be sufficient to constitute adequate notice; however, a report

lacking all of these details does not provide the accused enough information to defend himself. *Id.*

In the instant case, as in *Dawkins,* the misbehavior report Delgado received disclosed the date, time and place when and where the investigating officer acquired the confidential accusation but lacked the more critical information of the date, time and place of the alleged misconduct. The report provided no indication of the circumstances or nature of Delgado's alleged attempt to obtain the address information, and the report did not indicate that the "confidential information" on which it relied came from an informant, let alone that there was a single informant. The pleadings indicate that the confidential informant was concerned for his safety; this concern may have justified Defendants' withholding some information from the Plaintiff but it does not, on the current record, excuse the complete denial of meaningful information that Delgado could have used to prepare a defense. Therefore, the motion to dismiss the due process claim of inadequate notice will be denied.

*Calling Witnesses*

Due process requires that an inmate in a disciplinary hearing be permitted to call witnesses and present evidence in his defense. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citations omitted). This right, however, is "subject to the mutual accommodation between institutional needs and objectives and the provisions of the Constitution...." *Id.* (citation and internal quotation marks omitted). A prisoner's right to call witnesses may be denied if granting the request would be "unduly hazardous to institutional safety or correctional goals" or the proposed testimony would be irrelevant or unnecessary. *Id.* "The burden is ... upon the official to prove the rationality of the position." *Id.* (citation omitted). Here, Delgado sought to call Kates, the lawyer who had been handling his parole application. Hearing officer Brandow denied this request because he concluded that Kates could provide "no relevant testimony related to [the] incident in question." Brandow did not explain the basis for this conclusion. At this stage, the Court need not, and does not, make a finding on whether Kates' testimony would have been relevant, but the facts alleged in the Complaint support a plausible inference that the testimony would have been highly relevant to questions of Delgado's motive and the credibility of his accuser, given that the substance of the confidential informant's accusation was that Delgado

requested the address in order to obtain a document relevant to his parole effort and Kates was the attorney who was responsible for communicating with that parole officer on Delgado's behalf. The motion to dismiss Delgado's due process claim that he was improperly prohibited from calling Kates as a witness will be denied accordingly.

*The "Some Evidence" Standard and Presentation of Evidence*

**\*6** Due process dictates that a finding of guilt in a prison disciplinary hearing must be supported by "some evidence." *Dawkins v. Gonyea,* 646 F.Supp.2d at 610 (citation omitted). Additionally, "an inmate facing disciplinary proceedings is entitled to know the evidence upon which a disciplinary ruling is based" or, if evidence is withheld, to receive a reasonable explanation as to why it was withheld. *Id.* at 611–12 (citation omitted). "[T]he 'some evidence' standard may be met even if the sole evidence was supplied by a confidential informant, as long as there has been some examination of indicia relevant to the confidential informant's credibility." *Id.* (citation and some internal punctuation omitted). "When sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened." *Id.* (citation omitted).

All of the evidence supporting the charge against Delgado was derived from a single, confidential informant, and the documentation before the Court on this motion practice is ambiguous as to whether the informant ever actually testified before Brandow, the hearing officer. When asked whether he had conducted an assessment of the informant's credibility, Brandow said that he had "conducted an investigation of all the relevant documents" and "reviewed all the documents and came to a conclusion from [Delgado's] testimony, from the confidential informant's testimony, and the confidential informant's to-froms." However, nowhere in the copy of the hearing record that is annexed to the original complaint is there any testimony attributable to the informant. Rather, Brandow's knowledge as to the informant's accusation appears to have come entirely from the report and hearsay testimony of officer Howerter. Further, Brandow's response that he "conducted an investigation" is ambiguous as to whether it refers to the overall investigation into Delgado's guilt or to an assessment specifically of the informant's credibility.

When Brandow rendered his decision, he did not reveal to Delgado what evidence was relied on, stating only that:

> The evidence relied upon was confidential information which was established during an investigation. Various documents relating to the confidential investigation corroborate charges within the misbehavior report written by Sgt. Howerter.

Accordingly, the Court will deny the motion to dismiss Delgado's claim that his due process rights were violated when a decision was rendered against him without a sufficient evidentiary basis and without disclosure of the evidence relied upon.

*Inadequate Assistance of Counsel*

Inmates are not entitled to counsel in prison disciplinary proceedings. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (citation omitted). Delgado's constitutional claim will be dismissed insofar as it is based on inadequate assistance of counsel.

*Production of Hearing Record in Time for Administrative Appeal*

**\*7** It is well established that an inmate does not have a constitutional due process right to receive a transcript of his disciplinary hearing. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) (citations omitted). Accordingly, Petitioner's due process claim will be dismissed insofar as it is premised on his lawyer receiving a transcript only after his administrative appeal was filed. Because defendant Pauley's only alleged misconduct is failing to promptly produce the hearing record, she will be dismissed from this suit.

*Eighth Amendment Claim*

"Restraints on an inmate do not violate the [Eighth] amendment unless they are totally without penological justification, grossly disproportionate, or involve the

unnecessary and wanton infliction of pain." *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (citation and internal punctuation omitted). To establish an Eighth Amendment violation, "an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety ." *Id.* at 751.

Delgado alleges he was "stripped of all personal property, including nutritional foods ... and clothing." To the extent this allegation can be understood to mean that Plaintiff had no nutritional food and no clothing for 125 days, the Court finds it implausible without more detailed allegations demonstrating the factual basis of the claim. The Court construes the allegation, instead, to mean that, although the Plaintiff was given *prison-issued* clothing, he could not keep any *personal* clothing, and that although he received *prison-provided* food, he was not allowed to obtain or possess *additional* food that he considered to be more nutritious. So construed, this allegation does not state a plausible claim that Plaintiff was denied the "minimal civilized measure of life's necessities"—the basic necessities of food and clothing having been provided by the prison.

Plaintiff also alleges that during the winter months, he was made to sleep with the windows open and the heat at a minimum and that he was without his "personal blankets." Again, the Court construes the word "personal" to mean "owned by the inmate" and in contrast to "prison-issued." As such, the Court does not read the Amended Complaint to allege that Plaintiff was completely deprived of bedding but, rather, that he was deprived of additional blankets that he may have purchased or received from outside the prison. Plaintiff concedes that the heat was kept on, albeit at a minimal level. Sleeping with the windows open and heat low during the winter in New York might constitute an atypical and significant hardship, as in *Corselli v. Coughlin,* where an inmate alleged that prison officials had subjected him to cruel and unusual punishment when they forced him to sleep in solitary confinement with the windows open in sub-zero temperatures that caused ice to form in the toilet bowl and the inmate to became ill for over a month with a cold, fever and cramps. 842 F.2d 23, 27 (2d Cir.1988). In light of these allegations, the Second Circuit reversed a district court's grant of summary judgment against

the inmate, holding that the inmate had stated a claim sufficiently to be resolved by the trier of fact. *Id.*

**\*8** However, incarceration with bedding of some sort, the heat kept on and no allegation of illness or sub-zero temperatures inside the cell does not constitute a denial of the minimal civilized measure of life's necessities. Petitioner's other allegations of hardship are all less severe than his allegations of being denied sufficient food, clothing and heat during the winter, and they do not rise to the level of depicting cruel and unusual treatment either. Therefore, Petitioner's claim that he was subjected to cruel and unusual punishment will be dismissed.

*Personal Involvement*

As explained above, the Court will dismiss Delgado's Eighth Amendment claim and his due process claims premised upon ineffective assistance of counsel and untimely issuance of the hearing record, and all claims asserted against the Defendants in their official capacities. Delgado's other personal-capacity claims may proceed against only those Defendants who are alleged to have been personally involved. "Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation." *Prescott v. Riker Island Med. Staff,* No. 09 Civ. 255, 2011 WL 1435218, at \*4 (S.D.N.Y. Apr. 12, 2011) (citation omitted). Defendants do not dispute that Howerter, Weeden and Brandow were personally involved in the conduct giving rise to Delgado's claims, so the remaining claims against them will be permitted to go forward.

Defendants Prack, Bezio and Cook are each alleged to have affirmed, or declined to reconsider, the disposition of Delgado's disciplinary hearing. Until recently, it was clear that the personal involvement of a supervisor was to be evaluated in this Circuit by reference to the five-category test articulated in *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). *See Qasem v. Toro,* 737 F.Supp.2d 147, 151 (S.D.N.Y.2010). A supervisor's personal involvement could be demonstrated by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal,

failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873. The continuing vitality of this test has been called into question in light of the Supreme Court's holding in *Ashcroft v. Iqbal* that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. 1937, 1948 (2009); *see also Qasem,* 737 F.Supp.2d at 151.

**\*9** The Second Circuit has not yet addressed the impact, if any, of *Iqbal* on the *Colon* standard. Courts in this district have reached contrary conclusions, holding in some cases that only the first and third *Colon* categories remain viable bases for liability, *see, e.g., Bellamy v. Mt. Vernon Hosp.,* 07 civ 1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) and, in other cases, that "the personal involvement required to overcome a 12(b)(6) motion varies depending on the constitutional provision alleged to have been violated" such that the applicability of each Colon category will depend on the nature of the violation alleged, *see Qasem,* 737 F.Supp.2d at 151–52; *see also D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 346–47 (S.D.N.Y.2010).

This Court agrees with the latter line of reasoning. The *Iqbal* Court specifically observed that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," *Iqbal,* 129 S.Ct. at 1948, and that a *Bivens* action is the "federal analog to suits brought against state officials under ... 42 U.S.C. § 1983." *Id.* (citation omitted). "It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected [in

*Iqbal* ] the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009). Thus, where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply, insofar as it is "consistent with the particular constitutional provision alleged to have been violated." *Qasem,* 737 F.Supp.2d at 151–52. Here, Plaintiff does not assert an intentional discrimination claim of the sort that was at issue in *Iqbal,* and intent is not an element of his due process claims.

Plaintiff's due process claims against Prack, Bezio and Cook fall into the second *Colon* category of personal involvement—namely, that "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon,* 58 F.3d at 873. The *Iqbal* decision would clearly preclude liability of a supervisor on the basis of mere knowledge that a subordinate had rendered a decision that was intentionally discriminatory, and would likely preclude as well a claim based on affirmance of such a decision (at least absent a proffer that the affirmance was intentionally discriminatory). However, it cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff s due process rights, thus continuing a deprivation of liberty without due process of law. Plaintiff claims that he was denied due process by reason of the withholding of information on confidentiality grounds at his disciplinary hearing. He also alleges that he appealed to, or sought reconsideration from, Defendants Prack, Bezio and Cook. In his appeal and reconsideration-request papers, his attorney identified the withholding of information as grounds for the infirmity of the decision and argued that the reliance on confidential information denied Plaintiff the ability to defend himself at the hearing. (Compl. Ex R, Nov. 15, 2007, appeal letter; Compl. Ex. V, Dec. 11, 2007, appeal letter.) Defendants Prack, Bezio and Cook each denied an appeal or request for reconsideration. Read in the light most favorable to Plaintiff his Complaint and supporting documents allege sufficiently the personal involvement of Prack, Bezio and Cook, as they are alleged to have had the power, and to have refused, to vacate a penalty they knew had been imposed in violation of Plaintiff's due process rights, thus violating Plaintiff's constitutional rights by knowingly continuing

a deprivation of liberty without due process of law. Accordingly, the motion will be denied to the extent it seeks dismissal of Plaintiff s due process claims against Prack, Bezio and Cook.

*Qualified Immunity*

**\*10** Government officials performing discretionary functions generally enjoy qualified immunity from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 612–13 (S.D.N.Y.2009) (citation omitted). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Johnson v. Goord,* 487 F.Supp.2d 377, 398 (S.D.N.Y.2007) (citation omitted). Furthermore, prison officials, including hearing officers, are "charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989).

The right to adequate notice of a prison disciplinary hearing has been clearly established by both the Supreme Court and the Second Circuit. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 613 (2009) (citing *Wolff v. McDonnell,* 418 U.S. 539, 555–56 (1974), and *Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004)). The right to call witnesses at such a hearing has also been clearly established by both courts, subject to certain safeguards, which are also clearly established. *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). The Second Circuit has also clearly established that "an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information" and that an inmate has a "due process right to know the evidence upon which a discipline ruling is based." *Id.* at 614 (citing *Sira,* 380 F.3d at 77, 74). Accordingly, there is an insufficient basis for the Court to find at this stage that any Defendants are entitled to qualified immunity. As this matter proceeds, Defendants may, of course, proffer evidence and reassert their qualified immunity defense.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted with regard to all claims brought against Defendants in their official capacities, the Eighth Amendment claim and the due process claims premised on ineffective assistance of counsel and the untimely issuance of a hearing record. The motion to dismiss is denied in all other respects. This Memorandum Order resolves docket entry number 15. This case remains referred to Magistrate Judge Katz for general pretrial management.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1842294

---

Footnotes

1    Plaintiff's Amended Complaint references exhibits attached to the original Complaint. All exhibits referenced by the Amended Complaint are considered to be incorporated therein.

---

2013 WL 5951866
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Frederick DIAZ, Plaintiff,
v.
Robert BURNS, Correction Officer; John
F. Moran, Correction Officer; Frederick W.
Kintzel, Sergeant; T. Zerniak, Lieutenant;
Robert A. Kirkpatrick, Superintendent; Norman
R. Bezio, Director, Special Housing; Brian
Fischer, Commissioner, NYSDOCS, Defendants.

No. 6:10–CV–6595(MAT).
|
Nov. 6, 2013.

**Attorneys and Law Firms**

Thomas D. Terrizzi, Law Office of Tom Terrizzi, Buffalo, NY, for Plaintiff.

Benjamin A. Bruce, New York State Office of the Attorney General, Rochester, NY, for Defendants.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Introduction**

 *1  Proceeding *pro se,* plaintiff Frederick Diaz ("Plaintiff" or "Diaz"), an inmate in custody of the New York State Department of Corrections and Community ("DOCCS"), instituted the present action pursuant to 42 U.S.C. § 1983 against defendants, who are employees of DOCCS. Defendants have filed a motion to dismiss (Dkt # 10) the complaint, which Plaintiff has opposed (Dkt # 14).

On February 8, 2013, Thomas D. Terrizzi, Esq. filed a Notice of Appearance (Dkt # 16) in this matter, but he has not filed any pleadings in opposition to Defendants' Motion to Dismiss.

This matter was transferred to the undersigned on October 30, 2013 (Dkt # 17).

**II. Factual Background**

On September 14, 2007, Plaintiff was transferred to Wende Correctional Facility ("Wende"). *See* Complaint ("Compl."), ¶ 17. While at Wende, Plaintiff experienced numerous problems, about which he complained via letters to Commissioner Fischer and grievances to Superintendent Kirkpatrick. *Id.,* ¶¶ 24–25.

On April 7, 2008, Plaintiff was involved in a use of force ("UOF") incident with Correction Officer ("CO") Burns, CO Moran and Sergeant ("Sgt.") Kintzel. *Id.,* ¶¶ 30–35. As a result of the UOF incident, Plaintiff was charged in a misbehavior report with assaulting staff, engaging in violent conduct, interfering with an employee, and disturbing the order of the facility. A tier III disciplinary hearing was held, after which Plaintiff was found guilty of all charges. *Id.,* ¶ 43. The adverse finding was administratively reversed by Director of Special Housing ("DSH") Bezio, who ordered a new hearing. *Id.,* ¶¶ 45, 58, 59.

The re-hearing was conducted by Lieutenant ("Lt.") Zerniak, who found Plaintiff guilty of all charges. DSH Bezio upheld Lt. Zerniak's finding, and Plaintiff instituted a proceeding pursuant to Article 78 of New York's Civil Practice Law and Rules. Compl., ¶¶ 62, 72, 75.

The Appellate Division, Third Department, of New York State Supreme Court ("the Third Department") found that Plaintiff had been denied both his statutory and constitutional right to call witnesses. In particular, the Third Department noted, Plaintiff attempted to call, among others, an investigator from the Inspector General's office and a psychologist who examined Plaintiff shortly after the incident. Plaintiff's defense at both hearings was that, contrary to the accusation that he assaulted the correction officer without provocation, he actually was attacked by the officer in retaliation for his work with the grievance office. *Diaz v. Fischer,* 70 A.D.3d 1082, 1082, 894 N.Y.S.2d 218 (3d Dep't 2010). At the hearing, Plaintiff explained that the investigator commenced an investigation of the incident shortly after it occurred and, in addition to questioning those witnesses who testified at the first hearing, was planning to interview inmate witnesses who had refused to testify due to fear of retaliation. *Id.* at 1083, 894 N.Y.S.2d 218. However, the hearing officer (Lt.Zernkiak) denied the investigator as a witness because he was "not in the area of the alleged incident." *Id.* As the Third Department

noted, "investigators from the Inspector General's office routinely testify in prison disciplinary hearings, as do other witnesses who have gained information through investigation, rather than personal observation[.]" *Id.* n. 1 (internal and other citations omitted).

**\*2** With regard to the psychologist whom Plaintiff attempted to call as a witness, Lt. Zerniak denied the request, notwithstanding the fact DSH Bezio had administratively reversed the first hearing because "the record failed to indicate how [Plaintiff]'s mental health status was considered." *Diaz,* 70 A.D.3d at 1083, 894 N.Y.S.2d 218.

The Third Department found that "[i]nasmuch as these witnesses may have provided testimony that was material, their absence substantially prejudiced [Plaintiff]'s ability to present his defense ...." *Id.* (citations omitted). Because the "the deprivation constituted a violation of [Plaintiff]'s constitutional right to call witnesses, rather than merely his statutory right," the appropriate remedy was expungement. *Id.* (citations omitted). Accordingly, the Third Department annulled the disciplinary determination and directed DOCCS to expunge all references to the matter from Plaintiff's institutional record. *Id.*

Plaintiff's first claim in this lawsuit, "Violation of Equal Protection", alleges that Commissioner Fischer and Superintendent Kirkpatrick are liable for all of the problems he has experienced at Wende. Plaintiff asserts a "class of one" theory, alleging that the was subjected to retaliation and discrimination based solely on his hisotry of filing grievances and complaints against DOCCS' staff. Compl., ¶ 26.

In support of his second claim, "Assault" (based on the UOF involving CO Burns, CO Moran, and Sgt. Kintzel), he alleges that Superintendent Kirkpatrick is liable for "negligent supervision and shoddy investigations" into the UOF incident. *Id.,* ¶ 41, 894 N.Y.S.2d 218. Plaintiff also includes allegations that CO Burns, CO Moran, and Sgt. Kintzel attacked him "maliciously and sadistically for the very purpose of causing harm" and "in order to have Plaintiff removed from the Grievance Office...." *Id.,* ¶ 32, 894 N.Y.S.2d 218. Plaintiff asserts that the as a result of being "sucker-punched" by CO Burns in his right eye area and on other parts of his body, he "suffered a large contusion and swelling of his right eye, numerous

abrasions throughout his body, and severe neck and head pain[,]" with resultant vision problems and headaches. *Id.,* ¶ 37, 894 N.Y.S.2d 218.

Plaintiff's third claim, "Filing of False Misbehavior Report and Denial of Due Process", names CO Burns, CO Moran, and Sgt. Kintzel. Plaintiff accuses them of filing a false misbehavior report concerning the UOF incident. *Id.,* ¶ 43, 894 N.Y.S.2d 218. Plaintiff also implicates Lt. Zerniak for finding him guilty at the second administrative hearing and DSH Bezio for failing to administratively reverse the second hearing. *Id.,* ¶ 76, 894 N.Y.S.2d 218.

Defendants have moved to dismiss the first claim based upon a violation of the equal protection clause. In addition, Defendants have moved to dismiss all claims against Commissioner Fischer and Superintendent Kirkpatrick on the basis that there is insufficient personal involvement by these individuals. Defendants have also moved to dismiss the claim based on the filing of a false misbehavior report on the ground that it fails to state a constitutional claim.

**\*3** Defendants have not moved against the allegations that CO Burns and CO Moran utilized excessive force in violation of the Eighth Amendment and that Sgt. Kintzel failed to protect Plaintiff from the attack by CO Burns and CO Moran in violation of the Eighth Amendment. Likewise, Defendants have not moved against the allegations that Lt. Zerniak denied Plaintiff's constitutional rights at the second disciplinary hearing, and that DSH Bezio failed to remedy on appeal the constitutional errors committed by Lt. Zerniak.

Finally, Defendants have included in their memorandum of law some case law regarding qualified immunity, but they have not made any actual argument that they are entitled to qualified immunity.

For the reasons discussed below, Defendants' partial motion to dismiss is granted.

### III. General Legal Principles

#### A. Motions to Dismiss for Failure to State a Claim
Rule 12 (b)(6) allows dismissal of complaints based upon the plaintiff's failure "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In order "[t]o survive a motion to dismiss under [Rule 12(b)(6) ], a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In assessing a claim's plausibility, the district court must "assume [the] veracity" of all well-pleaded factual allegations contained in the complaint, *Iqbal,* 556 U.S. at 679, and draw every reasonable inference in favor of the plaintiff, *Zinerman v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). However, the plaintiff's allegations must consist of more than mere labels or a "formulaic recitation of the elements of a cause of action," *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555), and bare legal conclusions are "not entitled to the assumption of truth." *Id.* at 679.

### B. Construction of *Pro Se* Pleadings

The Supreme Court has noted that "[a] document filed *pro se* is to be liberally construed,' and must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v.Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)); see *also Bertin v. United States,* 478 F.3d 489, 491 (2d Cir.2007). Because Plaintiff is acting pro se, the Court will construe his submissions liberally, "to raise the strongest arguments they suggest." *Bertin,* 478 F.3d at 489.

### IV. Discussion

#### A. Violation of the Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment ensures that similarly situated persons are treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). This right to be protected from "invidious discrimination" extends to incarcerated persons. *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (citing *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968)). The guarantee of the Equal Protection Clause safeguards not only groups of individuals, but also individuals who constitute a "class of one." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (*per curiam* ) (*"Olech"* ). In *Olech,* the Supreme Court held that where the plaintiff is not a member of a suspect or protected class, he still may assert an equal protection claim is based on a "class

of one" theory, which requires the plaintiff to show that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* at 564. Here, Diaz claims that he is a "class of one" because he was "singled out for retaliation/discrimination for no reason except for his history of filing grievances/complaints, his lawsuit against Attica, and for having an assault on staff report reversed, and thus [he] was uniquely situated compared to other inmates at Wende." Compl., ¶ 26.

**\*4** Plaintiff has not come close to sufficiently alleging facts that could be used to infer an allegation that similarly situated prisoners were treated more favorably than he was. Plaintiff fails to allege the existence of similarly situated individuals or that he was treated differently from those individuals. Basically, he is alleging that every other inmate at Wende was treated more favorably than he. Plaintiff has not adequately identified, beyond a speculative level, other individuals with whom he can be compared for equal protection purposes. *Cf. Garcia v. Smith,* Civil No. 10cv01188 AJB(RBB), 2011 WL 7500435, at *8–9 (S.D.Cal. Dec. 13, 2011) (finding that plaintiff-inmate, who alleged a "class of one" equal protection claim and asserted disparate treatment based on his propensity for grievance-filing, "adequately identified, beyond a speculative level, other individuals with whom he [could] be compared", where he identified approximately ten specific inmates, similarly situated to him, who received more favorable treatment). Accordingly, the Court finds that Diaz has failed to state a claim for relief under the Equal Protection Clause. The First Claim is dismissed with prejudice.

#### B. Second Claim: "Retaliatory Assault by Staff Due to Plaintiff Having Been Elected as an Inmate Grievance Representative"

The "retaliatory assault" to which Plaintiff refers is the April 7, 2008 UOF in which he claims he was assaulted by CO Moran and CO Burns, and that Sgt. Kintzel failed to interrupt the attack while it was occurring. Plaintiff alleges that Superintendent Kirkpatrick is liable for the April 7, 2008 UOF based on his "negligent supervision [of the officers involved in the UOF] ...." Compl., ¶ 41. Plaintiff makes similar allegations against Commissioner Fischer. *E.g., id.,* ¶ 25. Defendants have moved to dismiss the claims against the supervisory defendants based on lack of personal involvement, but it does not appear that

they have moved to dismiss this claim on behalf of CO Burns, CO Moran, and Sgt. Kintzel.

Damages under 42 U.S.C. § 1983 are appropriate only if a defendant was personally involved in the alleged constitutional violation. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation and internal quotation marks omitted). In general, the plaintiff must demonstrate that there is a "tangible connection between the alleged unlawful conduct and the defendant." *Balkum v. Sawyer,* No. 6:06–cv–1467, 2011 WL 5041206, at *4 (N.D.N.Y.Oct.21, 2011) (citing *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986)). Where, as here, the defendants are supervisory officials, the doctrine of respondeat superior is inadequate to establish the requisite personal involvement. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

Five categories of personal involvement were articulated by the Second Circuit in *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995), which stated that personal involvement may be based on allegations that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Id.* (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986). [1]

**\*5** As an initial matter, the allegations in the Complaint do not indicate that Superintendent Kirkpatrick or Commissioner Fischer were directly involved in the constitutional violations.

Diaz's allegation that Commissioner Fischer and Superintendent Kirkpatrick were "negligent" is insufficient to state the required degree of personal involvement under th *Bass,* 790 F.2d at 262 (citing *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986)); *see also Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) ("An isolated omission to act by a

state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him.") (quotation omitted).

Plaintiff also appears to seek to confer liability under the second, third, and/or fifth *Colon* categories of liability. In particular, Plaintiff asserts that "[d]espite his detailed grievances[,] which continued to put defendant Kirkpatrick on notice that Plaintiff's safety was at risk, Kirkpatrick did nothing to end any of the retaliation Plaintiff was being subjected to." *Id.,* ¶ 24. He alleges that Superintendent Kirkpatrick's removal of Plaintiff from his position as a Grievance Clerk constituted a "clear message to the staff that they were free to retaliate against Plaintiff" and "subsequently led to Plaintiff being assaulted by the staff after Plaintiff was elected as an Inmate Grievance Representative...." *Id.* These allegations are far too vague and speculative to state the requisite level of personal involvement in the UOF by Superintendent Kirkpatrick. Essentially Plaintiff is asking the Court to hold that the filing of grievances is sufficient to put a supervisory official on notice that the grievant will be subjected to unconstitutional conduct at the hands of his or her staff members.

The Court agrees with Defendants that Plaintiff has not sufficiently alleged personal involvement by Commissioner Fischer and Superintendent Kirkpatrick in any of the asserted constitutional violations. Accordingly, the Second Claim, as against Commissioner Fischer and Superintendent Kirkpatrick, is dismissed with prejudice, and these two defendants are terminated from this lawsuit.

### C. Third Claim: "Filing of False Misbehavior Report and Denial of Due Process"

#### 1. Filing of a False Misbehavior Report

The Second Circuit has held that "a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988). Rather, an inmate's constitutional right to due process requires that, before prison officials mete out discipline based on a misbehavior report, they must conduct a proper hearing. "In other words, the failure to conduct a constitutionally

adequate disciplinary hearing may give rise to a Section 1983 action, but the mere filing of a false misbehavior report against an inmate does not." *Greaves v. State of N.Y.,* 958 F.Supp. 142, 144 (S.D.N.Y.1997) (citing *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.") (citing *Sommer v. Dixon,* 709 F.2d 173, 174–75 (2d Cir.), *cert. denied,* 464 U.S. 857, 104 S.Ct. 177, 78 L.Ed.2d 158 (1983)).

**\*6** Accordingly, the Third Claim, to the extent that is based on the mere filing of the allegedly false misbehavior report, is dismissed against CO Burns, CO Moran, and Sgt. Kintzel, is dismissed for failure to state a claim.

### 2. Denial of Due Process at Disciplinary Hearings

Plaintiff alleges that he was denied due process by an individual whom he identifies only as "Hearing Officer" in the Complaint. *See* Compl., pp. 8–11. He alleges that Lt. Zerniak, who conducted the re-hearing conducted regarding the April 7, 2008 misbehavior report, also committed constitutional violations. Plaintiff asserts that DSH Bezio is liable for affirming Lt. Zerniak's adverse disciplinary ruling on administrative appeal. Defendants have not moved to dismiss the due process claims asserted under the "Third Claim" heading in the Complaint.

### 3. The Unnamed "Hearing Officer"

In his Complaint, Plaintiff mentions an unnamed defendant, "Hearing Officer", in the section setting forth the allegations in support of his Third Claim. However, he does not list the unnamed Hearing Officer under the section setting forth the Parties to this action. It is therefore unclear whether Plaintiff intends to pursue recovery against the Hearing Officer who conducted the initial disciplinary hearing based upon the April 7, 2008 misbehavior report.

In addition to not being identified, this individual, to date, has not been personally served with process. F.R.C.P. 4(m) provides that "[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time ." FED. R. CIV. P. 4(m). If Plaintiff wishes to include this Hearing Officer in the instant lawsuit, he must effectuate service

against him within thirty (30) days of the date of this Decision and Order.

### IV. Conclusion

For all the foregoing reasons, Defendant's motion to dismiss (Dkt # 10) is granted, and the following claims are dismissed with prejudice: (1) the First Claim, which alleges a violation of the Equal Protection Clause, in its entirety; (2) the Second Claim, to the extent that it alleges failure to protect/failure to supervise by Commissioner Fischer and Superintendent Kirkpatrick in connection with the April 7, 2008 assault; and (3) the Third Claim, to the extent it alleges constitutional injury based upon the filing of a false misbehavior report by CO Burns, CO Moran, and Sgt. Kintzel.

Defendants have not moved against the following claims, which may proceed at this time: (1) the Second Claim, which asserts claims of retaliation under the First Amendment and an excessive use of force under the Eighth Amendment, and which seeks to hold CO Burns and CO Moran directly liable for the April 7, 2008 assault; (2) the Second Claim, which alleges that Sgt. Kintzel failed to intervene to stop the retaliatory assault by his subordinates, CO Burns and CO Moran, on April 7, 2008; (3) the Third Claim, to the extent it alleges that Lt. Zerniak committed due process violations at the re-hearing and that DSH Bezio failed to remedy these errors on administrative appeal.

**\*7** The following defendants are terminated with prejudice from this action based upon the lack of sufficient personal involvement: Superintendent Kirkpatrick and Commissioner Fischer.

The following Defendants remain in this action: CO Burns, CO Moran, Sgt. Kintzel, Lt. Zerniak, and DSH Bezio. These Defendants are directed to file a responsive pleading to the Complaint, in the form of an Answer, a Motion to Dismiss pursuant to F.R.C.P. 12(b) (6), or a Motion for Judgment on the Pleadings pursuant to F.R.C.P. 12(c) within thirty (30) days of the date of this Decision and Order.

If Plaintiff wishes to include the unnamed Hearing Officer in the instant lawsuit, he must effectuate service against this individual within thirty (30) days of the date of this Decision and Order. If Plaintiff does not effectuate service within the required time, the unnamed Hearing Officer

will be terminated from this lawsuit. If Plaintiff does serve the unnamed Hearing Officer with the Complaint, this individual will have thirty (30) days from the date of service in which to file a responsive pleading, in the form of an Answer, a Motion to Dismiss pursuant to F.R.C.P. 12(b)(6), or a Motion for Judgment on the Pleadings pursuant to F.R.C.P. 12(c).

**ALL OF THE ABOVE IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5951866

Footnotes

1    District courts in this Circuit are divided as which of the *Colon* "species" of personal involvement have survived the Supreme Court's decisions in *Iqbal,* 556 U.S., *supra,* and *Twombly,* 550 U.S., *supra. Contrast Plunkett v. City of N.Y.,* No. 10–CV–6778 (CM), 2011 WL 4000985 (S.D.N.Y. Sept.2, 2011), *with Bellamy v. Mount Vernon Hosp.,* 07–CV–1801 (SAS), 2009 WL 1835939 (S.D.N.Y. June 26, 2009). The Court need not enter the debate at this time since Plaintiff's allegations do not suffice under any of the five *Colon* categories.

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5308152
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald M. DOVE, Plaintiff,
v.
CITY OF BINGHAMTON, Binghamton
Police Department, and Police Officer
John Doe, County of Broome, Defendants.

No. 3:14–CV–627 (MAD/DEP).
|
Signed Oct. 16, 2014.

**Attorneys and Law Firms**

Donald M. Dove, Elmira, NY, pro se.

None, for Defendants.

**DECISION and ORDER**

MAE A. D'AGOSTINO, District Judge.

**\*1** Plaintiff, a New York State prison inmate, commenced this action pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his civil rights. *See* Dkt. No. 1. Plaintiff's claims center around his arrest in October 2007 and his sentencing as a persistent felony offender in January 2010. *See id.* Plaintiff alleges that he was denied due process and equal protection, and that Defendants' stop and frisk practices were unlawful. *See id.*

In a September 8, 2014 Amended Report and Recommendation, Magistrate Judge Peebles recommended that the Court deny Plaintiff's *in forma pauperis* ("IFP") application because he has accumulated three strikes pursuant to 28 U.S.C. § 1915 prior to the commencement of this action and because Plaintiff failed to allege any facts that would permit the Court to find that he was in imminent danger of serious physical injury at the time he filed suit. *See* Dkt. No. 6 at 5–9. As such, Magistrate Judge Peebles recommended that the Court deny Plaintiff leave to proceed IFP and dismiss this case if Plaintiff fails to pay the $400 filing fee no later than thirty days from the date of any order adopting the recommendation.

In a one page document, Plaintiff states that he objects to the Amended Report and Recommendation. *See* Dkt. No. 7. Specifically, Plaintiff states that he is aware of the three strikes rule and he requests that he be permitted to pay the filing fee in monthly installments as provided for in 28 U.S.C. § 1915(b). *See id.* (citing *Tafari v. Hues,* 473 F.3d 440, 443 (2d Cir.2007)). Further, Plaintiff contends that this matter was filed in May of 2014, before he had three strikes against him. *See id.*

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2007) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N .D.N.Y.2007) (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

**\*2** In the present matter, the Court finds that Magistrate Judge Peebles correctly determined that Plaintiff has three strikes and that he has failed to present facts indicating that he was in imminent danger of serious physical injury. Plaintiff's allegations relate to his arrest in conviction in 2007 and 2008, for which he is still incarcerated.

Further, the Court finds that Plaintiff's objections are without merit. The provision of the Prison Litigation

Reform Act to which Plaintiff cites does not permit him to pay the filing fee in monthly installments. Rather, that provision permits the payments of fees in monthly installments, drawn from a prison account, when the inmate has been granted leave to proceed *in forma pauperis. See* 28 U.S.C. § 1915(b). Further, in *Tafari v. Hues,* 473 F .3d 440, 443 (2d Cir.2007), the Second Circuit held that a dismissal without prejudice for failure to exhaust administrative remedies does not constitute a strike pursuant to 28 U.S.C. § 1915. In the present matter, Magistrate Judge Peebles determined that Plaintiff's three strikes were based on cases filed in 2013, which were dismissed for the following reasons: (1) judicial and prosecutorial immunity; (2) the action was duplicative of a previous case and because the named defendants were entitled to absolute immunity; and (3) precluded on the doctrine of *res judicata. See* Dkt. No. 6 at 5–6 (citing *Dove v. Smith,* No. 13–cv–1411 (N.D.N.Y. filed Nov. 7, 2013); *Dove v. Smith,* No. 13–cv–1315 (N.D.N.Y. filed Oct. 23, 2013); *Dove v. Pesce,* No. 13–cv–1417 (N.D.N.Y. filed Nov. 14, 2013)). Magistrate Judge Peebles correctly determined that these dismissals constituted strikes for purposes of the Prison Litigation Reform Act.

Finally, Plaintiff's argument that he had not yet received three strikes at the time this action was filed is without merit. *Dove v. Smith,* No. 13–cv–1411 (N.D.N.Y. filed Nov. 7, 2013) was dismissed by order of the Court and judgment was entered on April 3, 2014. *Dove v. Smith,* No. 13–cv–1315 (N.D.N.Y. filed Oct. 23, 2013) was dismissed by order of the Court and judgment was entered on January 14, 2014. Lastly, *Dove v. Pesce,* No. 13–cv–1417 (N.D .N.Y. filed Nov. 14, 2013) was dismissed by order of the Court and judgment was entered on April 3, 2014. As such, these actions constitute strikes for purposes of 28 U.S.C. § 1915.

In the alternative, the Court finds that the dismissal in *Dove v. Harder,* No. 9:09–cv–259 (N.D.N.Y. filed Mar. 4, 2009) constitutes a strike as well. Although that case was dismissed through both a summary judgment motion, as well as a motion to dismiss, the Court still made clear that Plaintiff's underlying claims were without merit. The Court found that the complaint was "bereft of facts demonstrating the existence of plausible cruel and unusual punishment, equal protection, procedural due process, and retaliation claims" and recommended that the claims be dismissed without leave to amend. *See Harder,* No. 9:09–cv–259, Dkt. No. 29 at 38–39.

A review of the complaint and documents supporting the motions demonstrate the absolute frivolous nature of Plaintiff's complaint in that action. As such, the Court finds that, although disposition of an action at the summary judgment stage generally does not count as a strike for purposes of section 1915(g), the dismissal in *Harder* falls within the limited exceptions to this general rule. *See Blakely v. Wards,* 738 F.3d 607, 611–12 (4th Cir.2013) (en banc) (holding that, "in keeping with Section 1915(g)'s plain language, we hold that a summary judgment dismissal stating on its face that the dismissed action was frivolous, malicious, or failed to state a claim counts as a strike for purposes of the PLRA's three-strikes provision").

**\*3** Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Peebles Amended Report and Recommendation (Dkt. No. 6) is **ADOPTED in its entirety;** and the Court further

**ORDERS** that Plaintiff's motion for leave to proceed *in forma pauperis* (Dkt. No. 2) is **DENIED;** and the Court further

**ORDERS** that Plaintiff is directed to pay the full filing fee of $400 no later than **thirty (30) days** from the date of this Decision and Order; and the Court further

**ORDERS** that, if Plaintiff fails to pay the full filing fee within thirty (30) days of the date of this Decision and Order, the Clerk of the Court shall enter judgment in Defendants' favor and close this case without further order of this Court; and the Court further

**ORDERS** that the Clerk of the Court shall serve this Decision and Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

*AMENDED REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*Pro se* plaintiff Donald M. Dove, a New York State prison inmate and serial litigant, has commenced this action pursuant to 42 U.S.C. § 1983 alleging that the

defendants violated his civil rights .[1] In his complaint, plaintiff challenges his arrest in October 2007, and his sentencing as a persistent violent felony offender in January 2010, alleging that he was denied due process and equal protection and defendants' stop and frisk practices are unlawful.

Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been forwarded to me for consideration. For the reasons set forth below, I recommend that plaintiff's application for leave to proceed IFP be denied.

## I. *BACKGROUND*

Plaintiff's complaint in this action was filed with the court on May 29, 2014. *See generally* Dkt. No. 1. Plaintiff is a state prison inmate being held at the Elmira Correctional Facility, located in Elmira, New York. *Id.* at 1. Plaintiff alleges that he was arrested in Binghamton, New York, on October 21, 2007, and sentenced on January 19, 2010, as a persistent violent felony offender. *Id.* at 4. In his complaint, plaintiff contends that (1) his Fourteenth Amendment rights were violated by his prosecution for criminal possession of a weapon in the third degree; (2) he was unlawfully stopped based on racial profiling in violation of his rights to due process and equal protection; (3) he was illegally sentenced; and (4) the stop-and frisk practices of the Broome County Police Department that led to his arrest are unconstitutional. *Id* . at 5.

## II. *DISCUSSION*

When a civil action is commenced in a federal district court, the statutory filing fee, set at $400 at the time plaintiff filed this action, must ordinarily be paid. 28 U.S.C. § 1915(a). Although a court is authorized to permit a litigant to proceed IFP if it is determined that he is unable to pay the required filing fee, 28 U.S.C. § 1915(a)(1), section 1915(g) provides that

> **\*4** [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The manifest intent of Congress in enacting this "three strikes" provision was to deter the filing of multiple, frivolous civil rights suits by prison inmates. *Tafari v. Hues,* 473 F.3d 440, 443–44 (2d Cir.2007) (citing *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997)); *accord, Gill v. Pidlychak,* No. 02–CV–1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec. 19, 2006) (Scullin, S.J., *adopting report and recommendation by* Treece, M.J.).[2] The prophylactic effect envisioned under section 1915(g) is accomplished by requiring a prisoner who has accumulated three strikes to engage in the same cost-benefit analysis before filing suit as other civil litigants engage in-that is, the provision forces inmates to assess whether the result sought to be achieved justifies the payment of the filing fee in advance, rather than in installments as provided under 28 U.S.C. § 1915(b). *Tafari,* 473 F.3d at 443.

The Second Circuit has defined a frivolous claim as one that "lacks an arguable basis either in law or in fact." *Tafari,* 473 F.3d at 442 (citing *Neitzke v. Williams,* 490 U.S. 319, 325 (1989)). To determine whether a dismissal satisfies the failure-to-state-a-claim prong of section 1915, courts look to Rule 12(b)(6) of the Federal Rules of Civil Procedure for guidance. *Tafari,* 473 F.3d at 442. The question of whether the dismissal of a prior action constitutes a strike for purposes of section 1915(g) is a matter of statutory interpretation and, as such, presents a question for the court. *Id.*

Based upon a careful review of plaintiff's litigation history, I conclude that, at the time this action was filed, plaintiff had accumulated at least three strikes for purposes of section 1915(g). Plaintiff's first strike occurred in *Dove v. Smith,* No. 13–CV–1411 (N.D.N.Y. filed Nov. 7, 2013), when the action was dismissed on the basis that the named defendants were entitled to judicial and prosecutorial immunity. *Smith,* No. 13–CV–1411, Dkt. Nos. 4, 6. *See Mills v. Fischer,* 645 F.3d 176, 177 (2d Cir.2011) ( "[Section

1915(g) ] does not explicitly categorize as frivolous a claim dismissed by reason of judicial immunity, but we will: Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of 28 U.S.C. § 1915(g).”); *accord, Collazo v. Pagano,* 656 F.3d 131, 134 (2d Cir.2011). Plaintiff accumulated a second strike in *Dove v. Smith,* No. 13–CV1315 (N.D.N.Y. filed Oct. 23, 2013). That action, in which he asserted claims identical to those presented in *Dove v. Smith,* No. 13–CV–1411, was dismissed, in the first place, because it was frivolous as duplicative of an action already pending, and alternatively based on the ground that the defendants were entitled to absolute immunity. *Smith,* No. 13–CV–1315, Dkt. Nos. 4, 7. Plaintiff accumulated his third strike in *Dove v. Pesce,* No. 13–CV–1417 (N.D.N.Y. filed Nov. 14, 2013), which was dismissed based on *res judicata. Pesce,* No. 13–CV–1417, Dkt. No. 4, 7. *See Elufe v. Clauberg,* No. 11–CV–5291, 2012 WL 1506692, at *1 (S.D.N.Y. Apr. 27, 2012) (construing dismissal based on *res judicata* a strike for purposes of section 1915(g)). [3]

**\*5** Because I conclude that plaintiff had accumulated at least three strikes for purposes of section 1915(g) prior to commencing this action, I find that he is not entitled to proceed in this action IFP unless he has alleged that he faces "imminent danger of serious physical injury." 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 562 (2d Cir.2002) ("[Section] 1915(g) allows prisoners to escape the three strikes rule only if the prisoner is under imminent danger of serious physical injury." (quotation marks, emphasis omitted)). In accordance with this exception, an inmate who has had three prior "strikes" but nonetheless wishes to commence a new action IFP must show that he was under imminent danger at the time of filing; the exception does not provide a basis to avoid application of the three strikes on the basis of past harm. *Malik,* 293 F.3d at 562–63. An inmate who claims the benefit of this exception must also show that the danger faced rises to the level of exposure to a "serious physical injury." 28 U.S.C. § 1915(g). The imminent danger claimed by the inmate, moreover, must be real, and not merely speculative or hypothetical. *See Johnson v. Barney,* No. 04–CV–10204, 2005 WL 2173950, at *1–2 (S.D.N.Y. Sept. 6, 2005) (finding that the inmate's allegation of danger at a facility in which he was not housed, but may pass through at infrequent occasions in the future, does not establish imminent danger). For a three-strikes litigant to qualify for the imminent danger exception, his complaint "must reveal a nexus between

the imminent danger it alleges and the claims it asserts." *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009). When determining whether the requisite relationship is present a court must examine "(1) whether the imminent danger of serious physical injury that a three-strikes litigant alleges is *fairly traceable* to unlawful conduct asserted in the complaint and (2) whether a favorable judicial outcome would redress that injury." Pettus, 554 F.3d at 299 (emphasis in original).

The term "serious physical injury," as utilized in section 1915(g), is nowhere concretely defined, although it has been construed by various courts as including a "disease that could result in serious harm or even death [.]" *Ibrahim v. D.C.,* 463 F .3d 3, 7 (D.C.2006). In deciding whether to invoke the exception, a court must examine the available pleadings, construed in a light most favorable to the plaintiff, to determine whether the plaintiff has alleged a serious physical injury. *McAlphin v. Toney,* 281 F .3d 709, 710 (8th Cir.2002).

In this instance, plaintiff's complaint fails to allege any facts related to imminent physical injury. *See generally* Dkt. No. 1. Plaintiff's claims, asserted against the City of Binghamton, the Binghamton Police Department, and a Binghamton police officer, stem from his arrest and prosecution that occurred several years ago. As such, plaintiff does not qualify for the imminent danger exception to section 1915(g).

**\*6** Based upon the foregoing, I recommend that plaintiff's application for leave to proceed IFP be denied.

## IV. *SUMMARY AND RECOMMENDATION*

Because plaintiff accumulated three strikes pursuant to section 1915(g) prior to the commencement of this action, he is precluded from proceeding IFP in this case. Accordingly, it is hereby respectfully

RECOMMENDED that plaintiff's motion for leave to proceed *in forma pauperis* (Dkt. No. 2) be DENIED, and that plaintiff be directed to pay the full filing fee of $400 no later than thirty days from the date of any order adopting this report; and it is further hereby

RECOMMENDED that if the full filing fee is not received within that thirty-day period, the clerk be directed to dismiss plaintiff's complaint without further order of the court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing amended report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Filed Sept. 8, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5308152

---

Footnotes

1   Aside from this lawsuit, plaintiff has commenced at least eight other actions in this district, including: (1) *Dove v. City of N.Y. Police Dep't,* No. 14–CV–0772 (N.D.N.Y. filed June 25, 2014); (2) *Dove v. Pesce,* No. 13–CV–1417 (N.D.N.Y. filed Nov. 14, 2013); (3) *Dove v. Smith,* No. 13–CV–1411 (N.D.N.Y. filed Nov. 7, 2013); (4) *Dove v. Smith,* No. 13–CV–1315 (N.D.N.Y. filed Oct. 23, 2013); (5) *Dove v. Lee,* 12–CV–0835 (N.D.N.Y. filed May 21, 2012); (6) *Dove v. Lee,* No. 12–CV–0738 (N.D.N.Y. filed May 3, 2012); (7) *Dove v. Broome Cnty. Corr. Facility,* No. 10–CV–0002 (N.D.N.Y. filed Jan. 4, 2010); (8) *Dove v. Harder,* 09–CV–0259 (N . D.N.Y. filed Mar. 4, 2009).

2   All unreported decisions cited in this report have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

3   Plaintiff also filed an action in the Eastern District of New York, *Dove v. Pesce,* No. 13–CV–5766, (E.D.N.Y. filed Oct. 17, 2013), which was dismissed for failure to state a claim upon which relief may be granted prior to the commencement of this action. *Pesce,* No. 13–CV–5766, Dkt. No. 5 at 5. Because plaintiff appealed that dismissal, and the Second Circuit did not dismiss that appeal, as lacking an arguable basis in law or fact, until after plaintiff filed this action, the dismissals in the district court and Second Circuit do not constitute strikes for purposes of this action. *See Partee v. Connolly,* No. 08–CV–4007, 2009 WL 1788375, at *2 (S.D.N.Y. June 23, 2009) ("[A] dismissal does not count as a strike until after the opportunity to appeal has been exhausted or waived." (citing cases)).

---

2014 WL 4437771
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shawn EVANS, Plaintiff,

v.

Officer P. MURPHY, et al., Defendants.

No. 12–CV–365.
|
Signed March 13, 2014.

**Attorneys and Law Firms**

Shawn Evans, Auburn, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

## ORDER

RICHARD J. ARCARA, District Judge.

**\*1** The above-referenced case was referred to Magistrate Judge Hugh B. Scott, pursuant to 28 U.S.C. § 636(b)(1)(B). Plaintiff filed a motion for a temporary restraining order (Dkt. No. 49) and defendants filed a motion for summary judgment (Dkt. No. 56). On February 11, 2014, Magistrate Judge Scott issued a Report and Recommendation recommending the following: (1) that plaintiff's motion for a temporary restraining order be denied; (2) that defendants' motion for summary judgment with respect to plaintiff's December 31, 2011 claims be granted; (3) that defendants' motion for summary judgment with respect to plaintiff's January 13, 2012 claims against defendants Rozell and Reppert be denied; (4) that defendants' motion for summary judgment with respect to plaintiff's failure to intervene claims be granted; (5) that defendants' motion for summary judgment with respect to plaintiff's retaliation claims be granted; and (6) that defendants' motion for summary judgment based upon qualified immunity be denied. (Dkt. No. 75)

Plaintiff filed objections to the Report and Recommendation on February 26, 2014. (Dkt. No. 76) Defendants filed a response on March 5, 2014 (Dkt.

No. 77), and the Court considered the matter submitted without oral argument.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon *de novo* review, and after reviewing the submissions of the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Scott's Report and Recommendation, plaintiff's motion for a temporary restraining order is denied, and defendants' motion for summary judgment is granted in part and denied in part, as set forth in detail in the Report and Recommendation.

The matter is referred back to Magistrate Judge Scott for further proceedings.

SO ORDERED.

### Order

HUGH B. SCOTT, United States Magistrate Judge.

Before the Court is the plaintiff's motion for a temporary restraining order (Docket No. 49) and the defendants' motion for summary judgment (Docket No. 56).

### Background

The plaintiff, Shawn Evans ("Evans"), commenced this action alleging that he was assaulted by various correctional officers while incarcerated at the Southport Correctional Facility ("Southport"). (Docket No. 1). Evans alleged that on January 13, 2012, Officers P. Murphy ("Murphy"), E. Rozell ("Rozell"), G. Reppert ("Reppert"), S. Davis ("Davis"), J. Terribilini ("Terribilini"), and R. Pulsifer ("Pulsifer") ran into his cell and assaulted him because he filed a grievance. (Docket No. 1 at page 5). He alleged that Rozell kicked him in the stomach, punched him in the face, and called him a "stupid faggot." (Docket No. 1 at page 5). Officer Reppert is alleged to have punched the plaintiff in the stomach and called him a "stupid niggar." (Docket No. 1 at page 5). Evans asserts that defendant Pulsifer was present but took

no action to stop the assault. The plaintiff claims that he suffered a cut to his left thigh, back and shoulder injuries, a swollen face and several abrasions. (Docket No. 1 at page 5). Evans asserted that on December 31, 2011, Officers Davis, Rozell and J. Yung [1] ("Yung"), and other officers, came into his cell. According to the plaintiff, "Davis took [off] his jacket and stated: 'I am tired of you niggars giving me a hard time.' Officer Rozell stated: 'You can fight a one on one;' and I went: 'Jump in.' " (Docket No. 1 at page 6) (punctuation added). Evans does not allege that any physical altercation took place at that time, but states that Yung was present and watched the other officers harass him. He was then allegedly denied recreation for that day. (Docket No. 1 at page 6).

*2 Before the original complaint was served upon the defendants, the plaintiff filed an Amended Complaint which contains the same claims relating to December 31, 2011 and January 13, 2012 as the original complaint. The Amended Complaint adds Yung (spelled "Young") as a defendant (although referred to in the body of the original complaint, Yung was not listed as a defendant in the caption). The Amended Complaint also adds a few details such as that the alleged assault on January 13, 2012 was in response to the fact that Evans had filed a grievance against Davis and Rozell; and that the officers wrote a fabricated misbehavior report against him as a result of this incident. (Docket No. 3 at page 3). After the defendants filed an answer (Docket No. 7) in this case and a scheduling order was issued (Docket No. 8), the plaintiff filed a purported Second Amended Complaint adding two new defendants and supplementing the allegations in support of his original claims. (Docket No. 9). Because the plaintiff could no longer amend the complaint as of right, the Court construed this filing as a motion to amend the complaint. (Docket No. 12). The defendants opposed the motion to amend the complaint (Docket No. 13). The Court determined that it would be futile to allow the amendment of the two additional defendants, and denied the motion to amend to that extent, but allowed the proposed Second Amended Complaint to constitute a supplement to the Amended Complaint regarding the averments against the original defendants. (Docket No. 46 at page 7).

In summary, the plaintiff's two existing claims in this case are that he was harassed on December 31, 2011 by Davis, Rozell, Yung (and possibly others), and assaulted in his

cell on January 13, 2012 by Murphy, Reppert, Davis, Terribilini, and Pulsifer.

**Temporary Restraining Order**

The plaintiff asserts that he has been threatened and harassed by "several of the defendants" because he filed the instant lawsuit against them. (Docket No. 49). The plaintiff seeks an order directing the defendants to stop the harassment and that the plaintiff be transferred to another correctional facility. (Docket No. 49 at page 1).

Preliminary injunctive relief "is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990). To obtain a preliminary injunction or temporary restraining order, the moving party must show "that 1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999). Motions for preliminary injunctions are "frequently denied if the affidavits [in support of the motion] are too vague or conclusory to demonstrate a clear right to relief under Rule 65." 11A C.Wright & A. Miller, Fed. Practice & Proc., Civil 3d § 2949 (2004); see, e.g., *Malki v. Hayes,* 2012 WL 32611 (E.D.N.Y.,2012) ("Plaintiff's allegation that 'he will be irreparably harmed by all kinds of threats of harassment, intimidation, and stiff punishment' absent an injunction is speculative."); *McGillicuddy v. Laidlaw, Adams & Peck, Inc.,* 1995 WL 1081307, at *12, n. 19 (S.D.N.Y. Aug.14, 1995) (summarily denying an application for preliminary injunctive relief where the movant's papers failed to demonstrate a basis for granting "this extraordinary remedy").

*3 The defendants assert that the plaintiff has not demonstrated any actual or imminent harm. (Docket No. 52 at page 5). Indeed, aside from being denied recreation on five occasions in January 02 2013 (Docket No. 55 at page 2), the plaintiff fails to articulate the facts and circumstances regarding any harassing or threatening conduct by the defendants in this action. [2] The plaintiff fails to identify any specific individual as having threatened or harassed him. The Court finds that the plaintiff's allegations in support of the motion for a

temporary restraining order are vague, conclusory and insufficient to warrant injunctive relief. In any event, inasmuch as the record reflects that the plaintiff has been transferred to the Auburn Correctional Facility (see Docket Entry dated January 10, 2014), the application for injunctive relief against the defendants, who are employed at the Southport Correctional Facility, is moot.

**Motion for Summary Judgment**

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *See Trans Port, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 188 (2d Cir.1992) (*citing Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). The Court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party. *See Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991); *Howley v. Town of Stratford,* 217 F.3d 141 (2nd Cir.2000). However, the non-moving party must, "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Information, Co.,* 970 F.2d 1110, 1112 (2d Cir.1992) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A fact is material:

> when its resolution would "affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."

*General Electric Company v. New York State Department of Labor,* 936 F.2d 1448, 1452 (2d Cir.1991) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "The nonmoving party must come forward with enough evidence to support a jury verdict ... and the ... motion will not be defeated merely ... on the basis of conjecture or surmise." *Trans Sport,* 964 F.2d at 188 (*citing Bryant v. Maffucci,* 923 F.2d at 982). If undisputed material facts are properly placed before the court by the moving party, those facts will be deemed admitted, unless they are properly controverted by the non-moving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992) (*citing Dusanenko v. Maloney,* 726 F.2d 82 (2d Cir.1984). The Court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them. *See Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 528 (2d Cir.1990).

However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc.,* 235 F.3d 53 (2d Cir.2000) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**Evans' December 31, 2011 Claim**

**\*4** The plaintiff asserts that he was verbally harassed on December 31, 2011. (Docket No. 1 at page 6). The plaintiff has not alleged any physical injury relating to this claim. It is well-settled that claims of verbal harassment, without more, are not actionable under § 1983. *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) ("The claim that a prison guard called [plaintiff] names also did not allege any appreciable injury and was properly dismissed."); *Mitchell v. New York State Dept. of Correctional Services,* 2012 WL 6204205 (W.D.N.Y.,2012) (the plaintiff failed to state a colorable constitutional claim). Evans has acknowledged as much, stating: "Summary judgment should be granted on this Count. Plaintiff agree with Defendants." (sic) (Docket No. 72 at page 5).

Based on the above, the defendants' motion for summary judgment with respect to the plaintiff's December 31, 2011 claim should be granted.

**Evans' January 13, 2012 Claim**

The original complaint filed by Evans asserted that defendants Murphy, Reppert, Davis, Terribilini and Pulsifer ran into his cell "and started assaulting me because I wrote a harassment grievance. Now Officer Rozell kicked me in my stomach and punched me in my face and called me a stupid faggot. Officer Reppert punched me in the stomach and called me a stupid nigger. Sergeant Pulsifer was present and didn't tell the officers to stop the assault. Now I suffered a cut to my left thigh, back and shoulder injury. I also had a swollen face, several abrasions." (Docket No. 1 at page 5).

In his Amended Complaint, as it relates to the January 13, 2012 incident, the plaintiff alleged:

> I was assaulted by Officer P. Murphy, Davis, Rozell, Reppert and Terribilini during showers

because I wrote a harassment grievance against Davis and Rozell. Officer Rozell kicked and punched me in the stomach and face and called me a stupid nigger. [3] Officer Reppert punched me in the stomach and called me a nigger and said I deserve everything I am getting. Officer Davis was holding me along with Officer Terribilini, while Officer Rozell and Reppert assaulted me. Sergeant Pulsifer was standing there and didn't tell the officers to stop assaulting me. He just watched. The officers wrote fabricated misbehavior reports. I suffered a cut to my thigh, shin and both of my feet. [4] Also back and shoulder injury, a swollen face and several abrasions.

(Docket No. 3 at page 3). Evans repeated these allegations in a supplemental filing. (Docket No. 9 at page 3).

At his deposition, Evans stated that on January 13, 2012, he was reading in his cell when officers came to take him for a shower. (Docket No. 71–1 at page 46). He stated that he had decided not to go for a shower because another inmate told Evans that he overheard Rozell and Pulsifer saying that they were going to retaliate against Evans. (Docket No. 71–1 at pages 47–49). The plaintiff states that when the defendants saw that he was not ready for his shower, [5] Murphy, Terribilini, Reppert, Pulsifer, Rozell and Davis entered his cell. (Docket No. 71–1 at page 56). Evans claims that Reppert cut his clothes off with a suicide prevention knife and a waist chain and shackles were put on him. (Docket No. 67–1 at page 9). After he was placed in these restraints, Evans claims that he was stood up and held by Davis and Terribilini while Rozell punched him in the stomach and in the face. (Docket No. 67–1 at pages 11, 14). Then, again with Davis and Terribilini holding him, the plaintiff claims that Reppert punched him in the stomach and the face. (Docket No. 71–1 at pages 63, 60). Evans claims that Pulsifer stood by and did nothing to stop Rozell and Reppert from punching him. (Docket No. 67–1 at page 14). [6] Evans asserts that he was then taken to the shower area where Reppert started choking Evans and

"saying I wish I had never filed a grievance now." (Docket No. 67–1 at page 12). [7]

**\*5** With respect to his alleged injuries, Evans acknowledges that when the officers came into his cell they told him not to move while they put on the waist chain and shackles. Notwithstanding, Evans stated that he was "moving wildly" and that he was kicking and thrashing his legs to resist the officers from putting on the waist chain and shackles. Thus, Evans acknowledges that the cut on his thigh, as well as abrasions to his shin and feet were due to the fact that he was thrashing wildly while the officers were putting on the restraints. (Docket No. 67–1 at page 14–15). The plaintiff asserts that he was not hit, pushed or kicked by the defendants while the restraints were being applied. (Docket No. 67–1 at page 10). The plaintiff claims that his only injury relating to the alleged "punches" by Rozell and Reppert was that he suffered puffiness in his face for 2 or 3 days. (Docket No. 67–1 at page 28). The plaintiff does not complain of any injury resulting from the alleged punches to his stomach or the purported choking. Evans also asserts that the defendants aggravated preexisting injuries to his back and shoulder when they put the waist chain on him. (Docket No. 67–1 at pages 21, 23–26). However, Evans states that he does not believe that the defendants intended to hurt his back or his shoulder when placing the restraints on him. (Docket No. 67–1 at pages 24–26).

Murphy asserts that at Southport, before an inmate may be let out of his cell, even for showers, he must be placed in mechanical wrist restraints. (Docket No. 59 at ¶ 5). Murphy states that on January 13, 2012, Evans was "in the proper attire to go to showers and standing with his back to the cell door" so that Murphy was able to place the mechanical wrist restraints on him. (Docket No. 59 at ¶ 6). According to Murphy, as Evans was exiting his cell, "he turned aggressively to his left, towards me, and attempted to head-butt me." (Docket No. 59 at ¶ 7). Murphy stated that Evans was forced back into his cell where he landed on his bed with his feet on the floor. Murphy stated that he was unable to control Evans, but that Evans was "kicking and struggling so vociferously" that he was unable to do so. Murphy directed Evans to stop resisting. Murphy was able to gain control of Evans' legs after Reppert applied mechanical leg restraints. (Docket No. 59 at ¶¶ 8–15). Murphy denies that Reppert or Rozell [8] struck Evans. Murphy states that he escorted Evans to the shower and that Reppert did not accompany Evans to the shower area.

(Docket No. 59 at ¶¶ 19–23). Terribilini states that he was working the shower duty with Murphy on January 13, 2012. According to Terribilini, as Evans backed out of his cell, he turned violently to his left and tried to head butt Murphy. Terribilini helped Murphy get Evans back into his cell and tried to get Evans to stop thrashing. Terribilini states that Evans started to comply after leg restraints were successfully applied. (Docket No. 63 at ¶ 13). Once the leg restraints were applied, Terribilini assisted Evans to his feet and escorted him to the shower area. Terribilini states that Evans was not struck by anyone while in his cell or in the shower area. (Docket No. 63 at ¶ 16).

**\*6** Reppert asserts that on January 13, 2012, he responded to Evans' cell relating to Evans attempted assault on Murphy and found Evans thrashing and kicking (as Evans admits doing). Reppert states that he was able to secure leg restraints on Evans and then helped him to his feet. (Docket No. 61 at ¶¶ 10–11). Reppert denies striking Evans and denies taking Evans to the shower area and choking him there. (Docket No. 61 at ¶¶ 12–18). Rozell states that he was not working on the first floor of "A" Block—where the incident took place—on January 13, 2012, but instead was assigned to the third floor. (Docket No. 62 at ¶¶ 13–14). He states that he responded to Evans' cell when a "use of force" call was made, but that by the time he arrived at that location, he was told he was not needed and returned to the third floor. (Docket No. 62 at ¶ 15). Rozell denies striking Evans. (Docket No. 62 at ¶ 20). Davis states that he was not working on the first floor of "A" Block on January 13, 2012, and did not respond to Evans' cell in any way on that date. (Docket No. 58 at ¶¶ 14–15).

*Eighth Amendment Standard*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. See *Wright v. Goord,* 554 F.3d 255, 268 (2d. Cir.2009) citing *Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S.Ct. 995, 117 L.Ed.2d 156, (1992) and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant "had the necessary

level of culpability, shown by actions characterized by 'wantonness' " in light of the particular circumstances surrounding the challenged conduct. *Wright,* 554 F.3d at 268 (internal citations omitted). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7; see also *Blyden,* 186 F.3d at 262–63.

Objectively, the plaintiff must show that the alleged use of force is grave or harmful enough to be actionable. Only the use of physical force that is "repugnant to the conscience of mankind" amounts to a constitutional violation. *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). Conversely, the Constitution's "prohibition of 'cruel and unusual' punishments necessarily excludes ... *de minimis* uses of physical force." *Hudson v. McMillian,* 503 U.S. 1, 9–10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The Second Circuit, for example, has noted that not "every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), cert. denied sub nom. *John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

**\*7** Notwithstanding, the "core judicial inquiry" in an Eighth Amendment excessive force case is "not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010). In *Hudson* the Court emphasized that "[w]hen prison officials maliciously and sadistically use force to cause harm," "contemporary standards of decency always are violated ... whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. In *Wilkins,* the Court stated that it was improper to read *Hudson* as merely "lower[ing] the injury threshold for excessive force claims from 'significant' to 'non-*de minimis*'—whatever those ill-defined terms might mean." *Wilkins,* 559 U.S. at 39. Instead, the Supreme Court explained that *Hudson* "aimed to shift the 'core judicial inquiry' from the extent of the injury to the nature of the force—specifically, whether it was nontrivial and 'was applied ... maliciously and sadistically to cause harm.' " *Wilkins,* 559 U.S. at 35

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 97 of 220

quoting *Hudson,* 503 U.S. at 7. The Supreme Court identified several factors to be considered in determining whether the use of force violates the Eighth Amendment:

> [T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur. In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Hudson,* 503 at 7.

Even accepting the plaintiff's version of facts as true, the defendants argue that the plaintiff cannot satisfy the objective element, that the plaintiff suffered an injury sufficiently serious to rise to a constitutional dimension. The defendants cite to six cases in support of the proposition that the plaintiff's alleged injuries in this case are so *de minimus* that the do not rise to a constitutional dimension. Several of those cases were decided prior to the Supreme Court's 2010 decision in *Wilkins,* which clarified the standard set forth in *Hudson.* See *Headley v. Fisher,* 2008 WL 1990771 (S.D.N.Y.,2008); *Sprau v. Coughlin,* 997 F.Supp. 390 (W.D.N.Y., 1998) (Larimer, D. J.); *Yearwood v. LoPiccolo,* 1998 WL 474073 (S.D.N.Y.,1998); *Brown v. Busch,* 954 F.Supp. 588 (W.D.N.Y.1997) (Skretny, D.J.). The defendants also cite to *Muhammad v. Lowe,* 2012 WL 4509836 (W.D.N.Y.2012) (Curtin, D.J.). In *Muhammad,* the Court found that the defendants had submitted proof that

physical force was used by the defendants because a weapon was found on the plaintiff during a pat down frisk and that the plaintiff had struck the officer conducting the search. The Court also determined that the plaintiff's medical records did not reveal an injury. *Muhammad,* 2012 WL 4509836 at *5. The defendants also cite to *Felder v. Diebel,* 2012 WL 6690239, 2012 U.S. Dist. LEXIS 181213 (W.D.N.Y.2012) (Curtin, D.J.), in which the Court held that a plaintiff who claimed to have been slapped and grabbed by the throat in connection with a pat frisk had not alleged specific facts alleging malicious intent on the part of the defendant and thus, no reasonable jury could find that the defendant had acted maliciously and sadistically to cause the plaintiff harm. *Felder,* 2012 U.S. Dist. LEXIS 181213 at *13–14.[9]

**\*8** In the instant case, a question of fact exists as to why the defendants entered the plaintiff's cell. While the defendants contend that they did so to get Evans under control and to restore order after the plaintiff head butted Murphy, the plaintiff alleges that the defendants entered his cell unprovoked, stripped him of his clothes and placed him in a waist chain and leg restraints to bring him to the shower area where he believed he would be further assaulted. Many of the injuries alleged by the plaintiff, by his own testimony, occurred because the plaintiff was thrashing wildly and refused to follow the defendants' directions to stop resisting while they placed him in the restraints.[10] In light of these admissions, such injuries cannot be said to have been *caused* by any malicious or sadistic conduct on the part of the defendants. However, after the restraints had been placed on the plaintiff, it appears to be undisputed that the plaintiff stopped resisting and complied with the defendants' directions. At this point, another question of fact emerges in that: the defendants contend that the plaintiff was then taken to the shower without further incident; but the plaintiff claims that while he was fully restrained[11] Rozell and Reppert each punched him in the face and stomach while still in his cell and that Reppert choked him while in the shower area.[12] Rozell and Reppert do not contend that it was necessary to punch or choke Evans to restore order, but they instead deny that Evans was punched and choked. Thus, a question of fact exists as to whether Evans was punched while in his cell or choked while in the shower. If a trier of fact were to believe that Evans was punched after he was in full restraints and was not resisting the officers, as he claims, a trier of fact might conclude that Rozell

and Reppert did so with a malicious and sadistic intent to harm the plaintiff even though Evans suffered, by his own account, only a puffy cheek for 2 or 3 days. [13] The same is true with respect to the plaintiff's claim that he was choked while in the shower area. Under the rubric set forth by *Hudson* and *Wilkins,* such a question of fact is sufficient to preclude summary judgment as to defendants Rozell and Reppert notwithstanding the fact that the plaintiff did not suffer a serious injury. [14]

*Inconsistencies in Plaintiff's Claims*

The defendants assert that the plaintiff's claims have been so inconsistent that summary judgment is warranted because no reasonable person would give credit to the plaintiff's allegations. (Docket No. 57 at page 17). In this regard, the defendants cite to *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2nd Cir.2005). In *Jeffreys,* the plaintiff had admitted on three occasions that he had "jumped" from the third story window of the school he was burglarizing. Nine months after being arrested, he claimed that police had thrown him out of the window. The Second Circuit stated that while "it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff ... and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys,* 426 F.3d at 554. In light of his previous admissions that he had jumped from the window, and the fact that no mention was made to medical workers or non-arresting officers that he had been beaten, the Court concluded that there was no evidence upon which a reasonable factfinder could base a verdict in the plaintiff's favor. *Jeffreys,* 426 F.3d at 554–555. Here, the defendants argue that Evans is relying solely on his own testimony which is contradictory and incomplete, and that the plaintiff's testimony has been contradicted by evidence produced by the defense. (Docket No. 57 at page 17). With respect to inconsistencies, the defendants assert that the plaintiff's original complaint alleged that all of the defendants "jumped" him, but that Evans now admits

that he was not assaulted by Murphy, Terribilini, Davis or Pulsifer. (Docket No. 57 at page 17). In his original Complaint, Evans does state that all of the defendants entered his cell "and started assaulting" him because he wrote a grievance." However, the allegations in the Complaint specifically allege only that Rozell and Reppert punched him and that Pulsifer did not intervene. (Docket No. 1 at page 5). The plaintiff's amended pleadings contain similar allegations regarding the January 13, 2012 incident. The plaintiff pleadings do not include any specific allegations of being struck by Davis, Murphy, Terribilini or Pulsifer. The fact that the plaintiff included all of the defendants who he claims were present at the time of the incident as having participated in "assaulting" him, does not render the allegations so inconsistent as to reach the level in *Jeffreys.* The defendants also point to the fact that they have presented testimonial evidence that Rozell arrived at the scene of the incident after the plaintiff had been restrained and order had been restored, which is corroborated by the fact that Rozell is not mentioned in the useof-force reports filed by Murphy and Reppert. The fact that Rozell claims to have arrived at the scene of the incident late and is not mentioned in the use-of-force reports creates questions of fact regarding the plaintiff's claims, but does not conclusively refute them. The same is true with respect to the fact that the defendants have submitted testimonial evidence that only Murphy and Terribilini escorted Evans to the showers, and that Reppert did not go to the shower area. The defendants also argue that the plaintiff's claim that Davis and Rozell enlisted the other officers to retaliate against Evans on their behalf because they did not want to be "on radar" with the administration, is inconsistent with the plaintiff's claim that Davis and Rozell participated in the incident. Finally, the defendants assert that the fact that Evans did not claim to have been choked in the shower area until he submitted his proposed Second Amended Complaint four months after commencing this action also renders the plaintiff's claims incredible. The plaintiff's delay in asserting this claim may cause a trier of fact to question its credibility. However, this is not a case like *Jeffreys,* where the plaintiff had made prior admissions contrary to the claim being asserted. Moreover, the content of the testimonial and documentary evidence pointed to by the defendants was created by the defendants, and thus, under the defendants' control. Again, while this evidence weighs against the plaintiff's claims, it does not conclusively refute them. The Court cannot conclude, as a matter of law, that a reasonable trier of fact could not believe Evans'

testimony that Rozell and Reppert punched Evans or that Reppert choked the plaintiff, as Evans claims.

*Failure to Protect*

**\*9** While Evans asserts that only Rozell and Reppert allegedly struck him, he asserts that Davis, Murphy, Terribilini and Pulsifer are liable because they failed to intervene. (Docket No. 72 at page 8). To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001). The plaintiff has failed to articulate a basis upon which a reasonable trier of fact could conclude that Davis, Murphy, Terribilini and Pulsifer had prior knowledge that Rozell and Reppert were going to strike Evans, or that they had a reasonable opportunity to take actions to intervene. Indeed, as noted above, Evans acknowledged that although Murphy and Terribilini were holding him, they were doing so because Evans had been placed in waist chains and restraints, and not so that Rozell or Reppert could strike the plaintiff. (Docket No. 67–1 at page 31). Moreover, while the plaintiff characterized his claims against Davis, Murphy and Terribilini as constituting a failure to protect in conclusory manner (Docket No. 72 at page 8), Evans' argument and analysis with respect to his failure to protect claim focuses exclusively on Pulsifer. (Docket No. 72 at pages 13–16). In this regard, Evans does not point to any evidence that Pulsifer possessed knowledge that Rozell and Reppert were going to punch him, but instead argues that Pulsifer did not investigate the situation or reprimand Rozell or Reppert *after* the alleged incident took place. (Docket No. 72 at page 15). This is insufficient to maintain a claim based upon a failure to intervene or protect.

To the extent this claim is asserted against Pulsifer, it must also be dismissed based on the plaintiff's failure to file a grievance against Pulsifer. It is well settled that the Prison Litigation Reform Act ("PLRA") provides that "[no] action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). There does not appear to be a factual dispute that Evans did not name Pulsifer in the grievance he filed relating to the January 13, 2012 incident. (See Grievance relating to January 13, 2012 Incident, attached as Exhibit A to Docket No. 65). Thus, even if the plaintiff had otherwise satisfied his burden under *Curley,* this claim would have to be dismissed as against Pulsifer. See *Hill v. Curcione,* 657 F.3d 116 (2nd Cir.2011) (There being no evidence that a grievance ever was filed against Williams by Hill, the exhaustion requirement of the PLRA has not been satisfied, and no genuine issue of material fact stands in the way of summary judgment in her favor.).

**\*10** In sum, to the extent that the plaintiff asserts failure to intervene claims against the defendants, the defendants' motion for summary judgment should be granted.

**Retaliation Claim**

To the extent that the plaintiff has asserted a separate claim of retaliation by the defendants based upon his filing of a grievance, this claim should also be dismissed. To succeed in maintaining a retaliation claim, a plaintiff must show that 1) the conduct cited as the cause for retaliation is protected; 2) the defendant took adverse action against the plaintiff; and 3) there was a causal connection between the protected conduct and the adverse action. *Davis v. Goord,* 320 F.3d 346 (2nd Cir.2003). The Second Circuit has advised that courts should be skeptical of prisoner retaliation claims, as "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Spies v. Kelleher,* 151 Fed.Appx. 72 (2nd Cir.2005) quoting *Dawes v. Walker,* 239 F.3d 489 (2nd Cir.2001) o*verruled on other grounds Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Indeed, in *Flaherty v. Coughlin,* 713 F.2d 10, 13 (1983), the Court held that a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone.

Here, the plaintiff has asserted only in a conclusory manner that the events which allegedly took place on

January 13, 2012 were in retaliation for his filing of a grievance. The plaintiff admits that his claim is based only upon his assumption, and that he has no evidence of retaliation by the defendants. (Docket No. 67–1 at page 84). Such conclusory allegations are insufficient to permit a reasonable trier of fact to conclude that the plaintiff can meet his burden to prove a claim of retaliation.

## Qualified Immunity

The defendants contend that they are entitled to qualified immunity. (Docket No. 57 at page 24). Public officials are protected by qualified immunity so long as "their conduct does not violate clearly established ... rights of which a reasonable person would have known." *Vincent v. Yelich.* 718 F.3d 157, 166 (2d Cir.2013). The qualified immunity inquiry "turns primarily on objective factors." *Id* (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19. The notion that " 'unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment' " is not a new or unusual constitutional principle. See *Whitley,* 475 U.S. at 319 (quoting *Ingraham v. Wright,* 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)); see also *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

As discussed above, questions of fact exist as to the conduct of Rozell and Reppert on January 13, 2012. An individual's right to be free from excessive force is a well-settled principal in American jurisprudence. Drawing all reasonable inferences in favor of the plaintiff, as the Court is required to do in the context of the instant motion, the Court cannot conclude that the officers involved would be entitled to qualified immunity. *Chaney v. Koupash,* 2008 WL 5423419 (N.D.N.Y.,2008) (It was clearly established that inmates had an Eighth Amendment right to be free from excessive force. Thus, accepting all of plaintiffs' allegations about the physical assaults as true, qualified immunity cannot be granted.). Thus, the motion for summary judgment based upon qualified immunity should be denied.

### Conclusion

**\*11** Based on the above, plaintiff's motion for a temporary restraining order should be DENIED; the defendants' motion for summary judgment should be GRANTED IN PART AND DENIED IN PART consistent with the above.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as W.D.N.Y. Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); see also 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and W.D.N.Y. Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See *Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." ***Failure to comply with the provisions of***

*Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.*

So Ordered.

Filed Feb. 11, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4437771

Footnotes

1    The plaintiff sued this individual as "Young," however the defendant is identified as "Yung" on the docket and in papers filed by defendants' counsel. (Docket No. 13)

2    Evans has filed multiple civil rights actions. See Civil Nos. 12CV570 and 13CV805. In his reply to the defendants' response to the instant motion, the plaintiff notes that he was "assaulted again by several other defendants who are in another action before this Court." (Docket No. 55 at page 2). The conduct of individuals who are not defendants in this action cannot properly serve as the basis for injunctive relief against the defendants in this case.

3    This is inconsistent with Evans' original complaint in which he asserts that Rozell called the plaintiff a "stupid faggot."

4    Evans did not mention injuries to his shin or feet in the original complaint.

5    The record reflects that at the scheduled shower time, an inmate is supposed to have stripped down to his underwear before the transport officers come to his cell to take the inmate to the shower. If you do not want to take a shower, you simply do not strip down to your underwear. The inmate does not even have to advise the officers that he does not want to take a shower. (Docket No. 71–1 at page 50).

6    Pulsifer states that at the time of the incident, he was at the end of the gallery and did not witness the application of the restraints or any use of force upon Evans. (Docket No. 60 at ¶ 11). Pulsifer also states that Evans did not name him in his grievance regarding the January 13, 2102 incident. (Docket No. 60 at ¶ 8).

7    The first mention of the alleged choking is contained in the plaintiff's the proposed Second Amended Complaint. Evans did not include an allegation that he was choked in either the original Complaint or the Amended Complaint.

8    Murphy states that Rozell was working on another floor at the time of the incident, and that by the time Rozell arrived at the scene, Rozell was told that his assistance was not needed. (Docket No. 59 at ¶ 18).

9    It is noted that the plaintiff in Felder did not file any response to the defendants' motion for summary judgment. *Felder,* 2012 U.S. Dist. LEXIS 181213 at * 2.

10    As noted above, the plaintiff acknowledges the cut on his thigh, as well as abrasions to his shin and feet were due to the fact that he was thrashing wildly while the officers were putting on the restraints (Docket No. 67–1 at page 14–15) and that he was not hit, pushed or kicked by the defendants while the restraints were being applied. (Docket No. 67–1 at page 10). Evans also asserts that the aggravation of the preexisting injuries to his back and shoulder occurred when the defendant put the restraints on him (Docket No. 67–1 at pages 21, 23–26) and that he does not believe that the defendants intended to hurt his back or his shoulder when placing the restraints on him. (Docket No. 67–1 at pages 24–27).

11    The plaintiff contends that he was being held by Murphy and Terribilini, but that these defendants were holding him because "when you are in restraints and you have a waist chain on you, you got to have two officers that escort you and walk with you." (Docket No. 67–1 at page 31). Evans testified that he did not believe that Murphy and Terribilini were holding him so that he could be choked and that Murphy and Terribiliini did not know that he was going to be choked. (Docket No. 67–1 at page 31).

12    The plaintiff admits that the other defendants did not strike him, but claims that Davis, Murphy, Terribilini and Pulsifer are liable because failed to intervene. (Docket No. 72 at page 8). The failure to protect claim against these defendants is discussed below.

13    The defendants challenge the credibility of the plaintiff's claim that he was punched because the records memorializing the plaintiff's examination by medical staff on the day of the incident do not reflect that he complained on being punched in the face or stomach. (Docket No. 57 at page 13). While this certainly is evidence weighing against the plaintiff's claims, it does not conclusively refute the claim.

14    For purposes of this analysis, the Court assumes the plaintiff's allegations that the defendants entered his cell without being provoked to be true. The Court notes, however, that even if the defendants entered the cell in response to Evans' head butting Murphy, a question of fact would still remain regarding whether Evans was punched by Rozell and Reppert after the plaintiff had been placed in restraints and was no longer resisting.

**Evans v. Murphy, Not Reported in F.Supp.3d (2014)**

2014 WL 4437771

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Gonzalez v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 382055

1998 WL 382055
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angel GONZALEZ, Plaintiff,

v.

THE CITY OF NEW YORK; New York City
Department of Correction; Warden, Otis
Bantum Correctional Center; Corrections
Officer Summer, Shield No. 11856, Defendants.

No. 97 CIV. 2246(MGC).
|
July 9, 1998.

MEMORANDUM OPINION AND ORDER

CEDARBAUM, J.

**\*1** Plaintiff *pro se,* Angel Gonzalez, brings this action under 42 U.S.C. § 1983. He alleges that while in the custody of the New York City Department of Correction ("NYC DOC"), he was beaten by Correction Officer Summer. This is a motion to dismiss the complaint as against the City of New York, Warden of Otis Bantum Correctional Center (the "Warden") and NYC DOC pursuant to Fed.R.Civ.P. 12(b)(6).

On April 22, 1998, a letter was sent to Gonzalez directing him to respond to this motion by June 22, 1998. The letter advised Gonzalez that if he did not respond by June 22, the motion would be decided on the basis of the existing record, and the City of New York, New York City Department of Correction and Warden of Otis Bantum Correctional Facility might be dismissed from the action. Gonzalez has not responded. For the reasons that follow, the motion to dismiss is granted.

BACKGROUND

The complaint alleges that plaintiff was assaulted by Correction Officer Summer while he was incarcerated at Otis Bantum Correctional Center on Rikers Island, New York City. According to the complaint, as plaintiff was coming into the facility's recreation area from the "yard," he passed through a metal detector which registered that he had a metal object on his person. Defendant Summer then swore at plaintiff and told him to hurry up. As plaintiff passed through the metal detector a second time, he said to Summer, "You don't have to act like that!" Summer then struck plaintiff in the face repeatedly until he lost consciousness. According to the complaint, when plaintiff regained consciousness, he found Summer "still abusing" him and swearing at him. Plaintiff left, found his way back to the housing area and felt as if he "had been hit with a bat to the face ." Plaintiff alleges that he suffered a cut under his left eye, serious swelling of his face and head, and lacerations of his scalp. He alleges that black and blue shadows still show under his eyes, and that he suffers from headaches. He seeks damages in the amount of three million dollars.

DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of the complaint must be accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and all reasonable inferences must be drawn in favor of the plaintiff, *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

1. NYC DOC and the City of New York
Defendants argue that Gonzalez cannot assert a claim against NYC DOC based on any legal theory because it is not a suable entity. They also contend that the complaint fails to state a claim against the City of New York because it does not allege that the actions complained of were the result of an official policy, custom or practice of the City of New York.

**\*2** In addition to the defect that NYC DOC is an agency of the City of New York that is not a suable entity, [1] the complaint fails to state a claim upon which relief can be granted against either NYC DOC or the City. To state a claim under § 1983, a plaintiff must allege that a person acting under color of state law deprived him of a right, privilege or immunity guaranteed by federal law. To state a claim against a municipality, a plaintiff must also

Gonzalez v. City of New York, Not Reported in F.Supp. (1998)

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 104 of 220

1998 WL 382055

plead that the wrongful action alleged was the result of an official policy, custom or practice of the municipality, and that that policy caused plaintiff's injury. *Monell v. Department of Social Services,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The complaint, however, alleges no official policy, custom or practice resulting in injury to Gonzalez. Indeed, the complaint does not even mention the City of New York or NYC DOC, except to the extent that they are listed as parties.

2. Warden of Otis Bantum Correctional Center
Defendants also urge dismissal of the complaint against the Warden, on the ground that there are no allegations in the complaint concerning that defendant. When an individual defendant is sued under § 1983, that defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to an award of damages. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). For a claim under § 1983, a complaint sufficiently alleges personal involvement of a supervisory official if it alleges one of the following: (a) direct participation in the alleged wrong; (b) failure to remedy a violation after receiving notice of it; (c) creation of a policy or custom under which unconstitutional practices occur; or, (d) grossly negligent management of subordinates who cause the constitutional violation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

A § 1983 claim against a municipal official in his official capacity is treated as a claim against the municipality itself. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). As noted above, § 1983 imposes liability on a municipality only when the action that is alleged to be unconstitutional implements or executes an official policy or custom. *See Monell,* 436 U.S. at 690–91.

From the complaint, it is unclear whether the warden is being sued in his personal or official capacity. However, *pro se* complaints, if possible, should be construed as asserting both claims. *Jackson v. Dinkins,* 1995 WL 657075, at *1 (S.D.N.Y. Nov.8, 1995) (citing *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993)).

The complaint does not allege the personal involvement of the Warden. The complaint mentions the Warden only in the caption, and fails to allege any act or omission by that party. *See Crown v. Wagenstein,* 1998 WL 118169, at *1 (S.D.N.Y. Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997) (same).

**\*3** Finally, to the extent that the complaint asserts an official-capacity claim against the Warden, the claim fails for the same reason that the claims against the City of New York and NYC DOC fail. There are no allegations of any municipal policy or custom that the Warden was executing, or that such a policy or custom caused the alleged violation of the plaintiff's constitutional rights, as required by *Monell.* The absence of any such allegation precludes a finding of liability against the Warden in his official capacity.

Accordingly, the complaint fails to the state a claim against the Warden upon which relief can be granted.

CONCLUSION

For the foregoing reasons, the motion to dismiss the complaint as against defendants the City of New York, New York City Department of Correction, and Warden of Otis Bantum Correctional Facility is granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 382055

Footnotes

1    Defendants correctly point out that New York City agencies, such as NYC DOC, are organizational subdivisions of the City of New York lacking independent legal existence and are not themselves subject to suit. *See, e.g., Adams v. Galletta,* 966 F.Supp. 210, 212 (S.D.N.Y.1997) ("where a plaintiff has named the Department of Corrections as a defendant, he has sued a non-suable entity").

**End of Document**
© 2019 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,
v.
Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional
Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General,
New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action
pursuant to 42 U.S.C. § 1983 on April 26, 1995.
Plaintiff's complaint alleges defendants violated his
constitutional rights while he was an inmate at Green
Haven Correctional Facility.[1] Plaintiff's complaint
was dismissed *sua sponte* by Judge Thomas P. Griesa on June
26, 1995 pursuant to 28 U.S.C. § 1915(d). On September
26, 1995, the Second Circuit Court of Appeals vacated the
judgment and remanded the case to the district court for
further proceedings.

The case was reassigned to Judge Barbara S. Jones
on January 31, 1996. Defendants moved to dismiss the
complaint pursuant to Fed.R.Civ.P. 12(c) on November
25, 1996. Thereafter, the case was reassigned to Judge Jed
S. Rakoff on February 26, 1997. On February 26, 1998,
Judge Rakoff granted defendants' motion to dismiss, but
vacated the judgment on April 10, 1998 in response to
plaintiff's motion for reconsideration in which plaintiff
claimed that he never received defendants' motion to
dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case
was referred to me for general pretrial purposes and
for a Report and Recommendation on any dispositive
motion. Presently pending is defendants' renewed motion
to dismiss. Plaintiff filed a reply on July 6, 1998. For the
reasons discussed below, plaintiff's complaint is dismissed
without prejudice, and plaintiff is granted leave to replead
within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates
in the Green Haven Correctional Facility mess hall on
March 14, 1995. (Complaint at 4.) He alleges that he
was struck with a pipe and a fork while in the "pop
room" between 6:00 p.m. and 6:30 p.m. (Complaint at
4–5.) Plaintiff contends that the attack left him with
11 stitches in his head, chronic headaches, nightmares,
and pain in his arm, shoulder, and back. (*Id.*) Plaintiff
also states that Sergeant Ambrosino "failed to secure
[the] area and separate" him from his attackers. (Reply
at 5.) Plaintiff's claim against Warden Artuz is that
he "fail [sic] to qualify as warden." (Complaint at 4.)
Plaintiff names Commissioner Coombes as a defendant,
alleging Coombes "fail [sic] to appoint a qualified warden
over security." (Amended Complaint at 5.) Plaintiff
further alleges that Dr. Manion refused to give him pain
medication. (Complaint at 5.) Plaintiff seeks to "prevent
violent crimes" and demands $6,000,000 in damages.
(Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing
that: (1) the Eleventh Amendment bars suit against
state defendants for money damages; (2) the plaintiff's
allegations fail to state a claim for a constitutional
violation; (3) the defendants are qualifiedly immune from
damages; and (4) plaintiff must exhaust his administrative
remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and
10 of the Federal Rules of Civil Procedure and dismiss
the complaint without prejudice and with leave to amend.
Federal Rule 8 requires that a complaint contain "a short
and plain statement of the claim showing that the pleader
is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose

of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

**\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.*[2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45– 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's

Hudson v. Artuz, Not Reported in F.Supp.2d (1998)
Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 108 of 220
1998 WL 832708

Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law.

Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

### CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

Footnotes

1    Plaintiff is presently incarcerated at Sullivan Correctional Facility.

2    Rule 10 states:

   (b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

KeyCite Yellow Flag - Negative Treatment
On Reconsideration in Part Marom v. City of New York, S.D.N.Y., July 29, 2016

2016 WL 916424
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Yotam MAROM, Miriam Rocek,
and Don Fitzgerald, Plaintiffs,
v.
The CITY OF NEW YORK, New York City Police
Department ("NYPD") Chief of Department
Joseph Esposito, NYPD Deputy Inspector
Edward Winski, NYPD Lieutenant Frank
Viviano, NYPD Sergeant Fior Blanco, Nypd Legal
Bureau Officer Oleg Charnyavsky, NYPD Officer
Michael Galgano, Shield No. 2671, NYPD Officer
Cynthia Boyle, Shield No. 6663, NYPD Officer
Steven Valentine, Shield No. 13585, and NYPD
Officers John and Jane Doe #1-15, Defendants.

15-cv-2017 (PKC)
|
Signed 03/07/2016

**Attorneys and Law Firms**

Gideon Orion Oliver, New York, NY, for Plaintiffs.

Andrew Joseph Lucas, Joy Tolulope Anakhu, Lamar Devaughn Winslow, NYC Law Department, Office of the Corporation Counsel, New York, NY, for Defendants.

MEMORANDUM AND ORDER

CASTEL, U.S.D.J.

*1 Plaintiffs Yotam Marom, Miriam Rocek, and Don Fitzgerald bring this action against the City of New York, eight named individual defendants employed by the New York City Police Department ("NYPD"), specifically Chief of Department Joseph Esposito, Deputy Inspector Edward Winski, Lieutenant Frank Viviano, Sergeant Fior Blanco, Legal Bureau attorney Oleg Charnyavsky, Officer Michael Galgano (Shield No. 2671), Officer Cynthia Boyle (Shield No. 6663), and Officer Steven Valentine (Shield No. 13585), and 15 unnamed individual NYPD

Officers (Officers John and Jane Doe #1-15), asserting nine claims under 42 U.S.C § 1983 and the First, Fourth, Sixth, and Fourteenth Amendments. Plaintiffs claim that, while participating in a protest in Zuccotti Park marking the six-month anniversary of the Occupy Wall Street ("OWS") movement, or in the aftermath of the protest, they were denied certain protected rights. They maintain that they were falsely arrested, subjected to excessive use of force, excessive detention, and malicious abuse of process, prevented from exercising their First Amendment rights, deprived of their rights to a fair trial, and denied the equal protection of the laws. The defendants now move to dismiss the complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. For reasons that will be explained, the motion is granted as to all claims except for: (1) Yotam Marom's and Miriam Rocek's false arrest, First Amendment retaliation, and certain failure to intervene claims; and, (2) Don Fitzgerald's claim of excessive force.

THE FACTS ALLEGED
For the purposes of defendants' motion, all non-conclusory factual allegations set forth in plaintiffs' First Amended Complaint (the "FAC") are accepted as true, see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all reasonable inferences are drawn in favor of the plaintiffs as the non-movants, see In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

Plaintiffs bring their claims against three categories of defendants. First, plaintiffs allege that the City of New York, through its agents in the NYPD, adopted policies aimed at depriving OWS protestors of their constitutional rights. (FAC ¶¶ 11, 105). Second, plaintiffs allege that Chief of Department Esposito, Deputy Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky, whom the plaintiffs call "supervisory defendants," were personally involved in designing and supervising policies that caused the deprivation of their constitutional rights. (FAC ¶¶ 12, 14-15). Third, plaintiffs allege that Officers Galgano, Boyle, and Valentine, as well as the remaining unnamed defendants, were personally involved in depriving plaintiffs of their rights by implementing the allegedly unconstitutional policies designed by the City and the supervisory defendants. (FAC ¶¶ 13, 16).

I. Events of March 17, 2012.

**Marom v. City of New York, Not Reported in Fed. Supp. (2016)**

2016 WL 916424

On March 17, 2012, plaintiffs Marom, Rocek, and Fitzgerald allege that they were "lawfully present" in Zuccotti Park (also known as Liberty Plaza) in connection with the six month anniversary of the OWS movement. (FAC ¶¶ 157, 175, 196). That same evening, the NYPD "raided Liberty Plaza" and arrested many OWS protestors, including the three plaintiffs. (FAC ¶¶ 151-52).

### A. Yotam Marom.

**\*2** Plaintiffs claim that NYPD Officers "violently arrested" Marom, "forcibly escorted" him to an NYPD-arranged holding area and eventually transported him to NYPD's Midtown South Precinct. (FAC ¶ 159, 161, 163). Marom alleges that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). According to the FAC, the police sent Marom to 100 Centre Street where he was arraigned before a New York City Criminal Court Judge "approximately 40 or more hours after his arrest." (FAC ¶¶ 166-67). The FAC also claims that Officer Galgano swore out "an accusatory instrument charging Mr. Marom and another person with various offenses based on false allegations," including that Galgano observed Marom inside Zuccotti Park resisting arrest by sitting down, interlocking arms with other protestors, and refusing to place his arms behind his back after the police gave dispersal orders. (FAC ¶ 171). Marom alleges that Officer Galgano did not actually observe those things himself. (FAC ¶ 172).

### B. Miriam Rocek.

Rocek was allegedly working as a "volunteer street medic" during the March 17, 2012 OWS protest. (FAC ¶ 175). She claims that an unidentified NYPD supervisor specifically targeted her for arrest and said "get her first, she's number one." (FAC ¶ 177). Two male NYPD officers then "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground." (FAC ¶ 178). The officers allegedly ripped her jacket during the process. (FAC ¶ 187). Even though Rocek was not resisting arrest, officers were telling her to stop resisting and to just relax. (FAC ¶¶ 179-81). Rocek then said "[f]uck you, don't tell me to relax" to the officers, to which an officer allegedly said "[f]ine, fuck you then," "twisted her arm back as he placed plastic flexcuffs

on her," and told her to "[g]et up." (FAC ¶¶ 182-84). The flexcuffs were tight on Rocek's wrist and remained on her for approximately four hours. (FAC ¶ 190). Rocek alleges that the police dragged her by her hair and pulled her up on to her feet because she was unable to get up on her own. (FAC ¶ 185). The police transported Rocek to 100 Centre Street where she was arraigned approximately 24 hours after her arrest. (FAC ¶ 193). The FAC asserts that Officer Boyle "filled out NYPD paperwork stating that he [sic] had seen Ms. Rocek engage in certain conduct when he [sic] had in fact not done so." (FAC ¶ 140).

### C. Don Fitzgerald.

Don Fitzgerald alleges that NYPD officers grabbed him and threw him face-down on the ground while arresting him during the March 17, 2012 "raid" on Zuccotti Park. (FAC ¶ 198). While on the ground, an unidentified NYPD officer allegedly hit Fitzgerald "at least ten times in the face while saying, '[s]top resisting!'" (FAC ¶ 199). The police handcuffed Fitzgerald tightly and transported him to the Midtown South Precinct. (FAC ¶¶ 201, 203). Approximately 30 hours after the police arrested Fitzgerald, they transported him to 100 Centre Street where he was arraigned in New York City Criminal Court. (FAC ¶¶ 204-05). Fitzgerald claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). He also claims that Officer Valentine "filled out NYPD paperwork stating that he had seen Mr. Fitzgerald engage in certain conduct when he had in fact not done so." (FAC ¶ 141).

### D. Processing of Plaintiffs' Arrests.

Plaintiffs allege that after NYPD officers removed them from Zuccotti Park and brought them to the Midtown South Precinct, defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to falsify arrest paperwork. (FAC ¶ 117). While at the NYPD's Midtown South Precinct, Blanco and Charnyavsky allegedly "met with and supervised Galgano, Boyle, and Valentine, along with all other approximately eight assigned arresting officers." (FAC ¶ 114). Blanco and Charnyavsky instructed Galgano, Boyle, Valentine, and the others "regarding what to write in their NYPD arrest processing paperwork related to plaintiffs' and other purportedly related arrests." (FAC ¶ 115). According to plaintiffs, this

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 111 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

process resulted in Blanco and Charnyavsky instructing and assisting Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). Plaintiffs claim that Galgano, Boyle, and Valentine—who filled out paperwork allegedly swearing they saw plaintiffs engage in certain conduct —never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs claim they were prosecuted for criminal offenses based on those statements, which they allege were false, (FAC ¶ 147), and that each plaintiff eventually accepted an Adjournment in Contemplation of Dismissal (an "ACD") to resolve the cases stemming from their arrests. (FAC ¶¶ 173, 194, 207). [1]

II. NYPD Policies and Practices.

**\*3** Plaintiffs further allege that their unlawful treatment by the NYPD on March 17, 2012 occurred because of two specific policies concerning mass protests that the City of New York, through individual defendant Esposito and others, adopted during a series of meetings leading up to the "raid" on Zuccotti Park. First, the City and supervisory defendants refined and adopted a "policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," which plaintiffs label the "No-Summons Policy." (FAC ¶¶ 59-64). Second, the City and supervisory defendants refined and adopted a "policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information," which plaintiffs claim was part of "an unreasonably lengthy and punitive mass arrest processing plan" they call "MAPP." (FAC ¶ 65). According to plaintiffs, the No-Summons Policy and MAPP were specifically directed at OWS protestors. (FAC ¶ 67).

They allege that those two policies differ drastically from the standard policing procedures codified in the NYPD Patrol Guide. (FAC ¶ 69). The standard procedures, according to plaintiffs, call for persons "detained and arrested for non-criminal violations ... as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, [to be given] individualized determinations of eligibility for release with a Universal Summons or [Desk Appearance Ticket ("DAT") ]." (FAC ¶ 69). The plaintiffs allege that the substitution of the No-Summons Policy and MAPP in place of the standard procedures resulted in longer detainment periods for OWS protestors. (FAC ¶¶ 70-73). Plaintiffs claim that these policies derived from "ill-will toward [protestors'] perceived association with OWS," (FAC ¶ 78), and defendants' desire to "deter and/ or prevent [protestors] from participating in further OWS-related demonstrations," (FAC ¶ 80).

Plaintiffs also claim that the City utilized similar policies and practices against protestors during the 2004 Republican National Convention (the "RNC"). (FAC ¶¶ 29-31). According to plaintiffs, the City's RNC policies led to unconstitutional results including the widespread failure to make individualized determinations of probable cause, (FAC ¶ 38); the use of excessive force by police officers, (FAC ¶ 39); and, unnecessarily long pre-arraignment detention periods for arrestees, (FAC ¶ 40). The City subsequently "failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with," mass protest activities, "despite decades of litigation" spurred by the RNC policies, among others. (FAC ¶¶ 45, 26).

On that basis, plaintiffs claim that the City and the "supervisory defendants" knew or should have known that the "NYPD's plans for policing and mass arrest processing" used in connection with the March 17, 2012 OWS protest "would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, fabrication of evidence, and other unlawful conduct that would lead to constitutional rights violations." (FAC ¶ 105). And, despite that knowledge, the supervisory defendants failed to intervene to prevent or remediate the injuries suffered by the plaintiffs, (FAC ¶ 148), which included "physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages," (FAC ¶¶ 174, 195, 208).

DISCUSSION

I. Legal Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S.

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 112 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to any presumption of truth. Id.

II. Plaintiffs' Section 1983 Claims.

**\*4** To state a claim under section 1983, a plaintiff must allege that state officials, acting under color of state law, deprived her of a right guaranteed to her by the Constitution or federal law. 42 U.S.C. § 1983; see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). Here, plaintiffs' claims are predicated on allegations that they were: (a) falsely arrested, (b) subjected to excessive force, (c) subjected to excessive detention, (d) victims of malicious abuse of process, (e) deprived of their rights to a fair trial under the Sixth Amendment, (f) deprived of their rights under the First Amendment, and, (g) deprived of the equal protection of the laws under the Fourteenth Amendment. Plaintiffs also allege that the named individual defendants were personally involved in, and failed to intervene to protect plaintiffs from, the deprivation of their rights, see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), and that the City of New York is liable for the alleged constitutional violations, see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978). The Court will examine each of these claims in turn.

A. False Arrest Claim.

As an initial matter, plaintiff Don Fitzgerald withdraws his false arrest claim because his arrest was not actually resolved with an ACD, as originally pled, but rather with a guilty plea to disorderly conduct, which is a "violation" and not a crime. (Plaintiffs' Memorandum of Law in Opposition, 4); see N.Y. Penal Law § 240.20. [2] Even if he had not withdrawn his false arrest claim, a "plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested." Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986); see Sealey v. Fishkin, 96 cv 6303 (RR), 1998 WL 1021470, at \*4 (E.D.N.Y. Dec. 2, 1998) (granting summary judgment dismissing false arrest claim on the basis that plaintiff was convicted, on his own guilty plea, to disorderly conduct, a "violation" rather than a crime).

Marom's and Rocek's false arrest claims remain. Claims for false arrest brought under section 1983 "are 'substantially the same' as claims for false arrest ... under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "To state a claim for false arrest under New York law, plaintiffs must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). Defendants argue that plaintiffs have not adequately pled facts showing that the arrests of the plaintiffs "was not otherwise privileged," and, alternatively, that defendants had probable cause to arrest Marom and Rocek. In response, plaintiffs contend that there was no probable cause to arrest or that the alleged basis for probable cause is improper because the arresting officers did not personally observe plaintiffs' conduct.

**\*5** In order to state a claim for false arrest, plaintiffs "must show that ... [their] confinement was not otherwise privileged." Savino, 331 at 75. Essentially, this element amounts to determining whether there was legal justification for the challenged arrest—in most cases, whether there was probable cause. See Benjamin v. United States, 554 F. Supp. 82, 85 (E.D.N.Y. 1982). The FAC includes no factual content regarding the arrests aside from the assertion that, prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196).

Defendants argue that plaintiffs' assertion that they were "lawfully present" is a legal conclusion and not a statement of fact upon which a claim for relief can be based. They also argue that the FAC does not state a plausible false arrest claim because it fails to describe any of the surrounding circumstances leading to the arrest. Defendants assert that, because showing that an arrest was "not otherwise privileged" is an element of a prima facie claim for false arrest, plaintiffs must actually allege sufficient factual content to permit the Court to reasonably infer that the arrest was unjustified. And, the federal pleading standards would seem to require plaintiffs, at a minimum, to do just that. See Iqbal, 556 U.S. at 678 ("The plausibility standard ... asks

2016 WL 916424

for more than a sheer possibility that a defendant has acted unlawfully.") On that basis, defendants argue that plaintiffs' false arrest claim cannot survive a motion to dismiss.

Claims in federal court are governed by federal pleading standards; in the case of section 1983 claims alleging false arrests, state law supplies the elements of the claim. The New York Court of Appeals has held that plaintiffs need not allege "want of probable cause" when stating a false arrest claim based on a warrantless arrest. Broughton v. State, 37 N.Y.2d 451, 458 (1975). This is because, as a matter of substantive law, there is a presumption that "[w]henever there has been an arrest and imprisonment without a warrant" the arrest is unlawful. Id.; Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) ("Where an officer makes an arrest without a warrant, the presumption arises that the plaintiff's arrest was unlawful"). In such cases, it is defendants who bear the burden "of proving that probable cause existed for the plaintiff's arrest" as an affirmative defense. Savino, 331 F.3d at 76 (citing Broughton, 37 N.Y.2d at 458). Thus, the requirement that plaintiffs "show that ... [their] confinement was not otherwise privileged" is satisfied simply by alleging that the arrest was made without a warrant. Because it is reasonable to infer from the FAC that plaintiffs were arrested without a warrant, plaintiffs Marom and Rocek have stated a plausible claim for false arrest despite the paucity of facts alleged in the FAC.

Given the lack of factual content alleged in the FAC, it is impossible for the Court to determine, as a matter of law, that there was probable cause to arrest. This also precludes the Court from being able to determine, at this stage, whether defendants are protected from liability by the doctrine of qualified immunity. See Savino, 331 F.3d at 71 (quoting Mandell v. Cty. of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003)) ("[U]nder the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights.")

B. Excessive Force Claim.

**\*6** A claim of excessive use of force during an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, the plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Marom alleges that he was "violently arrested," (FAC ¶ 159), and that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). Rocek alleges that officers "grabbed [her] by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground," (FAC ¶ 178); that officers ripped her jacket, (FAC ¶ 187); that an officer "twisted her arm back as he placed plastic flexcuffs on her," (FAC ¶ 183); that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185); and, that her flexcuffs were tight and remained fastened for approximately four hours, (FAC ¶ 190). Fitzgerald alleges that officers grabbed him and threw him face-down on the ground, (FAC ¶ 198), that an unidentified NYPD officer hit him "at least ten times in the face" (FAC ¶ 199), and that the police handcuffed him tightly, (FAC ¶ 203). Fitzgerald also claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). The Court will first address plaintiffs' excessive force claims regarding the use of handcuffs and then will address the balance of plaintiffs' excessive force claims.

"Although handcuffs must be reasonably tight to be effective, [ ], overly tight handcuffing can constitute excessive force." Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*." Id. (quoting Esmont v. City of New York, 371 F.Supp.2d 202, 215 (E.D.N.Y. 2005) (emphasis in original). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); see also Lynch, 567 F. Supp. at 468-69 (collecting cases).

While the FAC alleges that all three plaintiffs were handcuffed tightly, there are no allegations that any of the three ever complained to law enforcement about their handcuffs and that defendants ignored those complaints, and there are no allegations that any plaintiff experienced

injuries because of the handcuffs. Marom and Fitzgerald do claim they were handcuffed for "several hours," (FAC ¶¶ 165, 203), and Rocek claims she was handcuffed for "four hours," (FAC ¶ 190), but courts in this district have held other claims alleging similar periods of handcuffing insufficient to state a claim for excessive force. See, e.g., Higginbotham v. City of New York, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (three hours); Omor, 2015 WL 857587, at *7 (four to five hours); Bender v. City of N.Y., 09 cv 3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (fourteen hours). Because the FAC only contains allegations that plaintiffs were handcuffed tightly for several hours, it fails to state a plausible excessive force claim based on defendants' use of handcuffs.

With regard to the remaining allegations of excessive force alleged to have been used by defendants, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [ ], violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted). Courts in this district have regularly held that a plaintiff must have sustained some injury to maintain a claim of excessive force. See, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); Wims v. New York City Police Dep't, 10 cv 6128 (PKC), 2011 WL 2946369, at *4-5 (S.D.N.Y. July 20, 2011). That injury, however, need not be severe. See Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

 *7 In the case of Marom, the FAC fails to state a claim for excessive force. Marom alleges only that he was "violently arrested." The FAC does not explain what specific acts the unidentified officers took against Marom on March 17, 2012 or whether Marom suffered any injuries as a result of the arrest. In the absence of more detailed allegations, Marom has failed to plausibly allege an excessive force claim. See, e.g., Bender, 2011 WL 4344203, at *6 (dismissing excessive force claim where plaintiff claimed only that she was "turn [ed] [ ] upside down, handcuff[ed] [ ] multiple times, [and] physically assault[ed]") (alterations in original).

The FAC also fails to state a plausible excessive force claim with respect to Rocek. The most severe of Rocek's excessive force allegations are that officers "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground," (FAC ¶ 178), and that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185). The FAC does not, however, allege that Rocek sustained any injuries. Because Rocek does not assert that defendants injured her, allegations that defendants used this minimal amount of force during an arrest are not sufficient to defeat a motion to dismiss. See, e.g., Acosta, 2012 WL 1506954, at *10 (dismissing excessive force claim where plaintiff alleged that an officer "pushed his wrist into his pocket, punched him in the chest, threw him to the ground face first, forcibly handcuffed his left arm, and attempted to manipulate his right arm into handcuffs as well"); Wims, 2011 WL 2946369, at *4 (dismissing excessive force claim where plaintiff asserted that "he was pulled out of his car and 'thrown flat on [his] face unto the filthy ground'")

Conversely, Fitzgerald does allege a plausible claim for excessive use of force. Fitzgerald asserts that an unidentified NYPD officer hit him "at least ten times in the face," (FAC ¶ 199), and that, as a result, his face was swollen and painful for around a week. (FAC ¶ 206). In contrast to Marom's and Rocek's claims, Fitzgerald alleges that he was injured during his arrest. While his injuries were slight, a plaintiff need not suffer severe injuries to make out a plausible claim for excessive use of force. See Robison, 821 F.2d at 924. In the present case, the combination of the amount of force allegedly used—ten hits to the face—with the injuries allegedly sustained—a swollen and painful face for about a week—permit Fitzgerald's excessive force claim to survive a motion to dismiss.

In sum, the only excessive force claim that survives defendants' motion to dismiss is Fitzgerald's claim arising out of an unidentified officers' repeated hits to his face.

### C. Excessive Detention Claim.

The Fourth Amendment also "governs the procedures applied during some period following an arrest." Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005). Again, the Fourth Amendment's reasonableness test is one of "objective reasonableness," meaning that the subjective motivations of individual officers have no bearing on whether a seizure was reasonable under

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

the Fourth Amendment. Id. "In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention." Id.; see Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). The Supreme Court subsequently clarified what it meant by "prompt" judicial determination of probable cause and held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."). In New York, because probable cause determinations are made at arraignments, the Fourth Amendment requires that an arrestee be arraigned within 48 hours. See Bryant, 404 F.3d at 138. [3]

**\*8** Plaintiffs have failed to plead a plausible claim for excessive detention. According to the FAC, Marom was detained for "40 hours or more" prior to being arraigned, (FAC ¶ 167); Rocek was detained for 24 hours, (FAC ¶ 193); and Fitzgerald was detained for "30 or more hours," (FAC ¶ 205). Because plaintiffs' pre-arraignment detention did not exceed 48 hours, their detention period was presumptively reasonable.

Moreover, plaintiffs has failed to make any plausible, non-conclusory allegations showing that the length of their detention resulted from "extraordinary circumstances." McLaughlin, 500 U.S. at 56. The FAC alleges that plaintiffs' were detained "for the purpose of gathering additional evidence to justify the arrest," (FAC ¶ 77), "for delay's sake," (FAC ¶ 79), and "based on malicious, bad faith intent to inhibit or punish" them, (FAC ¶ 75), but those allegations are entirely conclusory and simply parrot the bases for finding "extraordinary circumstances." The fact that each plaintiff was arraigned on charges of resisting arrest, (N.Y. Penal Law § 205.30), second-degree obstruction of governmental administration, (N.Y. Penal Law § 195.05), disorderly conduct violation, (N.Y. Penal Law § 240.2), and trespass violation, (N.Y. Penal Law

§ 140.05), undermines the plausibility of the assertion that plaintiffs were held longer in order for police to gather evidence of those charges. (Winslow Decl., Ex. C). And, the fact that each plaintiff was detained for a substantially different period of time undermines the plausibility of the assertion that they were detained because of defendants' systemic ill-will towards OWS protestors. For all of the foregoing reasons, plaintiffs' excessive detention claims are dismissed.

### D. Malicious Abuse of Process Claim.

State law provides the elements of a section 1983 claim based on malicious abuse of process. See Savino, 331 F.3d at 76. "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). To establish that a defendant employed legal process "in order to obtain a collateral objective that is outside the legitimate ends of the process," a plaintiff must show more than just a malicious motive. Savino, 331 F.3d at 77; see also Curiano v. Suozzi, 63 N.Y.2d 113, 117 (1984) ("A malicious motive alone, however, does not give rise to a cause of action for abuse of process."). "A plaintiff must establish that the defendants had an improper *purpose* in instigating the action." Savino, 331 F.3d at 77 (emphasis in original).

While plaintiffs allege, albeit in a conclusory fashion, that a number of defendants conspired to falsify arresting documents against plaintiffs, (FAC ¶ 117), and that plaintiffs were prosecuted on the basis of those false documents, (FAC ¶ 147), they do not allege any facts permitting a plausible inference that defendants did so "in order to obtain a collateral objective that is outside the legitimate ends of the process." Sheldon, 41 F.3d at 80. Plaintiffs do not identify any possible collateral objective. The allegation that defendants falsified documents permits the Court to infer that defendants intended to do plaintiffs harm, but, an evil motive is not enough to sustain a claim for malicious abuse of process. See Savino, 331 F.3d at 77-78 (holding that plaintiff failed to state a malicious abuse of process claim where he alleged that his investigation and arrest by the defendants was motivated by the defendants' desire to seek vindication for embarrassment the plaintiff caused the City of New

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 116 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

York). Plaintiffs' claims for malicious abuse of process will be dismissed.

E. Right to a Fair Trial Claim.

**\*9** "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015). A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial. See Ricciuti, 124 F.3d at 127 (plaintiffs bringing a section 1983 claim for right to a fair trial had their criminal charges dismissed pre-trial); Canario v. City of New York, 5 cv 9343 (LBS), 2006 WL 2015651, at \*1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial).

As described above, plaintiffs allege that defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to create, and created, false arresting documents against plaintiffs. (FAC ¶ 117). Specifically, plaintiffs claim that defendants Blanco and Charnyavsky instructed and assisted Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). They claim that Galgano, Boyle, and Valentine—who filled out arresting paperwork allegedly swearing they saw plaintiffs engage in certain conduct —never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs assert that "[b]ased on those false statements, Plaintiffs were prosecuted for criminal offenses." (FAC ¶ 147).

Those assertions, however, are not sufficient to plausibly allege a fair trial claim. Critically, plaintiffs fail to assert how, in what way, or to what effect, the defendants specifically falsified their arrest processing paperwork. A fair trial claim cannot survive a motion to dismiss based only on broad and conclusory allegations the officers made "false narratives" about what they saw. See Abdul-Rahman v. City of New York, 10 cv 2778 (ILG), 2012 WL 1077762, at \*12 (E.D.N.Y. Mar. 30, 2012) (dismissing a plaintiff's fair trial claim "because he has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false or even in what material respect the charges against him were false").

The claim that the false reports were "likely to influence a jury's decision" is also entirely speculative. See Ricciuti, 124 F.3d at 130. The Officers would have had to testify to the purportedly false statements included in the arresting paperwork in court, as the arrest reports, if they included inculpatory evidence against plaintiffs, would have been inadmissible on their own on Confrontation Clause grounds. See Crawford v. Washington, 541 U.S. 36, 59 (2004) (stating Confrontation Clause rule applicable to "[t]estimonial statements of witnesses absent from trial"); See also United States v. Garcia, 282 F. App'x 14, 24 (2d Cir. 2008) (permitting two officers to read from arrest reports and holding that there was no Confrontation Clause violation "because both police officers were witnesses subject to cross-examination by the defendants testifying about their own prior recollection of events"). This kind of speculative chain of events does not suffice to state a plausible fair trial claim. See Brown v. City of New York, 2014 U.S. Dist. LEXIS 181736, \*10 (E.D.N.Y. Dec. 23, 2014) (dismissing right to fair trial claim based on allegedly false statements contained in arrest paperwork); see also Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at \*11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").

F. First Amendment Claim.

1. Retaliation.

**\*10** As an initial matter, Fitzgerald's First Amendment retaliation claim will be dismissed on the basis that there was probable cause to arrest him. The existence of probable cause will defeat a First Amendment claim "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive." Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."). Fitzgerald pled guilty to a disorderly conduct violation arising from his arrest on March 17, 2012. (Plaintiffs' Memorandum of Law in Opposition, 4);

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 117 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

see N.Y. Penal Law § 240.20. Because "a conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause," Cameron, 806 F.2d at 387, Fitzgerald's First Amendment retaliation claim will be dismissed at this stage.

Marom's and Rocek's retaliation claims, however, remain in issue. "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). To satisfy the first element, plaintiffs must allege that they were engaged in speech protected by the First Amendment. Defendants argue that plaintiffs have failed to establish this element because plaintiffs allege only that they were present in Zuccotti Park.

"It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Virginia v. Black, 538 U.S. 343 (2003)). The test for determining whether conduct is sufficiently expressive to implicate the First Amendment is whether "'[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Id. (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)) (alterations in original). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies [ ] and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Id. (internal citation omitted).

Plaintiffs allege that they were present in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). While they do not explicitly state that they were "protesting for" or "supporting" or "engaging in political speech with" the OWS movement, they assert that they "participated in a First Amendment Assembly." (FAC ¶ 2). In the context of the FAC, the Court finds it reasonable to infer that plaintiffs used the phrases "in connection with six-month anniversary of the OWS movement" and "participated in a First Amendment Assembly" as shorthand for alleging that they were present in Zuccotti Park with the intention of supporting the OWS movement and its

political message. That inference also applies to Rocek, whom plaintiffs allege was volunteering as a street medic in connection with the OWS movement. (FAC ¶ 175). However, because plaintiffs' allege only that they were present in Zuccotti Park "in connection with" the six-month anniversary of OWS, the question remains whether supportive presence at a political rally, without more, qualifies as expressive conduct.

Courts in this district have held that physical occupation of Zuccotti Park in connection with an OWS rally constitutes expressive conduct. Gersbacher v. City of New York, 14 cv 7600 (GHW), 2015 WL 5692178, at *8 (S.D.N.Y. Sept. 25, 2015); Meyers v. City of New York, 14 cv 9142 (ALC), 2015 WL 6503825, at *14 (S.D.N.Y. Oct. 27, 2015); cf. Pluma v. City of New York, 13 cv 2017 (LAP), 2015 WL 1623828, at *8 (S.D.N.Y. Mar. 31, 2015) (holding that plaintiff who admitted to being "a bystander and citizen journalist witnessing the event," rather than a protester in OWS, was not engaged in expressive conduct). This Court agrees with those holdings. The test for expressive conduct is whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." Johnson, 491 U.S. at 404. A fair reading of the FAC is that plaintiffs intended to convey a particularized message of political support for OWS with their presence in, and occupation of, Zuccotti Park. The Court also concludes that such a message would have been sufficiently clear to any passerby —even if plaintiffs were not shouting or holding signs. It is plausible to conclude that an individual that chooses to physically associate with the OWS movement in its iconic locale on its six-month anniversary was engaging in expressive conduct protected by the First Amendment.

**\*11** Plaintiffs must also plausibly allege that defendants' actions against them were motivated or substantially caused by the exercise of their First Amendment rights and that defendant's actions caused them some injury. Regarding the third element—injury— plaintiffs can show "*either* that [their] speech has been adversely affected by the government retaliation or that [they have] suffered some other concrete harm." Dorsett, 732 F.3d at 160 (emphasis in the original). Criminal charges qualify as "some other concrete harm." See Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (holding that the "issuance of the tickets was an injury in that it subjected [plaintiff] to a state action requiring that she either appear in court,

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 118 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

pay a fine, or both"). Defendants' arrest of Marom and Rocek qualifies as an injury to them because it both halted their speech immediately and subjected them to criminal charges.

Regarding the second element—that defendants arrested them *because* they were exercising their First Amendment rights—the FAC includes no factual content regarding the circumstances surrounding plaintiffs' arrests. The only pertinent allegation made in the FAC is that prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). Marom and Rocek fail to describe any part of the interaction between themselves and the police or recount what they or the police were doing at or around the time they were arrested. While the law in no way requires plaintiffs' to set forth a detailed account of the events surrounding their claims in order to survive a motion to dismiss, it does require enough factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

A court in this district has previously held that a plaintiff involved in an OWS protest in 2011 adequately pled the second element of a retaliation claim by alleging only that officers arrested him while he was engaged in First Amendment speech. Meyers, 2015 WL 6503825, at *12; see also Gersbacher, 2015 WL 5692178, at *8 (denying motion to dismiss retaliation claim where plaintiff alleged he was arrested due to his participation in Occupy Wall Street). The district court based its holding on the Second Circuit's decision in Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015). In that case, the Circuit held that an officer's appearance at the plaintiff's house to deliver traffic tickets "mere hours" after plaintiff engaged in protected speech by complaining about the officer's prior conduct to his superiors "was sufficiently proximate to imply that the issuance of the tickets was motivated by [the plaintiff's] complaint." Campbell, 782 F.3d at 100. It was on that basis—the proximity in time between the plaintiffs' protected speech and the defendants' act—that the court in Meyers concluded that the plaintiff alleged a plausible retaliatory motivation for his arrest. Meyers, 2015 WL 6503825, at *12.

Even though the facts alleged by the plaintiff in her complaint in Smith v. Campbell provided ample factual

support, beyond mere proximity in time, for the inference that the officer's conduct was in retaliation for the plaintiff's protected speech, 782 F.3d at 96, the Court concludes that Marom's and Rocek's allegation that they were "lawfully present in Liberty Plaza in connection with the six month anniversary of the OWS movement" and were subsequently arrested, (FAC ¶¶ 157-59, 175-77), is adequate to state a retaliatory motive. But see Anemone v. Metro. Transp. Auth., 629 F.3d 97, 120 (2d Cir. 2011) (affirming summary judgment denying a retaliation claim where the timing of allegedly impermissible action "reflected instead the steady accumulation of misconduct" by plaintiff and not a retaliatory motive). Thus, Marom and Rocek have stated a plausible First Amendment retaliation claim. The Court acknowledges that the claim, like all claims, may look very different at the summary judgment stage and mere temporal proximity may ultimately prove to be insufficient for a reasonable jury to rule in Marom's and Rocek's favor.

### 2. Time, Place, and Manner Restriction.

**\*12** In addition to their retaliation claim, it appears that plaintiffs also challenge "the restrictions imposed by defendants on plaintiffs' First Amendment rights" as being unconstitutional time, place, and manner restrictions. (FAC ¶ 242).

"[E]xpressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used. Accordingly, [the Supreme Court] has held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication."

Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992) (quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)). It is not clear, however, what plaintiffs are asserting were improper time, place, and manner restrictions.

The FAC, read in a light most favorable to plaintiffs, could be alleging that the rules governing the use of Zuccotti Park were unconstitutional time, place, and manner restrictions. To that end, plaintiffs cite several zoning regulations that deal with a variety of issues regarding the park: the requirement that at least 50% of

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 119 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

the sidewalk must be free of obstruction, (FAC ¶ 50), the process for making physical modifications to the park, (FAC ¶¶ 51-52), the requirement that all prohibitions on conduct in the park must be clearly posted in writing, (FAC ¶ 53), and the requirement that "public plazas shall be accessible to the public at all times, except where the [New York City Planning Commission] has authorized a nighttime closing," (FAC ¶ 55). However, plaintiffs make no allegations explaining how any of these regulations could plausibly be an improper time, place, and manner restriction on plaintiffs' First Amendment activity. They do allege that police erected barricades around Zuccotti Park beginning on November 15, 2011, (FAC ¶ 93), and "ratified and enforced arbitrary and shifting criteria determining who could enter the park," (FAC ¶ 94). But, plaintiffs fail to specifically identify any regulation or allege how that regulation was unconstitutional.

Instead, plaintiffs allege that defendants violated the rules regarding Zuccotti Park when arresting OWS protestors on March 17, 2012. And, to the extent the FAC is alleging that the NYPD's conduct itself was somehow an unconstitutional time, place, and manner restriction, plaintiffs only make reference to two actual "policies:" the No-Summons and MAPP policies. According to plaintiffs own complaint, however, those policies dealt with how arrested protestors would be processed by the NYPD. Plaintiffs do not claim that those policies were related to the decision to arrest OWS protestors in the first place. And, to the extent the police arrested plaintiffs in violation of the First Amendment, that constitutional deprivation is covered by plaintiffs' retaliation claim. In sum, even assuming that Zuccotti Park is a traditional public forum in which the First Amendment applies with full force, see Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at *9 (S.D.N.Y. Aug. 26, 2015) (describing that the recent decisions in this court involving OWS have assumed, but not clearly held that the First Amendment applies to Zuccotti Park), plaintiffs fail to identify any plausible unconstitutional time, place, and manner restriction.

G. Equal Protection Claim.

*13 "There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff could: (1) "point to a law or policy that expressly classifies persons on [an improper basis];" (2) "identify a facially neutral

law or policy that has been applied in an intentionally discriminatory manner;" or, (3) "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Id. It appears from the FAC that plaintiffs are proceeding with an Equal Protection claim based on a selective enforcement theory.

"[A] violation of equal protection for selective enforcement would arise if: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Plaintiffs claim the OWS protestors were subjected to different policing policies than other similarly situated individuals. In essence, plaintiffs allege that the City, through the supervisory defendants and the NYPD, implemented two different policies regarding persons detained and arrested for non-criminal violations. The first policy, the standard one codified in the NYPD's Patrol Guide, calls for individuals detained and arrested for non-criminal violations to be eligible "for release with a Universal Summons or DAT [Desk Appearance Ticket] rather than being held in custody for arraignment." (FAC ¶ 69). This would reduce the amount of time such individuals spent in custody to between two and four hours. (FAC ¶ 70). In contrast, plaintiffs allege that defendants used a second policy, which plaintiffs called the No-Summons Policy and MAPP, to specifically target OWS protestors detained and arrested at demonstrations and to deny them individual consideration for release with a summons. (FAC ¶ 64). Instead, the police centralized the processing of OWS protestors, created false documents regarding those protestors, and subjected them to unreasonably lengthy detention periods. (FAC ¶ 65).

Plaintiffs assert that they were subjected to these policing practices because of their political views. In other words, defendants arrested plaintiffs and refused to give them summonses because they intended to inhibit or punish plaintiffs for the exercise of their First Amendment rights. But, plaintiffs plead only conclusory allegations regarding

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

defendants' intent to discriminate against plaintiffs. They allege no factual content that leads to a reasonable inference that defendants used the "No-Summons" and "MAPP" policies specifically against OWS protestors with an intent to discriminate against them or their political message. There is no non-conclusory allegation that defendants have any antipathy toward any aspect of the viewpoint of the OWS protestors. Conclusory allegations alone are not sufficient to establish a plausible equal protection claim. See Turkmen v. Hasty, 789 F.3d 218, 253-54 (2d Cir. 2015) (finding that claims of discriminatory intent are sufficient to defeat a motion to dismiss where plaintiffs alleged that high level officials condoned discriminatory actions by other officials).

Moreover, plaintiffs fail to adequately allege that they were in fact treated differently than other similarly situated persons. The Second Circuit has interpreted "similarly situated" to mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). Plaintiffs fail to allege any comparative cases at all. Plaintiffs have also failed to adequately allege that defendants policed the March 17, 2012 OWS demonstration differently than other similarly large and disruptive demonstrations. In fact, while the FAC fails to allege that defendants used the standard policing policy during other similarly large demonstrations, it does allege that other large demonstrations not associated with OWS were subjected to policies similar to the "No-Summons" and "MAPP" policies. Specifically, plaintiffs allege that similar policies were used against demonstrations connected with the Republican National Convention in 2004. (FAC ¶¶ 29-45).

**\*14** Thus, even assuming that defendants utilized a non-standard policing policy on March 17, 2012, plaintiffs fail to plausibly allege that it was applied selectively against OWS or with an intent to discriminate against OWS protestors. Plaintiffs' equal protection claims do not survive a motion to dismiss.

H. Personal Involvement of Named Defendants.
"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)

(quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Plaintiffs only surviving claims are Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's claim for excessive use of force. If the FAC fails to plausibly allege the personal involvement of the individual defendants' in each of those claims, those respective claims must be dismissed as to those particular defendants.

Prior to the Supreme Court's decision in Iqbal, the law in this Circuit regarding when a defendant was "personally involved" in a constitutional deprivation differentiated sharply between subordinate and supervisory officials. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); Colon, 58 F.3d at 873. Any defendant, subordinate or supervisory, was liable under section 1983 if he or she "directly participated" in a constitutional deprivation. Williams, 781 F.2d at 323; see also Colon, 58 F.3d at 873. Supervisory officials, however, could also be liable for constitutional deprivations arising from conduct related to his or her supervisory responsibilities. Colon, 58 F.3d at 873. Specifically, the Circuit in Colon held that personal involvement of a supervisor may be established by evidence that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The "Colon test" permitted courts to find that supervisory officials were "personally involved" in any constitutional deprivation, regardless of the elements of the underlying constitutional provision at issue, if plaintiffs could prove any one of those five factors. See, e.g., Jenkins v. Garvin, 95 cv 3273 (JSM), 1997 WL

414128, at \*3 (S.D.N.Y. July 23, 1997) (recognizing that in a section 1983 claim premised on the Eighth Amendment a "prisoner may demonstrate the personal involvement of a supervisor by evidence that shows that the supervisor created or allowed the continuance of a policy under which the constitutional deprivation occurred or was grossly negligent in the supervision of a subordinate").

The Iqbal decision rejected Colon's one-size-fits-all "supervisory liability" test in the context of examining a claim of "invidious discrimination in contravention of the First and Fifth Amendments." 556 U.S. at 676. Emphasizing that "vicarious liability is inapplicable to Bivens and § 1983 suits," the Court held that a supervisory official could be found personally liable for a constitutional deprivation only on the basis of "his or her own misconduct." Id. at 676-77. The Court also held that the factors necessary to establish when a supervisor's actions constituted "misconduct" depended only on "the constitutional provision at issue." Id. at 675-76. For example, on a claim of discrimination in violation of the Fifth Amendment's equal protection component, a plaintiff must establish that each defendant acted with a discriminatory purpose.[4] Id. at 676. A plaintiff cannot establish that a supervisor was liable for discrimination simply by proving that the supervisor knew that a subordinate acted with a discriminatory purpose. Id. Where "purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." Id. at 677.

**\*15** The Second Circuit has yet to definitively address the impact of Iqbal on the Colon test in areas outside of discrimination. See Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (casting doubt on the Colon test); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal."). In the absence of binding precedent, district courts in this Circuit have divided into two camps. Some courts hold that Iqbal categorically eliminated the second, fourth, and fifth Colon factors. See, e.g., Bellamy v. Mount Vernon Hosp., 07 cv 1801 (SAS), 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009) aff'd sub nom. Bellamy v. Mount Vernon Hosp., 387 F. App'x 55 (2d Cir. 2010) ("Only the first and part of the third Colon categories pass Iqbal's muster—a

supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."). While other courts hold that the viability of the second, fourth, and fifth Colon factors depends on the underlying constitutional claim. See, e.g., Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."); Delgado v. Bezio, 09 cv 6899 (LTS), 2011 WL 1842294, at \*9 (S.D.N.Y. May 9, 2011) (holding that "where the claim does not require a showing of discriminatory intent, the Colon analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated") (internal quotation marks omitted). Neither sect, however, disputes the viability of the "direct participation" and "policy or custom" factors.

With regard to the disputed second, fourth, and fifth factors of the Colon test, this Court agrees with the latter group. The holding in Iqbal does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was "grossly negligent" or "deliberately indifferent." It only requires that a supervisor's action —whether direct or through "his or her superintendent responsibilities"—must itself violate the terms of the constitutional provision at issue. Iqbal rejected the idea that subordinates and supervisors could be held to different standards of liability for violations of the same Constitutional right, which, to the majority, amounted to applying the forbidden vicarious liability standard under a different label. But, Iqbal does not insulate supervisors from liability for any act or omission that on its own satisfies "each element of the underlying constitutional tort." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015). The Second Circuit's recent decision in Turkmen v. Hasty supports this reading of Iqbal. 789 F.3d at 250 (holding that plaintiffs stated a plausible 1983 claim for an Eighth Amendment deprivation against certain supervisory defendants whose conduct amounted to "deliberate indifference" because the "underlying constitutional violation requires no more than deliberate indifference").

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

In the current case, the surviving claims are for false arrest, First Amendment retaliation, and excessive force. Plaintiffs allege that the supervisory defendants were personally involved in each those violations. In line with the view stated above, the second, fourth, and fifth Colon factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement. See Dorsett, 732 F.3d at 160 (holding that on a claim for First Amendment retaliation plaintiffs must show that a "defendant's actions were motivated or substantially caused by his exercise of [plaintiff's First Amendment rights]"). But, those factors may be viable when it comes to false arrest and excessive force claims because those claims have no state-of-mind requirement, only an objectively reasonable standard. It is not necessary, however, for the Court to weigh in definitively on which of the disputed Colon factors are viable for which claims because plaintiffs fail to plausibly allege any facts showing that the supervisory defendants were "grossly negligent" or "deliberately indifferent." Plaintiffs only plausibly allege that defendants "directly participated" in, and "created a policy or custom" allowing for, their constitutional deprivations.

**\*16** Importantly, even if plaintiffs did establish that one of the supervisory defendants created a policy or custom under which a constitutional deprivation occurred, they "must also establish that the supervisor's actions were the proximate cause of the [their] constitutional deprivation." Raspardo, 770 F.3d at 116 (2d Cir. 2014). Section 1983 specifically extends liability to "every person who ... subjects, *or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any [Constitutional rights.]" 42 U.S.C. § 1983 (emphasis added). The Supreme Court has interpreted this language to mean that "Congress did not intend § 1983 liability to attach where such causation was absent." Monell, 436 U.S. at 692. Causation incorporates the tort concept of proximate cause, a concept that has long turned on reasonable foreseeability. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 833 (1985) ("Ordinary principles of causation used throughout the law of torts recognize that 'but for' causation, while probably a necessary condition for liability, is never a sufficient condition for liability."); See also Stanford v. Kuwait Airways Corp., 89 F.3d 117, 125 (2d Cir. 1996) (describing two concepts of foreseeability, with one, "the foreseeability of the specific injury the plaintiff suffered,"

being related to proximate cause). Where acts of third parties are involved, which will generally be the case in section 1983 claims where a supervisor's liability is premised only on her creation of a "policy or custom," the supervisor may be held liable for "those consequences attributable to *reasonably foreseeable* intervening forces." Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (internal quotation marks omitted) (emphasis added). Thus, if the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant. See Victory v. Pataki, No. 13--3592, 2016 WL 373869, at \*15 (2d Cir. Feb. 1, 2016), as amended (Feb. 24, 2016) (affirming dismissal of claims against Governor Pataki for lack of personal involvement where plaintiff only alleges that Governor Pataki had a blanket policy of opposing parole to violent offenders, but does not allege that that policy led the Governor's staff "to intervene in parole decisions" or to ratify "the rescission procedures employed by the Board of Parole").

### 1. False Arrest.

#### i. Officers Galgano, Boyle, and Valentine.

Plaintiffs do not allege that Galgano or Boyle were personally involved in seizing Marom or Rocek from Zuccotti Park. However, they do allege that Galgano and Boyle were personally involved in creating the NYPD paperwork documenting Marom's and Rocek's arrests. (FAC ¶¶ 139-40). Galgano allegedly filled out the arresting paperwork for Marom, (FAC ¶ 139), and Boyle allegedly filled out the arresting paperwork for Rocek, (FAC ¶ 140). Plaintiffs also allege that the paperwork included "false statements" about what the officers allegedly saw. (FAC ¶¶ 144-45, 147). These allegations are adequate, at this stage, to support claims that Galgano "directly participated" in Marom's false arrest and Boyle "directly participated" in Rocek's false arrest. [5]

"Direct participation" means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001). First, Galgano and Boyle intentionally participated in the

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 123 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 916424

respective arrests by filling out the arresting paperwork for each of those plaintiffs. Second, there is a plausible basis to infer that Galgano and Boyle knew that the arrests were unlawful, if indeed they were, because they were tasked with filing the arrests, which presumably included stating the basis for probable cause. While the FAC also alleges that Officer Valentine filled out the arresting paperwork for Fitzgerald, his false arrest claim does not survive the motion to dismiss. Beyond that, there are no allegations that Officer Valentine directly participated in the arrests of, or filled out the arresting paperwork for, Marom and Rocek.

In sum, Marom adequately alleges that Officer Galgano was personally involved in his false arrest and Rocek adequately alleges that Officer Boyle was personally involved in her false arrest.

ii. Supervisory Defendants.

Marom and Rocek also claim that the named "supervisory defendants"—Chief of Department Esposito, Deputy Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky—were personally involved in their false arrests.

The FAC alleges that Blanco and Charnyavsky met with and supervised Officers Galgano and Boyle in connection with processing Marom's and Rocek's arrests. (FAC ¶¶ 127-28). A supervisor can be personally liable if he "participated directly in the alleged constitutional violation." Colon, 58 F.3d at 873. "[O]rdering or helping others to do the unlawful acts, rather than doing them [oneself]," can constitute "direct participation." Provost, 262 F.3d at 155. Blanco and Charnyavsky allegedly gathered together and conferred with the arresting officers and eight other officers, and "conferred with each other about" what they had observed and what the charges were against plaintiffs. (FAC ¶ 114). And, Blanco and Charnyavsky allegedly "instructed" Officers Galgano and Boyle "regarding what to write in their NYPD arrest processing paperwork," including "creating false narratives." (FAC ¶¶ 115-17). Those allegations, coupled with the allegations that Officers Galgano and Boyle lied about conduct they allegedly did not see, (FAC ¶¶139-40), create a plausible claim that Blanco and Charnyavsky "participated directly in the" purported false arrests

of Marom and Rocek with knowledge that they were unconstitutional. Colon, 58 F.3d at 873.

**\*17** Regarding Lieutenant Viviano, the FAC fails to plausibly allege that he was personally involved in Marom's and Rocek's false arrests. Plaintiffs allege that Viviano was responsible for ensuring the accuracy of Galgano's, Boyle's, and Valentine's arrest processing paperwork, (FAC ¶ 112), and that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Neither of those allegations give rise to a plausible inference that Viviano directly participated in either false arrest or created any policy or custom.

Regarding Deputy Inspector Winski, the allegations establishing his personal involvement in the false arrests are substantially the same as those against Viviano. Plaintiffs merely allege that he was the second highest ranking NYPD Officer in the vicinity of Marom's and Rocek's arrests, (FAC ¶ 108); that he, or Defendant Esposito, or both, had the responsibility "to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest," (FAC ¶ 111); and, that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Again, these allegations do not create a plausible inference that Winski directly participated in, or created a policy causing, the alleged unconstitutional arrests.

Lastly, regarding Chief of Department Esposito, plaintiffs' allegations fit into two categories. First, similar to the aforementioned allegations against Viviano and Winski, Marom and Rocek allege that Esposito was the highest ranking NYPD Officer "in the vicinity" of their arrests, (FAC ¶ 107), and that he was responsible for all supervisory decisions regarding all fellow officers at Zuccotti Park on March 17, 2012, (FAC ¶¶ 109-11). These allegations fail to state a plausible claim that Esposito "participated directly" in Marom's or Rocek's false arrest. Colon, 58 F.3d at 873.

Second, plaintiffs allege that Esposito "created a policy or custom under which unconstitutional practices occurred,

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 124 of 220

or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873. They allege that between September 17, 2011 and March 17, 2012, Esposito was personally involved in planning for policing the OWS protests and in designing and implementing the NYPD's police responses to OWS. (FAC ¶ 61). They also allege that he met with the then-NYPD Commissioner on a regular basis to discuss the OWS protest and that during those meetings the City adopted the "No-Summons" and "MAPP" policies. (FAC ¶ 63-65). According to plaintiffs, the "MAPP" policy called for NYPD Legal Bureau and Criminal Justice Bureau agents to be involved in "the centralized processing of arrestees in a single mass arrest processing center," which led to the "creation of boilerplate NYPD documents containing false information." [6] (FAC ¶ 65). In an endeavor to connect the "MAPP" policy to Marom's and Rocek's allegedly false arrest, plaintiffs assert that Legal Bureau Attorney Charnavsky instructed Officers Galgano and Boyle to include false information in Marom's and Rocek's arresting documents.

The allegations connecting Esposito to the "MAPP" policy and their attempts to connect the "MAPP" policy to Marom's and Rocek's false arrests are too attenuated to be a plausible basis for showing Esposito's personal involvement. First, the FAC does not "show[ ]" that Esposito was responsible for creating and implementing the "MAPP" policy other than the assertion that he was present during certain meetings with other high ranking NYPD and City decision makers.

*18 Second, the FAC fails to plausibly allege that the "MAPP" policy proximately caused the falsified reports or false arrests. In a major population center, multiple individuals may violate the law at a single location and at approximately the same time. Those situations may dictate that the police arrest many people in a short span of time. Nothing is inherently unlawful or unconstitutional about creating a plan in advance to deal with such occurrences. There is nothing wrong with developing a uniform procedure for all arrests arising out of a large event. Nor is the use of boilerplate forms or specifically trained agents to facilitate the processing of multiple arrests inherently unlawful or unconstitutional. Of course, the entry of knowingly false information on any record, boilerplate or otherwise, is unlawful. The FAC, however, fails to plausibly allege how Esposito or the "MAPP" policy he allegedly created *caused* false information to be relied upon or recorded during the processing of

Marom's and Rocek's arrests. Even assuming *arguendo* that certain defendants entered false information into Marom's and Rocek's arrest reports, plaintiffs fail to show how that intervening event was a reasonably foreseeable consequence of the so called "MAPP" policy.

In sum, plaintiffs' claims that Blanco and Charnyavsky were personally involved in the false arrest of Marom and Rocek survive the motion to dismiss, but their claims against Viviano, Winski, and Esposito do not.

2. First Amendment Retaliation.

Marom's and Rocek's claims for First Amendment retaliation also survive defendants' motion to dismiss. Those claims are functionally identical to plaintiffs' false arrest claims regarding the alleged basis for personal involvement of the named defendants, with support for the allegation of a retaliatory motive arising from the proximity in time between plaintiffs' expressive conduct and their arrests. Because both claims arise from the same factual allegations—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest on March 17, 2012—plaintiffs make identical contentions regarding how the named individual defendants were personally involved in those events. On that basis, the Court's analysis regarding the issue of personal involvement is the same on these claims as it was on the false arrest claims.

Thus, for the reasons explained above, plaintiffs adequately allege that Officer Galgano was personally involved in Marom's First Amendment retaliation claim and that Officer Boyle was personally involved in Rocek's First Amendment retaliation claim. Marom's and Rocek's claims that Blanco and Charnyavsky were personally involved in their retaliatory arrests also survives defendants' motion to dismiss. However, the claims that Viviano, Winski, and Esposito were personally involved in the plaintiffs' retaliatory arrests do not.

3. Excessive Force.

Fitzgerald's excessive force claim, as noted, also survives defendants' motion to dismiss. A single unidentified officer was allegedly responsible for the actual force used against Fitzgerald. (FAC ¶ 198). Nevertheless,

Fitzgerald maintains that Officers Galgano, Boyle, and Valentine and the "supervisory defendants" were personally involved in that use of excessive force.

### i. Officers Galgano, Boyle, and Valentine.

With regard to Officers Galgano and Boyle, plaintiffs do not allege that they saw Fitzgerald in Zuccotti Park, or otherwise participated in or witnessed the use of force against him. And, with regard to Officer Valentine, plaintiffs affirmatively state that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct. (FAC ¶¶ 136-37). Therefore, the FAC does not plausibly allege that any of the officers were personally involved in the unconstitutional use of force against Fitzgerald. Fitzgerald's excessive force claim is dismissed as to Officers Galgano, Boyle, and Valentine.

### ii. Supervisory Defendants.

There are no allegations that any of the supervisory defendants participated directly in the use of force against Fitzgerald. The most Fitzgerald alleges is that the supervisory defendants were "in the vicinity" of Zuccotti Park during the protest. For example, the FAC asserts that Esposito was "the highest ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 107), and that Winksi was "the second-highest-ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 108). It also alleges that "at least defendants Winski and Viviano were personally involved in OWS-related false arrests in the vicinity of Liberty Plaza." (FAC ¶ 150). These claims of presence in a "vicinity," in the context of a large protest in Zuccotti Park, do not plausibly allege direct participation in the use of excessive force against Fitzgerald.

**\*19** Plaintiffs do not plausibly allege a claim against Esposito. As already discussed, plaintiffs allege that defendant Esposito helped develop policing policies used in Zuccotti Park on March 17, 2012, (FAC ¶¶ 61, 63-65). They also allege, in a conclusory manner, that the use of force by police in making arrests was excessive or "extreme." (FAC ¶ 86). However, plaintiffs fail to draw any causal connection between the "No-Summons" and "MAPP" policies, which deal with methods of arrest processing and post-arrest disposition, and the use of force against OWS protestors. (FAC ¶ 86). Plaintiffs allege

that Esposito helped design similar policing policies for the 2004 RNC protests and that those policies resulted in the use of excessive force by police against many arrestees in 2004. (FAC ¶¶ 30-39). But again, the FAC fails to plausibly allege that the policies were the proximate cause of the use of force against Fitzgerald during this OWS protest. Instead, the facts alleged in the FAC give rise to the reasonable inference that the actual use of force was an unforeseeable intervening act. There is nothing alleged about any of the cited policies from which a police supervisor could reasonably foresee that subordinate officers would use excessive force by reason of those policies. Rule 8(a) requires a party to set forth or "show[ ]" facts that make the allegation plausible. Apart from conclusory allegations, the FAC does not permit a reasonable inference that Esposito created or continued policies that caused the excessive use of force against Fitzgerald.

In sum, plaintiffs do not plausibly allege a basis for holding any of the named individual defendants personally liable for the excessive use of force against Fitzgerald and the claim is dismissed as to them all.

### I. Failure to Intervene.

Plaintiffs also claim that the named individual defendants are liable for failing to intervene to prevent plaintiffs' alleged constitutional deprivations. Specifically, Marom alleges that the supervisory defendants and Officers Boyle and Valentine failed to intervene to protect his rights; Rocek alleges that the supervisory defendants and Officers Galgano and Valentine failed to intervene to protect her rights; and, Fitzgerald alleges that the supervisory defendants and Officers Galgano and Boyle failed to intervene to protect his rights. Because a "failure to intervene [ ] claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012); see also Feinberg v. City of New York, 99 cv 12127 (RC), 2004 WL 1824373, at \*4 (S.D.N.Y. Aug. 13, 2004), plaintiffs' failure to intervene claims are assessed only as they relate to Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's excessive force claim.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 126 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [ ] (2) that a citizen has been unjustifiably arrested [ ] or (3) that any constitutional violation has been committed by a law enforcement official [ ]." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id.

1. False Arrest Claims.

Rocek alleges that Officers Galgano and Valentine failed to intervene in her unlawful arrest and Marom alleges that Officers Boyle and Valentine failed to intervene in his unlawful arrest. Specifically, the FAC alleges that Galgano, Boyle, and Valentine "gathered together and conferred with each other about what they had observed and what the charges were" regarding Marom and Rocek, prior to filing formal arresting paperwork and further detaining the two plaintiffs. (FAC ¶ 114). On that basis, Rocek plausibly alleges that Galgano and Valentine had a realistic opportunity to intervene in her false arrest and Marom plausibly alleges that Boyle and Valentine had a realistic opportunity to intervene in his false arrest.

Marom and Rocek also allege that the supervisory defendants failed to intervene to stop their false arrests. As an initial matter, Marom and Rocek plausibly allege that Blanco and Charnyavsky were personally involved in their false arrests. Those defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation. Regarding Viviano's, Winski's, and Esposito's failure to intervene in Marom's and Rocek's false arrest, the two plaintiffs fail to allege any facts showing that those three supervisory defendants were present during any part of the arrest or arrest processing of Marom and Rocek. For that reason, there is no basis to infer that Winski, Viviano, or Esposito had "a realistic opportunity to intervene to prevent" the false arrests from occurring and there is no plausible failure to intervene claim pled against those defendants.

2. First Amendment Retaliation Claims.

*20 As previously explained, Marom's and Rocek's claims for First Amendment retaliation arise from the same factual allegations as their false arrest claim—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest after which Officers Galgano, Boyle, and Valentine, along with Sergeant Blanco and attorney Charnyavsky, gathered together to discuss filing the arresting paperwork for both plaintiffs. As a result, the allegations as to how each of the named defendants are liable for a failure to intervene to prevent Marom's and Rocek's First Amendment retaliation claims are the same as for their false arrest claims. The Court's analysis regarding the plausibility of the failure to intervene claims is the same as well. Marom plausibly alleges that Officers Boyle and Valentine are liable for failing to intervene to prevent his retaliatory arrest and Rocek plausibly alleges that Officers Galgano and Valentine are liable for failing to intervene to prevent her retaliatory arrest. But, neither Marom nor Rocek plausibly allege that Winski, Viviano, or Esposito failed to intervene.

3. Excessive Force Claim.

Fitzgerald fails to plausibly allege that any of the named defendants are liable for failing to intervene to prevent the use of excessive force against him. With regard to Officers Galgano and Boyle, Fitzgerald does not allege that they saw him in Zuccotti Park, nor does he allege that they participated in or witnessed the use of force against him. With regard to Officer Valentine, Fitzgerald affirmatively states that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct. (FAC ¶¶ 136-37). And, regarding the supervisory defendants, Fitzgerald fails to allege that any of the supervisory defendants were present at the actual scene of Fitzgerald's arrest with a "realistic opportunity" to prevent the use of force.

J. Monell Claims.

Finally, plaintiffs assert that the City of New York is liable for the deprivation of their constitutional rights. "In order to establish municipal liability, 'a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy.'" DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 122 (2d Cir.1991)). A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of respondeat superior." Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986). Instead, municipal liability can be found where: (1) "a particular municipal action itself violates federal law, or directs an employee to

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 127 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

do so," Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," Id. at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," Connick v. Thompson, 563 U.S. 51, 61 (2011), and (4) where a municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference," Id. In any case, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cty., 520 U.S. at 404.

To succeed in plausibly alleging a claim for municipal liability against the City of New York, the FAC must demonstrate a "direct causal link between" a municipal action and one of the surviving claims: (1) Marom's and Rocek's false arrest claims, (2) Marom's and Rocek's First Amendment retaliation claims, and (3) Fitzgerald's excessive force claim. Plaintiffs list nine potential policies and practices of the City of New York that they believe are bases for municipal liability, (FAC ¶ 269), as well as one claim that the City failed to properly train its police officers. The Court will first address the various alleged municipal practices and then will address the failure to train theory.

1. Municipal Policies and Practices.

**\*21** When alleging a Monell claim based on the existence of a municipal policy or practice, plaintiffs must show that the practice causing the deprivation of federal rights is "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Generally, "a single incident alleged in a complaint, especially if it involved only actors below the policy making level, does not suffice to show a municipal policy." DeCarlo, 141 F.3d at 61. "[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.1995) (alterations omitted) (quoting Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir.1993)).

Three of the alleged municipal policies and practices bear no direct causal link to the constitutional deprivations implicated in the surviving claims. First, the alleged practice of using "arrests and full-blown arrest processing in lieu of issuing summonses for summons-eligible offenses," (FAC ¶ 269g), has no connection to Marom and Rocek being arrested without probable cause, or in retaliation for their speech, or with Fitzgerald being subjected to excessive force. That alleged practice is possibly related to plaintiffs' excessive detention claims, but those have been dismissed.

Second, the alleged practice of "assigning 'arrest teams' of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to 'process' the arrests of multiple arrestees, including by filing out NYPD paperwork and swearing out accusatory instruments containing false information," (FAC ¶ 269h), may relate to plaintiffs' malicious abuse of process or right to a fair trial claims because of the implication that materials were regularly falsified, but neither of those underlying claims has survived the motion to dismiss.

Third, the alleged practice of "inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact," (FAC ¶ 269i), similarly may relate to plaintiffs' dismissed malicious abuse of process and fair trial claims, but has no plausible causal link to the surviving claims.

In contrast, the remaining six alleged municipal policies and practices bear some plausible connection to plaintiffs surviving claims. Plaintiffs allege that the City has practices whereby the NYPD applies the prohibition against "violation-level trespass," (FAC ¶ 269e), and the prohibition on disorderly conduct, (FAC ¶ 269f), against protestors without justification. And, that the City has a practice of treating groups of protestors as a "unit" for "mass arrest" without first giving meaningful notice or opportunities for dispersal. (FAC ¶ 269d). Presumably, plaintiffs are alleging that these three practices regularly lead to false arrests.

Similarly, plaintiffs allege that the City has two practices whereby the NYPD unreasonably restricted protected activities in Zuccotti Park between September 2011 and March 17, 2012, (FAC ¶ 269a), and continually fails to provide adequate opportunities to disperse before arresting protestors engaged in First Amendment activity,

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

(FAC ¶ 269b). Presumably, plaintiffs are alleging that these practices led, and continue to lead, to retaliatory arrests without probable cause. Plaintiffs also allege that there is an NYPD policy and practice of using excessive force against protestors. (FAC ¶ 269c).

For each of these policies, Plaintiffs fail to allege sufficient factual content allowing for the plausible inference that any one of them were "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Plaintiffs allege that these policies were "persistent and widespread" on the basis of purported connections to the events of prior demonstrations. For example, the FAC includes allegations that, during the RNC protests in 2004, the City's "crowd and disorder control planning" and "mass arrest and mass arrest processing plans" led to mass arrests, a failure to make individualized probable cause determinations, and excessive force. (FAC ¶¶ 37-39). And, it cites, in blunderbuss fashion, a number of lawsuits brought against the City for actions during that and various other protests in the early 2000s. (FAC ¶ 26). Plaintiffs, however, fail to assert which—if any—of those lawsuits led to findings of liability against the City for false arrests, First Amendment retaliatory arrests, or excessive force. According to the FAC, only one of the referenced cases led to any finding of guilty or liability: a conviction of a police officer for falsifying police records. (FAC ¶ 26, citing People v. Pogan, 06416-2008 (Sup. Ct. N.Y. Co.)). Plaintiffs also fail to specifically connect any of the mentioned lawsuits or the RNC allegations to the specific policies and practices they allege in their Monell claims in this action. On that basis, the FAC lacks sufficient factual content tending to show, even circumstantially, the existence of municipal policies and practices responsible for the plaintiffs constitutional deprivations.

2. Failure to Train.

**\*22** Plaintiffs' last theory of Monell liability is based on the City's failure to train its police officers about their legal duty to avoid violating a citizen's rights—namely, using excessive force and making false or retaliatory arrests during mass protests. See Connick, at 61. They allege that the City, through its agents in the NYPD, knew or should have known that the mass arrest policies used in 2004 during the RNC protests led officers to use excessive force against protestors and to falsely arrest protestors for engaging in First Amendment activity. (FAC ¶¶ 42-45). And, that the City thereafter failed to properly train officers to ensure that similar constitutional deprivations

would not occur under comparable circumstances again— such as the March 17, 2012 "raid" on Zuccotti Park. (FAC ¶ 45).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61. Plaintiffs must show that a municipality's failure to train its employees amounted to "deliberate indifference." Id. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (quoting Bryan Cty., 520 U.S., at 410). Generally, "[a] pattern of similar constitutional violations by untrained employees is [ ] necessary to demonstrate deliberate indifference for purposes of failure to train." Id. at 62 (internal quotation marks omitted). A plaintiff must also "demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). "[D]eliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, [ ], but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." Id. (internal citations and quotation marks omitted).

At the motion to dismiss stage, the Second Circuit utilizes a three-prong test to determine whether plaintiffs have demonstrated a municipality's "deliberate indifference" in the context of a failure to train claim. Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). "First, the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation." Id. at 297 (internal quotation marks omitted). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." Id. And, third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Id. at 298. Where all three elements are established a plaintiff has stated a plausible Monell claim based on a failure to train. Id.; see also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004).

Plaintiffs have failed to make this threshold showing. It is plausible to infer from the FAC, and is matter of

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 129 of 220

Marom v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 916424

general common sense, that NYPD decision makers are aware that their officers, at some point, will need to arrest protestors taking part in a large demonstration. (FAC ¶¶ 29, 59-64), and that NYPD officers mishandling large protests could cause constitutional deprivations, (FAC ¶¶ 26, 38-40). However, plaintiffs fail to plausibly allege that there is a history of the NYPD mishandling mass protesting situations on a scale that could be reasonably construed as setting out a pattern or practice of constitutional abuse.

As previously explained, plaintiffs only factual support for the assertion that there is a pattern of the NYPD causing similar constitutional deprivations are the allegations about the 2004 RNC protests and the mention of various other section 1983 lawsuits brought against the City. (FAC ¶¶ 26, 37-39, 42). However, the allegations regarding the RNC protest are plaintiffs' own conclusions, unsupported by facts, that the NYPD's actions in 2004 caused a substantial number of constitutional violations. And, the allegations concerning previous section 1983 lawsuits fail to explain which—if any—lawsuits led to findings of liability against the NYPD for constitutional violations, beside the one conviction of an NYPD officer. (FAC ¶ 26). They also do not allege for that testimony was taken during any of those lawsuits that shows a pattern and practice of constitutional abuse. Plaintiffs do cite a joint study produced by The Global Justice Clinic at NYU Law School and the Walter Leitner International Human Rights Clinic at Fordham Law School, but that paper references 130 "alleged incidents of physical force [in New York City] ... which warrant investigation by authorities." (Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (July 25, 2015), p.1, http://hrp.law.harvard.edu/criminal-justice/suppressing-protest-human-rights-violations-in-the-us-response-to-occupy-wall-street/). Neither a newspaper report nor an academic paper reporting on incidents that ought to be investigated is a showing of anything entitled to a presumption of truth.

**\*23** In sum, plaintiffs fail to plausibly allege the City, through the NYPD, engaged in a pattern or practice of similar constitutional deprivations against protestors. See Pluma, 2015 WL 1623828, at \*12 (holding that allegations of a "handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations through their deployment of pepper spray"); cf. Connick, 563 U.S. at 62 (holding that four overturned Brady convictions "could not have put [the defendant] on notice that the office's Brady training was inadequate with respect to the sort of Brady violation at issue here"). In addition, plaintiffs allege no facts explain how policing the OWS protest "presents [NYPD officers] with a difficult choice of the sort that training or supervision will make less difficult." While the bar at this early stage of litigation is modest, See Amnesty Am., 361 F.3d at 130 n.10 (interpreting Walker test to have held that, at the motion to dismiss stage, plaintiffs are not required to identify a specific deficiency in a municipality's training program or to establish a causal link between the lack of training and the misconduct to establish a failure to train claim), plaintiffs' simply do not meet the standard of plausibility on this, or any other, theory of Monell liability.

CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part. Specifically, all claims are dismissed except for: (1) Yotam Marom's false arrest and First Amendment retaliation claims against defendants Galgano, Blanco, and Charnyavsky and the unidentified defendants who physically arrested him, as well as his related failure to intervene claims against defendants Boyle and Valentine; (2) Miriam Rocek's false arrest and First Amendment retaliation claims against defendants Boyle, Blanco, and Charnyavsky, and the unidentified defendants who physically arrested her, as well as her related failure to intervene claims against defendants Galgano and Valentine; and, (3) Don Fitzgerald's claim for excessive use of force against the unidentified defendants who hit him. All claims against the City of New York, Winski, Viviano, and Esposito are dismissed and they are no longer parties to this action.

SO ORDERED.

All Citations

Not Reported in Fed. Supp., 2016 WL 916424

**Marom v. City of New York, Not Reported in Fed. Supp. (2016)**

2016 WL 916424

Footnotes

1    Plaintiffs' memorandum of law in opposition, however, states that Fitzgerald's charges were actually resolved with a
     guilty plea to a disorderly conduct, which, under New York Law is not a crime but a "violation." (Memorandum of Law
     in Opposition, 4).

2    The Certificate of Disposition for Fitzgerald states that he pled guilty to N.Y. Penal Law § 240.20, which prohibits various
     acts as "disorderly conduct." It is a "violation" rather than a crime. (Declaration of Lamar Winslow in Support of Defendant's
     Motion to Dismiss ("Winslow Decl."), Ex. C). It is appropriate for the Court to consider the Certificates of Disposition at
     this stage because plaintiffs repeatedly reference that their cases were disposed of on ACDs, (see FAC ¶¶ 173, 194,
     207), and thus the Certificates of Disposition setting forth the disposition of their arrests are incorporated by reference
     in, and are integral to, the FAC. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that
     district court could properly consider the text of contracts on motion to dismiss because Amended Complaint was "replete
     with references to the contracts" and the content of the contracts was integral to the Amended Complaint); see also San
     Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 809 (2d Cir. 1996).

3    Plaintiffs argue that under New York law and the New York State Constitution "a delay in arraignment of anything over
     24 hours is presumptively unreasonable." (Plaintiffs' Memorandum of Law in Opposition, 35). Even assuming arguendo
     that plaintiffs' understanding of the requirements of New York's law and constitution is correct, plaintiffs' present claims
     are brought pursuant to section 1983, which provides a remedy for the deprivation of federal or US Constitutional rights.
     See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).

4    The Supreme Court noted that Bivens actions are the "federal analog to suits brought against state officials under" section
     1983. Iqbal, 556 U.S. at 675.

5    Damages for a false arrest claim "cover the time of detention up until issuance of process or arraignment," Wallace v.
     Kato, 549 U.S. 384, 390 (2007), not just the initial seizure.

6    The "No-Summons" policy, which was "related to OWS of denying persons arrested at demonstrations individual
     consideration for release with summonses," (FAC ¶ 64), only bears a causal relationship to the dismissed excessive
     detention claims.

2010 WL 3033796
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Wayne MARTIN, Plaintiff,

v.

PATTERSON, et al., Defendants.

No. 9:09–CV–1372 (LEK/ATB).
|
July 16, 2010.

**Attorneys and Law Firms**

Wayne Martin, pro se.

Adrienne J. Kerwin, Esq., Assistant Attorney General for
Respondent.

*REPORT AND RECOMMENDATION*

ANDREW T. BAXTER, United States Magistrate Judge.

 **\*1** This matter has been referred to me for Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
LOCAL RULES N.D.N.Y. 72.3(c). [1]

**I.** *Facts and Contentions*
Plaintiff alleges that in early February, 2008, he was
incarcerated at Ulster Correctional Facility ("Ulster"),
awaiting transfer to Kings County Supreme Court when
defendant Cuartro issued plaintiff clothing that did not fit
because it was too small. (Compl.¶¶ 1, 3). Plaintiff alleges
that he asked to speak to another officer for a change
of clothing, and when defendant Cuartro overheard, he
pulled plaintiff out of his cell and pushed plaintiff's head
into the wall. (Compl.¶¶ 9–11). Plaintiff alleges that for
"five minutes," he suffered a "massive assault of kicks,
punches, knees to [the] head, chest, ribs [and] legs [,]
causing injuries." (Compl.¶ 12). After the alleged assault,
plaintiff was then transferred to court. (Compl.¶ 13).
Later, a disciplinary hearing was held, and plaintiff was
"held accountable." (Compl.¶ 14).

Plaintiff alleges that the reason defendant Cuartro issued
clothing that did not fit and then assaulted plaintiff was
because of a grievance complaining of dirty shower and
sink water, unacceptable toiletries, and cold temperatures
in the mess hall and dormitory. (Compl.¶ 15). Plaintiff
makes the connection between his grievance and the
alleged assault based on defendant Cuartro's alleged
statement that plaintiff "likes writing grievances" just
prior to issuing plaintiff the clothing and assaulting him.
(Compl.¶¶ 4, 14).

The complaint contains eleven causes of action,
purportedly based on the above factual allegations.
(Compl. at pp. 8–10). In his eleven causes of action,
plaintiff makes additional factual allegations and claims
(1) assault, (2) failure to protect, (3) failure to
properly train staff, (4) failure to properly investigate
the "matter," (4) retaliation, (5) assault and battery,
(6) retaliation, (7) harassment, (8) conspiracy and
violation of procedural due process, (9) excessive force,
and (10) malice. (Compl. pp. 8–10). Plaintiff seeks
millions of dollars in damages, injunctive relief, and
declaratory relief. *Id.* Plaintiff alleges that he wrote
to the superintendent of Ulster and the Commissioner
of the Department of Correctional Services ("DOCS")
regarding his grievance, as well as to the Attorney General
of New York State. (Compl. pp. 3–4). Plaintiff also alleges
that the Attorney General visited him "while in [the]
box." (Compl. p. 4).

**II.** *Motion to Dismiss*
Defendants move to dismiss the complaint as to
defendants Goord, Patterson, and Carlsen, arguing they
were not personally involved in the alleged constitutional
deprivations. (Dkt.Nos.9, 14). To survive dismissal for
failure to state a claim, the complaint must contain
sufficient factual matter, accepted as true, to state a claim
that is "plausible on its face." *Ashcroft v. Iqbal,* ––
U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)
(quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570,
127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare
recitals of the elements of a cause of action, supported
by mere conclusory statements," do not suffice. *Id.* (citing
*Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual
allegations must also be sufficient to give the defendant "
'fair notice of what the ... claim is and the grounds upon
which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation
omitted).

**\*2** When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

### III. *Personal Involvement*
Personal involvement is a prerequisite to the assessment of damages in a § 1983 case, and respondeat superior is an inappropriate theory of liability for any constitutional claim. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub*

*nom. Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (stating that defendant could be liable under section 1983 if he failed to remedy constitutional violation after learning of it or was grossly negligent in managing subordinates who caused violation); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

#### A. Defendant Patterson
Plaintiff alleges no facts that he had any contact with Governor Patterson at all. Certainly Governor Patterson was not personally involved in the assault. The complaint contains no explanation of how the Governor of the State of New York would be personally involved in the management of a correctional facility or in training employees of a correctional facility. Plaintiff's causes of action mention only "defendants" or "corrections employees" and fail to refer to anyone by name. (*See* Compl. pp. 8–10).

**\*3** Plaintiff's opposition to defendants' first motion to dismiss indicates that plaintiff "believed Goord and Patterson failed to keep some type of periodic training and records of intradepartmental communication ... concerning violence and recommendations to subordinates on how to train employees to handle situaitions [sic] without use of force or force as [a] last resort." (Pl.'s Resp. p. 4, Dkt. No. 10). This conclusory statement of belief is insufficient to state a claim. Plaintiff's complaint should be dismissed as to defendant Patterson. [2]

#### B. Defendant Goord
As mentioned above, plaintiff's claims relating to defendant Goord are only that he failed to properly train DOCS employees. (Pl.'s Resp. p. 4, Dkt. No. 10). Defendants correctly point out that defendant Goord retired as Commissioner of DOCS in 2006, almost two years before the alleged incident. *See Holland v. Goord,* 2007 WL 2789837, n. 3 (W.D.N.Y.2007). Therefore, defendant Goord could not have been aware of any incident involving plaintiff in 2008. [3] Accordingly, plaintiff's claims as to defendant Goord should be dismissed.

#### C. Defendant Carlsen
Plaintiff alleges that the "Warden" was informed of the alleged events with defendant Cuartro by a letter

from plaintiff. (Compl. p. 3–4). Plaintiff alleges that a disciplinary hearing was held about the incident with Cuartro, and plaintiff was "held accountable." (Compl.¶ 14). The fact that a disciplinary hearing was held indicates some form of investigation occurred, but plaintiff does not allege that defendant Carlsen was involved directly. [4] The failure of defendant Carlsen to investigate plaintiff's claims personally, based upon plaintiff's letter of complaint, is insufficient to state a claim. *See Smart v. Goord,* 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006).

Plaintiff's conclusory allegations that defendants failed to properly train staff and investigate the matter, and that current policy condones excessive force, is not enough to establish that defendant Carlsen (or any defendant) was aware of any history of excessive force toward plaintiff or at Ulster in general. *See Reyes v. Fairfield Properties,* 661 F.Supp.2d 249, 269 (E.D.N.Y.2009) (plaintiff must plead sufficient factual content to allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged).

To the extent that plaintiff filed a grievance regarding the alleged assault, he has failed to establish that defendant Carlsen had any knowledge of, or involvement with, the review of plaintiff's grievances sufficient to establish personal involvement in the allegedly unconstitutional conduct underlying the grievances. Carlsen, as Superintendent, may be involved in the review of prisoner grievances at some level. However, to establish that a supervisory official became personally involved by learning of the constitutional violation through a "report or appeal," the supervisor must be in a position to "remedy the wrong." *See Harnett v. Bar,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (stating that the appropriate guiding principle for assessing personal responsibility is to determine whether the supervisory official was presented with an "ongoing" violation that he or she could remedy directly). In this case, plaintiff can not show the personal involvement of defendant Carlsen based upon his failure to "remedy the wrong" and based on a single incident of alleged excessive force.

**\*4** Plaintiff also claims that defendants failed to properly investigate his grievances. The failure to investigate, as stated above, does not confer personal responsibility on the supervisory official. To the extent that plaintiff attempts to assert a separate constitutional

claim of "failure to investigate," the law is clear, however, that inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Bernstein v. New York,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) (citing *Nieves v. Gonzalez,* No. 05 Civ. 17, 2006 U.S. Dist. LEXIS 24302, \*11–13 (W.D.N.Y. Mar. 2, 2006); *Longi v. County of Suffolk,* No. CV–02–5821, 2008 U.S. Dist. LEXIS 25468, \*22–23 (E.D.N.Y. Mar. 27, 2008)).

In order for a constitutional violation to have occurred, the investigation itself must have resulted in a deprivation of a constitutional right. *Faison v. Hash,* 03–CV–6475P, 2004 U.S. Dist. LEXIS 29151, \*6 (W.D.N.Y. Apr. 23, 2004) (citing *Malloy v. City of New York,* 1996 U.S. Dist. LEXIS 16417, \*6 (S.D.N.Y. Nov. 7, 1996) (holding that warden's alleged failure to investigate assault by correctional officer did not give rise to constitutional violation, where plaintiff failed to show that warden could have anticipated or had other direct involvement in the assault); *Gomez v. Whitney,* 757 F.2d 1005 (9th Cir.1985) (a claim against a police department for failure to investigate is insufficient to state a civil rights claim without another recognized constitutional right being involved)).

Plaintiff had no constitutional right to any investigation, and he certainly had no right to a particular outcome. Plaintiff's claims against defendant Carlsen may be dismissed for lack of personal involvement, and, to the extent that plaintiff attempts to assert a separate claim of failure to investigate his complaints, that claim may be dismissed for failure to state a constitutional claim.

The court is recommending dismissal against defendants Patterson, Goord, and Carlsen in this case. The court is well aware that generally, a district court should not dismiss a pro se complaint on the pleadings without granting leave to amend ***at least once*** when a liberal reading of the complaint gives any indication that a valid complaint may be stated. *Cuoco v. Moritsugo,* 222 F.3d 99, 112 (2d Cir.2000). In this case, the court doubts that, based on the facts stated in the complaint, plaintiff will be able to amend his complaint to state a claim against either defendant Patterson or Goord, thus the court will recommend dismissal with prejudice as to these defendants. However, given the liberality with which *pro se* plaintiffs must be treated, the court will recommend a dismissal without prejudice as to defendant Carlsen.

*Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

## IV. Plaintiff's State Claims

Because the court is recommending dismissal of plaintiff's federal claims, the court recommends that plaintiff's claims under state law should not be considered under the court's pendent jurisdiction. *See* 28 U.S.C. § 1367(c) (3); *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997); *Pitchell v. Callan,* 13 F.3d 545, 549 (2d Cir.1994). Plaintiff's state law claims against defendants Patterson, Goord, and Carlsen should therefore be dismissed.

## V. Service of Process

 **\*5** Because this court is recommending dismissal of the complaint as to defendants Patterson, Goord, and Carlsen, the only remaining defendants would be defendant Cuartro and defendant John Doe, Deputy Commissioner. As indicated above, plaintiff filed his complaint on December 9, 2009, which gave him until April 8, 2010, to serve the defendants. Service on defendant Cuartro was attempted by the Marshal. However, on March 26, 2010, the summons was returned unexecuted as to defendant Cuartro. (Dkt. No. 11). The Marshal's form was returned with a letter from the Inmate Records Coordinator, dated January 29, 2010, stating that there was "no employee at Ulster Correctional Facility with the name ... C.O. Cuartro." (Dkt. No. 11 at p. 2).

It is true that a *pro se* plaintiff, proceeding *in forma pauperis* may rely upon the Marshal to properly serve the summons and complaint. *Romandette v. Weetabix,* 807 F.2d 309, 311 (2d Cir.1986). This reliance is balanced by Federal Rule of Civil Procedure 4(m), which directs that "[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." A district court is required to grant an "appropriate" extension if the plaintiff shows "good cause" for failure to timely serve, but the court also has the discretion to enlarge the time for service in the absence of a showing of "good cause" by the plaintiff. *Id. See Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007).

If plaintiff in this case wishes the action to proceed as against defendant Cuartro and any John Doe defendants, plaintiff must make an effort to identify these defendants *and* have them properly served with process. In a letter dated April 13, 2010, the court informed plaintiff that the U.S. Marshal Service was unsuccessful in serving "Officer Cuartro," and that additional information from plaintiff was required to enable the U.S. Marshal to effect service on defendant Cuartro. (Dkt. No. 13). On July 13, 2010, the court wrote to the deputy counsel of DOCS, inquiring as to an address for defendant Cuartro to assist the U.S. Marshal in effecting service. (Dkt. No. 18).

Plaintiff has supplied no additional information as to defendant Cuartro or any information as to the identity of the John Doe defendant. Plaintiff may request the information from defense counsel through discovery, but need not file any "motions" with the court unless plaintiff cannot obtain the information through good faith efforts to seek discovery. As indicated in the letter sent to the deputy counsel of DOCS, if contact information is supplied, the marshals will attempt once more to effect service. The court notes, however, that plaintiff should also be attempting to obtain the necessary information to serve defendant Cuartro and also identify the John Doe defendant.

 **\*6 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 9) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE** as to defendants Patterson and Goord, and it is further

**RECOMMENDED,** that defendant Carlsen's motion to dismiss (Dkt. No. 14) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE** as to defendant Carlsen.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

2010 WL 3033796

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3033796

Footnotes

1    The case was originally referred to the Honorable Gustave J. Di Bianco and was assigned to me upon Judge Di Bianco's
     retirement on January 4, 2010.

2    The court must also note that although defense counsel appeared on defendant Patterson's behalf and included him in the
     motion to dismiss, defendant Patterson was never actually served in this case. (Dkt. No. 16). Defendants also correctly
     point out that at the date of the alleged incident, February 6 or 8, 2008, defendant Patterson was not yet governor of New
     York State. This fact does not change the court's analysis as to the personal involvement of the Governor, regardless
     of who was occupying the office at the relevant time.

3    In addition, plaintiff's conclusory allegations that the Commissioner "failed" to properly train employees due to one alleged
     incident is insufficient to establish personal involvement as to the Commissioner of DOCS in February 2008, whoever
     it may have been at the relevant time.

4    Plaintiff does not appear to be challenging the disciplinary hearing itself in any way. Plaintiff appears to be stating that
     although defendant Cuartro was the aggressor, when the disciplinary hearing was held, plaintiff was "held accountable,"
     or found responsible for the incident.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3033809
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Wayne MARTIN, Plaintiff,
v.
PATTERSON, et al., Defendants.

No. 9:09–CV–1372 (LEK/ATB).
|
Aug. 3, 2010.

**Attorneys and Law Firms**

Wayne Martin, East Elmhurst, NY, pro se.

Adrienne J. Kerwin, Office of Attorney General, Albany,
NY, for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a
Report–Recommendation filed on July 16, 2010, by the
Honorable Andrew T. Baxter, United States Magistrate
Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3(c)
of the Northern District of New York. Report–Rec. (Dkt.
No. 19).

Within fourteen days after a party has been served with
a copy of a Magistrate Judge's Report–Recommendation,
the party "may serve and file specific, written objections
to the proposed findings and recommendations," FED. R.
CIV. P. 72(b), in compliance with L.R. 72.1. No objections
have been raised in the allotted time with respect
to Magistrate Judge Baxter's Report–Recommendation.
Furthermore, after examining the record, the Court has
determined that the Report–Recommendation is not
subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt.
No. 19) is **APPROVED** and **ADOPTED** in its
ENTIRETY; and it is further

**ORDERED,** that Defendants Patterson and Goord's
Motion to dismiss (Dkt. No. 9) is **GRANTED,** and
Plaintiff's Complaint is **DISMISSED in its entirety with
prejudice as to Defendants Patterson and Goord;** and it is
further

**ORDERED,** that Defendant Carlsen's Motion to dismiss
(Dkt. No. 14) is **GRANTED,** and Plaintiff's Complaint
is **DISMISSED in its entirety without prejudice as to
Defendant Carlsen;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on
all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3033809

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Disagreement Recognized by Curry v. Kerik, S.D.N.Y., April 10, 2001

1998 WL 199923
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Reginald MCFADDEN, Plaintiff, pro se,
v.
Nicholas SOLFARO, Anthony Farina, William
Clark, Joseph Conjura, Maynelle E. Nowlin,
J.C. Liska, Hugh Tracy, William Schoenleber,
John Byron, Louis Lanton, J. Garofal, John
Stein, Richard Mallin, Christopher Falco, Todd
Layman, Fred Malone, and S. Felix, Defendants.
Reginald McFadden, Plaintiff, pro se,
v.
Philip Coombe, Sr., Robert Kuhlman, W. Wilhelm,
Pitt (CAPT.), Heazy (LT.), Hosking (C.O.), Sanok
(C.O.), Klein (C.O.), Senft (C.O.), Saccone (C.O.),
Burlingame (C.O.), Faller (C.O.), Defendants.

Nos. 95 Civ. 1148(LBS), 95 Civ. 3790(LBS).
|
April 23, 1998.

**Attorneys and Law Firms**

Reginald McFadden, Fallsburg, NY, plaintiff pro se.

William K. Kerrigan, MacCartney, MacCartney,
Kerrigan & MacCartney, Nyack, NY, for defendants.

Dennis C. Vacco, Attorney General of the State of NY,
New York City, by Michael Kennedy, for the defendants.

**OPINION**

SAND, J.

**\*1** *Pro se* Plaintiff Reginald McFadden ("McFadden")
brings this consolidated civil rights action [1] pursuant
to 42 U.S.C. § 1983 against Philip Coombe,
Commissioner of the State of New York Department
of Correctional Services ("DOCS"), Nicholas Solfaro,
Facility Administrator of the Rockland County
Correctional Center ("RCCF") in New City, New
York and Robert Kuhlmann, Superintendent of Sullivan

Correctional Facility in Fallsburg, New York ("Sullivan")
and against twenty-five corrections officers at both
RCCF and Sullivan as listed in the above caption
("Defendants"). [2] McFadden's Amended Complaint of
March 5, 1996 ("the 95 Civ. 1148 Complaint"), submitted
after the consolidation of the two cases, but addressing
only the claims of the original action, alleges nineteen
causes of action for violations of rights under the
First, Sixth, Eighth and Fourteenth Amendments as a
result of alleged incidents during McFadden's period
of incarceration as a pre-trial detainee at RCCF from
October 1994 through April 10, 1995. McFadden's
Complaint of April 30, 1995 ("the 95 Civ. 3790
Complaint") contains seven causes of action, also
for violation of his constitutional rights, during his
immediately subsequent period of pre-trial incarceration
at Sullivan from April 10, 1995 through April 30, 1995.
McFadden alleges that Defendants at Sullivan conspired
to deprive him of his rights in retaliation for his filing of
the original 95 Civ. 1148 lawsuit.

Plaintiff, currently an inmate at the Sullivan Correctional
Facility, seeks declaratory and injunctive relief for
practices he describes as abusive and unconstitutional,
including his placement in administrative segregation
without due process of law at RCCF and at Sullivan
while he was a pre-trial detainee, the conditions of
his confinement at these institutions and his allegedly
retaliatory transfer from RCCF to Sullivan in April 1995.
He further demands compensatory and punitive damages
from each Defendant. Defendants now collectively bring
two Motions for Summary Judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure. Plaintiff, who
proceeds here *pro se,* opposes the Defendants' Motions
and has styled his own Cross–Motion as one for Summary
Judgment.

In McFadden's Affidavit in Opposition to the Notice
of Motion for Summary Judgment in the 95 Civ. 3790
action, he drops Defendants Pitt, Heazy (or Healy
as he is sometimes called), Hosking, Sanok, Senft,
Saccone, Burlingame, Klein and Faller. (McFadden Aff.
in Opp'n at 3 and McFadden EBT at 153.) On Plaintiff's
consent, therefore, we grant these Defendants' Motion for
Summary Judgment and hereby order all claims against
them dismissed.

Despite the numerosity of causes of action alleged
against the remaining Defendants as contained in the

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 138 of 220

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

Complaints relevant to this consolidated action, after careful consideration, we find the action to be entirely without merit. For the reasons set forth below, we grant Defendants' Motions for Summary Judgment and deny Plaintiff's Cross–Motion.

### BACKGROUND

**\*2** On October 7, 1994, McFadden entered RCCF in New City, New York as a pre-trial detainee to await trial on charges of rape, robbery, burglary and kidnaping. [3] Previously convicted for murder, he had been paroled after twenty-five years from the Pennsylvania prison system the same year. Early in his incarceration in Rockland County, he was moved to Nassau County Jail where he remained briefly (November 2–December 6) until he was returned to RCCF. On April 10, 1995 he was transferred from RCCF to Sullivan where he is incarcerated in the custody of DOCS at the present time.

In Plaintiff's two Complaints [4] and pleadings related to these Motions presently before us, McFadden sets forth the following facts.

In the 95 Civ. 1148 Complaint, pertaining to events at RCCF from October 7, 1994 through April 10, 1994, Plaintiff alleges that while still a pre-trial detainee he was unjustly and arbitrarily placed in punitive "lock-in," also known as administrative segregation, separate from the general prison population at Rockland, without the requisite procedural due process. He challenges Defendants' failure to follow "the minimum standards of their own statutory and regulatory mandatory procedures." (Pl.'s 95 Civ. 1148(LBS) Mem. of Law at 10.) Facility Administrator Solfaro is alleged to have acquiesced in this abuse. Lieutenant Liska is said to have participated in Plaintiff's unfair classification and lock-in. McFadden describes incidents in December 1994 at RCCF when he was allegedly dragged by c.o.s Layman, Stein, Mallone and Schoenleber, shackled and handcuffed, under orders from c.o. Clarke, acting under orders from Captain Anthony Farina, from his cell to the medical facility for weighing on three occasions. (95 Civ. 1148(LBS) Compl. at 17.) McFadden asserts that the nurse's notation that he was weighed "sitting down," without any further explanation, "made it clear that force was used." (95 Civ. 1148(LBS) Pl.'s Mem. of Law at 22.) Defendants argue, by contrast, that McFadden's willful

refusal to walk or to cooperate in any way necessitated the use of force to bring him to the medical facility. While at RCCF, McFadden asserts that the was denied proper medical care, including inattention to injuries suffered while in police custody subsequent to his arrest, and that he was exposed to and not treated for tuberculosis. Lieutenant Clark is alleged to have ordered c.o.s Lanton, Malone, Stein and Garofal to spray the Plaintiff with pepper spray on three occasions in late March of 1995. (Pl.'s EBT at 154, ln. 12.) C.O. Christopher Falco is said to have aided in the "daily harassment and dehumanizing treatment" of Plaintiff. (95 Civ. 1148(LBS) Compl. at 14.) C.o. Felix is accused of "putting human hair in my meals, dehumanizing Plaintiff with abusive names, throw [sic] coffee or juice and water into cell, keep turning on night light." (95 Civ. 1148(LBS) Compl. at 16) In addition, in his "Third Cause of Action," Plaintiff makes a general allegation of restraint on his freedom of religious practice and belief, claiming that he was denied the right to shave his body, a part of his religious practice . [5]

**\*3** In the 95 Civ. 3790(LBS) Complaint, relevant to the April 10–30, 1995 stay at Sullivan, McFadden alleges that Defendants, in particular Commissioner Coombe and Superintendent Kuhlmann, unfairly conspired to transfer him on April 10, 1995 from RCCF to Sullivan to retaliate for his filing of the 95 Civ. 1148(LBS) action and to impede the progress of this suit and limit his access to counsel in his criminal trial. He also blames these Defendants for his assignment to a Special Housing Unit ("SHU"), segregated from the general population, allegedly without due process, on charges of three disciplinary violations. Defendants contend that he was afforded the necessary due process and that the assignment was the result of McFadden's obstreperous behavior with which the county prison found itself unable to cope. He lived in a cell in Sullivan where the water to his sink and toilet was twice temporarily cut off (April 13–17, 1995 and April 25–30, 1995) and conditions were cold and smelling of urine and excrement. He attributes the failure to remedy the water situation to Superintendent Kuhlmann and to Deputy Superintendent Wilhelm (as well as to Lieutenants Pitt, Heazy [sic] and c.o. Saccone, who have since been dropped from this suit). He claims that the water shut-off—and not any conduct on his part—gave rise to the flooding for which Plaintiff was written up and placed in administrative segregation. McFadden further states, in general terms, that he was denied his religious rights when he was served pork on his meal tray by c.o.s Hosking and

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

Klein, denied permission to speak to a "member of his faith" (presumably a cleric) and prevented from prayer by the odor in his cell. These allegations are not substantiated by any additional details. McFadden also states generally that he was denied access to the law library in violation of his Sixth Amendment rights though he gives no details with regard to this claim. Finally, guards harassed him with frequent cell searches and the use of pepper spray, activity sanctioned by Captain Farina and acquiesced in by Superintendent Solfaro. McFadden believes that his abuses suffered in prison were the result of a conspiracy among RCCF and Sullivan, then-candidate for governor, George Pataki, and Pataki's brother, as well as police officers, to frame McFadden and cover up a death caused by police.[6] (McFadden 95 Civ. 1148 Aff. in Opp. S.J. ¶ 31a.)

### RELEVANT LEGAL STANDARDS

This Court has read *pro se* Plaintiff's meticulously prepared and voluminous pleadings with care and accorded them greater latitude than it would to those of a litigant represented by professional counsel. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *reh'g denied,* 405 U.S. 948, 92 S.Ct. 963, 30 L.Ed.2d 819 (1972); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("[W]e read [the pro se party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest.") *Pro se* litigants are entitled to liberal construction of otherwise inartfully drafted pleadings. Though McFadden is what is sometimes referred to as a "vexatious litigant," known for the repeated filing of lawsuits, some of which are still *sub judice* before this Court, nevertheless we have considered the instant suit with its twenty-eight defendants and twenty-six causes of action carefully, on its own merit, and read and weighed the claims in this case rigorously and with due care, applying the following apposite standards for summary judgment in the matter before us.

**\*4** Summary judgment may be granted where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The role of the court is not to resolve disputed facts, but rather to determine whether the record as a whole supports any

issues that require a trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Used properly, Rule 56 is a sharp procedural weapon to ward off wasteful trials and "to isolate and dispose of factually unsupported claims," *Celotex* at 323–24 (1986). Without passing on the merits of the claims, the question therefore before us is whether the facts as alleged, if assumed to be true, would constitute controverted facts worthy of trial and ripe for adjudication by a rational trier of fact. The central issue to be resolved in the instant motions is whether the parties have, in fact, established that no genuine issue of material fact exists relevant to 42 U.S.C. § 1983 regarding Plaintiff's allegations of unconstitutional treatment during his incarceration as a pre-trial detainee in RCCF and Sullivan from October 7, 1994 through April 30, 1995.

When Congress enacted 42 U.S.C. § 1983, it created a civil cause of action against any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by federal law. *See Lugar v. Edmonson Oil Co.,* 457 U.S. 922, 924, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). In order to prevail on a claim under § 1983, a plaintiff must prove that the defendants: (1) acted; (2) under color of state law; and (3) in a manner that deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993).

McFadden's claims of unconstitutional abuses in prison arise in the context of his confinement *before* he was convicted of those crimes for which he is now incarcerated for the rest of his life. As a result, Plaintiff's case, despite his pleading to the contrary, does not implicate the Eighth Amendment prohibition against "cruel and unusual punishment," because presumed-innocent pre-trial detainees are not subject to punishment.[7] A pre-trial detainee is presumed innocent and therefore cannot be punished. If he or she cannot be punished then

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 140 of 220
McFadden v. Solfaro, Not Reported in F.Supp. (1998)
1998 WL 199923

the nature of the punishment cannot be either cruel or unusual. Rather, this action invokes an altogether different legal standard which we can apply to all of Plaintiff's claims. We are not writing on a clean slate; this action implicates a line of cases concerning the rights of pre-trial detainees held in the custody of DOCS awaiting trial. *Ingraham v. Wright,* 430 U.S. 651, 671–672 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). [8] Generally speaking, the inquiry we undertake will examine whether Plaintiff has been subjected to punishment prior to his conviction when, despite his prior criminal record, his innocence was still presumed. At the same time as we consider whether those conditions amounted to punishment. The scope of this Court's review encompasses consideration of the exigencies of prison administration. There are understandably difficulties which arise from the need to house together two categories of inmates, pre- and post-trial detainees, with different rights. In assessing the conditions of confinement, we must distinguish between the rights of a pre-trial detainee and a convicted prisoner. *Bell v. Wolfish,* 441 U.S. 520, 534–535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128, 129 (2d Cir.1991); *Lareau v.. Manson,* 651 F.2d 96, 102 (2d Cir.1981) The absence of Eighth Amendment protection does not mean that pre-trial detainees are without recourse to complain of the conditions of their confinement. To the contrary, we review the claims of a pre-trial detainee in a state facility under the Fourteenth Amendment's Due Process clause, rather than under the Eighth Amendment, which affords him protection at least as great, if not more, than that afforded a convicted prisoner. *Bell v. Wolfish,* 441 U.S. 678, 685 (1978). To determine whether an event or action should be construed by the courts as despotic and unlawful "punishment" for purposes of due process, the Supreme Court has guided us to ask if the event or action is imposed for the purpose of punishing or is "but an incident of some other legitimate governmental purpose." *Wolfish* at 538; *Lareau v. Manso,* 651 F.2d 96, 103 (2d Cir.1981). Hence the applicable test here is whether the events McFadden complains of in any way constitute "punishment" in violation of his due process rights. "Not every disability imposed during pretrial detention amounts to "punishment" in the constitutional sense, however. Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Wolfish* at 537. We find that on the record before us, the conditions detailed by the

Plaintiff, while perhaps unpleasant, do not rise to the level of *unconstitutional* punishment.

**\*5** This Court is obliged to ensure that inmates, such as McFadden, despite a notorious criminal past, are not unlawfully subjected to punishment by the corrections system before their conviction in a court of law. Innocent until proven guilty applies with as much force to those who were, on a prior occasion, found guilty and to whom punishment has been meted out and served, as to those with a spotless record. At the same time, the Court recognizes that pre-trial detainees are often imprisoned without bail because they represent potential security threats to society and, similarly, to the orderly and safe administration of prison life. Corrections institutions are well within their bounds —which the courts invade normally with reluctance and with dispatch when necessary—in imposing the necessity of incarceration and its attendant unpleasantness on pre-trial detainees. So long as the conditions and incidents of the confinement are not "punitive," (a standard we shall explore below) but reasonably related to the institution's interest in maintaining security, safety and order, then they will be found to be constitutional. [9]

## DEFENDANTS NOT PERSONALLY OR DIRECTLY INVOLVED

At the outset, we must dismiss the action as to those captioned Defendants who, based on the facts alleged by Plaintiff McFadden, were not personally or directly involved in any way in the actions alleged by McFadden's Complaints. In addition to those Defendants already dismissed on Plaintiff's consent, we clearly must dismiss the Complaint as to Defendants Coombe, Solfaro, Byron, Conjura, Mallin and Tracy. In order to succeed on a claim under § 1983, a plaintiff must allege direct or personal involvement in the alleged constitutional deprivations by each defendant. Such allegations must further be supported with specific factual support, linking the acts of a defendant to the injuries a plaintiff suffers. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Where the Plaintiff fails to allege facts demonstrating that a particular Defendant had any direct involvement with, knowledge of, or responsibility for an alleged deprivation of his civil rights, such a claim will be dismissed with regard to such Defendant(s) as it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,*

1998 WL 199923

490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338
(1989) (discussing dismissal of frivolous actions which
embrace invalid legal conclusions and fanciful factual
allegations). Furthermore, with particular reference to
Defendants Coombe and Solfaro, liability for damages
in a § 1983 action may not be based on the doctrines of
respondeat superior or vicarious liability. *Monell v. Dep't.
of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56
L.Ed.2d 611 (1978); *Morales v. New York State Dep't. of
Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (inmate stated
no claim against prison superintendent absent allegation
of a connection between inmate's injuries and any acts on
the part of superintendent). Plaintiff has made Defendants
Coombe and Solfaro party to this action as a result of their
titular status without concrete indications on this record
of their actual participation in any of the described events.

**\*6** None of these six Defendants, though named in
the above caption, are alleged in these pleadings to
have been directly responsible for any unconstitutional
wrongs perpetrated upon the Plaintiff. Where accusations
are levelled against them as, for example, against
Commissioner Coombe, they are without sufficient
specificity to create any connection between the
Defendant and any unconstitutional action. Sergeant
John Byron is only alleged to have failed to act
on Plaintiff's complaints and to have refused to have
given him a haircut. Defendant Joseph Conjura "was
not involved in any of the abusive attacks." (95 Civ.
1148(LBS) Compl. at 10 & 13.) He, too, is accused only
of passive participation and not of active involvement.
Sergeant Richard Mallin is alleged not to have perpetrated
any wrong on the Plaintiff but to have abused other
inmates, which would not give rise to a claim by Plaintiff
against him. (95 Civ. 1148(LBS) Compl. 14.) Lieutenant
Hugh Tracy is alleged (without anything more on the
record) to have searched Plaintiff's cell, removed property
and given orders to use force on the Plaintiff but not
directly to have participated in any way in the use of force.
(95 Civ. 1148(LBS) Compl. at 12.) Because § 1983 requires
direct involvement in any unconstitutional actions, no
triable claim has been proferred as to Lt. Tracy.

No allegation on these Complaints, no matter how
generously construed, can be read to state a claim against
Defendants Coombe, Solfaro, Byron, Conjura, Mallin
and Tracy and summary judgment is granted as to these
six Defendants.

## ASSIGNMENT OF PRE–TRIAL DETAINEE TO ADMINISTRATIVE AND DISCIPLINARY SEGREGATION

We examine Plaintiff's assignment to administrative
segregation at RCCF and his confinement to disciplinary
segregation in an SHU at Sullivan. [10] We treat the two
instances together, not only because they are factually
somewhat similar incidents in this consolidated action,
but because they are reviewed under this same legal
standard. In his Complaint, Plaintiff states that "his
October 8th, 1994 classification and assignment to
administrative segregation was arbitrarily, erraticly [sic],
unconstitutionally done in gross violation of state and
federal laws, statutes and constitutions." (Pl.'s Mem. of
Law at 41.) The Plaintiff complains, first, of placement
in administrative segregation at RCCF without a hearing
and without opportunity to challenge such a classification.
He raises the question of whether the method used in
his assignment, when he was still a pre-trial detainee, to
administrative segregation involving 23–hour a day lock-
in was, in fact, constitutional or constituted a violation of
his due process rights. (Aff. in Opp. to S.J. in 95 Civ. 1148
at ¶ 6.) He implicates primarily Lieutenants Kuhlmann
and Liska in this alleged abuse.

Secondly, McFadden objects to his placement in
disciplinary segregation in an SHU almost immediately
after his arrrival at Sullivan. This separation from the
general population was the result of disciplinary violations
at the prison which Plaintiff believes were concocted
to place him unlawfully in segregation, also robbing
him of due process in retaliation for the suit filed
against Rockland County officials. As a result of alleged
disciplinary infractions on April 12, 1995 (unhygienic
acts), on April 13 (unhygienic acts and threats) and April
25 (unhygicnic acts), [11] McFadden was confined to a
Special Housing Unit continuously through November
29, 1995. According to Defendants, in each instance,
prison disciplinary officers held a hearing on the matter
which McFadden refused to attend.

**\*7** McFadden asserts that the ongoing confinement
to segregation, either as a result of classification as
maximum security or as a result of disciplinary action,
was unconstitutional per se because of the lack of due
process, the deprivation of adequate access to his lawyer,
an issue we shall address in turn, and the hardship created

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

for him in resolving affairs outside of prison prior to his trial. (Pl.'s 95 Civ. 3790 at 4.) Defendants argue that Plaintiff's placement in pre-trial detention did not violate his constitutional rights. Under New York Correctional Law, the Commissioner of DOCS "shall provide for such measures as he may deem necessary or appropriate for the safety, security and control of correctional facilities and the maintenance of order therein." N.Y. Correction Law § 137(2). The Commissioner has "broad discretion in the formulation and implementation of policies relating to security and the disciplining of inmates. *Arteaga v. State,* 72 N.Y.2d 212, 532 N.Y.S.2d 57, 527 N.E.2d 1194, 1197 (N.Y.1988) Inmates may be placed in administrative segregation when their presence in the general population would jeopardize security and where there is "some evidence" on the record to support the classification. *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). Defendants further challenge Plaintiff's claim by pointing to the lack of specificity in identifying the source of the constitutional deprivation. His classification as a maximum security risk and assignment to segregation and the continuation of that status during his stay in Rockland, Defendants contend, comported with his past criminal and prison record and present behavior. His placement in a Special Housing Unit at Sullivan, they claim, was not arbitrary but directly and rationally related to disciplinary purposes —the need to impress upon him the rigors of prison discipline and to protect staff and other inmates from McFadden's spreading of bodily fluids, in particular, feces and urine—subsequent to McFadden's "unhygienic acts" and threats described in Defendants appended exhibits. (95 Civ. 3790(LBS) Defs.' Mem. of Law at 13.)

Plaintiff's pleadings suffer, on this claim, from a paucity of details describing the specific individuals responsible for the allegedly unconstitutionality. Technically, we need not even reach the question of the existence of disputed material fact surrounding McFadden's claims with regard to his segregation. He does not tell the Court how his assignment to administrative segregation upon intake into RCCF constituted any abuse of discretion. (95 Civ. 1148(LBS) Defs.' Mem. of Law at 4.) Furthermore he failed to respond to Defendants' presentation of prison disciplinary hearing reports from Sullivan, finding him guilty of infractions of prison rules and therefore subject to segregation pursuant to 7 N.Y.Comp.Codes R. & Regs. Tit. 9, § 300 (1997). In order to state a colorable claim under 42 U.S.C. § 1983 a litigant must establish

the personal involvement of particular defendants in a deprivation of rights. *Morales v. New York State Dep't. of Corrections,* 842 F.2d 27, 30 (2d Cir.1988); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Given the opacity to incarcerated inmates of prison administrative measures, the courts may inquire into such matters when raised by a *pro se* litigant. Nevertheless, we find that Plaintiff still fails to state a claim for deprivation of due process, either on the basis of his assignment at RCCF or Sullivan.

**\*8** The Supreme Court held in *Bell v. Wolfish,* 411 U.S. 520, 535–37 (1979) that the conditions of pre-trial detention are constitutional under the Due Process Clause as long as they do not amount to punishment of the detainee. *El–Shabazz v. Wagenstein,* 1995 WL 489686 (S.D.N.Y.1995). Our initial inquiry is, therefore, whether the placement of Reginald McFadden in pre-trial administrative segregation, away from the general prison population was punitive. This inquiry has two parts: (1) was he deprived of due process under the Constitution; and (2) following the Court of Appeals lead in *Covino,* we next inquire whether state law, by statute or regulation, gave rise to a liberty interest in remaining in the general population by prescribing mandatory procedures to government placement in administrative segregation. [12] *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128 (2d Cir.1991).

The contentious issue at hand is therefore whether prison officials' confinement of Plaintiff to segregation based on his security classification and continued detention there for six months as well as his "sentence" to SHU after hearings which Plaintiff did not attend constituted sufficient due process. On the Due Process prong, we find that at both RCCF and Sullivan, the assignment to segregated housing was not punitive. The Supreme Court has held that legitimate operational concerns of prisons in this country often necessitate "administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial," including the maintenance of security and order. *Wolfish* at 5. Defendants append documentary evidence of Plaintiff's initial classification as a maximum security, high escape risk candidate for administrative segregation. (Honan Aff. Ex. C.) They also include copies of Plaintiff's signed acknowledgment of his classification status and copies of bimonthly classification review letters. It would appear from the record in this case that Defendant was considered

for a change of classification after two months in administrative segregation at Rockland. Officials decided, however, to delay the change in status. It was at this point in mid-December, that Plaintiff's disciplinary infractions and noncooperative behavior at RCCF began in earnest, thereby prolonging his confinement to administrative segregation (and prompting the recommendation for transfer which put an end to his stay in administrative segregation at RCCF). (Honan Aff. Ex. D.)

On the second prong of our inquiry, the creation of any liberty interests by state statute or regulation, we can find nowhere on the record before us, any suggestion that the hearing provided for by DOCS regulations is not designed to afford an inmate the opportunity to challenge his removal from the general population. Nor is there evidence that DOC's regulations were not complied with. The record in this case indicates that Plaintiff received notice at RCCF of his placement in administrative segregation in RCCF as a result of his "present criminal charges, past criminal history, present classification and recommendations from Supervisory Personnel." (Honan Aff. C.) The record contains regular letters of review of Plaintiff's status and extensive evidence of his disciplinary problems at the RCCF. On these facts, Plaintiff's administrative segregation was a reasonable response to concerns for institutional safety, order and morale, serving the goals of prison administration to which this Court must grant wide-ranging deference. Though McFadden alleges that his hearings did not comply with DOC regulations, there is no indication of such beyond his conclusory statements to that effect. The Rockland County Jail's Inmate Rules and Regulations on Disciplinary Procedures ¶ ¶ 15, 16, in accordance with 9 N.Y.Comp.Codes R. & Regs. tit. 9, § 7006.8 (1997), specifically allow for a prisoner's non-attendance or even exclusion from his or her disciplinary hearing. (Pl.'s Ex. B.) Disciplinary infractions constitute a basis for assignment to an SHU.

**\*9** State Defendants at Sullivan have provided ample documentary evidence that McFadden's segregation from the general population was not unwarranted, but tied to the legitimate objective of maintaining order and impressing the need for discipline. The record indicates that Plaintiff had contravened prison regulations on three occasions, committing so-called unhygienic acts and threatening guards, for which he was written up and granted three hearings for prison disciplinary violations.

He was informed of the charges against him and invited to participate in these hearings but chose not to attend and was "sentenced" in absentia to two terms of ninety and one term of forty-five days in SHU as well as a loss of other privileges (commissary, walkman, phone). This modicum of due process afforded him the opportunity to be heard in an "informal, non-adversary review of the information supporting respondent's administrative confinement...," though he did not avail himself of it. *Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *El–Shabazz* at 4.

### ACCESS TO COUNSEL

Plaintiff additionally alleges that his incarceration in segregation as a pre-trial detainee and his transfer from RCCF to Sullivan (*see infra* ) both interfered with the successful defense of his criminal case in violation of his Sixth Amendment rights. In order to make a valid § 1983 claim on this ground, the Plaintiff must allege facts showing that the alleged interference actually impeded his access to the courts or prejudiced an existing action. A claim of inadequate access to the courts must be made on a showing of actual injury. A mere statement, as Plaintiff makes in his pleadings, that a prison law library is inadequate does not state a claim for constitutional redress. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2176, 135 L.Ed.2d 606 (1996); *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995).

A prison transfer is unconstitutional under the Sixth Amendment only if it moves a prisoner to a facility so distant as to impair his access to his legal counsel. *Covino v. Vermont Dep't. of Corrections,* 933 F.2d 128 (2d Cir.1991) (*per curiam* ). Beyond the naked claim that the segregation and transfer abrogated his right of access to counsel and courts, Plaintiff offers no specific facts to support his claim. He does not inform us how and on what occasion he was denied access to his counsel or legal relief to which he was entitled. He details no contested actual events where Defendants maliciously or otherwise prevented his representation or prejudiced his existing legal actions.

The only name mentioned (and not subsequently dismissed from this suit) in connection with the restriction of access to courts or counsel was that of c.o. Wilhelm at Sullivan (Pl.'s Dep. at 184). This reference, however, lacks the requisite specificity for us to find there to be

1998 WL 199923

any triable issue of fact on this claim. There is nothing on the record to indicate that Plaintiff was in any way prejudiced in his legal representation. McFadden's prodigious litigation and extensive pleadings before this Court, even without counsel, evidence Plaintiff's ability to navigate the complex pathways of the judicial system.

**PRISON TRANSFER**

*10 McFadden alleges that his transfer on April 10, 1995 from RCCF to Sullivan violated his First, Fourth, Sixth and Fourteenth Amendment rights because it was done solely in retaliation for his filing of the 95 Civ. 1148(LBS) action and intended to interfere with his litigation of this case and his pending criminal trial on charges of kidnaping, rape and robbery. He deems this transfer to have been "arbitrary, capricious, retaliatory, and in violation of the procedural and substantive due process of both state and federal laws and constitutions." (Pl's Mem. of Law at 51)

The only remaining Defendant implicated by McFadden in the unlawful prison transfer claim is Captain Farina, who signed the transfer request. At the outset therefore we dismiss this claim with regard to any other Defendants. This Defendant asserts that he is immune from suit because the Eleventh Amendment bars prosecution of all actions in federal court against state officials sued in their official capacities where the state is the real party in interest. (State Defs.' Mem. of Law at 8) There is no evidence from Plaintiff's papers that this should be construed as a suit against the state. Obliged to construe Plaintiff's pleadings liberally, we reject this defense as inapposite in a case such as this one where Defendant is alleged to have acted wantonly and capriciously, exceeding the scope of his official duties. Plaintiff has provided no facts, however, to demonstrate how Defendant Farina was personally involved in any deprivation of Plaintiff's rights. Even had he made such a showing, however, there is no evidence here of any constitutional misdeeds.

It is true that prison transfer solely in retaliation for the exercise of constitutional rights is unlawful. *Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989); *see also Matiyn v. Henderson,* 841 F.2d 31, 34 (2d. Cir.1988), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). Due process does not protect against transfer.

There is no constitutional right to process before or after a prison transfer. Absent a constitutionally impermissble motive, such as to interfere with a prisoner's litigation, he may be transferred in compliance with state law and regulations without any hearing. Prisoners also possess no right to be placed in a particular facility. The Department of Corrections has broad leeway in deciding where to house the inmates under its protective care, be it state or county jail. Furthermore, the Supreme Court has held that, absent state law or practice conditioning such transfers on proof of serious misconduct or occurrence of other events, the due process clause of the Constitution does not even entitle a state prisoner to a hearing when he is transferred to a prison, the conditions of which are substantially less favorable. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

In assessing the adequacy of Plaintiff's claim, we must inquire whether he was constitutionally deprived as a result of the transfer. "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the states." *El–Shabazz v. Wangenstein,* 1995 WL 489686 *3 (S.D.N.Y.) (quoting *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). As a matter of Due Process, a pretrial detainee has a right not to be subjected to conditions which amount to punishment of the detainee. *Bell v. Wolfish,* 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Butler v. New York State Correctional Dep't.,* 1996 WL 438128, *4 (S.D.N.Y.). The Second Circuit has held that the mere transfer of a pretrial detainee "to less amenable and more restrictive quarters for nonpunitive reasons" does not amount to punishment per se. *Covino v. Vermont Dep't of Corrections,* 933 F.2d 128, 129 (2d Cir.1991). Despite Plaintiff's allegations, there is no factual evidence on the record to show that the transfer was in any way punitive and therefore violative of his Due Process. He was not deprived of access to counsel nor was he denied any notice due to him as a result of the transfer. The record, instead, indicates that McFadden, due to his misconduct, caused a strain on resources at the RCCF which permitted a transfer to another correctional facility.

*11 We must next inquire whether McFadden's transfer contravened any state law. Here the Court must determine whether any state "statute or regulation prescribes mandatory procedures that ... create a liberty interest." *Covino v. Vermont Dep't of Corrections,* 933 F.2d 128, 129 (2d Cir.1991), citing *Hewitt v. Helms,* 459 U.S. 460, 103

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

S.Ct. 864, 74 L.Ed.2d 675 (1983). The mere existence of a regulation does not, by itself, create an expectation on the prisoner's part that he would not be transferred absent misbehavior. *Butler v. New York State Correctional Dep't.,* *1996 WL 438124, *5 (S.D.N.Y.1996)* (quoting *Cofone v. Manson,* 594 F.2d 934, 938 (2d Cir.1979)). New York Corrections Law provides for the transfer of detainees, whether pre-trial or post-conviction, from one facility to another "when, due to extraordinary circumstances, the facility administrator determines that the public interest and facility security would be served by the transfer of an inmate or group of inmates to another suitable place or facility." N.Y.Comp.Codes R. & Regs. tit. 9, § 7300.5 (1997) ("Substitute Jail Order"); *see* McKinney's Correction Law § 504 ("Designation of Substitute Jail").

We find Plaintiff's claim based on prison transfer, or the procedures used to effect the transfer in his case, to be without merit in light of the fact that, according to Plaintiff himself, he *asked* Judge Kelly of Rockland County to be transferred out of RCCF. (Pl.'s EBT at 155–56.) His transfer was then requested by Captain Farina of RCCF as a result of McFadden's disciplinary problems.[13] (Honan Aff., Ex. F.) McFadden' was dissatisfied with his treatment there and filed an Order to Show Cause requesting to be transferred out of RCCF. (Pl.'s EBT at 156.) We find nothing improper or unconstitutional with regard to McFadden's transfer from RCCF to Sullivan.

## FIRST AMENDMENT CLAIM

Plaintiff, despite his initial invocation of the First Amendment, fails to state a claim that his prison transfer or any other conduct alleged in the instant case infringed upon his First Amendment right of free expression. There is absolutely no evidence before us to indicate that McFadden's free speech had been curtailed. In addition, even assuming that there was some speech or expression at issue here, a prisoner's right to free speech must always be assessed in the institutional context of necessary and legitimate penological interests. "[T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is 'reasonably related to legitimate penological interests' ... This is true even when the constitutional right claimed to have been infringed is fundamental." *Washington v. Walter Harper,* 494 U.S. 210, 223, 110 S.Ct. 1028, 108

L.Ed.2d 178 (1990) (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)). The transfer of a prisoner or his confinement to administrative segregation with extensive monitoring, searches and other controls, subject to periodic review, can be attendant necessities of safe and secure prison life without violating the inmate's constitutional fights. McFadden's segregation, as well as his transfer, have been shown to have been neither exaggerated nor unreasonable responses on the part of prison officials.

## CONDITIONS OF CONFINEMENT

**\*12** Plaintiff's Complaints allege that the conditions of his confinement and the treatment he received at the hands of his jailers violated his constitutional rights. He catalogues a variety of unpleasant conditions. He states that he was kept in an "unsanitary cell." (95 Civ. 1148 Compl. at 4.) Additionally, Plaintiff complains that various Defendants denied him hot showers, confined him to a small cell, exposed him to cold air and unbearable noise and caused him to witness the beating of other inmates. (95 Civ. 1148 Compl. at 9.) More specifically, he alleges that Defendant Sergeant William Schoenleber refused Plaintiff the right to clean his cell. (95 Civ. 1148 Compl. at 12.) "Only when [the] condition became too unbearable for him and his guards ... did [Schoenleber] finally allow Plaintiff to clean [the] cell." (95 Civ. 1148(LBS) Compl. at 12.) Plaintiff alleges that Defendant correctional officer S. Felix deliberately placed human hairs in Plaintiff's meals and was wont to throw coffee, juice and water into the cell. (95 Civ. 1148(LBS) Compl. at 16.) Plaintiff also objects to the shut-off of water to his cell in Sullivan over two periods of three days each in April 1995. Finally, Plaintiff further charges that, while at RCCF, Defendants knowingly exposed him to tuberculosis. (95 Civ. 1148(LBS) Compl. at 2.) He claims that Defendants Lieutenants J.C. Liska and M.E. Nowlin detained Plaintiff over an extended period in a cell usually reserved for "in-take," where new inmates are temporarily held until a cell becomes available in the general population. (95 Civ. 1148(LBS) Compl. at 11, 16.) Plaintiff alleges that inmates with tuberculosis resided in "in-take" previously and that his detention there exposed him to the disease which he claims to have contracted. (Pl.'s Mem. of Law at 58.) However, Defendants assert that "there is no proof whatsoever that plaintiff presently

1998 WL 199923

has or previously contracted tuberculosis." (Def.'s Mem. of Law at 6.)

First, with regard to the nature of Plaintiff's cell, we find that his confinement to a small cell did not violate his due process. The Supreme Court has held that confinement of two pre-trial inmates to a cell designed for single occupancy did not deny due process. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Plaintiff's complaint, therefore, that his cell, which he inhabited by himself, was small does not create a cause of action. Furthermore we find that, even for a pretrial detainee, the presence of unpleasant odors, while unfortunate, also does not constitute punishment where, as in the instant case, the condition was temporary.

Secondly, Plaintiff's claim that he was injured by virtue of witnessing the abuse of another prisoner does not state a cause of action. Plaintiff cannot demonstrate how his rights were deprived nor does he state with sufficient specificity any supporting facts to bolster such a claim.

Third, Plaintiff's complaints of excessive noise are unsupported by any additional evidence or specific allegations. By themselves, these accusations are merely conclusory and describe a *de minimis* infraction, if any.

 **\*13** Fourth, the allegation that on at least one occasion, hair was placed in his food tray, is a non-material fact. One or two instances of finding a hair in one's food is not only not a punitive and unconstitutional violation of rights but a frequent occurrence, even for non-incarcerated diners in better restaurants. Officials are not charged here with any interference with McFadden's essential nutritional requirements, such as starving him or serving inadequate and generally unsanitary food. The offense complained of and the facts alleged are *de minimis* and therefore do not give rise to any triable issues on this point. *Cf. Robles v. Coughlin,* 725 F.2d 12 (2d Cir.1983) (Court of Appeals found allegation that prison officials served food contaminated with glass, dust and human waste for twelve days, three of which were consecutive, over a fifty-three day period, thereby starving prisoners, withstood *sua sponte* dismissal).

Fifth, Plaintiffs claim that the shut-off of his water for two three-day stints violated his contitutional rights is without merit. Given the temporary nature and limited consequence of this water problem, again the unpleasant

condition did not trigger a constitutional controversy. On an Eighth Amendment inquiry, a court has found that an inoperable sink for nine days did not constitute a constitutional violation. *Johnson v. Commissioner of Correctional services,* 699 F.Supp. 1071 (S.D.N.Y.1988). Defendants claim that the water shut-off was not retaliatory, but necessary to stop overflowing of the Plaintiff's sink and toilet. It is thoroughly disingenuous for Plaintiff, who harrassed his keepers by throwing feces and urine at them, to now attempt to recover on a constitutional claim for a situation which he precipitated. Furthermore it is not disputed that the Plaintiff received drinks with his meals at this time and therefore suffered no dehydration. Finally, not only is the claim not cognizable on these facts, but it is not actually alleged against any Defendants still remaining in this suit. We therefore dismiss this claim altogether.

Finally, on the question of tuberculosis contamination we must inquire whether prison officials here acted or failed to act with "deliberate indifference to serious medical needs of prisoners" in such a way, in this case, as to have punished the Plaintiff unconstitutionally. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (indifference to serious medical needs constitutes violation of Eighth Amendment rights). There is no evidence on this record that Defendants caused Plaintiff to be infected with tuberculosis or failed to treat such an illness. In fact, there is no evidence at all that Plaintiff at any time had or continues to have tuberculosis. Defendants append Plaintiff's RCCF medical reports from the duration of his stay at that institution. (Honan Aff. Ex. E.) Nowhere is there any indication that Plaintiff had or contracted tuberculosis at Rockland. Furthermore there is ample documentation indicating regular medical examination and treatment. We therefore dismiss his claim for redress based on tuberculosis infection for which there is no supporting evidence beyond unsupported allegations. "[M]ere negligence in the treatment of a prisoner's physical condition, or claims based on differences of opinion over matters of medical judgment, fail to rise to the level of a § 1983 violation." *Sloan v. Zelker,* 362 F.Supp. 83, 84 (S.D.N.Y.1973) (quoting *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972)). Furthermore Plaintiff alleges no facts relating to his medical condition which shows that specific Defendants here were indifferent to his medical needs.

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 147 of 220

1998 WL 199923

## OTHER ABUSES

**\*14**  We dismiss Plaintiff's allegations of verbal abuse and harrassment. Mere words cannot create a cognizable injury under § 1983. *Zeno v. Cropper,* 650 F.Supp. 138 (S.D.N.Y.1986) (the alleged use of vile and abusive language against pre-trial detainees does not provide a basis for a civil rights action).

We also dismiss Plaintiff's allegations of unconstitutional violation of his religious rights. There is no evidence on this record that he was in any meaningful way deprived of the exercise of his faith. His claim that the odor in his cell and his inability to shave his body inhibited his religious practice does not state a claim which rises to the level of a constitutional violation. McFadden does not explain what religious belief purportedly requires him to shave the entirety of his body. Defendants' exhibits of prison logs show that McFadden received special Ramadam meals during the relevant period, served to him especially early to comply with his religious needs. (Honan Aff. Ex. C.)

Also Plaintiff describes the use on him of pepper spray on three occasions. Unfortunately, the use of pepper spray is sometimes a required incident of prison discipline to maintain order and safety under difficult conditions. There is no indication that the use of the spray was punitive or inflicted on Plaintiff except on three discrete and necessary occasions with no injury or lasting harm suffered. On these uncontroverted facts, we can find no action in violation of 42 U.S.C. § 1983.

Plaintiff's Complaint charges that in December 1994, while incarcerated at RCCF, he was dragged forcibly and shackled from his cell to the prison medical facility for weighing.[14] McFadden, as a protest, stopped eating while in prison and a state court ordered that he be weighed to ensure his safety. (Compl. at 17.) McFadden describes that, when the guards dragged him down the concrete corridor and steps, his head banged against the stairs and he became partially paralyzed in his left hand due to the pressure from the metal shackles on his wrists. Whereas many of Plaintiff's other allegations have been without merit as a matter of law, we find that this allegation presents a much closer call, especially as Plaintiff details the incident with specificity and reference to particular responsible Defendants, namely c.o. Stein, c.o. Layman and c.o. Malone, acting under orders from

Lt. Clark. Controverted charges that corrections officers dragged a prisoner, allegedly indifferent to his safety and the possible infliction of bodily harm, would normally survive a motion for summary judgment and constitute the kind of material fact requiring trial. However, we have a unique situation before us. It appears from Plaintiff's, as well as Defendants', papers that this deplorable-sounding treatment was not unprovoked but made regrettably necessary by Plaintiff's own conduct.

McFadden admits, that, when the appointed time arrived to go to the hospital for weighing, he refused, despite the court order, to be weighed. In fact, he refused to walk or to move, leaving prison officials with no choice but to move him in some forcible way. They had already had experience with McFadden's refusal to cooperate with a court order, such as when he threatened to "kick in the head" of the doctor sent to take a pubic hair sample. As the path from his cell to medical required the traversing of a flight of stairs, Defendants allegedly opted against the use of a wheelchair to transport McFadden and chose, instead, to drag him. The question we must answer is whether it was permissible on three occasions for prison officials to drag a pretrial detainee against his will to and from the prison hospital down concrete steps for the purpose of fulfilling a court order. We inquire, cognizant of the Plaintiff's due process rights and also against "the backdrop of prior decisions recognizing that courts are ill-equipped to substitute their judgments on matters of prison administration for those of prison authorities." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996).

**\*15**  Prison officials have the authority and discretion to use reasonable physical force upon an inmate to compel compliance with necessary orders, maintain prison safety and the requisite order vital to security in a correctional facility. We find on the uncontroverted facts that prison officials, faced with an extremely difficult situation, applied reasonable force in good faith to further legitimate penological interests.

In this unique and narrow instance, where there is no dispute that Plaintiff was difficult, uncooperative and, historically, a troublemaker, Defendants choice to drag him, though perhaps unwise, does not rise to the level of a constitutional violation. Plaintiff's allegations of egregious abuses are unsupported by any evidence that he suffered lasting injury as a result of this incident.

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 148 of 220

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

We find based on the record before us that there remains no outstanding issue of material fact necessitating trial. For the reasons set forth above we grant all Defendants' Motions for Summary Judgment on all claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 199923

Footnotes

1   These two actions (*McFadden v. Coombe, et al.,* 95 Civ. 1148(LBS) & *McFadden v. Solfaro, et al.,* 95 Civ. 3790(LBS)), which contain related issues of law and fact, were consolidated for all purposes by order of this Court signed January 17, 1996 pursuant to Fed.R.Civ.P. 42.

2   The actions consolidated here involve two distinct lists of named defendants employed as corrections officers in a state and a county facility and represented by different counsel. For purposes of this consolidated motion for summary judgment and cross-motion for summary judgment, we treat them as one group, labeled "Defendants." For the sake of clarity, however, we make specific reference to allegations cited in complaints from both actions and distinguish between the Defendants' two motions for summary judgment and other pleadings by original case number.

3   He was convicted of these crimes perpetrated upon a victim from South Nyack, New York (and on subsequent additional counts of murder, rape and robbery) and sentenced to 37.5 to 75 years in August 1995 for this incident.

4   We refer to the Amended Complaint in 95 Civ. 1148(LBS) and the original Complaint in 95 Civ. 3790(LBS), both of which are relevant to this consolidated case. Because this Plaintiff proceeds *pro se* and his Amended Complaint subsequent to the Order of Consolidation of this Court clearly does not cover the incidents alleged in 95 Civ. 3790(LBS), though both case numbers are referenced in the caption to the Amended Complaint, we consider both pleadings in order that Plaintiff might have all his claims heard and be considered for full and final relief in this action.

5   Plaintiffs chemical depilatory creme was removed from his cell in order to facilitate a court ordered hair sampling for his criminal trial. McFadden's use of the the hair remover to denude himself of any body hair made it impossible to take a sample. (Honan Aff. at ¶ 12.)

6   Sullivan c.o.s Hosking, Senf, Sanok and Klein were alleged during the time period relevant to 95 Civ. 3790(LBS) to have humiliated and threatened the Plaintiff upon his intake to Sullivan and subsequently. He originally alleged that on April 25 and April 28, 1995, Defendants Saccone, Burlingame and Fuller rigorously searched his cell and took away his pen and messed up his legal papers before Plaintiff withdrew allegations against them. Plaintiff has, however, dropped his suit against these Defendants and therefore any consideration of these facts is irrelevant to the matter before us.

7   *Pro se* Plaintiff cannot be faulted for misapplying the Eighth Amendment to his case. Defendants' attorneys, however, can be.

8   The distinction between the rights of pre- and post-trial convicts is expounded upon in a series of Supreme Court cases, including, *inter alia: Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

9   The Supreme Court has held that prison officials must be granted broad discretionary authority. "To hold ... that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (quoting *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)).

10  The Second Circuit has previously characterized confinement in the SHU as a form of solitary confinement. Prisoners are separated from the general population and face a loss of other benefits in addition to being restricted in their right to visitors and commissary privileges. *Walker v. Bates,* 23 F.3d 652, 655 (2d Cir .1994), *cert. denied,* 515 U.S. 1157, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995) (citing *Patterson v.. Coughlin,* 761 F.2d 886, 893 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986)); *see also McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1982) ("[A]n inmate who is or may be sentenced to a term of confinement in a Special Housing Unit has a right to the procedural protections of the Due Process Clause.").

11  The Rules of Prohibited Prisoner Behavior in New York prohibit the throwing of feces or urine. N.Y.Comp.Codes R. & Regs. tit. 7, § 270.2

McFadden v. Solfaro, Not Reported in F.Supp. (1998)

1998 WL 199923

**12**    The Supreme Court in *Sandin* moved away from this rule, holding that due process liberty interests created by prison regulations will be generally limited to freedom from restraint which, while not exceeding sentence in such unexpected manner as to give rise to protection by due process clause of its own force, "nonetheless imposes atypical and significant hardship on inmate in relation to ordinary incidents of prison life," *Sandin* focused only the rights of convicted prisoners and not of pre-trial detainees. *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**13**    Capt. Anthony Farina writes in a letter of April 10, 1995 to the Undersheriff of Rockland County that, "McFadden has become increasingly hostile and has been involved in assaults on inmates and staff. His conduct has escalated and required a number of officers to be present each time he is taken out of his cell. This involves a substantial drain on the resources of the jail which is overcrowded. This, in turn, effects our ability to ensure the safety of other inmates and staff." (Honan Aff. Ex. F.)

**14**    Captain Farina is alleged to have ordered the guards to "drag plaintiff to the prison hospital, while both his hands and legs were cuffed, on the floor, with his head knocking violently against the hard floor and down the concrete steps—at the prison hospital, plaintiff was disgraceful [sic] hung up by the chains linking the two writst and two ankels [sic], while plaintiff bottom sat on scale to be weigh like a piece of meat while the female looks on." (95 Civ. 1148(LBS) Compl. at 8.)

2019 WL 315058
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maleatra MONTANEZ, Plaintiff,

v.

CITY OF SYRACUSE; Police Officer Chester
D. Thompson; Chief of Police Frank L. Fowler;
and Police Captain Thomas Galvin, Defendants.

6:16-cv-00550 (BKS/TWD)
|
Signed 01/23/2019

**Attorneys and Law Firms**

For Plaintiff: Edward Sivin, Sivin & Miller, LLP, 20 Vesey
Street, Suite 1400, New York, NY 10007.

For Defendants City of Syracuse, Frank L. Fowler,
and Thomas Galvin: Khalid Bashjawish, Assistant
Corporation Counsel, City of Syracuse, 233 E.
Washington Street, Suite 300, Syracuse, NY 13202 John
G. Powers, Paul J. Tuck, Hancock Estabrook LLP, 1500
AXA Tower I, 100 Madison Street, Syracuse, NY 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, U.S. District Judge

**I. INTRODUCTION**

 *1 Plaintiff Maleatra Montanez brings this action
against Defendants City of Syracuse (the "City"), Police
Officer Chester D. Thompson, Chief of Police Frank
L. Fowler, and Police Captain Thomas Galvin. (Dkt.
No. 1). These claims arise from Plaintiff's allegation
that, on February 14, 2015, Thompson, a patrol officer
with the Syracuse Police Department ("SPD"), reported
to her residence in response to a 911 call and, while
he was there, directed her to engage in sexual acts
with him. (Dkt. No. 1).[1] Plaintiff brings: (1) a battery
claim against Thompson and the City; (2) an intentional
infliction of emotional distress ("IIED") claim against
Thompson and the City; (3) a prima facie tort claim
against Thompson and the City; (4) a negligent hiring,
training, supervision, and retention claim against the
City; (5) a Fourth Amendment excessive force and
unreasonable search and seizure claim against Thompson;

(6) a Fourteenth Amendment substantive due process
claim against Thompson; (7) a supervisory liability claim
against Fowler; (8) a supervisory liability claim against
Galvin; and (9) a *Monell* municipal liability claim against
the City. (*Id.*). The City, Fowler, and Galvin[2] move
for summary judgment under Rule 56 of the Federal
Rules of Civil Procedure. (Dkt. No. 89). Plaintiff does
not oppose dismissal of her battery, IIED, prima facie tort,
and negligent hiring claims against the City but otherwise
opposes summary judgment and submits evidence in
support of her contention that there are material issues
of fact requiring trial. (Dkt. No. 97, at 5). Defendants
move to strike certain aspects of that evidence, (Dkt. No.
102), and Plaintiff opposes the motion to strike. (Dkt.
No. 107). The Court held oral argument on January 8,
2019. For the reasons that follow, Defendants' motion for
summary judgment is granted in part and denied in part,
and Defendants' motion to strike is denied.

**II. FACTS**[3]

**A. Thompson's Employment at SPD**[4]
 *2 Thompson began his employment as a patrol officer
with the SPD on January 3, 1997. In general, during his
shifts, Thompson worked by himself—without a partner
—and drove a marked SPD vehicle. (Dkt. No. 9-3, at 9).
On February 15, 2015, the day after he allegedly sexually
assaulted Plaintiff, Thompson was suspended pending
investigation of Plaintiff's complaint. (Dkt. No. 89-31,
at 4). The SPD terminated Thompson's employment
following the investigation. (Dkt. No. 89-10, ¶ 91). Prior to
the incident at issue in this case, Thompson was the subject
of five complaints, four of which the SPD investigated or
responded to in some manner.

**B. Prior Complaints**

**1. 1999 to 2001 – Bassett/Malenick Complaint**

Cheryle Bassett has submitted a declaration detailing
the following contact with Thompson. (Dkt. No. 99-10).
Bassett met Thompson at some point between 1999 and
2001, when he pulled over her motor vehicle "because
of a traffic infraction." (Dkt. No. 99-10, ¶¶ 1, 3; Dkt.
No. 99-16, ¶ 2). Bassett told Thompson that she was
struggling financially and "he offered to lease to [her] a
portion of a house that he managed" in Syracuse. (Dkt.

No. 99-10, ¶ 3). Bassett states that, after she moved in, she fell behind on rent. (*Id.* ¶ 4). Thompson "began to make sexual advances, which [Bassett] did not rebuke." (*Id.*). Bassett and Thompson "had sexual relations for several weeks and during that time period [Bassett] paid little or no rent." (*Id.*). Subsequently, Bassett was arrested for prostitution. (*Id.* ¶ 5). During an interview with SPD officers, "in an attempt to avoid the criminal charges," Bassett told them about her relationship with Thompson. (*Id.*). According to Bassett, "[t]his appeared to anger the officers," and the charges were dismissed. (*Id.*).

Bassett states that, after "this incident," Thompson was angry with her, and their relationship ended. (*Id.* ¶ 6). Thompson demanded that she pay the back rent, which she was unable to do, and "then demanded that [Bassett] have sex with him," but Bassett "told him that [she] did not want to." (*Id.*). Bassett remained at the residence and attempted to pay Thompson what she owed. (*Id.*). Thompson, however, "threatened" eviction if she "did not have sex with him." (*Id.*). Bassett states that, "[o]ver the next several months," "Thompson showed up at the [residence] at various hours of the day and night, mostly unannounced and often in uniform, and raped me." (*Id.* ¶ 7).

At some point during this time period, Bassett became friends with John Malenick, to whom she confided "what Chester Thompson was doing to [her]." (*Id.* ¶ 8). Malenick advised her to report Thompson to the police, but she "was afraid to do so." (*Id.*). Malenick "then took it upon himself to contact the [SPD] to notify them of what Chester Thompson was doing" to Bassett. (*Id.*). Malenick has submitted a declaration regarding his report. (Dkt. No. 99-16, ¶ 6). In late 2001 or early 2002 Malenick told an officer at SPD's Internal Affairs [5] that he believed Thompson "had forced [Bassett] to have sex with him and that he threatened to evict her ... if she didn't have sex with him." (*Id.*). The officer asked whether Malenick had any direct proof of the accusation. (*Id.*). When Malenick said that he did not, the officer responded that "without any direct proof there was nothing that could be done." (*Id.*). There is no evidence of an investigation.

### 2. 2002 – Health Insurance Complaint

**\*3** In 2002, the SPD received information concerning Thompson's 2000 application for, and procurement of,

health insurance coverage for his ex-wife, whom he had divorced in 1995. (Dkt. No. 99-18, at 9). On the application, Thompson filled in the date of marriage but left the marital status box blank. (Dkt. No. 99-18, at 10). As Thompson's ex-wife "appear[ed] not to be an eligible dependent," the SPD commenced an internal investigation. (Dkt. No. 99-18, at 7). As part of the investigation, Captain John Agne from the Human Resources Division and Captain Mark McArdle from the Patrol Services Division, searched SPD records, made inquiries to the health insurance office, and interviewed Thompson. (Dkt. No. 99-18, at 7–12). Captain Agne concluded that his investigation showed "a pattern of the [sic] less than truthful behavior of Ofc. Thompson, as well as the fact that he may have participated in criminal behavior by filing these documents and receiving insurance benefits that he is not entitled to." (*Id.* at 8). Then-Chief of Police Dennis DuVal found Thompson in violation of the SPD's Rules and Regulations governing unbecoming conduct, unsatisfactory performance, and performance of duties, and on October 17, 2002, he issued a letter of reprimand reminding Thompson "that future acts in violation of the Rules & Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 99-18, at 1). [6] Defendant Galvin personally served the letter on Thompson. (*Id.*).

### 3. 2005–Complaint From Woman at Syracuse Corporation Counsel

According to an October 6, 2005 SPD interdepartmental memo, a woman employed by the Syracuse Corporation Counsel made a complaint of "Unbecoming Conduct" against Thompson ("the SCC complaint"). (Dkt. No. 99-20, at 1). The woman complained that Thompson had "struck up a conversation" with her outside a bar and "offered to follow her home to make sure she made it there safely." (*Id.*). "[O]nce they arrived at her home ... he walked her on to the porch," and then she "opened the door to let herself in and Officer Thompson walked inside." (*Id.*). The woman said "goodbye so Officer Thompson would leave and Officer Thompson said he needed a hug first." (*Id.*). "She gave him a hug so he would leave and he left." (*Id.*). "[O]n another night," Thompson was working and saw the woman getting out of her car; Thompson thought she flashed her lights "at him wanting to talk." (*Id.*). The woman, however,

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 152 of 220

"related [to Thompson] that she was only locking her car remotely." (*Id.*). Thompson provided a different account of these events. He acknowledged knowing her but stated that "she asked him to follow her home" and that he did not go inside, "request a hug," or "receive or give a hug to her." (*Id.*). The SPD determined that "all that was needed at this time was to talk to Officer Thompson and instruct him not to contact" her; SPD did not speak to her. (*Id.*). Thompson agreed to comply with the instruction "not to have further contact" with her. (*Id.*).

### 4. 2006 – Buske Complaint

In 2006, Candy Buske made a complaint to the SPD about Thompson. (Dkt. No. 99-8, at 14). Buske was "incarcerated at the time ... on a Robbery charge" and "made it known that she had information about two Syracuse police officers that she would like to provide in order to obtain leniency on her ... pending criminal charge." (Dkt. No. 89-10, ¶ 37). Then-Chief of Police Gary Miguel [7] instructed Galvin, who was the head of the SPD's Office of Professional Standards ("OPS"), *see supra* note 5, to open an investigation. (Dkt. No. 89-10, ¶¶ 4, 34). Galvin interviewed Buske at the jail on May 17, 2006 (*Id.* ¶ 38). Buske acknowledged that she had a drug habit that she supported through prostitution. (Dkt. No. 99-21, at 1, 11). Buske stated that, in February or March 2006, she was walking "in the area of No. State St ... between three and four in the morning," when a marked SPD car "pulled up next to" her. (*Id.* at 11). Buske stated that the police officer in the car, whom she identified as Thompson, "called [her] by name and asked if [she] was working." (*Id.*). Thompson told her to "get into the back seat of the car" so he could "run [her] name." (*Id.*). After Buske got into the car, they drove "around the north side of the city" and talked. (*Id.*). Buske believed that there was a warrant for her arrest for violating probation, but concluded that Thompson did not check her name because he did not speak on the radio, use the computer, or ask for her identification. (*Id.*). Thompson asked her if she "would do something for him," which Buske knew meant "something sexual." (*Id.*). Buske "was afraid [Thompson] would arrest [her] if [she] refused" so she said she would. (*Id.*). Thompson asked Buske to "give him a blow job" and she agreed. (*Id.*). Thompson got into the back seat of the car, "unzipped his pants and [Buske] performed oral sex on him." (*Id.* at 12). Afterwards, Thompson gave her twenty dollars, dropped her off, and said he would like to

see her again. (*Id.*). Buske stated that she saw Thompson three weeks later, again in a marked SPD vehicle, and that he asked her to meet him in "a little while"; she agreed but "never went." (*Id.*). In addition, Buske "indicated that her adult daughter, who was also a prostitute and a drug user, also knew, and had some dealings with, Officer Thompson." (Dkt. No. 89-10, ¶ 43).

**\*4** Galvin "pulled" Thompson's "activity Detail Reports from the beginning of 2006 on occasions where he was working the North side of the City, to see if [he] could place [Thompson] at the location described by Ms. Buske." (*Id.* ¶ 44). "The reports did not conclusively confirm the information provided by Ms. Buske." (*Id.*). Galvin presented a photo array to Buske; "[s]he picked out a photo of Chester Thompson as the police officer that had paid her for oral sex." (*Id.* ¶ 45). Galvin obtained a sworn statement from Buske and included it in the investigation file. (*Id.* ¶ 46).

Galvin states that he also contacted Cari Buske, Candy Buske's daughter, who told him that she met Thompson "in late 2005 or early 2006, and that afterward, Thompson would contact her via cell phone wanting to meet her in person." (*Id.* ¶ 47). Cari Buske stated that she never "had any relationship with him." (*Id.*). Galvin "subpoenaed Cari Buske's cell phone records to try to determine whether Chester Thompson's number appeared," but it did not. (*Id.* ¶ 48). Galvin also researched both Candy and Cary Buske's criminal histories, which contained arrests for prostitution. (*Id.* ¶ 49).

Galvin interviewed Thompson regarding the allegations by Candy and Cari Buske. (*Id.* ¶ 50). Thompson said that "he was, from time to time, involved in investigations on the North side of the City that involved him stopping prostitutes to obtain information ... on drug houses and illegal weapons possession, because he assumed that ... prostitutes may have inside information on other criminal activity." (*Id.* ¶ 51). Thompson "denied ever having Candy Buske in his police vehicle" or "engaging in any sexual activity with ... any ... prostitute, while he was on duty." (*Id.* ¶ 52). Thompson, however, "admitted that approximately eight months previously he had another prostitute [in] his vehicle, who he could not identify." (*Id.* ¶ 53). Thompson told Galvin that he "did not notify the dispatcher of the transport." (Dkt. No. 99-21, at 6).

During the interview, Galvin showed Thompson a picture of Cari Buske, who was "also a prostitute." (*Id.* at 2, 5). Thompson told Galvin that "he had dealt with her on a call six to eight months ago" and "at that time" obtained her cell phone number. (*Id.* at 5). Thompson acknowledged that he called Cari Buske "on a personal note" "three or four times" and that he should not have called her because "he was married." (*Id.*). Thompson indicated that he "may have" tried to meet with Cari Buske "but that did not occur." (*Id.*). Galvin noted that Thompson was "extremely agitated" during the interview, which led Galvin "to question [Thompson's] denial." (Dkt. No. 89-10, ¶ 56).

Following the interview, Thompson submitted a memo to Galvin regarding Candy Buske's complaint and his knowledge of Cari Buske. (Dkt. No. 99-21, at 9–10). Thompson stated that he stopped Candy Buske six months before, that he asked her why she was in the area, and that Candy Buske responded that she was searching for her daughter Cari Buske, "whom she believed to be in a troubled situation." (*Id.* at 9). As the memo detailed, Thompson told Candy Buske that he knew who her daughter was and that, if he saw Cari, he would tell her that her mother was looking for her. (*Id.*). In his memo, Thompson acknowledged that he called Cari Buske's "cell phone approximately 6 times" but did so "at her request" to discuss "matters which she had questions about of a police nature." (*Id.*). Thompson acknowledged that, "approximately 6 to 8 months" previously, a female he believed to be a prostitute "flag[ged] [him] down and ask[ed] if [he] could transport her"; however, Thompson did "not recall if [he] called out on this occasion or not." (*Id.*).

 **\*5** The same day, Galvin completed a case report for Chief Miguel about the complaint against Thompson summarizing his investigation. (*Id.* at 1–7). Galvin noted that there were inconsistencies between Thompson's interview and the memo Thompson submitted after the interview: "His [memo] was consistent with what was stated during the interview, with the exception of telephoning Cari Buske. It was no longer done 'inappropriately,' 'on a personal note' but be called her cell phone approximately six times 'at her request' as she had questions of a police nature." (*Id.* at 6).

In the case report, Galvin concluded that the "basic allegation made by Candy Buske" against Thompson had

"not been substantiated"[8] but that "some concerns have been raised." (*Id.* at 6). Galvin explained that "Officer Thompson was extremely agitated during the interview, and after having been apprised of Buske's allegation asked several times if that was the only complaint against him. He ... appeared to have a questionable relationship with prostitutes, repeatedly telephoning Cari Buske 'on a personal note,' and giving one a ride without contacting the dispatcher." (*Id.*). Next to "Recommendation," Galvin wrote: Thompson "violated the Departmental Rules and Regulations regarding persons in police vehicles. Disciplinary action initiated." (*Id.*).

"Consistent with the SPD disciplinary process," Galvin prepared a Discipline Report stating: "In the month of January or February 2006, Officer Chester Thompson did transport a female in his assigned police unit without permission and without notifying the dispatcher," in the SPD's Rules and Regulations. (*Id.* at 16). Galvin sent the Discipline Report, "Investigative Case Report, the entire investigation file, and a summary of Officer Thompson's prior disciplinary history" to "the chain of command" and to Chief Miguel. (Dkt. No. 89-10, ¶ 58).

Though he recommended a finding of unsubstantiated as to Buske's allegations, because Galvin found her "description of events as being plausible" and Thompson had been "very nervous" during his interview, Galvin advised Chief Miguel that because Thompson "worked the midnight shift ... [a]nd that's when prostitutes are out working and they can be manipulated sometimes" it was "something that should be monitored." (Dkt. No. 99-8, at 14–16). Ultimately, "[t]he chain of command ... recommended," and Chief Miguel ordered, that Officer Thompson be disciplined with a formal letter of reprimand for transporting "a female in his assigned police unit." (Dkt. No. 89-10, ¶¶ 59–60; Dkt. No. 99-21, at 16). Chief Miguel adopted the finding that the Buske allegation was not substantiated. (Dkt. No. 99-21, at 7).

On July 26, 2006, Galvin served the letter of reprimand, signed by Chief Miguel, on Thompson. Dkt. No. 89-10. The letter also contained a reminder "that future acts in violation of the Rules and Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 89-14, at 14).

Thompson's duties did not change following Buske's complaint: the SPD did not place any restrictions on him,

and he was not aware of any additional monitoring. (Dkt. No. 99-3, at 192). Thompson testified that Galvin never expressed any disapproval of his interactions with Candy Buske or Carrie Buske. (*Id.* at 193).

### 5. 2014 – Melissa Popcun-Roach Complaint

**\*6** On June 2, 2014, the SPD received a complaint by "Patricia Popcun over the alleged activities of an unidentified [SPD] officer and her thirty-five-year-old daughter Melissa Popcun Roach" at Melissa's home on Cayuga Street in Syracuse. (Dkt. No. 99-6, at 1, 4). Galvin initiated an investigation, and interviewed Popcun, who related that her daughter Melissa had told her that:

> a Syracuse Police officer followed her into her apartment unannounced and uninvited ... and that she told the officer that she didn't want any trouble because she already had problems with the police. The officer told her that he would take care of any police problems in exchange for oral sex, which [she] then gave him.

(Dkt. No. 99-5, at 1). Popcun also relayed to Galvin that Melissa said that "[s]he performed the act and the officer left" and that the officer had "worn a wedding ring." (Dkt. No. 99-6, at 1; Dkt. No. 89-10, ¶ 68). Galvin testified that Popcun told him that she felt what the officer had done "wasn't right" and that he had taken "advantage of her daughter, who was a heavy drinker and bipolar medication [sic] and that she was a drug abuser," and that "the officer should have been aware that [her daughter, Melissa,] was not capable of consent." (Dkt. No. 99-8, at 47).

To "determine the identity of the officer in question," Galvin reviewed the Officer Activity Detail Reports for June 1, 2014 and found that Thompson and Officer Thomas Nicolini had responded to the Cayuga Street area "on an animal complaint." (Dkt. No. 89-10, ¶ 72). Since "of the two, only Officer Thompson wore a wedding band," Galvin identified Thompson "as the potential subject." (*Id.*).

Galvin then interviewed Nicolini, who confirmed that he and Thompson had responded to a call in the Cayuga Street area, where a "pit bull ... had been found running lose." (Dkt. No. 99-6, at 2; Dkt. No. 89-10, ¶ 73). According to Galvin, Nicolini stated that, while they were there, "they were approached by a woman named Melissa," who "stated she had information regarding the owner of the dog that was the subject of the complaint." (Dkt. No. 89-10, ¶ 73).[9] Nicolini reported that "[i]t appeared that Melissa was intoxicated as she was stumbling when she walked and there was alcohol on her breath." (Dkt. No. 99-6, at 5). Nicolini told Melissa "to leave this area due to the aggressive dog." (*Id.*). After Melissa went back inside her apartment, Thompson went to the apartment for roughly 10-15 minutes, and returned "with no more information." (*Id.* at 2, 5).

Galvin next interviewed Thompson, who "admitted going into Melissa Popcun[-Roach's] apartment ... to attempt to collect information from her about the animal control complaint that was being investigated," "denied that anything improper occurred but indicated that he was not able to learn anything useful from her regarding the investigation." (Dkt. No. 89-10, ¶ 75). Galvin directed Thompson to prepare a written statement, which Galvin "included in the investigation file." (*Id.*; Dkt. No. 99-6, at 6). In his written statement, Thompson maintains that he "spoke briefly" with Melissa in her apartment "for approximately 10 minutes regarding the neighbors [sic] dog." (*Id.*).

**\*7** Galvin did not obtain a written statement or affidavit from Popcun or Melissa. In a declaration filed in connection with this summary judgment motion, Popcun states that she spoke with Galvin a second time after her daughter was upset about the fact that Popcun reported the incident to the police. (Dkt. No. 89-21, ¶¶ 9–10). Popcun told Galvin that her "daughter did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (*Id.* ¶ 10). Galvin did not interview or attempt to interview Melissa Popcun-Roach. (Dkt. No. 99-8, at 9).[10] After completing the investigation, Galvin prepared a case report and recommended that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). As described below, Plaintiff has highlighted discrepancies in the evidence regarding aspects of this report, including: (1) Galvin's report that Melissa "refused to meet" and

"was not available," (*Id.* at 2) and (2) Galvin's report that Melissa had "retracted her accusations .. soon after they were made," and that Melissa "said it did not happen," (*Id.* at 1–2).

Galvin has explained that he recommended a finding of "unsubstantiated" because he "could not corroborate through first-hand testimony that the incident did occur" and "there were serious credibility issues with Melissa Popcun[-Roach] based on her mother's credible representations that her daughter was struggling with substance abuse and had recanted her original account of the events in question." (Dkt. No. 89-10, ¶ 80; Dkt. No. 99-6, at 1–3). In his report, Galvin stated that "Officer Thompson and I discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations. He was reminded of the penalties should such conduct be verified as true. He understood the Departments [sic] concerns." (Dkt. No. 99-6, at 2). Galvin testified that, during the course of the investigation, he became "aware" of the Buske allegations, which he had investigated in 2006, eight years before. (Dkt. No. 99-8, at 21). The Buske allegations are not referred to in the Popcun-Roach case report.

Upon completion of the case report, Galvin sent the Popcun-Roach case file, including the report, to Rebecca Thompson, [11] a deputy chief at the SPD for review and signature. (Dkt. No. 99-9, at 8, 20–21). Deputy Chief Thompson testified that at the time she reviewed the case file, she had no questions or follow up for Galvin. (Dkt. No. 99-9, at 21–22). When she was asked during her deposition about the indication in the case report that Popcun-Roach "refused to meet with any police officers," Deputy Chief Thompson responded that Galvin had told her that he had "reached out" to Melissa Popcun-Roach but that "she would not return any of his calls or give him any information." (*Id.* at 23). Chief Deputy Thompson "concurred with the investigation of Captain Galvin, that it was unfounded" and signed the case report. (*Id.* at 31).

 **\*8**  Chief of Police Fowler, as the "final decision" maker, conducted the "final review" of the Popcun-Roach report. (Dkt. No. 99-7, at 28). Fowler testified that he understood that the SPD had received a "complaint from a mother who alleged that her daughter ... had been coerced to perform oral sex on Officer Thompson." (*Id.* at 22). The only document in the file Fowler recalled receiving

in connection with the Popcun-Roach investigation was the case report. (*Id.* at 33). According to his declaration, Fowler "carefully considered all the facts and noted, as discussed by Captain Galvin, that there was no first hand testimony that the act had actually occurred." (Dkt. No. 89-3, ¶ 60). Fowler testified that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her." (Dkt. No. 99-7, at 41). Although Fowler found Ms. Popcun's allegations "concerning," he determined that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct," and explained this "was a judgment call made based on consideration of all the evidence and the investigation experience of myself and Captain Galvin." [12] (Dkt. No. 89-3, ¶ 61). Fowler signed the Popcun-Roach case report, adopting the recommendation that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). [13] During his deposition, when Fowler was asked whether, "[a]t the time that [he] signed off on this report" he was "concerned about the possibility that Chester Thompson had done what was alleged and that he might do it again in the future," he responded: "No." (Dkt. No. 99-7, at 40).

Thompson testified that he was never disciplined in connection with Popcun-Roach's allegations, that his duties with the SPD did not change following the investigation, that he did not perceive that he was being "monitored any more closely than before" the allegations, and that he was not asked to undergo any training. (Dkt. No. 99-3, at 234–35).

### C. 2015 Montanez Incident

Thompson met Plaintiff Maleatra Montanez approximately eight months after the Popcun-Roach incident. Plaintiff alleges the following. On February 14, 2015, she "called 911 to report that her sister had taken [Plaintiff's] minor daughter from Syracuse to Alabama without [Plaintiff's] permission." (Dkt. No. 98, ¶ 62). Thompson, who was already at Plaintiff's building on an unrelated call, responded to Plaintiff's apartment. (Dkt. No. 99-3, at 18–19). Plaintiff and her newborn son were in the apartment. (Dkt. No. 99-2, ¶ 4). Once inside her apartment, Thompson, who was in uniform and equipped with his service weapon and a baton, (Dkt. No. 99-3, at 53–54), told Plaintiff she "was pretty," "commented on [her] rear end and made a sexual comment about [her] lips." (Dkt. No. 99-2, ¶ 5). "He also started to rub himself

in his groin area over his pants" and "then removed his penis from his pants and told [Plaintiff] to 'suck it.' " (*Id.*). Plaintiff "did not try to fight Officer Thompson, but ... told him 'Whoa, we don't have to do this.' " (*Id.*). "In response, he just repeated, 'suck it.' " (*Id.*). Plaintiff "was terrified for [her] safety and for the safety of [her] newborn son, so [she] began to give Officer Thompson oral sex." (*Id.*). Thompson then told Plaintiff "to get a condom" and raped her. (*Id.* ¶¶ 7–8). The next day, February 15, 2015, Plaintiff went to a local hospital, where she reported that she "had been raped by a Syracuse police officer with the last name 'Thompson.' " (*Id.* ¶ 9). [14]

**\*9** Fowler learned of the incident the same day Plaintiff reported it, on February 15, 2015. Dkt. No. 89-13. Following a briefing, Fowler met with Thompson's supervisor and the police officer who initially interviewed Plaintiff, referred the matter to the district attorney's office for investigation, and, after conferring with Galvin, suspended Thompson pending investigation. (Dkt. No. 89-3, ¶¶ 29–33; Dkt. No. 89-10, ¶ 88). Galvin states that he "recommended the immediate suspension of Officer Thompson ... pending further investigation of the allegations" "based, in part, on [his] prior experience with Officer Thompson, including the nature of the allegations, though unproven, from the 2006 Buske and 2014 Popcun complaints." (Dkt. No. 89-10, ¶ 88).

Galvin commenced an investigation, which included interviews of Plaintiff and Thompson, and provided their versions of the incident in a case report dated February 20, 2015. (Dkt. No. 99-24). Galvin recounted the following aspect of his interview of Thompson:

> This writer asked Officer Thompson why he thought it would be allowable for an officer to engage with a complainant in sex, whether consensual or not, while on duty. He replied he did not think it would be a problem. I asked if he recalled my having counseled him six months before in regards to an allegation having been made at the time that he had allowed a vulnerable female (drugs, mental) to perform oral sex

on him while he was on duty and he said that he did.

(Dkt. No. 99-24, at 4). Galvin recommended that disciplinary action be initiated. (*Id.*).

An SPD discipline report dated February 24, 2015 contains findings that Thompson violated SPD's Rules and Regulations governing unbecoming conduct. (Dkt. No. 89-5, at 31). The report describes the violation as follows: "On 14 February 15 while on duty and during the course of his official duties, Officer Thompson did engage in sexual intercourse and fellatio with a female complainant while conducting an investigation at her residence." (*Id.*). The report is signed by Galvin and Fowler. (*Id.*). According to the report, on February 24, 2015, Galvin notified Thompson that he was terminated. (*Id.*). A certificate of conviction dated January 11, 2016 indicates that Thompson was convicted of official misconduct in violation of New York Penal Law § 195.00 [15] and sentenced to three years of probation. (Dkt. No. 89-9).

### D. Rumors and Other Alleged Incidents

Plaintiff has submitted evidence of Thompson's alleged sexual activity with respect to four other women while on duty. (Dkt. No. 99-15; Dkt. No. 99-23; Dkt. No. 99-3, at 139–40; 195–209, 236–43). It is undisputed, however, that these alleged incidents "were not officially reported to the SPD." (Dkt. No. 107, at 6).

Plaintiff has also offered the deposition testimony of John Baggett, who was an SPD police officer at the same time as Thompson, (Dkt. No. 99-14, at 11, 30), who testified that "rumors were running rampant throughout the SPD" concerning allegations that, while on duty, Thompson had "sexually assaulted" women. (*Id.* at 44–45). Baggett could not "pinpoint" when, during his approximately 21-year career, he first started hearing those rumors, (*Id.* at 22), but he believed Miguel might have been Chief of Police when they first came out, (*id.* at 49). To illustrate how "widespread" the rumors were throughout the SPD, Baggett explained that, even though he did not work with or "run in the same circles" as Thompson, the rumors "got to [him] somehow." (*Id.* at 23). Both Galvin and Fowler testified, however, that they had no knowledge of these rumors. (Dkt. No. 99-8, at 30; Dkt. No. 99-7, at 59).

### E. Brown Declaration

**\*10** In opposition to Defendants' motion for summary judgment, Plaintiff filed a declaration by Robert Brown, whom she offers as an expert in the area of internal investigations into allegations of police misconduct as well as "strateg[ies] and penalties" in connection with criminal cases against members of a police force. (Dkt. No. 107, at 8). Brown has been "a practicing attorney [16] with an emphasis on criminal defense" for the past 17 years. (Dkt. No. 99-13, ¶ 4). Prior to becoming an attorney, Brown worked for the New York Police Department ("NYPD"), from which he retired "with the rank of captain." (*Id.* ¶ 1). As captain, Brown "supervised over two-hundred members of the NYPD." (*Id.*). Brown was also "the Commanding Officer and Chief Investigator of the NYPD's Special Prosecutor's Office." (*Id.*). In this role, he "investigated allegations of police misconduct and conducted administrative interrogations ... of police personnel accused of high-profile corruption and serious misconduct"; further, he "conducted a department-wide review of all open cases against members of the NYPD and made recommendations regarding strategy and penalties." (*Id.*).

Brown states that his declaration is based on his review of "various documents and deposition testimony generated in connection with" this matter, including the SPD General Rules and Procedure Manual; relevant literature regarding issues of police integrity and proper responses to allegation of police misconduct; and his "years of training and experience" as a criminal defense lawyer and employment with the NYPD and New York City Housing Police Department ("NYCHPD"). (*Id.* ¶ 6). In Brown's opinion, Galvin failed to address "reported instances of misconduct by Thompson" "in a manner that was consistent with" the SPD Manual. (*Id.* ¶ 15). According to Brown, although the SPD manual "prohibits officers from knowingly associating with persons known to have a reputation of criminal conduct except in the performance of their assigned duties, and further prohibits officers from utilizing their on-duty time in the pursuit of private business or association," Galvin did not discipline or recommend discipline against Thompson "for knowingly associating for personal reasons with Cari Buske, a known prostitute." (*Id.*). Brown further notes that, "[w]hen interviewing Thompson in connection with the Buske, Popcun, and Montanez incidents, Galvin also failed to

record the interviews mechanically or by a stenographer," "failed to interview Popcun's daughter," "failed to obtain an affidavit from Popcun or her daughter," and "failed to document what he alleges were his unsuccessful attempts to obtain the cooperation of Popcun and her daughter, as required by the Manual." (*Id.*). In Brown's opinion, Fowler and Galvin "should have made every attempt to interview Popcun's daughter," and "Popcun's alleged statement to Galvin that she did not want her daughter to be interviewed—even if true—did not justify Galvin's failure to interview the daughter." (*Id.* ¶ 18). Brown opines that, following the Popcun-Roach investigation, "the SPD definitely should have implemented" increased monitoring and supervision of Thompson. (*Id.* ¶ 19). Brown further opines that the SPD's "investigations and responses to these prior reported allegations also deviated materially from good and accepted standards of police practice, including the SPD's own internal rules and policies." (*Id.* ¶ 7).

### III. MOTION TO STRIKE

Defendants seek an order striking from Plaintiff's statement of material facts paragraphs concerning: (1) "rumors that Chester Thompson sexually assaulted women while on duty"; (2) "sexual misconduct about which the SPD was never notified"; and (3) "the declaration of Robert Brown." (Dkt. No. 102-1, at 2).

**\*11** The evidence concerning "rumors" and Thompson's alleged sexual misconduct against four women, about which the SPD was never formally notified, is discussed above. (*See supra* Section II.D). While the Court finds this evidence insufficient to raise a material issue of fact, (*see infra* Section V.B.2.b.) the Court declines to strike paragraphs concerning this evidence from Plaintiff's statement of material facts.

The Court also declines to strike the paragraph in Plaintiff's statement of material facts that cites Brown's declaration. Plaintiff cites Brown's declaration only once in her statement of material facts, (Dkt. No. 98, ¶ 3), and it is one cite among six. Paragraph 3 of Defendants' statement of material facts, and Plaintiff's responses, are as follows:

> 3. The Office of Professional Standards ("OPS") is responsible for the SPD's internal affairs function and investigates any internal or external complaints made against any SPD officers whose conduct is a violation

of law or otherwise fails to comply with SPD policies, rules, or regulations. *See* Fowler Decl. at ¶¶ 8, 9.

*Plaintiff admits only that OPS is responsible for the SPD's internal affairs function and is **obligated** to investigate internal or external complaints made against any SPD officers whose conduct is a violation of law or otherwise fails to comply with SPD policies, rules, or regulations, but denies any suggestion that OPS always complied with that obligation. Specifically, OPS and its predecessor in name, the Internal Affairs Division, either failed to investigate allegations of sexual predation by Chester Thompson or failed to conduct any meaningful investigation of those allegations. See Exhibit 4 (Affidavit of Melissa Popcun), Exhibit 5 (Affidavit of Patricia Popcun), Exhibit 10 (Declaration of Cheryle Bassett), Exhibit 11 (SPD General Rules and Procedure Manual (the Manual), Vol. 1, Article 3, titled "Sex Crime Investigations," Sections 22.13(A)(1),(3), & (9) and Section 22.14(A)(3), Exhibit 13 Declaration of Robert Brown), and Exhibit 15 (Declaration of John Malenick).*

(Dkt. No. 98, ¶ 3). As the proposition for which Plaintiff cites Brown's declaration is supported by other admissible evidence—specifically, the Popcun and Popcun-Roach affidavits (Dkt. Nos. 99-4, 99-5)—and Plaintiff has not offered it for any other purpose, Defendant's motion to strike "the portion of Plaintiff's opposition to Defendants' Statement of Material Facts that relies on the Brown Declaration, as well as the Brown Declaration itself," (Dkt. No. 102-1, at 14), is denied as moot. Any dispute regarding the admissibility of Brown's testimony at trial should be addressed by the parties in a motion in limine. Accordingly, Defendants' motion to strike is denied.

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might

affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson* ). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

**\*12** If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## V. DISCUSSION

### A. State Law Claims

#### 1. Battery, IIED, Prima Facie Tort, and Negligent Hiring Claims

Defendants seek, and Plaintiff does not oppose, dismissal of her battery, IIED, prima facie tort, and negligent hiring claims against the City. (Dkt. No. 97, at 5). Accordingly, those claims are dismissed against the City.

#### 2. Negligent Training, Supervision, and Retention

The City moves for summary judgment dismissing the negligent training, supervision, and retention claims as barred by governmental immunity. (Dkt. No. 89-1, at 20–24). Plaintiff argues that the City is not entitled to governmental immunity because its responses to "prior allegations of malfeasance by Thompson were either ignored, involved no real exercise or discretion, or involved an exercise of discretion that violated the SPD's own internal rules and policies." (Dkt. No. 97, at 23).

"New York courts have held governmental employers liable for placing employees, like police officers who are known to be violent, in positions in which they can harm others." *Gonzalez v. City of New York*, 133 A.D.3d 65, 68 (1st Dep't 2015). "A necessary element of a cause of action alleging negligent retention or negligent supervision is that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.' " *Bumpus v. N.Y.C. Transit Auth.*, 47 A.D.3d 653, 654, 851 N.Y.S.2d 591 (2d Dep't 2008) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161, 654 N.Y.S.2d 791 (2d Dep't 1997) ).

Under New York law, municipalities, however, enjoy governmental immunity when "official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." *Mon v. City of New York*, 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 (1991). Immunity "insulates a municipality for its employees' performance of their duties where the ... conduct involves the exercise of professional judgment such as electing one among many acceptable methods of carrying out tasks, or making tactical decisions." *Johnson v. City of New York*, 15 N.Y.3d 676, 681, 917 N.Y.S.2d 10, 942 N.E.2d 219 (2010) (quoting *McCormack v. City of New York*, 80 N.Y. 2d 808, 811, 587 N.Y.S.2d 580, 600 N.E.2d 211 (1992) (internal quotations omitted) ). When, however, "the retention of an employee may involve a known risk of bodily harm to others, the field in which [a police official's] discretion may be exercised ... is limited [and] is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *McCrink v. City of New York*, 296 N.Y. 99, 106, 71 N.E.2d 419 (1947). Further, "immunity ... presupposes that judgment and discretion are exercised in compliance with the municipality's procedures, because 'the very basis for the value judgment supporting immunity and denying individual recovery becomes irrelevant where the municipality violates its own internal rules and policies and exercises no judgment or discretion.' " *Johnson*, 15 N.Y.3d at 681, 917 N.Y.S.2d 10, 942 N.E.2d 219 (quoting *Haddock v. City of New York*, 75 N.Y.2d 478, 485, 554 N.Y.S.2d 439, 553 N.E.2d 987 (1990) ).

**\*13** A municipality is not, therefore, entitled to summary judgment based on immunity if there is a question of fact as to whether the employees' conduct at issue violated applicable procedures. *See, e.g., id.* (affirming summary judgment in favor of the city after finding no question of fact "as to whether officers' discharge of their firearms violated the [NYPD deadly physical force] guideline"); *Newsome v. Cty. of Suffolk*, 109 A.D.3d 802, 802–03, 971 N.Y.S.2d 208 (2d Dep't 2013) (denying summary judgment to municipality because there was "[a] question of fact with respect to whether the conduct of the dog's handler was consistent with acceptable police practice"); *Galapo v. City of New York*, 219 A.D.2d 581, 582–83, 631 N.Y.S.2d 366 (2d Dep't 1995) (finding "triable issues of fact with respect to whether Officer Martin's actions were consistent with or in contravention of the procedures relating to use of firearms as set forth in the New York City Police Department Patrol Guide"); *see also Lubecki v. City of New York*, 304 A.D.2d 224, 235, 758 N.Y.S.2d 610 (1st Dep't 2003) (ruling that city is not immune when "the evidence established that the police violate clearly established protocols and procedures" concerning the discharge of weapons).

In this case, construing the record in the light most favorable to Plaintiff, the SPD was aware of allegations that Thompson had forced a woman (Bassett) to have sex with him on threat of eviction in 2001; coerced another woman (Buske) who was afraid of being arrested to give him oral sex in 2006; and offered to expunge the criminal record of an intoxicated woman (Popcun-Roach) in exchange for oral sex in 2014. Although there was no investigation of, and thus no exercise of discretion regarding, the first allegation concerning Bassett, the City argues that this complaint is "immaterial" and cannot be a "cause in fact or proximate cause" of Plaintiff's injuries because "over thirteen years separates the alleged ... complaint and the incident at issue." (Dkt. No. 103, at 7–8). The City further argues because Galvin and Fowler exercised discretion in investigating and responding to Thompson's two other alleged acts of misconduct (Buske and Popcun-Roach), governmental immunity applies. (Dkt. No. 89-1, at 23). [17]

Even assuming that the first two complaints (Bassett and Buske) were temporally too distant to be a proximate cause of Plaintiff's injuries, or, in the case of the Buske complaint, the investigation entailed an exercise of discretion to which immunity attaches, there are triable issues of fact as to whether Galvin's actions in the Popcun-Roach investigation were consistent with the

SPD's procedures and within the realm of acceptable practice.

The procedures governing complaints of police officer misconduct require that the supervisor or command officer "document a preliminary investigation to include: (a) [i]nterviewing the complainant; (b) [o]btaining, as soon as practical, an affidavit ... containing details of his/her complaint; [and] (c) [l]ocating and interviewing available witnesses." (Dkt. No. 99-11, at 47). [18] Galvin himself acknowledged "the importance of interviewing every percipient witness to an event" and agreed that he would consider contacting Popcun-Roach to be the "most essential aspect of [his] investigation." (Dkt. No. 89-10, ¶ 78; Dkt. No. 99-8, at 42).

**\*14** Galvin maintains his decision not to interview Popcun-Roach "was a very difficult judgment call," (Dkt. No. 89-10, ¶ 78), and the Defendants argue that the City of Syracuse is immune from any errors in the judgments made by Galvin and Fowler in their discretionary decisions. Plaintiff, on the other hand, argues she has raised a triable issue of fact as to whether Galvin's acts were a consistent and acceptable method of complying with SPD procedures, noting that not only did Galvin not interview Popun-Roach or obtain any affidavit from Popcun-Roach, but that he has provided entirely different explanations for this failure. (Dkt. No. 97, at 8–9).

In his case report Galvin stated that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 2). Chief Deputy Thompson and Fowler, the officers who were responsible for deciding whether to adopt his recommendation that the complaint be deemed unsubstantiated, testified that Galvin told them that he had "reached out" to Popcun-Roach but that "she would not return any of his calls or give him any information," (see also Dkt. No. 99-7, at 41 (Fowler testifying that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her") ). His case report does not refer to any attempts to contact Popcun-Roach, and Galvin acknowledged during his deposition that he did not in fact attempt to contact Popcun-Roach. (Dkt. No. 99-8, at 9).

Plaintiff notes that Galvin's most recent explanation for not interviewing Popcun-Roach is "completely different" from what he reported in his report and what he told

his superiors. (Dkt. No. 97, at 9). In his deposition and declaration submitted in support of his motion for summary judgment, Galvin states that Popcun was "adamant that [he] not speak with her daughter," who "had bipolar problems" and "was an alcoholic," because Popcun was raising her daughter's child and "was afraid that if she had sent to the police to talk to her daughter about the alleged incident" it might cause a "rift" and "some problem with the parents raising the ... child." (Dkt. No. 99-8, at 34). This explanation is not reflected in Galvin's report, any statement from Popcun or any other contemporaneous records concerning the investigation. To the extent that this was in fact Galvin's discretionary decision, it was undocumented and apparently unknown to the supervisors tasked with reviewing Galvin's report and making a judgment regarding Thompson's conduct.

In addition, Galvin stated in the case report, and to Fowler, that Popcun told him that "her daughter [had] refuted the claim and said it did not happen." (Dkt. No. 99-6, at 1). Since Galvin did not interview Popcun-Roach or obtain an affidavit from either Popcun or Popcun-Roach, there is no witness statement documenting this alleged refutation. And Popcun avers that she told Galvin something different; she states that she said that Melissa "did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (Dkt. No. 89-21, ¶ 21). The difference between a representation that an alleged victim threatened to recant an allegation to avoid speaking to law enforcement and a representation that an alleged victim expressly stated that that the alleged incident "never happened," may be material to a decision-maker assessing both the investigation and whether the alleged misconduct was substantiated. Indeed, Fowler stated in his declaration that he "carefully considered," among other things, the fact that "Melissa Popcun, had, according to her mother, recanted the story and 'said that it did not happen,' " in determining that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct." (Dkt. No. 89-3, ¶¶ 60–61).

**\*15** There are, therefore, factual questions as to whether Galvin complied with the SPD's procedures requiring that he document an investigation including an interview of the complainant, and an affidavit containing details of the complaint and interview available witnesses. (Dkt. No. 99-11, at 47) (section 8.16(D)(2) ). Since the outcome of that investigation was determinative of

whether Thompson would return to his solo patrol duties, unsupervised and without additional training, which "may involve a known risk of bodily harm to others," if, as he was likely to, he encountered vulnerable individuals on patrol, *McCrink*, 296 N.Y. at 106, 71 N.E.2d 419, "the field in which [the officers'] discretion" could be exercised, was "limited" and "superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *Id.* Thus, while Galvin had the authority to exercise discretion in his investigation, under the circumstances of this case, there is a triable issue of fact as to whether he exercised that discretion consistent with SPD's procedures and whether it was one of "many acceptable methods of carrying out" the investigation. *Kenavan v. City of New York*, 70 N.Y.2d 558, 569, 523 N.Y.S.2d 60, 517 N.E.2d 872 (1987), *superseded by statute on other grounds as recognized by Galapo v. City of New York*, 95 N.Y.2d 568, 721 N.Y.S.2d 857, 744 N.E.2d 685 (2000).

Citing *Mon*, the City argues that where a municipality's officers have exercised discretion, a procedural violation does not render governmental immunity inapplicable, and that it is only inapplicable when there is a "total failure to exercise discretion." (Dkt. No. 103, at 3). In *Mon*, the Court of Appeals found that the discretionary hiring of the employee at issue did not violate the applicable civil service rules because the rules were "permissive," the "applicant's nondisclosures" of a prior disorderly conduct conviction was not "such as would mandate his disqualification" under the rules, and "any violation" of the "provisions" "was because the officials *did exercise their discretion*, but did so improperly." 78 N.Y.2d at 316–17, 574 N.Y.S.2d 529, 579 N.E.2d 689. In contrast, here, the SPD's provisions governing an investigation are not permissive, (*see* Dkt. No. 99-11, at 47 ("Command Officer ... *shall* ... document a preliminary investigation to include ...) (emphasis added) ). And here, unlike *Mon*, there is a triable question of fact as to whether Galvin exercised his discretion in compliance with SPD procedures. It will be up to the jury to decide whether his alleged negligent investigation was "an error of judgment and immune from liability," or was, instead, "outside the realm of accepted practice and therefore actionable." *See Kenavan*, 70 N.Y.2d at 571, 523 N.Y.S.2d 60, 517 N.E.2d 872 (Titone, J. dissent). Thus, the City's motion for summary judgment dismissing the negligent retention, supervision, and training claim on grounds of governmental immunity is denied. [19]

**B. Section 1983 Claims**

**1. Plaintiff's Constitutional Claim**

Plaintiff alleges that Thompson violated her Fourth Amendment right "to be free from the use of excessive force and unreasonable searches and seizures" and her Fourteenth Amendment right to substantive due process. (Dkt. No. 1, ¶¶ 78–81). The parties have not addressed which constitutional provision applies to Plaintiff's allegations. Although Thompson was in Plaintiff's apartment in response to a 911 call, and thus on police business, there is no evidence that Thompson sexually assaulted Plaintiff during the course of an arrest or seizure or that Plaintiff was under suspicion of criminal activity. Thus, for the purposes of this motion, the Court assumes that Plaintiff's "claim is appropriately analyzed pursuant to the Fourteenth Amendment's guarantee of substantive due process." *Poe v. Leonard*, 282 F.3d 123,137 (2d Cir. 2002) (citing, *inter alia, Haberthur v. City of Raymore*, 119 F.3d 720, 723–24 (8th Cir. 1997) (concluding that the plaintiff, who was not under arrest or under suspicion of criminal activity, adequately alleged that police officer's sexual assault violated her substantive due process right to bodily integrity or privacy) and *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that claim brought by a plaintiff, who was not arrested or a criminal suspect but was raped by a police officer, was properly viewed as asserting a violation of her substantive due process right to bodily integrity under the Fourteenth Amendment, rather than as a violation of her Fourth Amendment rights) ).

**\*16**  "The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ). The Second Circuit has explained, however, that "the Due Process Clause 'does not transform every tort committed by a state actor into a constitutional violation.' " *Id.* (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ). "Government action resulting in bodily harm is not a substantive due process violation unless 'the government action was so egregious, so outrageous, that it may fairly

be said to shock the contemporary conscience.' " *Id.* (quoting *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) ).

Courts have recognized a police officer's use of his position to coerce sex as a violation of a right to bodily integrity that violates substantive due process. *See, e.g., Villanueva v. City of Scottsbluff*, 779 F.3d 507, 513 (8th Cir. 2015) (noting that an encounter in which a woman who was followed home by "an on-duty, armed, and uniformed officer," who entered her house "demanded that she undress, and had sexual intercourse with her," was "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate government objective," even though she did not object); *see also United States v. Giordano*, 260 F.Supp.2d 477, 484 (D. Conn. 2002) (explaining that the Fourteenth Amendment right to bodily integrity "includes the right to be free from ... coerced sexual activity."); *c.f. Poe*, 282 F.3d at 139 (holding that police officer's manipulation of the situation in making a police training video "to ensure that [the plaintiff] would be videotaped unclothed from the waist up" "all while purporting to act for the benefit of the police academy" qualified as "conscience-shocking" in violation of the Fourteenth Amendment). Mindful of these principles, the Court turns to Defendants' motion for summary judgment on the federal claims.

### 2. Supervisory Liability

Defendants Galvin and Fowler seek summary judgment dismissing Plaintiff's claims that their failure to supervise and discipline Thompson caused the violation of her constitutional rights. Plaintiff opposes dismissal of her supervisory liability claims.

"A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe*, 282 F.3d at 140. As the Second Circuit has explained, the personal involvement of supervisory personnel may be shown through evidence that they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information

indicating that an unconstitutional act was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

Before proceeding to the merits, the Court must address the argument Defendants Fowler and Galvin have advanced concerning the continued viability of the *Colon* factors. (Dkt. No. 89-1, at 24). Defendants assert that, in view of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the personal involvement of a supervisory defendant may no longer "be proven by evidence that the supervisory defendant's conduct met any of the five so-called *Colon* factors, which, inter alia, purported to equate 'personal involvement' with types of indirect involvement." (*Id.*). Thus, Defendants argue, where, as here, there is no evidence that they "participated in, were present for, ordered, or acquiesced to the alleged sexual assault of the Plaintiff," they cannot be held liable. (Dkt. No. 89-1, at 24).

**\*17** In *Ashcroft v. Iqbal*, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion or national origin, in violation of the First and Fifth Amendment. *Id.* at 668–69, 129 S.Ct. 1937. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677, 129 S.Ct. 1937. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.*

While "*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), the Second Circuit has not resolved this conflict, *see Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the

extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, ... 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.' " (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) ) ).

As Defendants note, some district courts have held that only the first and third *Colon factors* survive Iqbal. (Dkt. No. 89-1, at 25 (citing *Bouche v. City of Mount Vernon*, No. 11-cv-5246, 2012 WL 987592, at *8, 2012 U.S. Dist. LEXIS 40246 (S.D.N.Y. Mar. 23, 2012) ) ). However, "neither the Second Circuit nor the Supreme Court has endorsed this reading of *Iqbal*," and the Court declines to follow that caselaw. *Doe v. New York*, 97 F.Supp.3d 5, 12 (E.D.N.Y. 2015) (quoting *Cano v. City of New York*, 44 F.Supp.3d 324, 336 (E.D.N.Y. 2014) ); *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) ("The holding in *Iqbal* does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was 'grossly negligent' or 'deliberately indifferent.' ").

As Defendants also note, some courts have continued to apply the *Colon* factors. *See, e.g., Lebron v. Mrzyglod*, No. 14-cv-10290, 2017 WL 365493, at *4, 2017 U.S. Dist. LEXIS 9751 (S.D.N.Y. Jan. 24, 2017) (noting that "[s]ome courts have simply concluded that, in the absence of Second Circuit precedent suggesting otherwise, they will continue to apply the Colon test.") (citing *Doe*, 97 F.Supp.3d at 12 and *Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429, at *7 n.6, 2014 U.S. Dist. LEXIS 182153 (N.D.N.Y. August 5, 2014), *report and recommendation adopted by*, 2015 WL 670429, 2015 U.S. Dist. LEXIS 18601 (N.D.N.Y. Feb. 17, 2015) ). Defendants urge the Court not to adopt this position because the Supreme Court reversed the Second Circuit's application of the *Colon factors in Iqbal*. (Dkt. No. 89-1, at 25–26).

Many district courts have considered "the constitutional provision at issue," *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937, in determining whether to apply the *Colon* factors. *See, e.g., Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917 (S.D.N.Y. May 9, 2011); *Qasem v. Toro*, 737 F.Supp.2d 147, 151–52 (S.D.N.Y. 2010). Some of these courts have concluded that "where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still

apply insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Id.* They have thus applied the *Colon* factors when the constitutional claim relies on "the unreasonable conduct or deliberate indifference standards of the Fourth, Eight or Fourteenth Amendments." *Shepherd v. Powers*, No. 11-cv-6860, 2012 WL 4477241, at *10, 2012 U.S. Dist. LEXIS 141179 (S.D.N.Y. Sept. 27, 2012) (collecting cases). Other courts have applied the *Colon* factors as long as the constitutional violation at issue does not require a showing of discriminatory intent. *See, e.g., Carpenter v. Apple*, No. 15-cv-1269, 2017 WL 3887908, at *9, 2017 U.S. Dist. LEXIS 143296 (N.D.N.Y. Sept. 5, 2017) (collecting cases).

*\*18* The Court agrees with the reasoning of the cases holding that the *Colon* analysis may still apply where the claim does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917 (S.D.N.Y. May 9, 2011) (quoting *Qasem*, 737 F.Supp.2d at 151–52; *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) (noting that all five *Colon* factors should be viable for false arrest and excessive force claims based on an objectively reasonable standard, but not for First Amendment retaliation claims which have an intent requirement); *Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.") ). In this case because Plaintiff's claims do not require a showing of discriminatory intent and are based on the unreasonable conduct standard of the Fourteenth Amendment, the Court will apply the *Colon* factors.

### a. Defendant Galvin

Plaintiff argues that Galvin acted with gross negligence and deliberate indifference in supervising and disciplining Thompson. [20] (Dkt. No. 97, at 26). The Second Circuit has explained that " 'gross negligence' denotes a higher degree of culpability than mere negligence" and "is 'the

kind of conduct where the defendant has reason to know of facts creating a high degree of risk of ... harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " *Raspardo*, 770 F.3d at 116 (quoting *Poe*, 282 F.3d at 140 n.14, 146). "The standard of gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Id.* Thus, Plaintiff "must allege sufficient facts to raise a triable issue of fact as to whether [Galvin] knew or should have known that there was a high degree of risk that [Thompson] would behave inappropriately with a woman [while on duty], but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [Plaintiff]." *Poe*, 282 F.3d at 142.

Here, viewed in the light most favorable to Plaintiff, there is evidence that Galvin received two complaints —the 2006 Buske complaint and 2014 Popcun-Roach complaint—that Thompson, while on duty, had coerced women into sexual acts. Galvin acknowledged having concern about Buske's complaint because he found her "description of events as being plausible" and Thompson was "very nervous" during his interview. Although Galvin recommended that Buske's complaint be deemed "unsubstantiated," he advised Chief Miguel that Thompson's midnight shift hours "should be monitored" because prostitutes working those hours can be manipulated. Although Galvin recommended that the next complaint, from Popcun-Roach, be deemed "unsubstantiated," there is evidence from which a reasonable factfinder could infer that Galvin's investigation of that complaint was inadequate. *See H.H. v. City of New York*, 11-cv-4905, 2017 WL 3396434, at *8, 2017 U.S. Dist. LEXIS 124317 (E.D.N.Y. Aug. 7, 2017) ("Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."). As previously described, Galvin never attempted to interview Popcun-Roach, and yet represented in his case report that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 1–2). There is nothing in the record of the investigation or in the record currently before the Court to support Galvin's

deposition testimony that Popcun was "adamant" that he not speak with her daughter. And Galvin's report that Popcun-Roach "retracted" her claim, and "said it didn't happen" are not supported by what Popcun states she told Galvin. Plaintiff has adduced evidence that Popcun-Roach was willing to speak to police and tell "them about what happened with the police officer."

**\*19** Drawing all inferences in favor of Plaintiff, the evidence, if credited, would allow a reasonable factfinder to conclude that Galvin, in failing to adequately investigate the Popcun-Roach complaint, was indifferent to the truth of the allegations that Thompson had engaged in coercive sexual conduct, and "exhibited gross negligence or deliberate indifference to a high risk" that Thompson would violate the rights of other women, and that Galvin's deliberate indifference caused Thompson to violate Plaintiff's rights. *Poe*, 282 F.3d at 140; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("[I]f the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims."). Thus, in view of these factual disputes, summary judgment as to Galvin's supervisory liability is inappropriate.

### b. Defendant Fowler

Plaintiff argues that Defendant Fowler's testimony that he was not "concerned about the possibility that in the future Thompson would do to others what he was accused of having done to [Popcun-Roach]" and his failure to take "precautionary or remedial steps with respect to Thompson" demonstrate his "deliberate indifference to the rights of others." (Dkt. No. 97, at 26). Thus, Plaintiff alleges that Fowler was grossly negligent in the exercise of his supervisory duties.

To establish gross negligence Plaintiff must adduce evidence that Fowler had "reason to know of facts creating a high degree of risk of physical harm to another and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk." *Poe*, 282 F.3d at 140 n.14. The evidence suggesting that Fowler had reason to know that Thompson may have posed a risk of using his position as a police officer to coerce women to engage in sexual acts consists of his evaluation of the Popcun-Roach

case report and Galvin's testimony that he advised Fowler there had been a "similar" complaint against Thompson involving a "vulnerable person" eight years before. (Dkt. No. 99-8, at 25–26). There is no other evidence about what Fowler knew about Buske's complaint, which was several years before Fowler became chief, and Plaintiff does not rely on Galvin's limited testimony. Plaintiff in fact cites to Fowler's testimony that he was *unaware* of Buske's complaint, as evidence of SPD's inadequate response to the Popcun-Roach investigation. (Dkt. No. 97, at 10) (citing Dkt. No. 99-7 at 43, 44, 57) (emphasis added). In any event, this limited evidence about a "similar" complaint that a prior chief deemed unsubstantiated is, in and of itself, insufficient to raise a material issue of fact as to Fowler's gross negligence.

The Popcun-Roach case report recommended a finding of "unsubstantiated" and indicated that the alleged victim "refused to meet with any police officers," was "not available" for interview and had "retracted" her allegations "soon after they were made" and "said it did not happen." (Dkt. No. 99-6, at 2–3). [21] Nothing in the report or information *provided to Fowler* indicated otherwise. Thus, the Popcun-Roach investigation would not allow an inference that Fowler knew or had reason to know that Thompson posed a high risk of using his position as a police officer to coerce women to engage in sexual acts. *See Raspardo,* 770 F.3d at 124 (concluding that the "prior incidents of misconduct" by the subordinate, which involved, among other things, "allegations concerning improper comments and behavior toward female officers and personnel," "an inappropriate joke about a female officer," picking up female officers in his patrol vehicle despite being ordered not to, and the inappropriate use of a mobile messaging system," all of which supervisor was aware of and in response to which "disciplined [subordinate] through verbal counseling" "were not sufficient to put [supervisor] on notice that [subordinate] was likely to sexually harass" female officers).

**\*20** Further, to the extent Plaintiff contends the Popcun-Roach complaint should have prompted Fowler to review Thompson's disciplinary history, such a contention would not raise a material issue of fact as to Fowler's gross negligence. The Buske complaint was deemed unsubstantiated, and "[s]upervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely

upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe,* 282 F.3d at 144; *see also Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir. 1992) ("Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent.").

Plaintiff cites Baggett's testimony that there were "rampant" rumors regarding Thompson's sexual misconduct toward women while on duty as evidence that Fowler was on notice that Thompson was prone to sexual misconduct with respect to women. Plaintiff argues that the evidence regarding Thompson's sexual misconduct with respect to four other women "corroborates Officer Baggett's testimony that rumors of prior sexual assault by Thompson were rampant." (Dkt. No. 107, at 7). While allegations that other officers were in a position to have seen Thompson's conduct is consistent with Baggett's testimony concerning rumors, [22] Baggett's testimony is conclusory in nature. It contains no specifics concerning the content of the rumors, where they came from, who spread them, or when they were circulating. Further, there is no evidence that Fowler was aware of the rumors or that any complaints had been made to the SPD concerning Thompson's conduct with respect to these four women. Thus, the rumors and evidence of unreported incidents are insufficient to create a material issue of fact as to whether Fowler had notice that there was a high degree of risk that Thompson would coerce sex from women while on duty. *See, e.g., Romero v. City of New York,* 839 F.Supp.2d 588, 608 (E.D.N.Y. 2012) ("[T]he unspecified rumors circulating among students at Richmond Hill about a possible relationship between Mr. Benavides and Ms. Doe is not sufficient to constitute actual knowledge by school officials of sexual harassment, particularly where there is no evidence that any NYCDOE officials even heard the rumors."). Accordingly, Fowler is entitled to summary judgment dismissing the supervisory liability claim.

### c. Qualified Immunity

Defendants Galvin and Fowler argue that they are entitled to qualified immunity because there are no facts that would have placed them on notice that their conduct

violated the Plaintiff's "clearly established" rights and because their decision-making is "only arguably incorrect in hindsight." (Dkt. No. 89-1, at 27; Dkt. No. 103, at 9–10).[23] "Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe*, 282 F.3d at 132 (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001) ). "In deciding 'questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.' " *Raspardo*, 770 F.3d at 113 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) ). "The first prong 'asks whether the facts, taken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a federal right[,] ... [and] [t]he second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation.' " *Id.* (quoting *Tolan*, 572 U.S. at 655–56, 134 S.Ct. 1861); *see also Kisela v. Hughes*, ––– U.S. ––––, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (quoting *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) ) ). An officer "cannot be said to have violated a clearly established right unless the right's contours are sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ).

**\*21** Here, as Plaintiff has failed to raise a material issue of fact as to Fowler's supervisory liability, the first prong is met, and the Court need proceed no further in the qualified immunity analysis as to Fowler.[24] But the Court has found that the facts, taken in the light most favorable to Plaintiff, raise a material issue of fact as to whether Galvin was grossly negligent in the investigation of and response to allegations of sexual coercion by Thompson. Thus, the Court must turn to the second prong of the qualified immunity analysis; this requires consideration of whether the law Thompson allegedly violated was clearly established as well as whether the supervisory

liability theory under which Plaintiff seeks to hold Galvin liable was clearly established. *Grice v. McVeigh*, 873 F.3d 162, 169 (2d Cir. 2017) ("Defendants are entitled to qualified immunity on a supervisory liability claim unless the actions of the supervisor and the subordinate both violate clearly established law."); *see also Poe*, 282 F.3d at 135 (explaining that the court "must determine whether both laws, the law violated by [the subordinate] and the specific supervisory liability theory under which [the plaintiff] wishes to hold [the supervisor] liable, were clearly established by ... the time of the incident.").

Thompson's alleged conduct of sexually assaulting Plaintiff after she allowed him into her apartment in response to her 911 call, if proved, "would constitute a violation of Plaintiff's substantive due process right to bodily integrity, a right which was clearly established" in 2015. *Atwood v. Town of Ellington*, 468 F.Supp.2d 340, 352 (D. Conn. 2007). The supervisory liability theory under which Plaintiff seeks to hold Galvin liable was also clearly established at the time of the incident: "Case law clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions." *Poe*, 282 F.3d at 141 (citing *Fiacco*, 783 F.2d at 331 (finding sufficient evidence to support a jury's conclusion that a police chief was deliberately indifferent "to whether or not excessive force was used[ ]" based on the failure "to conduct a nonsuperficial investigation into civilian claims of excessive force") ). Thus, in order to defeat a police supervisor's claim of qualified immunity, Plaintiff

> must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the subordinate] would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury. The issue [with respect to] qualified immunity then, is whether a plaintiff "has ... proffer[ed] sufficient evidence to meet this standard."

*Raspardo*, 770 F.3d at 123–24 (quoting *Poe*, 282 F.3d at 142).

Here, there are material issues of fact regarding whether Galvin conducted a nonsuperficial investigation into Popcun-Roach's allegation that Thompson, while on

duty, coerced her, while she was intoxicated and suffering from mental health issues, to perform oral sex by promising to help with her police problems. Specifically, the material issues of fact include: (i) whether Galvin misrepresented in his case report and to his superiors that Popcun-Roach refused to meet with police officers, was not available and had retracted her allegation; (ii) whether Galvin failed to account for his "lingering concerns" about Buske's prior allegation of similar coercive sexual misconduct when investigating the Popcun-Roach complaint; and (iii) whether Galvin failed to caution Thompson about such conduct. (Dkt. No. 99-3, at 231–34). On this record, considering all inferences in the light most favorable to the Plaintiff, the Court finds that there are material issues of fact as to whether Galvin knew or should have known that there was a high degree of risk that Thompson would coerce sex from a woman while on duty, and whether, in failing to adequately investigate the Popcun-Roach complaint or caution Thompson in any manner, Gavin disregarded that risk, and that his failure caused Plaintiff's alleged constitutional injury. Accordingly, given these disputed facts, a finding of qualified immunity is inappropriate at this stage.

### 3. Municipal Liability

**\*22** "For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ).

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690, 98 S.Ct. 2018; (2) action taken by the official responsible for

establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30, 108 S.Ct. 915, 99 L.Ed.2d 107 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Zahra*, 48 F.3d at 685. Further, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Batista*, 702 F.2d at 397; *see also Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. 1980) (holding that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

In this case, Plaintiff's theory of municipal liability is that the City's failure to adequately investigate the complaints against Thompson and supervise him properly amounted to deliberate indifference to the rights of those with whom he interacted as an SPD patrol officer. (Dkt. No. 97, at 27–28). "Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).

Deliberate indifference, however, "is a stringent standard of fault," *Connick v. Thompson*, 563 U.S. 51, 70, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ), "and necessarily depends on a careful assessment of the facts at issue in a particular case," *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). The Second Circuit has instructed that "[t]he operative inquiry is whether those facts demonstrate that

the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Id.* (quoting *Amnesty Am.*, 361 F.3d at 128). Deliberate indifference, therefore, "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker [25] 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiff.' " *Id.* (citation omitted) (quoting first *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), then *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ).

**\*23** Here, Plaintiff cites five complaints made against Thompson during the course of his career with the SPD to support her claim that Defendant City was deliberately indifferent toward Thompson's misconduct. While the health insurance complaint does not reflect sexual misconduct, the SPD concluded that Thompson had engaged in "a pattern of the less [sic] than truthful behavior." (Dkt. No. 99-18, at 8). The SCC complaint, while troubling to the extent it includes an allegation that Thompson walked inside a woman's home uninvited and then demanded a "hug" before he would leave, (Dkt. No. 99-20), is insufficient to show that Defendant City was on notice that Thompson, while on duty, was coercing women to perform sexual acts. The complaints concerning Bassett, Buske, and Popcun-Roach, in contrast, all allege that Thompson engaged in sexual misconduct toward women, and the latter two allege that Thompson engaged in sexual misconduct while on duty. Though Galvin credited Thompson's explanations, and found the Buske and Popcun-Roach complaints to be "unsubstantiated", this meant only that they were "not conclusively disproven but ... there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred." (Dkt. No. 89-10, ¶¶ 16–18). In addition, to the issue of material fact already identified regarding the adequacy of the Popcun-Roach investigation, there are material issues of fact as to whether the SPD received and failed to investigate a complaint about Bassett.

If credited, Plaintiff has provided evidence from which a reasonable factfinder could conclude that, had the City adequately investigated the complaints against Thompson and supervised and disciplined him appropriately,

Plaintiff's rights would not have been violated. The allegations by Buske and Popcun—that, in performing his patrol duties, Thompson coerced women he encountered to perform sexual acts—"sufficiently resemble" his actions toward Plaintiff so as to render Plaintiff's injury "foreseeable." *H.H.*, 2017 WL 3396434, at \*10, 2017 U.S. Dist. LEXIS 124317. Indeed, even after being investigated twice in connection with the Buske and Popcun-Roach complaint, Thompson indicated to Galvin that he "did not think it would be a problem" "for an officer to engage with a complainant in sex, whether consensual or not, while on duty." (Dkt. No. 99-24, at 4). A reasonable jury could find from this evidence that a more thorough investigation and increased supervision and discipline would have prevented Thompson from engaging in such conduct, and, consequently, from violating Plaintiff's rights.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is **GRANTED** as to the battery, IIED, prima facie tort, and negligent hiring claims against the City and the supervisory liability claims against Fowler; and it is further

**ORDERED** that the battery, IIED, prima facie tort, and negligent hiring claims against the City and the supervisory liability claims against Fowler are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that Defendants' motion to strike (Dkt. No. 102) is **DENIED.**

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 315058

---

Footnotes

1    The facts regarding this encounter are disputed. Defendants assert that the sex was consensual. (Dkt. No. 89-1, at 9;
     Dkt. No. 99-3, at 72–99). Plaintiff says that she complied with Officer Thompson's direction to give him oral sex because

she was terrified; that he raped her after directing her to get a condom; and that she went to the hospital the next day to report the rape. (Dkt. No. 99-2, ¶¶ 5–9). That dispute is immaterial to the resolution of the present motion. Construing the facts in the light most favorable to the Plaintiff, the Court refers to the incident as a sexual assault.

2      For convenience, the Court refers to the City, Fowler, and Galvin collectively as "Defendants." This reference does not include Defendant Thompson, who is represented by separate counsel and has no motion before the Court at this time.

3      The facts are drawn from Defendants' statement of material facts, (Dkt. No. 89-2), Plaintiff's responses thereto (Dkt. No. 98), and the attached affidavits, declarations, exhibits, and depositions. The facts are taken in the light most favorable to Plaintiff.

4      As Defendants seek summary judgment dismissing the negligent training, supervision, and retention claims and § 1983 supervisory and municipal liability claims, the material facts principally relate to Defendants' knowledge of and response to Thompson's alleged misconduct throughout his career as a police officer at the SPD.

5      Defendant Galvin, who was head of the SPD's Internal Affairs Division—later known as the Office of Professional Standards ("OPS")—from 1989 until he retired in June 2015, (Dkt. No. 99-8, at 7–9), states in his declaration that "[t]he purpose of OPS is to receive and fairly investigate any complaints made, whether external or internal, against police officers serving within the Department whose conduct is a violation of law or otherwise a failure to comply with Department policies, rules, or regulations." (Dkt. No. 89-10, ¶ 6).

6      Chief DuVal also suspended Galvin for three days without pay. (*Id.* at 2).

7      Fowler was appointed Chief of Police at some point in 2009. (Dkt. No. 99-7, at 9).

8      Galvin explained that there are three basic findings—unfounded, substantiated, and unsubstantiated—and explained that: "unfounded" means "conduct that is disproved or demonstrated to have not occurred"; "unsubstantiated" means "conduct that is not conclusively disproven but ... there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred"; and substantiated means "there is sufficient evidence to conclude that the misconduct as alleged has actually occurred." (Dkt. No. 89-10, ¶¶ 16–18).

9      Officer Nicolini's written report to Galvin regarding the incident does not mention any conversation indicating that Melissa had information about the dog. (Dkt. No. 99-6, at 5).

10      Melissa Popcun-Roach has submitted an affidavit stating that no one from the SPD "ever contacted [her] or, to [her] knowledge, attempted to contact" her. (Dkt. No. 99-4, at 1). She further states that, had someone from the SPD contacted her, she "would have spoken to them and told them about what happened with the police officer." (*Id.*). She "did not contact anyone at the SPD on [her] own because [she] was not in a good mental state during the time period when this incident happened." (*Id.*). She recounts the incident with Thompson as follows:

> Some time in 2014 a [SPD] officer entered my apartment unannounced and without my permission.... I jokingly asked the officer if he could help me with some open traffic tickets. In response, the officer walked over to the couch on which I was seated, unzipped his pants, removed his erect penis, and told me to give him oral sex. The officer had a very scary and demanding demeanor and I was afraid and intimidated by him so I began to give him oral sex.

(*Id.* at 1).

11      There is no familial relation between Defendant Chester Thompson and Chief Deputy Rebecca Thompson.

12      In his declaration, Fowler states that, in determining the "appropriate discipline for substantiated complaints," he reviews, among other things, "the officer's prior performance history and prior disciplinary history." (Dkt. No. 89-3, ¶ 24). The Popcun-Roach case report, however, recommended, and Fowler adopted, a finding of unsubstantiated. (Dkt. No. 99-6, at 3). There is no evidence that Fowler reviewed Thompson's prior history or that SPD policy required such review in the event of an unsubstantiated finding.

13      Fowler stated that, at the time he learned of the "incident regarding Melissa Popcun[-Roach]," he was not aware of any other allegations of sexual impropriety by Thompson, and that he did not learn about Buske's allegations until after the present lawsuit. (Dkt. No. 99-7, at 43–44). Galvin, on the other hand, testified that he apprised Fowler of Galvin's concerns that "this is a second time. Even though there was a gap of eight years, it was a similar allegation. She was a vulnerable person, in my perspective, and it would have been easy to take advantage of that, as it would have been with a prostitute." (Dkt. No. 99-8, at 25–26).

14      Thompson disputes her account. Thompson asserts that Montanez initiated the sexual encounter when she "reached back" and "grabbed [him] in his penis area," as he was about to leave her apartment. (Dkt. No. 99-3, at 72–75). According to Thompson, Montanez then led him into the living room, unzipped his pants and began giving him oral sex. (*Id.* at 72–85). Thompson testified that after about three minutes of oral sex Montanez stood up, told him to wait, and got a condom from her bedroom. (*Id.* at 86–90). According to Thompson, Montanez then again began giving Thompson oral sex and he did not enter her vaginally because he had already ejaculated. (*Id.* at 95–99).

15    New York Penal Law § 195.00, as relevant here, provides that: "A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: 1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized."

16    As an attorney, Brown has "defended both private citizens and law enforcement officials against various criminal charges," has defended "law enforcement officials against civil and administrative charges," and has "represented plaintiffs and defendants in civil actions involving allegations of police misconduct." (Dkt. No. 99-13, ¶ 4). In addition, he has served as a guest lecturer on "police procedures and culture," "police drug enforcement policy," and "police use of force" at three law schools. (*Id.*).

17    As the commanding officer of OPS and chief of Police, Galvin and Fowler were required to exercise discretion and judgment in the investigation of complaints, determinations regarding whether complaints were substantiated and, if substantiated, determinations regarding the appropriate discipline. The City has submitted evidence outlining the SPD procedures for investigating a complaint against an officer as well as the disciplinary, supervisory, and training options available when needed. (*See, e.g.*, Dkt. No. 89-12 (SPD "Disciplinary System" Policy); Dkt. No. 89-3, ¶ 26 (Fowler Declaration listing disciplinary options); Dkt. No. 89-10, ¶¶ 11–33 (Galvin Declaration detailing "Process for Investigating and Adjudicating Police Misconduct") ).

18    Plaintiff cites the SPD procedures for "sex crime complaints" which require that the investigator "[c]onduct a detailed interview and obtain the victim's affidavit." (Dkt. No. 99-11, at 13, section 22.14(A)(3) ). Defendants argue that this was not a sex crime complaint and rely on the procedures applicable to complaints made against the police. (*Id.* at 43). For the purposes of this motion, the Court has considered the procedures applicable to complaints made against the police.

19    The parties refer to training, supervision, and retention as one claim. As neither party has briefed the substantive elements of these claims, the Court does not address them.

20    To the extent Plaintiff argues that Galvin and Fowler are subject to supervisory liability based on their alleged failure to act on information that a constitutional violation was occurring, (*see* Dkt. No. 97, at 26 ("Fowler and Galvin can be found liable under § 1983 pursuant to the fourth and fifth *Colon* factors, i.e., if they were 'grossly negligent' in supervising Thompson or if they 'exhibited deliberate indifference' rights of others by 'failing to act on information indicating that unconstitutional acts' were being committed by Thompson.") ), the Court notes that there is no evidence that either Galvin or Fowler knew that Thompson allegedly sexually assaulted Plaintiff until after she formally complained the following day. *See, e.g., Raspardo*, 770 F.3d at 124 (finding "no evidentiary basis to conclude that Gagliardi knew that Carlone was sexually harassing Russell or Raspardo and impermissibly allowed this harassment to continue" where the "plaintiffs did not report the sexual harassment of them by Carlone until after Gagliardi had already placed Carlone on administrative leave").

21    Further, according to the report, Galvin and Thompson "discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations" and that Galvin had reminded Thompson "of the penalties should such conduct be verified as true." (Dkt. No. 99-6, at 2).

22    One of the women, for example, who alleges that in 1997 Thompson followed her into a porta potty at a rock concert; locked the door; and raped her inside; described how a uniformed officer with Thompson remained outside the porta potty during the rape. (Dkt. No. 99-15, at 1–2).

23    Defendants also argue that they were only on notice that Thompson had committed acts of consensual sex while on duty, but that ignores the reasonable inferences in Plaintiff's favor, i.e., that Officer Thompson coerced sex while on duty.

24    Even if there were a material issue of fact as to Fowler's gross negligence, Fowler would be entitled to qualified immunity because, interpreting the facts in the light most favorable to Plaintiff, it was not clearly established that Fowler's conduct violated Plaintiff's constitutional rights for the reasons discussed in Section V.B.2.b. *See Poe*, 282 F.3d at 141-147.

25    The City makes no argument with respect to who should be considered a policymaker for purposes of the *Monell* analysis; its argument centers exclusively on deliberate indifference. (Dkt. No. 89-1, at 28–33; Dkt. No. 103, at 10–11).

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

1995 WL 236245

1995 WL 236245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,
v.
Heather WOLLOWITZ, Attorney, Defendant.

No. 95–CV–0272 (TJM) (RWS).
|
April 10, 1995.

**Attorneys and Law Firms**

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*
**\*1** Presently before this Court is the above-captioned
plaintiff's application to proceed in forma pauperis and
civil rights complaint. Plaintiff has not paid the partial
filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is
dismissed pursuant to 28 U.S.C. § 1915(d) and Local
Rule 5.4(a) of the General Rules of this Court as without
arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that
plaintiff was represented by defendant Wollowitz, a public
defender for the County of Rensselaer, in a County
Court proceeding. Plaintiff alleges that after a criminal
proceeding in that Court, plaintiff was "sentenced to a
illegal sentence." *Id.* at 2. Plaintiff contends that due
to the ineffective assistance of his counsel, defendant
Wollowitz, his constitutional rights were violated. For a
more complete statement of plaintiff's claims, reference is
made to the entire complaint filed herein.

*II. Discussion*
Consideration of whether a *pro se* plaintiff should be
permitted to proceed in forma pauperis is a two-step
process. First, the court must determine whether the
plaintiff's economic status warrants waiver of fees and

costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies
by economic status, the court must then consider whether
the cause of action stated in the complaint is frivolous
or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333
(N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State
Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's
inmate account statements, the Court has determined
that plaintiff's financial status qualifies him to file or
"commence" this action in forma pauperis. 28 U.S.C.
§ 1915(a). Turning to the second inquiry, a court may
"dismiss the proceeding under 28 U.S.C. § 1915(d) if the
court thereafter determines that ... the action is frivolous
or malicious." *Moreman,* 848 F.Supp. at 333 (citation
omitted).

In determining whether an action is frivolous, the court
must look to see whether the complaint lacks an arguable
basis either in law or in fact. *Neitzke v. Williams,* 490 U.S.
319, 325 (1989). Although the court has the duty to show
liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d
605, 606 (2d Cir.1990) (per curiam), and extreme caution
should be exercised in ordering sua sponte dismissal of a
*pro se* complaint before the adverse party has been served
and the parties have had an opportunity to respond,
*Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there
is a responsibility on the court to determine that a claim is
not frivolous before permitting a plaintiff to proceed with
an action in forma pauperis. Dismissal of frivolous actions
pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent
abuses of the process of the court, *Harkins v. Eldredge,* 505
F.2d 802, 804 (8th Cir.1974), as well as to discourage the
waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See
generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which
individuals may seek redress for alleged violations of their
constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–
CV–612, 1994 WL 688306, *3, 1994 U.S.Dist. LEXIS
17698, *8–9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A
party may not be held liable under this section unless it can
be established that the defendant has acted under the color
of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625,
628 (2d Cir.1994) (noting state action requirement under §
1983); *Wise v. Battistoni,* 92–Civ–4288, 1992 WL 380914,
*1, 1992 U.S.Dist. LEXIS 18864, *2–3 (S.D.N.Y. Dec. 10,
1992) (same) (citations omitted).

1995 WL 236245

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at \*1, 1992 U.S.Dist. LEXIS 18864 at \*2–3; *see also D'Ottavio v. Depetris,* 91–Civ–6133, 1991 WL 206278, \*1, 1991 U.S.Dist. LEXIS 13526, \*1–2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 236245

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2944642
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Anthony PERRI, Plaintiff,

v.

Michael BLOOMBERG, Mayor of the City of New
York; Raymond Kelly, Commissioner of the
New York City Police Department; Captain John Doe;
Sergeant Barriteau, P.O. Susan Saviano, and
P.O. Ditucci, in their individual as well as official
capacities; and the City of New York, Defendants.

No. 06-CV-403 (CBA)(LB).
|
July 31, 2008.

**Attorneys and Law Firms**

Anthony Perri, Flushing, NY, pro se.

Johana Castro, Mary Theresa O'Flynn, Corporation
Counsel of the City of New York, New York, NY, for
Defendants.

MEMORANDUM AND ORDER

AMON, District Judge.

**\*1** Plaintiff Anthony Perri brought this *pro se* action
pursuant to 42 U.S.C. § 1983 and state tort law alleging
that the defendants violated his federal constitutional
and state law rights by using excessive force during
his detention, by exhibiting deliberate indifference
to his medical needs, by intentionally inflicting emotional
distress upon him, and by maintaining a custom, policy,
and practice that resulted in the violation of these
rights. The claims arise out of events taking place in the
aftermath of his October 11, 2003 arrest for Assault in
the Third Degree, Endangering the Welfare of a Child,
and Harassment in the Second Degree. By motion filed on
December 27, 2007, Perri seeks a preliminary injunction
and/or temporary restraining order to enjoin what he
refers to as the "illegal units" of the New York City Police
Department from killing him or his two cats by "poison,
gunshot, fire, [g]as, explosive device ... [o]r any other act

of sabotage, subterfuge, or, terrorism." (Mot. for Prelim.
Injunction ("PI Mot.") at 1.) He also seeks to enjoin these
"illegal units" from entering his apartment, eavesdropping
on his phone calls, from using his neighbors and familiy
for the purposes of threatening or harassing him, and from
vandalizing his property. (PI Mot. at 1-2.) He also seeks
a preliminary injunction "[t]o cut off Federal funding of
these illegal units of N.Y.P.D. officers." (PI Mot. at 2.)
The Court referred Perri's motion to Magistrate Judge
Lois Bloom for a Report and Recommendation (R & R),
which she issued on May 27, 2008, recommending that
it be denied. Perri filed timely objections dated June 11,
2008. For the reasons that follow, the Court hereby adopts
Magistrate Judge Bloom's R & R.

*I. Standard of Review*

Magistrate Judge Bloom's recommendation that the
Court deny Perri's motion for a preliminary injunction is
reviewed *de novo. See* 28 U.S.C. § 636(b)(1).

*II. Discussion*

As Magistrate Judge Bloom correctly noted, " '[a]
party seeking a preliminary injunction must establish
irreparable harm and either (a) likelihood of success on
the merits or (b) sufficiently serious questions going to
the merits and a balance of hardships tipping decidedly
in its favor.' " (R & R at 2 (quoting *Green Party of New
York State v. New York State Bd. of Elections,* 389 F.3d
411, 418 (2d Cir.2004) and citing Fed.R.Civ.P. 65).) She
further noted that a movant must demonstrate irreparable
harm before the other requirements are analyzed, and
that, in order for harm to be irreparable, it must be non-
compensable by an award of monetary damages. (R &
R at 2 (citing *Kamerling v. Massanari,* 295 F.3d 206,
214 (2d Cir.2002) and *Wisdom Import Sales Co., L.L.C.
v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113-14 (2d
Cir.2003).) The R & R concludes that Perri's allegations-
which consist of unsupported and bizarre allegations
regarding the acts of the so-called "illegal units of the
NYPD"-do not establish that he is in danger of irreparable
harm. Moreover, Magistrate Judge Bloom concludes that
although the allegations in the Third Amended Complaint
were sufficient to survive the defendants' motion to
dismiss, Perri has not demonstrated a likelihood of success
on the merits. Accordingly, she concludes that he has
not established that he is entitled to injunctive relief and
recommends that the Court deny the motion.

**\*2** In his objections to the R & R, Perri fails to discuss the legal standards applicable to his motion. Instead, he continues to make allegations regarding the actions of the "illegal units" that are not only unsupported but also have nothing to do with the subject matter of this lawsuit.[1] Magistrate Judge Bloom was correct to conclude that these allegations do not suffice to establish irreparable harm.

Moreover, as Magistrate Judge Bloom pointed out, and Perri failed to dispute, although his Third Amended Complaint passed muster under the liberal pleading standards of Federal Rule of Civil Procedure 8(a), he has failed to establish a likelihood of success on the merits of his lawsuit. He has used this docket number to submit periodic filings he tends to call "The Perri Report," with content similar to that in his objections to the instant R & R. Those filings, like the instant objections, deal not with the merits of his lawsuit, but rather contain a litany of sensational allegations pertaining not only to the NYPD, but also to various arms of government, both state and federal. Accordingly, Perri has not established that he is entitled to a preliminary injunction, because his allegations of irreparable harm are unsupported and bizarre and because he has established neither a likelihood of success on the merits nor serious questions regarding the merits and a balance of hardships tipping decidedly in his favor.

*I. Conclusion*

Magistrate Judge Bloom's R & R is hereby adopted. Perri's motion for a preliminary injunction is denied.

SO ORDERED

## REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge.

Plaintiff, Anthony Perri, brings this *pro se* action pursuant to 42 U.S.C. § 1983 (" § 1983"), alleging that on or around October 11, 2003, defendants used excessive force during his detention and were deliberately indifferent to his medical needs, thereby violating his constitutional rights. Plaintiff also alleges that defendants intentionally inflicted emotional distress upon him. By motion filed December 28, 2007, plaintiff seeks a preliminary injunction and

a temporary restraining order to enjoin various police officers from, among other things, killing him, entering his apartment, eavesdropping on his phone calls, using his neighbors, landlord, or landlord's family to threaten or harass him, and to cut off funding of such "illegal units of N.Y.P.D." *See* docket entry 104. The Honorable Carol B. Amon referred plaintiff's motion to me for a Report and Recommendation in accordance with 28 U.S.C. § 626(b). For the following reasons, plaintiff s motion should be denied.

## DISCUSSION

A party seeking a preliminary injunction must establish irreparable harm and either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor." *Green Party of New York State v. New York State Bd. of Elections,* 389 F.3d 411, 418 (2d Cir.2004); Fed.R.Civ.P. 65. A movant must show irreparable harm before the other requirements for a preliminary injunction will be considered. *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002). The Second Circuit has defined "irreparable harm" as "certain and imminent harm for which a monetary award does not adequately compensate," noting that "only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113-14 (2d Cir.2003); see also *Kamerling, 295 F.3d at 214* ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." (internal quotation omitted)). The same standards govern consideration of an application for a temporary restraining order. *See Therrien v. Martin,* No. 3:07-cv-1285 (JCH), 2007 WL 3102181, at \*5 (D.Conn. Oct. 19, 2007).

**\*3** In the underlying incident, which happened in October 2003, plaintiff was arrested, taken to the 109th precinct, had a panic attack, was taken to the hospital (after allegedly being dropped face-down as a test by the police and EMS workers of whether he was really suffering from an attack or was faking his symptoms), was taken back to the precinct, and ultimately was released.

Plaintiff's third amended complaint alleges that he is an "emotionally disturbed person" ("EDP") and that the City has a policy, custom, or practice that constitutionally fails to afford proper treatment to EDPs when arrested.

Here, plaintiff seeks a "Praliminary [sic] injunction/ Temporary Restraining Order"

    A) To restrain the officers so named in the above-mentioned memorandum of law as John Doe No.1, and, No.2, and one Anthony R. Disalvio, and any other member of the illegal units of the N.Y.P.D., including civilian employees, and, or, governmental employees, from causing the death to this plaintiff, so named Anthony Perri. Or, his two cats named Beauty, or, Picasso, By poison, gunshot, fire, Gas, explosive device. Or any other act of sabotage, subterfuge, or, terrorism.

    B) To restrain said officers from entering plaintiff s apartment, or from eavesdropping on my phone calls without a warrent [sic]. (Or from having their civilian employees enter said abode).

    C) To restrain said illegal units of the N.Y.P.D., from using my neighbors, my landlord, Anthony Tammero, or his family to threaten or harrass [sic] this plaintiff in his home, or general living area.

    D) To restrain said City of New York, and, The New York City Police Department, and the illegal units of the N.Y.P.D., from assaulting, stalking, or harrassing [sic] plaintiff. And to restrain said officers from vandalizing plaintiff's property. Or engaging in further acts of set-ups, sabotage, or terrorism. (Which acts are done in furtherance of a conspiricy [sic] to decline my redress to the court, and report these issues).

    E) To cut off Federal funding of these illegal units of N.Y.P.D., officers.

Docket entry 104 at 1(A)-(E).

These conclusory allegations do not meet the requirements for preliminary injunctive relief. *See Kamerling,* 295 F.3d at 214 (noting that preliminary relief cannot be founded on "remote or speculative" harms). Plaintiff's belief that he is being followed and is in constant danger does not demonstrate irreparable harm. Plaintiff's self-description that he is emotionally disturbed has led to his filing this motion as well as another case that was dismissed. *See*

*Perri v. City of New York, et al.,* No. 08-cv-451 (ARR) (LB), slip op. at 6 (E.D.N.Y. Feb. 15, 2008) (denying injunctive relief and dismissing plaintiff's action against the "illegal units of the N.Y.P.D." as frivolous and on "the level of the irrational or the wholly incredible.") (quoting *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)). *See also Neitzke v. Williams,* 490 U.S. 319, 325-28, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (defining as factually frivolous and therefore dismissible *sua sponte* claims encompassing "fanciful," "fantastic," or "delusional" allegations); *Shoemaker v. U.S. Dept. of Justice,* 164 F.3d 619, 1998 WL 681274, at *2 (2d Cir.1998) ("A case is frivolous when it presents 'clearly baseless' factual contentions.") (quoting *Neitzke,* 490 U.S. at 327) (unpublished opinion).

  **\*4** Plaintiff fails to connect defendants to the harm he alleges and makes only conclusory allegations. Although the Court denied the motion to dismiss the underlying complaint herein, it is respectfully recommended that plaintiff's motion for a preliminary injunction should be denied as he has not established irreparable harm and a likelihood of success on the merits. [1]

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physician's Health Plan, Inc.,* 293 F.3d 42 (2d Cir.2002); *Small v. Sec'y of Health and Human Services,* 892 F.2d 15 F.2d Cir.1989): *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435(1985).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2944642

2008 WL 2944642

Footnotes

1    Above and beyond not being connected to the claims at issue in this lawsuit, it would seem that Perri would lack standing to seek redress for many of the atrocities that he claims have been committed by the "illegal units" of the NYPD against young women. *See generally Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

1    Plaintiff's motion filed on January 18, 2008 seeking similar injunctive relief is nearly identical to his motion filed on December 28, 2007. *See* docket entry 107. It is recommended that it should also be denied for the same reasons stated herein.

---

**End of Document**        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 941283
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sidney E. PURDIE, Plaintiff,
v.
Harold D. GRAHAM, et al, Defendants.

No. 9:09−CV−971 (GTS/ATB).
|
Jan. 19, 2011.

**Attorneys and Law Firms**

Sidney E. Purdie, Dannemora, NY, pro se.

Adrienne J. Kerwin, Office of Attorney General, Albany, NY, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

 **\*1** This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). Liberally construed, the amended complaint alleges that defendants retaliated against plaintiff, failed to protect him from an assault by another inmate, were deliberately indifferent to a serious medical need, and denied him due process rights while plaintiff was an inmate in the custody of the Department of Correctional Services ("DOCS") at Auburn Correctional Facility ("Auburn"). (Dkt. No. 20).

Presently before this court is defendants' motion to dismiss certain defendants and claims pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 32). Plaintiff has filed two responses in opposition. [1] (Dkt.Nos.36, 50). For the following reasons, this court recommends granting defendants' motion.

**I.** *Facts and Contentions*
Plaintiff alleges that on July 19, 21, and 23, 2009, he wrote "complaints" regarding Correctional Officer (C.O.) Vosberg "for trying to involve me into gang and drug activities." (Compl.¶ 6). Plaintiff alleges that C.O. Vosberg kept asking "where the weapons are hidden and who had the drugs." (Am.Compl.¶ I.a). Plaintiff alleges that C.O. Vosberg "denied me chow and recreation for a week straight," so plaintiff wrote to Superintendent Graham. (Am.Compl.¶ I.d).

Plaintiff spoke with C.O. Conners, who is usually C.O. Vosberg's relief officer, about why Conners also refused to let plaintiff out for chow and recreation. (Am.Compl.¶ I.f-g). Plaintiff alleges that Conners told him that plaintiff was not complying with Vosberg's rules, that Conners would "teach" plaintiff about writing up Conner's co-worker, and that Vosberg "runs the gangs and drugs around the facility." (Am.Compl.¶ I.g-h). Plaintiff also alleges that C.O. Vosberg told plaintiff to "stay out of [C.O. Vosberg's] business and not intervene in his drug move." (Am.Compl.¶ I.i).

Plaintiff alleges that on August 4, 2009, around the time for noon chow, his cell was opened up by C.O. Guzewicz, and inmate Zebrowski came in plaintiff's cell and stabbed him above his left eye, his neck twice, his head once, his left arm, and his right leg twice. (Compl.¶ 6, Am.Compl.¶ III.1). C.O. Guzewicz noticed that plaintiff was not leaving his cell, and after investigating, saw plaintiff and inmate Zebrowski fighting. (Am.Compl.¶ III.2). Guzewicz gave numerous orders to break up the fight. (Am.Compl.¶ III.2). Officers Ramsey and Blaisdell assisted in stopping the altercation. (Am.Compl.¶ III). Some time later, plaintiff "was informed" that C.O. Vosberg allegedly paid inmates cigarettes to stab petitioner in retaliation for the grievances plaintiff had submitted against Vosberg and Conners. (Am.Compl.¶ IV).

Plaintiff was sent to medical, but refused to be stitched up "because the doctor wanted to stick the needle in the wound and it scared me so much." (Am.Compl.III.7). Plaintiff requested to be seen by an "outside doctor," but was refused. (Compl. ¶ 6; *see also* Am. Compl. ¶ III.6). A weapon was found in plaintiff's cell, so after he was treated by medical staff, he was sent to the Special Housing Unit (SHU). (Am.Compl.III.8).

 **\*2** Plaintiff also requested emergency sick call while he was in the Auburn SHU, and he saw Nurse Quinn. (Am.Compl.¶ V). Nurse Quinn allegedly told plaintiff to "shut up and don't say any more about [his] injuries." (Am.Compl.¶ V.b). Plaintiff "refused to stay quiet about [his] injuries" and Nurse Quinn allegedly had

him placed in OMH [2] by reporting that plaintiff was trying to kill himself. (Am.Compl.¶ V.c).

As a result of the August 4, 2009 altercation and discovery of a weapon in plaintiff's cell, a Tier III disciplinary hearing was held, conducted by Captain McCarthy, who removed plaintiff from the hearing after he objected that his witnesses were not able to testify at the hearing for "security reasons." (Am.Compl.¶ IX). Petitioner was found guilty, and received 18 months in the SHU and a loss of all privileges. (Am.Compl.¶ IX).

## II. *Motion to Dismiss*
Defendants McCarthy, Graham, Ramsey, Blaisdell, Bellamy, and Quinn move to dismiss the complaint, arguing that plaintiff has failed to state a claim against them based on due process, failure to protect, and deliberate indifference to a serious medical need. (Dkt. No. 32). [3] To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

## III. *Due Process*
Plaintiff claims that Captain McCarthy violated his due process rights during the Tier III disciplinary

hearing, when plaintiff was apparently removed after objecting because his witnesses were not allowed to testify. (Am.Comp.¶ IX). For the reasons set forth below, this court finds that the due process claim should be dismissed.

### A. Applicable Law
To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998). Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

**\*3** In *Wolff v. McDonnell,* 418 U.S. 539, 563–64, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court held that due process requires advance notice of the charges against the inmate, and a written statement of reasons for the disposition. The inmate should also have the ability to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Id.* at 566. Finally, the inmate is entitled to a fair and impartial hearing officer, and the hearing disposition must be supported by "some" or "a modicum" of evidence. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (some evidence standard); *McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983) (fair and impartial hearing officer). Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations. *See Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir.1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred); *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995) (state law violation does not necessarily rise to the level of a constitutional violation).

### B. Application
Plaintiff argues that he was denied the right to "defend himself fully" at the Tier III hearing. (Pl.'s Resp. p. 5). However, plaintiff makes no factual allegations indicating that he was prevented from presenting a defense or that Captain McCarthy otherwise denied plaintiff due process in his Tier III hearing. Plaintiff states that his witnesses were not allowed to testify at his Tier III hearing "because

2011 WL 941283

of security reasons," which is an acceptable reason not to call an inmate's witnesses. *See Wolff v. McDonnell,* 418 U.S. at 556 (1974); *see also Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991). In any event, plaintiff acknowledges that his witnesses did, in fact, testify on the record in the presence of Captain McCarthy, albeit not in plaintiff's presence. (Pl.'s Second Resp. ¶ 10). Taking testimony from witnesses out of plaintiff's presence does not violate the due process requirement. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). Plaintiff also admits the reason he was removed from the hearing: he was irate and would not be quiet. (Pl.'s Resp. pp. 3, 5). Accordingly, plaintiff's claim against Captain McCarthy should be dismissed.

### IV. *Personal Involvement*

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

**\*4** A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007) (citing *Colon v. Coughlin,* 58 F.3d 865, 873) (2d Cir.1995)), *rev'd on other grounds,* ––– U.S. ––––, 129 S.Ct. 1937, 173 L.Ed.2d 868 (U.S.2009).

### A. Application

#### 1. Defendant Graham

Plaintiff has failed adequately to allege personal involvement on the part of defendant Graham, the Superintendent of Auburn. Plaintiff states that

Superintendent Graham assigned Captain McCarthy to conduct plaintiff's Tier III hearing, but does not indicate that defendant Graham would have had any reason to think Capt. McCarthy would infringe plaintiff's constitutional rights. In fact, as noted above, plaintiff does not state a viable claim that defendant McCarthy violated plaintiff's due process rights in connection with the disciplinary hearing.

Plaintiff alleges that Superintendent Graham had been "notified" through grievance appeals of plaintiff's complaints regarding C.O. Vosberg. (Pl.'s Resp. p. 6; *see also* Am. Compl. at II). However, the mere fact that a prisoner writes to supervisory officials about alleged mistreatment does not justify holding those supervisory officials liable under Section 1983. *Liner v. Goord,* 310 F.Supp.2d 550, 555 (W.D.N.Y.2004) (stating that the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (stating that letters to and a response from an official did not demonstrate personal involvement). Plaintiff's argument that "Superintendent Graham should not be dismissed because he was the sole chief to give order at the Auburn Correctional Facility" merely relies on a *respondeat superior* theory, which is not a proper basis for liability under Section 1983. (Pl.'s Resp. p. 6).

Plaintiff has failed to allege facts indicating that defendant Graham implemented any policy or custom which resulted in a violation of his constitutional rights, or that Superintendent Graham he was grossly negligent in managing any official that he supervised. With respect to the alleged assault, plaintiff can not show the personal involvement of Superintendent Graham based upon his failure to remedy a known wrong or adequately supervise his staff, based on a single incident of alleged excessive force. *See, e.g., Harnett v. Bar,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (stating that the appropriate guiding principle for assessing personal responsibility is to determine whether the supervisory official was presented with an "ongoing" violation that he or she could remedy directly). Thus, this court must recommend dismissal of plaintiff's claims against defendant Graham for lack of personal involvement.

#### 2. Defendants Ramsey and Blaisdell

**\*5** As to Officers Ramsey and Blaisdell, plaintiff alleges only that they were called to assist on August 4, 2008,

when he was stabbed in his cell, and one of them retrieved a weapon from inside plaintiff's cell. [4] (Am.Compl.¶ III, p. 9). Plaintiff does not appear to claim that these defendants were involved in instigating the assault or otherwise violated his constitutional rights. Rather, plaintiff wishes them to "testify at trial upon what took place on August 4th, 2008." (Pl.'s Resp. p. 7). Officers Ramsey and Blaisdell do not need to be named defendants in order to testify in the event of a trial. Accordingly, plaintiff's claims as to Officers Ramsey and Blaisdell should be dismissed.

### 3. Defendant Bellamy

Plaintiff alleges that defendant Bellamy, Director of the Department of Correctional Services Central Office Review Committee, "is solely at fault and responsible for filing the final level for review of the inmates grievances [.]" (Pl.'s Second Resp. ¶ 2). Plaintiff claims that, because she was involved in processing his grievance, defendant Bellamy is responsible for DOCS' alleged failure to thoroughly investigate plaintiff's complaints regarding C .O. Vosberg. (Pl.'s Second Resp. ¶¶ 4–5). Plaintiff also alleges that defendant Bellamy "failed to alert" Superintendent Graham of C.O. Vosberg's "harassment" of plaintiff, and suggests that his makes her liable for the subsequent assault. (Pl.'s Second Resp. ¶¶ 7–8).

In the absence of any factual allegations indicating that defendant Bellamy had any further involvement in the underlying events, her limited role in processing plaintiff's grievance is no basis for any Section 1983 claim against her. *Marrero v. Kirkpatrick,* 659 F.Supp.2d 422, 427 (W.D.N.Y.2009). To the extent she failed to cause an investigation of plaintiff's complaints, that would not give rise to a constitutional claim. *Id* . (citing *Swift v. Tweddell,* 582 F.Supp.2d 437, 445–46 (W.D.N.Y.2008)). In any event, plaintiff alleges nothing to indicate that plaintiff's complaint of harassment gave defendant Bellamy any reason to anticipate that he would later be assaulted. Nor was it necessary for defendant Bellamy to alert Superintendent Graham; plaintiff acknowledges that he had already complained to and appealed grievances to Superintendent Graham (Am.Compl.¶ II), and that the Superintendent assigned a sergeant to investigate plaintiff's claims of harassment. (Am.Compl.¶ II). Plaintiff has failed adequately to allege personal involvement on the part of defendant Bellamy, and claims against her should be dismissed.

### V. *Deliberate Indifference to Medical Needs*

Plaintiff appears to argue that Nurse Quinn was deliberately indifferent to plaintiff's serious medical need when she allegedly told plaintiff that he was "abusing sick call." (Pl.'s Resp. p. 8).

### A. Legal Standards

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id* .

**\*6** The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 Fed. Appx. 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 Fed. Appx. at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by

2011 WL 941283

failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Even if the medical judgments of prison staff amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (1992) (table); *Kellam v. Hunt,* 9:04–CV–1225 (LEK/GJD), 2007 WL 2764814, at *6 (N.D.N.Y. Sept. 20, 2007).

### B. Application

The amended complaint alleges that the plaintiff was provided medical treatment immediately after his injury, although his request to be sent to an outside hospital was denied. (Am.Compl.III). Plaintiff also suggests that he was denied emergency sick treatment, at some point, by Nurse Quinn. Plaintiff claims that Nurse Quinn told the plaintiff to "shut up about his injuries," and said that he wouldn't need medical care if he had not fought with another inmate. (Am.Compl.V). Finally, plaintiff alleges that, because of his continuing complaints about his injuries, Nurse Quinn placed the plaintiff in the care of the Office of Mental Health, which continued to treat plaintiff after he left Auburn.

**\*7** While plaintiff may have disagreed with Nurse Quinn's medical judgment as to his condition and the level of care he required on one particular occasion, he fails to state a claim of deliberate indifference, given the medical care that he admittedly received for his injuries. *See Sonds,* 151 F.Supp.2d at 312 (disagreements over forms of treatment implicate medical judgments and not the Eighth Amendment) (citing *Estelle,* 429 U.S. at 107) (inmate who alleged doctors did not credit his repeated

assertions that severe back pain should preclude him from manual labor did not state a claim for deliberate indifference where the medical staff repeatedly saw and treated him, even if their lack of diagnosis and inadequate treatment constituted malpractice). [5] Even if Nurse Quinn made the harsh comments plaintiff alleges, that would support an Eighth Amendment claim for deficient medical care. See, e.g., *Murray v. Michael,* 9:03–CV–1434, 2005 WL 2204985, at *13–14 (N.D.N.Y. Sept.7, 2005) (Report–Recommendation) (alleged threats from a doctor to an inmate patient to stop "abusing sick call privileges" did not rise to the level of deliberate indifference).

The decision not to refer plaintiff to an outside hospital, and Nurse Quinn's decision that he required mental health treatment does not constitute deliberate indifference, even if contrary to plaintiff's preferences. The fact that plaintiff admittedly continued to receive mental health treatment following his transfer from Auburn (Am.Compl.¶ V) undercuts plaintiff's conclusory allegation that Nurse Quinn referred him to OMH for any malicious reason. Accordingly, plaintiff's claim as to Nurse Quinn should be dismissed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 32) be **GRANTED,** and that the claims in the amended complaint against defendants McCarthy, Graham, Ramsey, Blaisdell, Bellamy, and Quinn be **DISMISSED IN THEIR ENTIRETY.** [6]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 941283

2011 WL 941283

## Footnotes

1   Plaintiff's Second Response (Pl.'s Second Resp.) (Dkt. No. 50), was filed after defendant Karen Bellamy joined the motion to dismiss (Dkt. No. 32).

2   Office of Mental Health (*See* Pl.'s Resp. 8).

3   Defense counsel has not moved to dismiss the claims against defendants Vosberg, Conners, Gusewicz, or Graf—a Sergeant at Auburn who responded to the assault of plaintiff on August 4, 2009, who ordered the subsequent search of plaintiff's cell, and who allegedly caused plaintiff to be confined in the SHU after a weapon was found in his cell. (Am.Compl.¶ ¶ III.3, VIII).

4   Plaintiff states that Ramsey "was ordered to search my cell A–7–4 and a weapon was found on the floor under my bed." (Am.Compl.¶ III.9). Plaintiff later states that "C.O. Blaisdell was the office[r] I believe to retrieve the weapon." (Am.Compl. p. 9). Either way, helping to break up a fight among inmates, and subsequently retrieving a weapon from a cell is not connected with any constitutional violation plaintiff alleges.

5   *See also Brown v. White,* 9:08–CV–200 (GLS/ATB), 2010 WL 985184, at *11 (N.D.N.Y. Mar. 15, 2010) (even if nurse had been completely dismissive of plaintiff, who sought emergency medical treatment based on complaints of back pain that the nurse did not view as an emergency, it would not constitute deliberate indifference); *Savage v. Brue,* 9:05–CV–857, 2007 WL 3047110 at *9 (N.D.N.Y. Oct.18, 2007) (nurse refused pain medication to an inmate confined in a special housing unit for 48 hours with no mattress who complained of "extreme" back and neck pain due to a recent injury, and advised the inmate that he would need to "adjust to it"; while the nurse may have been negligent in her care, she was not reckless or deliberately indifferent).

6   All claims against defendants Conners, Gusewicz, Graf, and Vosberg remain.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 940469
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sidney E. PURDIE, Plaintiff,
v.
H.D. GRAHAM, Superintendent; Conners,
Correctional Officer; M. Ramsey, Correctional
Officer; C. Guzewicz, Correctional Officer;
Blaisdell, Correctional Officer; McCarthy, Captain;
Karen Bellamy, I .G.R.C. Director; Vosberg,
Correctional Officer; and Quinn, Nurse, Defendants.

No. 9:09–CV–0971 (GTS/ATB).
|
March 16, 2011.

**Attorneys and Law Firms**

Sidney E. Purdie, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Adrienne J. Kerwin, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendant.

### DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Sidney E. Purdie ("Plaintiff")
against nine employees of the New York State
Department of Correctional Services ("Defendants"), are
the following: (1) Defendants' motion to dismiss Plaintiff's
claims in his Second Amended Complaint against
Defendants McCarthy, Graham, Ramsey, Blaisdell,
Quinn, and Bellamy for failure to state a claim
upon which relief can be granted (Dkt. Nos.32,
48), and (2) United States Magistrate Judge Andrew
T. Baxter's Report–Recommendation recommending
that Defendants' motion be granted and Defendants
McCarthy, Graham, Ramsey, Blaisdell, Quinn, and
Bellamy be dismissed from this action (Dkt. No. 51). For
the reasons set forth below, the Report–Recommendation
is accepted and adopted in its entirety; Defendant's motion
is granted; and Defendants McCarthy, Graham, Ramsey,

Blaisdell, Quinn, and Bellamy are dismissed from this
action.

### I. RELEVANT BACKGROUND

Plaintiff filed his initial Complaint on August 27, 2009.
(Dkt. No. 1.) On November 18, 2009, Plaintiff filed an
Amended Complaint (Dkt. No. 6), which was stricken
by the Court pursuant to its Decision and Order of
July 20, 2010. (Dkt. No. 19.) In that same Decision and
Order, the Court accepted for filing Plaintiff's Second
Amended Complaint, except for certain of the claims
therein, which were futile due to their failure to state
a claim upon which relief could be granted. (*Id.*) More
specifically, the Court dismissed without prejudice, as
Defendants to this action, the following individuals and
entity: Lt. Quinn, Sgt. E. Graf, M. Sullivan, Stichland,
Nancy Doe, John F. Zebrowski, Richard Roy, J. Festa, an
unnamed Disciplinary Hearing Officer, and the Auburn
Correctional Facility Medical Department. (*Id.*)

#### A. Plaintiff's Claims

Generally, construed with the utmost of liberality,
Plaintiff's Second Amended Complaint alleges that,
while Plaintiff was incarcerated at Auburn Correctional
Facility ("Auburn C.F."), he filed "complaints" against
Defendant Vosberg claiming that Vosberg was harassing
him, which resulted in Defendants Vosberg and Conners
retaliating against him by, among other things, denying
him food and recreation. (Dkt. No. 20 at 2.) Plaintiff
alleges that he filed his "complaints" with Defendant
Bellamy, the Head Grievance Director, and appealed the
decisions to Defendant Superintendent Graham. (*Id.* at
2–3.) Plaintiff alleges that, because he filed grievances
against Defendant Vosberg, Vosberg told Plaintiff that he
was going to get even with Plaintiff. (*Id.* at 3–4.)

Plaintiff further alleges that Defendant Vosberg "paid
inmates cigarettes to stab [Plaintiff] in retaliation
for written reports upon C.O. Vosberg and C.O.
Conners." (*Id.* at 5.) Plaintiff alleges that, as a result, on
August 4, 2009, Defendant Guzewicz opened Plaintiff's
cell doors and permitted an inmate to assault him,
in retaliation for Plaintiff filing complaints against
Defendant Vosberg. (Dkt. No. 20.) Plaintiff alleges that,
after the assault, he was deprived of medical treatment and
denied the process he was due at his Tier III disciplinary,
which took place as a result of Defendant Ramsey finding
a weapon in his cell during a search subsequent to the

assault, and resulted in his confinement in a special housing unit. (*Id.*)

**\*2** Based on these factual allegations, Plaintiff's Complaint—when construed with the utmost of special leniency—alleges that Defendants violated his constitutional rights in the following manner: (1) Defendants Vosberg and Conners retaliated against him by denying him recreational and meal privileges because he filed "complaints" against Defendant Vosberg, in violation of his First Amendment rights; (2) Defendant Guzewicz retaliated against him for filing grievances against Defendant Vosberg by opening his cell door and permitting an inmate to assault him, in violation of his First Amendment rights; (3) Defendant Guzewicz failed to protect him from an assault by an inmate, in violation of his Eighth Amendment rights; (4) Defendant Quinn acted with deliberate indifference to Plaintiff's serious medical needs by refusing to treat his wounds or grant his request for a hospital transfer, in violation of his Eighth Amendment rights; (5) Defendant McCarthy denied him the process he was due at his disciplinary hearing by not permitting him to present witnesses, in violation of the Fourteenth Amendment; (6) Defendant Bellamy, as the "Head Grievance Director," was aware of Plaintiff's complaints regarding Defendant Vosberg, yet failed to prevent Vosberg's subsequently ordered assault of Plaintiff; and (7) Defendant Graham, as the Supervisor of Auburn C.F., is liable for the unconstitutional acts of his subordinates. (*Id.*) [1]

For a more detailed recitation of the factual allegations giving rise to the above-described claims, the Court refers the reader to Plaintiff's Second Amended Complaint in its entirety, and to Magistrate Judge Baxter's Report–Recommendation. (Dkt.Nos.20, 51.)

### B. Defendants' Motion

On September 10, 2010, Defendants filed their motion to dismiss. (Dkt. No. 32.) In their motion, Defendants argue that, because Plaintiff's Second Amended Complaint fails to state a claim against Defendants McCarthy, Graham, Ramsey, Blaisdell or Quinn, each of these individuals should be dismissed as Defendants from the action. (Dkt. No. 32.) For a more detailed recitation of Defendants' argument, the Court refers the reader to the motion to dismiss in its entirety, as well as Magistrate Judge Baxter's thorough Report–Recommendation. (*Id.*)

On September 16, 2010, Plaintiff submitted a response in opposition to Defendants' motion. (Dkt. No. 36.) In his response, Plaintiff argues as follows: (1) his due process claim against Defendant McCarthy should not be dismissed because, by not allowing Plaintiff to present witnesses at the disciplinary hearing, Defendant McCarthy violated his right to present a proper defense; (2) his claims against Defendant Graham should not be dismissed because (a) as Supervisor of Auburn C.F., Defendant Graham received notice of Defendant Vosberg's threats against Plaintiff, yet failed to remedy the situation, and (b) Defendant Graham assigned Defendant McCarthy to conduct his Tier III hearing, and Defendant McCarthy violated his constitutional rights; (3) Defendants Ramsey and Blaisdell should not be dismissed because, although "none of the[ ] allegations [in the Second Amended Complaint] allege any conduct on the part of ... Ramsey or Blaisdell that violates any constitutional right of the Plaintiff[,]" these Defendants "should be permitted to testify at trial upon what took place on August 4, 200[9] ....“; and (4) his medical indifference and retaliation claims against Defendant Quinn should not be dismissed because Plaintiff has alleged facts plausibly suggesting that she denied him proper medical treatment and placed him in the care of Mental Health instead of a hospital. (Dkt. No. 36.)

**\*3** On December 27, 2010, Defendant Bellamy submitted a letter motion requesting to join in Defendants' motion to dismiss, which was subsequently granted by the Court. (Dkt. No. 48.)

On January 7, 2011, Plaintiff submitted a second response, in opposition to Defendant Bellamy's letter-motion. (Dkt. No. 50.) In his response, Plaintiff argues that his claim against Defendant Bellamy should not be dismissed because she failed to process his grievance filings, and therefore his "complaints" were not brought to the attention of the Superintendent and properly investigated. (*Id.*)

### C. Magistrate Judge Baxter's Report–Recommendation

On January 19, 2011, Magistrate Judge Baxter issued a Report–Recommendation recommending that Defendants' motion be granted, and that Defendants McCarthy, Graham, Ramsey, Blaisdell, Quinn, and Bellamy be dismissed from this action. (Dkt. No. 51.) In support of his recommendation, Magistrate Judge

Baxter found, *inter alia,* as follows: (1) because Plaintiff's witnesses submitted testimony prior to Plaintiff's Tier III disciplinary hearing, Plaintiff's Fourteenth Amendment due process claim against Defendant McCarthy must fail as a matter of law; (2) Plaintiff's Second Amended Complaint fails to allege facts plausibly suggesting that Defendant Quinn was deliberately indifferent to his serious medical needs because his claim rests on his disagreement with the treatment received, which is not actionable under the Eighth Amendment; and (3) Plaintiff's Second Amended Complaint fails to allege facts plausibly suggesting that Defendants Graham, Bellamy, Ramsey, or Blaisdell were personally involved in any alleged constitutional violations. (*Id.*) Familiarity with the remaining grounds of Magistrate Judge Baxter's Report–Recommendation is assumed in this Decision and Order, which is intended primarily for review by the parties.

On January 27, 2011, Plaintiff filed his Objection to the Report–Recommendation. (Dkt. No. 52.) In his Objection, Plaintiff argues, *inter alia,* as follows: (1) Defendant McCarthy deprived him of a fair and impartial hearing by not allowing him to present witnesses at the hearing for safety reasons, and/or declining to provide him, prior to the hearing, with a copy of the record testimony given by his witnesses; (2) Defendant Quinn acted with deliberate indifference to his serious medical needs by not providing him with bandages to stop bleeding from his eye, and instead recommending that he be taken to the Office of Mental Health; and (3) "The Supervisory Officials [were] personally involved in the grossly negligent [actions of] the[ir] subordinates" because they were aware of the threats made to Plaintiff and failed to take remedial action. (*Id.*)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review Governing a Report–Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo"* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). [2] When only general objections are made to a magistrate judge's report-recommendation, or where the objecting party merely reiterates the same arguments taken in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear

error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). [3] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### B. Standard Governing a Motion to Dismiss

**\*4** Magistrate Judge Baxter correctly recited the legal standard governing a motion to dismiss. (Dkt. No. 51.) As a result, this standard is incorporated by reference in this Decision and Order.

## III. ANALYSIS

As an initial matter, even when construed with the utmost of liberality, Plaintiff's Objections fail to specifically address Magistrate Judge Baxter's recommendations. Instead, Plaintiff's Objections simply reiterate the arguments Plaintiff presented in his prior papers to the Court. As a result, and for the reasons explained above in Part II.A. of this Decision and Order, the Court need review the Report–Recommendation only for clear error.

After carefully reviewing all of the papers in this action, including Magistrate Judge Baxter's Report–Recommendation, and Plaintiff's objections thereto, the Court concludes that the Report–Recommendation is well-reasoned and not clearly erroneous. Magistrate Judge Baxter employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. The Court would add only three points.

First, the Report–Recommendation would survive even a *de novo* review.

Second, with regard to his deliberate-indifference-to-serious-medical-needs claim against Defendant Quinn, Plaintiff's asserts for the first time in his objections that

Defendant Quinn refused to provide him with bandages on a second occasion, despite the fact that he was bleeding from his eye. More specifically, Plaintiff asserts that (1) after he was treated by medical staff for his injuries, he was permitted to shower, (2) during his shower, his bandages came loose, causing him to bleed from his eye, and (3) he subsequently was taken to medical to see Defendant Quinn, who refused to provide him with bandages, instead recommending that he be taken to the Office of Mental Health. (Dkt. No. 52.) As an initial matter, the Court need not, and does not, consider this allegation because it was raised for the first time in Plaintiff's objection to the Report–Recommendation. *See Morales v. Santor,* 94–CV–0217, 1995 WL 760625, at *2 (N.D.N.Y. Dec. 4, 1995) (McAvoy, C. J.) (refusing to consider issues raised for the first time in objections to a magistrate judge's report and recommendation). Plaintiff has already filed a Complaint, an Amended Complaint, and a Second Amended Complaint, in which he could have asserted this allegation. Furthermore, Defendants have gone to the burden and expense of preparing a lengthy motion to dismiss with regard to Plaintiff's allegations. Moreover, permitting Plaintiff to change the landscape of his allegations at such a point in the action would be an inefficient use of judicial resources, and indeed would frustrate the purpose of the Magistrates Act. *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638–39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992). Finally, the Court notes that, even if it were to consider this allegation, Plaintiff's deliberate-indifference-to-serious-medical-needs claim would still be dismissed because in neither his Second Amended Complaint nor his Objections does Plaintiff allege facts plausibly suggesting that the cut over his eye was severe enough to produce death, degeneration or extreme pain. Indeed, his allegation that he refused stitches belies such a conclusion.

**\*5** Third, to the extent that Plaintiff now argues that he attempted to assert, in his Second Amended Complaint, a retaliation claim against Defendant Quinn based on her allegedly having had him transferred to the Office of Mental Health for "refus[ing] to stay quiet about [his] injuries," the Court rejects that argument (and dismisses any such claim) for the following two alternative reasons: (1) Plaintiff has not alleged facts plausibly suggesting that his "refus[al] to stay quiet about [his] injuries" was activity protected by the First Amendment under the circumstances; and (2) even if he has alleged such facts, Plaintiff has not alleged facts plausibly suggesting a causal connection between that activity and his transfer to the Office of Mental Health, which-according to Plaintiff's own factual allegations-appears to have been caused by (a) Defendant Quinn's (allegedly erroneous) medical judgment that he was a harm to himself, and (b) his subsequently diagnosed depression and severe mood swings. The Court notes that conspicuously missing from Plaintiff's otherwise factually laden Second Amended Complaint is any factual allegation plausibly suggesting how (1) he subsequently "refused to stay quiet about [his] injuries," (2) any such subsequent refusal constituted a complaint that he experienced a correctional employee-ordered assault, and (3) how Defendant Quinn *knew* of that subsequent complaint of assault.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Baxter's Report–Recommendation (Dkt. No. 51) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt.Nos.32, 48) is *GRANTED* and the following Defendants are dismissed from the action: McCarthy, Graham, Ramsey, Blaisdell, Bellamy, and Quinn.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 940469

Footnotes

1    The Court notes that, even when construed with the utmost of special liberality, Plaintiff's Second Amendment Complaint does not attempt to assert a claim against Defendants Ramsey and Blaisdell. For example, with regard to these two Defendants, Plaintiff alleges merely as follows: "The following staff responded to the Code (1) alert on August 4, 2009 [:] Sgt. Graf, C.O. M. Ramsey, Blasdell and another Officer unknown to Petitioner.... After medical staff patched me up with multiple bandages, I was sent to the SHU Housing because the Sgt. said that C.O. M. Ramsey was ordered to search

my cell A–7–4 and a weapon was found on the floor under my bed.... I was not present when my cell got searched, nor was I present when my cell got packed up. I did not retrieve my property until I arrived at Clinton Correctional Facility, and that was after I was housed in Clinton Correctional Facility for a month. By this time, all of my property was stolen and I lost most of my legal documents to develop the facts of my claim upon.... While at Auburn Correctional Facility, Sgt. Graf had received a phone call, unknown to the petitioner, where he informed petitioner that he had to be sent to SHU Housing Unit because an order was given to C.O. Ramsey to search petitioner's cell and a weapon was found under petitioner's bed.... Also, note C.O. Blaisdell was the office[r] I believe to retrieve the weapon." (Dkt. No. 20, at 4–5, 7, 9.) Indeed, in his responsive papers, Plaintiff suggests that he named Defendants Ramsey and Blaisdell merely so that they could testify at a trial in this action. (Dkt. No. 36 at 7.)

2    On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

3    *See also Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

---

**End of Document**                                            © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 188 of 220

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6644112

🚩 KeyCite Red Flag - Severe Negative Treatment

Report and Recommendation Adopted in Part, Rejected in Part by Sawyer v. New York State Dept. of Correctional Services, W.D.N.Y., October 28, 2015

2015 WL 6644112
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Trazz SAWYER, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES, Brian Fischer, Commissioner, Dept. of Corr. Services, Mark Bradt, former Superintendent of Elmira Corr. Facility, S.E. Racette, Superintendent, Elmira Corr. Facility, S.J. Wenderlich, Deputy Superintendent of Security, Raymond Coveny, Captain, Elmira Corr. Facility, Jeffrey Gray, Lieutenant, Elmira Corr. Facility, Sgt. Michael Backer, Sergeant, Elmira Corr. Facility, Tim Sewalt, Corr. Officer, Elmira Corr. Facility, D.J. Knuth, Corr. Officer, Elmira Corr. Facility, Jason Elliott, Corr. Officer, Elmira Corr. Facility, and Karen Bellamy, Director, Inmate Grievance Program, Defendants.

No. 11–CV–00152S(F).
|
Signed June 30, 2015.

**Attorneys and Law Firms**

Trazz Sawyer, Moravia, NY, pro se.

Eric T. Schneiderman, Attorney General, State of New York, Kathleen M. Kazcor, Assistant Attorney General, of Counsel, Buffalo, NY, for Defendants.

REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, United States Magistrate Judge.

### JURISDICTION

*1 This case was referred to the undersigned by Honorable William M. Skretny on October 29, 2014, for all pretrial matters including preparation of a report

and recommendation on dispositive motions. The matter is presently before the court on Defendants' motion to dismiss (Doc. No. 23), filed November 28, 2014.

### BACKGROUND

On February 23, 2011, Plaintiff Trazz Sawyer ("Plaintiff" or "Sawyer"), proceeding *pro se,* commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging Defendants, employees of New York State Department of Correctional Services ("DOCCS"),[1] at Elmira Correctional Facility ("Elmira" or "the correctional facility"), engaged in conduct resulting in numerous constitutional violations against Plaintiff. On March 7, 2012 (Doc. No. 8) ("March 7, 2012 Order"), District Judge Michael A. Telesca, *inter alia,* screened the Complaint pursuant to the criteria of 28 U.S.C. §§ 1915(e) and 1915A, dismissing some claims and Defendants, allowing other claims to proceed, and granting Plaintiff until April 12, 2012 to file any amended complaint, which the United States Marshal was directed to serve upon Defendants.

On April 20, 2012, Plaintiff filed the Amended Complaint (Doc. No. 9) ("Amended Complaint"), asserting nine claims for relief, including, as relevant here, Eighth Amendment claims for failure to protect, deliberate indifference and cruel and unusual punishment against former Superintendent of Elmira Mark Bradt ("Bradt"), Amended Complaint ¶¶ 27–30 ("Third Claim"), Lieutenant Jeffery Gray ("Gray"), Amended Complaint ¶¶ 36–38 ("Fifth Claim"), and Correctional Officer Jason Elliott ("Elliott"), Amended Complaint ¶¶ 64–69 ("Ninth Claim"). Plaintiff's Third Claim also alleges denial of due process by Defendant Bradt. Amended Complaint ¶ 30. On March 13, 2014 (Doc. No. 11) ("March 13, 2014 Order"), Judge Telesca stated "[t]he amended complaint has been screened by the Court with respect to the 28 U.S.C. §§ 1915(e) and 1915A criteria." March 13, 2014 Order at 1.

On August 6, 2014, a motion seeking dismissal of the action (Doc. No. 14) ("First Motion to Dismiss"), was filed by Defendants Backer, Coveny, Fischer, Knuth, Sewalt, and Wenderlich. On November 28, 2014, the instant motion seeking dismissal of the action (Doc. No. 23) ("Second Motion to Dismiss"), was filed by Defendants Bradt, Gray and Elliott

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 189 of 220

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6644112

(together, "Defendants"), supported by the attached Defendants' Memorandum of Law in Support of Motion to Dismiss (Doc. No. 23–1) ("Defendants' Memorandum"), and an appendix of unpublished decisions on which Defendants rely (Doc. No. 23–2) ("Unpublished Decisions Appendix"). On December 18, 2014, Plaintiff filed Plaintiff's Second Memorandum of Law in Opposition to Defendants Motion to Dismiss (Doc. No. 25) ("Defendant's Response").

In a Report and Recommendation filed December 23, 2014 (Doc. No. 26) ("December 23, 2014 R & R"), the undersigned recommended the First Motion to Dismiss be granted. No objections to the December 23, 2014 R & R were filed and, by text order entered January 14, 2015, District Judge William M. Skretny adopted the R & R (Doc. No. 27) ("January 14, 2015 Order"), and the action was dismissed as against Defendants Backer, Coveny, Fischer, Knuth, Sewalt, and Wenderlich. On February 20, 2015, Defendants filed Defendants' Memorandum of Law in Further Support of the Second Motion to Dismiss (Doc. No. 29) ("Defendants' Reply"). Oral argument was deemed unnecessary.

**\*2** Based on the following, Defendants' Second Motion to Dismiss should be GRANTED in part and DENIED in part.

## FACTS [2]

At all times relevant to this action, Plaintiff Trazz Sawyer ("Plaintiff" or "Sawyer"), was incarcerated at Elmira Correctional Facility ("Elmira" or "the correctional facility"). Plaintiff's claims against Defendants Bradt, Gray, and Elliott arise from an alleged scheme at the correctional facility in which certain unidentified DOCCS employees who worked in the correctional facility's mess hall were stealing boxes of meat from the correctional facility by transferring the food from the correctional facility to a state vehicle, and then to their personal vehicles by which the food was then driven to the thieving employee's homes. Plaintiff claims the thieving DOCCS employees shared some of the stolen food with other inmates in return for the inmates' cooperation by not reporting the thefts. Plaintiff claims that after Plaintiff reported the theft to other DOCCS employees, the inmates who had benefited from the alleged thefts made physical threats against Plaintiff, calling plaintiff

a "rat" and snitch," which DOCCS employees ignored. Plaintiff also filed several inmate grievances regarding the alleged threats against him, including a grievance of February 8, 2008 ("February 8, 2008 grievance"), none of which were found to have any merit.

At 11:00 A.M. on February 28, 2008, an unidentified gallery officer opened Plaintiff's cell door despite the fact that Plaintiff was not scheduled to attend any program at that time. Plaintiff looked out of the open cell door, and was attacked by two unidentified inmates who punched Plaintiff in the face and slashed him several times with a weapon, resulting in two deep cuts to Plaintiff's arm requiring 28 staples to close, as well as a cut to his chest and face ("the assault"). Plaintiff reported the assault to a corrections officer making his rounds, who arranged for Plaintiff to be escorted to the correctional facility's hospital, subsequent to which Plaintiff was placed in the correctional facility's Special Housing Unit ("SHU"). On February 29, 2008, Plaintiff was charged in an Inmate Misbehavior Report ("the Misbehavior Report") with self-harm based on the injuries Plaintiff sustained during the assault. On March 17, 2008, Plaintiff, following a Tier III Superintendent's Hearing, was found guilty of self-harm and sentenced to six months SHU confinement with loss of personal property and mail. Plaintiff ultimately served only 60 days in SHU during which he maintains he was served food that was tampered with and continued to receive threats, was harassed and was "poked with a needle like object" that caused Plaintiff further stress, *i.e.,* a fear of infection, until he was able to take an HIV/ AIDS test several months later. Amended Complaint ¶ 20. Plaintiff maintains he although knew "that making such outlandish sounding claims would make him sound not too mentally sound and like a person who would harm himself by cutting," it was clear no correctional officer truly believed Plaintiff was mentally unsound because Plaintiff was never offered mental or psychological care. *Id.*

**\*3** Plaintiff claims Defendant Bradt, as former Elmira Superintendent, supervised all DOCCS employees at the correctional facility, was aware of each grievance filed, and in receipt of Plaintiff's claim that a physical assault against him by other inmates was imminent, yet failed to appoint staff to properly investigate Plaintiff's complaints, failed to protect Plaintiff from the threatened assault and was deliberately indifferent to Plaintiff's risk of harm. According to Plaintiff, despite repeatedly complaining to

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6644112

Bradt, prior to the assault, that a "hit" had been placed on him and that corrections officers were calling Plaintiff a "snitch" and "rat" because Plaintiff had complained about the food theft, Bradt failed to provide Plaintiff with any protection. Amended Complaint ¶ 30. Plaintiff further maintains Bradt violated Plaintiff's Fourteenth Amendment due process rights by appointing to preside over the Tier III disciplinary hearing a hearing officer who had previously been appointed to investigate Plaintiff's food theft complaints against the hearing officer's co-workers and friends. *Id.* ¶ 29.

Plaintiff alleges that Defendant Gray investigated Plaintiff's grievances and claims prior to the assault, including a February 13, 2008 grievance, EL–984–08, concerning plots by officers and other inmates to harm Plaintiff, had information that Plaintiff had been labeled a "snitch" and "rat," and knew inmates so labeled were often assaulted such that Gray was aware of the need to protect Plaintiff from the threatened assault. Amended Complaint ¶¶ 36–37. According to Plaintiff, because Gray disliked Plaintiff for reporting the food theft, Gray was deliberately indifferent to the threats directed toward Plaintiff and then supported the self-harm Misbehavior Report to protect staff from culpability for the thefts. *Id.* ¶ 38.

With regard to Defendant Elliott, Plaintiff maintains that while housed in SHU following the assault, Elliott twice physically assaulted Plaintiff by pricking Plaintiff with a needle or needle-like object, and that following the second assault, Plaintiff noticed a small prick mark on his hand from which blood issued when squeezed. Amended Complaint ¶¶ 64–66. Plaintiff had to wait months for an HIV/AIDS test, the results of which were negative, but that Plaintiff suffered much stress while awaiting the test results. *Id.* ¶ 69.

### DISCUSSION

#### 1. Service of Amended Complaint

Preliminarily, although Defendants argue in support of their Second Motion to Dismiss that the Amended Complaint was not timely served, Defendants' Memorandum at 2–6, the undersigned, in the December 23, 2014 R & R, recommended this same argument made by Defendants in support of the First Motion to Dismiss be denied, December 23, 2014 R & R at 12–13, and

that recommendation was adopted by Judge Skretny. January 14, 2015 Order. Accordingly, that decision is now the law of the case and applies with equal force to the Second Motion to Dismiss. *Rezzonico v. H & R Block, Inc.,* 182 F.3d 144, 148 (2d Cir.1999) ( "The law of the case doctrine is similar to the issue preclusion prong of *res judicata* in that it limits relitigation of an issue once it has been decided."). Alternatively, although Plaintiff argued in opposition that the Amended Complaint was timely served, Plaintiff's Response at 4–6, Defendants, by failing in their Reply, filed February 20, 2015, to argue in further support of the argument have effectively conceded it. *See Ceglia v. Zuckerberg,* 2013 WL 1208558, at *20 (W.D.N.Y. Mar. 26, 2013) (citing cases), *report and recommendation adopted by* 2014 WL 1224574 (W.D.N.Y. Mar. 25, 2014), *aff'd,* 600 Fed.Appx. 34 (2d Cir. Apr. 20, 2015).

**\*4** Accordingly, Defendants' Second Motion to Dismiss should be DENIED insofar as Defendants challenge the service of the Amended Complaint as untimely.

#### 2. Motion to Dismiss

Defendants further argue in support of dismissal that Plaintiff has not stated a plausible claim against Defendants, asserting Plaintiff's claims against Bradt and Gray rely on *respondeat superior* without making the necessary showing of personal involvement, Defendant's Memorandum at 7–10, and that the injury Elliott allegedly inflicted on Plaintiff by the needle prick did not cause the requisite physical injury to support Plaintiff's claim for mental or emotional distress. *Id.* at 10. In opposition, Plaintiff asserts that the Amended Complaint alleges sufficient facts to state a claim against each Defendant, Plaintiff's Response at 6–8, including personal involvement in investigating Plaintiff's complaints by Bradt, *id.* at 8–9, and Gray, *id.* at 10–11, and that Plaintiff suffered the requisite physical harm to support an Eighth Amendment violation when Elliott used a needle to penetrate Plaintiff's skin. *Id.* at 11–12. In further support of dismissal, Defendants reiterate that Plaintiff has failed to show the requisite personal involvement of Defendants Bradt, Defendants' Reply at 2–4, and Gray, *id.,* at 4–5, and that administering a needle prick on two separate occasions is insufficient to satisfy the objective standard for an Eighth Amendment claim. *Id.* at 5–7.

On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b) (6)"), the court looks to the four corners

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 191 of 220

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6644112

of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor). The Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris,* 572 F.3d at 72 (quoting *Iqbal,* 556 U.S. at 678). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal,* 556 U.S. at 679).

**\*5** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Sykes v. Bank of America,* 723 F.3d 399, 403 (2d Cir.2013) (quoting *Ashcroft,* 556 U.S. at 678); *see Twombly,* 550 U.S. at 570 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face"). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 570. "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached, and any document upon which the complaint heavily relies." *ASARCO LLC v. Goodwin,* 756 F.3d 191, 198 (2d Cir.2014) (quoting *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir.2013)). *See Rothman v. Gregor,* 220 F.3d 81, 88–89 (2d Cir.2000) (considering the complaint to include "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference,"

as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit...."). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which render the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

In the instant case, Plaintiff, by attaching as exhibits to the original complaint numerous documents, including, *inter alia,* copies of letters sent and grievances filed by Plaintiff, which are not also attached as exhibits to the Amended Complaint and only generally referenced therein, has established that Plaintiff is, nevertheless, in possession of such documents. Furthermore, because the numerous letters exchanged between Plaintiff and Defendants, Plaintiff's February 8, 2008 grievance, the allegedly false Misbehavior Report charging Plaintiff with self-harm, and the resulting investigations conducted by Defendants regarding the grievances and Misbehavior Report provide the basis for Plaintiff's claims, the court considers the documents Plaintiff attached as exhibits to his original complaint as incorporated by reference into the Amended Complaint, allowing the court to consider them in analyzing Defendant's Second Motion to Dismiss. *Chambers,* 282 F.3d at 153; *Rothman,* 220 F.3d at 88–89.

## 3. Personal Involvement

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, for which a valid claim requires the plaintiff "must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d Cir.1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875–76 (2d Cir.1994)). Here, Plaintiff's claims include denial of due process in violation of the Fourteenth Amendment, and failure to protect and excessive force in violation of the Eighth Amendment.

**\*6** It is basic that a defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to liability in a § 1983 action. *Spavone v. New York State Dept. of Correctional Services,* 719 F.3d 127, 135 (2d Cir.2013) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). A supervisor's liability in a § 1983 action "cannot rest on respondeat superior." *Richardson*

*v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (citing cases)). "To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violation." *Id.* (citing *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995)). "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Id.* (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985), and citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting a § 1983 defendant may not be held liable for constitutional violations merely because he holds a position of high authority)). Instead, the requisite personal involvement

> "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring."

*Id.* (quoting *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003)).

### 4. Defendant Bradt

Plaintiff claims Defendant Bradt, as former Elmira Superintendent who supervised all DOCCS employees at the correctional facility, was aware of Plaintiff's grievance complaining corrections officers were calling Plaintiff a "snitch" and "rat" for complaining about theft of food, and that a physical assault against him by other inmates was imminent, yet failed to appoint staff to properly investigate Plaintiff's complaints, failed to protect Plaintiff from the threatened assault and was deliberately indifferent to Plaintiff's situation. Amended

Complaint ¶¶ 27–28, 30. Plaintiff further maintains Bradt violated Plaintiff's Fourteenth Amendment due process rights by appointing to preside over the Tier III disciplinary hearing regarding the allegedly false Misbehavior Report charging Plaintiff with self-harm, a hearing officer who had previously been appointed to investigate Plaintiff's food theft complaints against the hearing officer's co-workers and friends. *Id.* ¶ 29.

Defendants move to dismiss the claims against Bradt for lack of personal involvement, asserting Plaintiff's Eighth Amendment claim against Bradt is based on respondeat superior which is insufficient for liability under § 1983. Defendants' Memorandum at 7–9. In opposition, Plaintiff argues Bradt was obligated, upon learning of the threats to Plaintiff, to take steps to ensure Plaintiff's safety. Plaintiff's Response at 8–9. Plaintiff further maintains that because 2,000 inmates are housed at Elmira, it was not reasonable to expect Plaintiff to identify by name the inmates who assaulted him. *Id.* at 9. In further support of dismissal, Defendants characterize Plaintiff's allegations against Bradt as "conclusory statements," asserting that Bradt's mere receipt of Plaintiff's letters complaining about threats and conditions of confinement which Bradt forwarded and ordered investigations, is insufficient to hold Bradt liable for the alleged constitutional deprivations. Defendants' Reply at 2–3. Defendants further maintain that Plaintiff's admission in his responding papers that he did not know the identity of the inmates who were planning to assault Plaintiff underscores the insufficient detail to state a claim against Bradt for failing to protect Plaintiff from the assault. *Id.* at 4.

**\*7** To establish a constitutional violation under the Eighth Amendment, an inmate must meet both an objective and subjective requirement. *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citing cases). The objective requirement is met where the alleged violation is "sufficiently serious" by objective standards. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (quoting *Wilson v.. Seiter,* 501 U.S. 294, 298 (1991)). The subjective prong requires the inmate allege facts which, if true, would establish a prison official was deliberately indifferent to his health or safety. *Farmer,* 511 U.S. at 837. The Eighth Amendment also "imposes a duty on prison officials 'to take reasonable measures to guarantee the safety of inmates in their custody.' " *Garcia v. Witkowski,* 988 F.Supp.2d 360, 361 (W.D.N.Y.2013) (quoting *Hayes v.*

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 193 of 220

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6644112

*New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 832–33))). "A failure-to-protect claim requires a showing that prison officials acted with 'deliberate indifference' to the inmate's safety." *Id.* (citing *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988)). A prison official acts with deliberate indifference toward an inmate's safety only if the official, despite knowledge that the inmate faces a substantial risk of serious harm, disregards that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 835–37. *See Garcia,* 988 F.Supp.2d at 362 ("in failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety."). Neither mere negligence nor a prison guard's mere failure to act reasonably is enough to state an Eighth Amendment deliberate indifference claim. *Garcia,* 988 F.Supp.2d at 362 (citing *Pope v. Shafer,* 86 F.3d 90, 92 (7th Cir.1996)). Instead, the inmate must show "actual or imminent harm." *Benjamin v. Fraser,* 343 F.3d 35, 41 n. 17 (2d Cir.2003) (quoting *Lewis v. Casey,* 518 U.S. 343, 350 (1996)), *overruled on other grds., Caiozzo v. Koreman,* 581 F .3d 63 (2d Cir.2009).

Insofar as Plaintiff claims Bradt, as the recipient of Plaintiff's letters complaining about threats and conditions of confinement, failed to properly investigate such complaints and is thus responsible for the assault, Amended Complaint ¶¶ 28–28, 30, mere receipt of a letter is insufficient to establish the requisite personal involvement for § 1983 liability; rather, personal involvement may be found were a supervisory official receives and acts on or undertakes an investigation of the inmate's complaint or grievance. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009). Nor is the forwarding of a letter to a subordinate for investigation and response sufficient to hold the prison official personally involved in the alleged constitutional deprivation. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). Significantly, Plaintiff fails to allege any facts establishing that Bradt became personally involved in the investigation into the matters raised by Plaintiff's letters of complaint. *Rivera,* 655 F.Supp.2d at 238. Furthermore, not only has Plaintiff failed to allege, but the letters and grievances Plaintiff filed do not reveal that Plaintiff ever asserted a physical attack was imminent such that Bradt cannot be found to have known that Plaintiff was being threatened by certain inmates with "actual or imminent harm." *Benjamin,* 343 F.3d at 41 n. 17. As

such, Defendants' Second Motion to Dismiss should be GRANTED at to the Eighth Amendment claim against Bradt because Plaintiff has failed to plead facts which, liberally construed in favor of Plaintiff, could plausibly establish the requisite personal involvement of Bradt in the alleged Eighth Amendment violations.

**\*8** Nor does the Amended Complaint adequately allege a Fourteenth Amendment due process violation against Bradt based on Bradt's appointing as the hearing officer for the Tier III disciplinary hearing held on the Misbehavior Report falsely charging Plaintiff with self-harm a DOCCS employee who had previously been directed to investigate the food theft complaints Plaintiff made against the hearing officer's coworkers and friends such that the hearing officer was biased against Plaintiff. Amended Complaint ¶ 29. Defendants argue in support of summary judgment that Plaintiff fails to allege Bradt's personal involvement in the investigation of the Misbehavior Report and disciplinary hearing and thus fails to establish Bradt knew Plaintiff's due process rights were being violated. Defendants' Memorandum at 9. Plaintiff does not offer any argument in opposition to dismissal of this claim.

"Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). "[R]egardless of state procedural guarantees, the only process due an inmate is that minimal process guaranteed by the Constitution as outlined in *Wolff.*" *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004). As such, a violation of a state prison regulation during a prison disciplinary hearing does not give rise to a § 1983 due process claim. *Blouin v. Spitzer,* 356 F.3d 348, 363 (2d Cir.2004) ( "federal law, not state regulations, determined the procedures necessary to protect that liberty interest ."). Prison inmates nevertheless are "entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004). In particular, "an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary action taken." *Sira,* 380 F.3d at 69.

Although Plaintiff does allege that he was denied at the Tier III disciplinary hearing a "fair and impartial hearing officer," *Sira,* 380 F.3d at 69, Plaintiff's Fourteenth Amendment due process claim should be dismissed because Plaintiff's 60–day confinement in SHU [3] did not constitute the requisite denial of a liberty interest within the meaning of *Sandin v. Conner,* 515 U .S. 472, 484 (1995) (holding inmate does not suffer the deprivation of a liberty interest supporting a Fourteenth Amendment due process violation based on a prison disciplinary hearing unless the subsequent punishment imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."). Here, Plaintiff does not allege the SHU conditions in which he was held upon being found guilty on the Misbehavior Report charging him with self-harm were any more extreme than generally encountered in SHU such that Plaintiff's 60–day confinement in SHU is too short to establish the requisite deprivation of a liberty interest. *See Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000) ("The longest confinement in normal SHU conditions that we have ruled was not shown to meet the *Sandin* standard was 101 days."). Accordingly, Defendants' Second Motion to Dismiss should be GRANTED as to Plaintiff's Fourteenth Amendment due process claim against Bradt.

**5. Defendant Gray**

**\*9** Plaintiff alleges that because Defendant Gray investigated Plaintiff's grievances and claims prior to the assault, had information that Plaintiff had been labeled a "snitch" and "rat," and knew inmates so labeled were often assaulted, Gray was aware of the need to protect Plaintiff from the threatened assault, but because Gray disliked Plaintiff for reporting the food theft, Gray was deliberately indifferent to the threats directed toward Plaintiff and then supported the self-harm Misbehavior Report to protect staff from culpability for the thefts. Amended Complaint ¶¶ 36–38. Defendants argue in support of dismissal that Plaintiff fails to allege facts sufficient to establish Gray's personal involvement, such as that Plaintiff ever requested protection from Gray prior to the assault, that Gray knew an attack was imminent, or that Gray had any ability or authority to place Plaintiff in protective custody for an undefined harm. Defendants' Memorandum at 9. Nor does Plaintiff allege facts to establish Gray knew the identity of Plaintiff's attackers or their intent to attack Plaintiff,

had the ability to prevent the assault, or even that Gray was at work when Plaintiff was assaulted. *Id.* Defendants maintain that Plaintiff essentially is alleging that Gray's investigation of Plaintiff's February 8, 2008 grievance somehow vested Gray with knowledge of and imputed wrongdoing for failure to protect Plaintiff from the assault, which Defendants further maintain is too attenuated to state a plausible Eighth Amendment claim based on a failure to protect. *Id.* at 9–10. Plaintiff argues in opposition that Gray knew an attack on Plaintiff was imminent because Plaintiff filed multiple grievances asserting physical threats were being made against him, and Plaintiff also told Gray "face-to-face" that some of the DOCCS employees were stealing food. Plaintiff's Response at 10. Nevertheless, according to Plaintiff, Gray ignored the threats because he wanted Plaintiff to be assaulted as punishment for reporting the food thefts. *Id.* In further support of dismissal, Defendants reiterate that Plaintiff fails to allege Gray denied any requests from Plaintiff for protection, that Gray knew an attack on Plaintiff was imminent, that by investigating one grievance, Gray became personally involved in protecting Plaintiff from the undefined future assault, or that Gray had any ability to prevent the assault on Plaintiff. Defendants' Reply at 4–5. Defendants further maintain that insofar as Plaintiff claims that Gray's failure to protect Plaintiff was motivated by Gray's desire to punish Plaintiff for reporting that other DOCCS employees were stealing food could be construed as retaliation, Plaintiff fails to allege the requisite causal connection between Gray's investigation of the February 8, 2008 grievance and the opening of his cell door on February 28, 2008, just prior to the attack. *Id.* at 5.

A plain reading of the Amended Complaint establishes it fails to allege sufficient personal involvement by Gray in any Eighth Amendment failure to protect claim, and also fails to allege the requisite causal connection to state a claim for retaliation. In particular, although Plaintiff alleges that Gray, despite being advised by Plaintiff that unidentified inmates were threatening to attack him, yet failed to take steps to protect the inmate from a physical attack, an Eighth Amendment claim based on an alleged failure to protect requires not mere conclusory statements that a defendant was aware of threats to an inmate's personal safety, but that the inmate show "actual or imminent harm." *Benjamin,* 343 F.3d at 41 n. 17. *See* Discussion, *supra,* at 13–14. Here, Plaintiff failed to allege, and the February 8, 2008 grievance Plaintiff

Case 9:19-cv-00428-BKS-TWD  Document 8  Filed 05/09/19  Page 195 of 220

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6644112

filed concerning plots involving physical threats toward Plaintiff, and which Plaintiff alleges Gray investigated, failed to reveal that Plaintiff ever asserted a physical attack was imminent such that Gray cannot be found to have known that Plaintiff was being threatened by certain inmates with "actual or imminent harm." *Benjamin, 343 F.3d at 41 n 17.* Nor do any of the other letters and grievances Plaintiff attached as exhibits to the original complaint show Plaintiff was complaining of any threat of imminent harm or by any specific inmate or correctional facility staff member. Rather, most of the documents filed as exhibits are dated after the February 28, 2008 assault, and the few that pre-date the assault do not mention any specific threat. Accordingly, Defendants' Second Motion to Dismiss should be GRANTED as to Plaintiff's claim alleging an Eighth Amendment violation against Gray for failing to protect Plaintiff from the February 28, 2008 assault.

**\*10** Furthermore, insofar as the Amended Complaint can be construed as alleging Gray's failure to protect Plaintiff was motivated by Gray's desire to punish Plaintiff for reporting that other DOCCS employees were stealing food could be construed as retaliation, Plaintiff fails to allege the requisite causal connection between Gray's investigation of the February 8, 2008 grievance and the opening of his cell door on February 28, 2008, just prior to the attack. Defendants' Second Motion to Dismiss should thus be GRANTED as to any retaliation claim against Gray.

## 6. Defendant Elliott

Plaintiff claims that while housed in SHU following the assault, Elliott, in violation of the Eighth Amendment's prohibition against cruel and unusual punishment, twice physically assaulted Plaintiff by pricking Plaintiff with a needle or needle-like object, and that Plaintiff suffered much stress during the two-month period Plaintiff had to wait for the results of an HIV/AIDS test. Amended Complaint ¶¶ 64–66, 69. Defendants, in support of dismissal of this claim, rely on the Prisoner's Litigation Reform Act ("PLRA"), *42 U.S.C. § 1997e*[e], providing as relevant that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing or physical injury...." Defendants' Memorandum at 10. As such, Defendants maintain that because Plaintiff is suing for mental or emotional harm unrelated to a physical injury, the claim

must be dismissed. *Id.* In opposition to dismissal, Plaintiff maintains that when Elliott pricked him twice with a needle, breaking his skin, he suffered the requisite physical injury to state a claim for mental suffering under the PLRA. Plaintiff's Response at 1112. In further support of dismissal, Defendants maintain that the needle pricks of which Plaintiff complains posed no more than a *'de minimis* injury' which is insufficient to support an Eighth Amendment claim. Defendants' Reply at 6.

It is settled that not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson v. McMillian,* 503 U.S. 1, 9–10 (2d Cir.1992) (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " *Hudson,* 503 U.S. at 9–10 (quoting *Whitley v. Albers,* 475 U.S. 312, 327 (1986)). Nevertheless, the deliberate stabbing of an inmate with a needle has been held sufficient to allege an Eighth Amendment violation. *See, e.g., Wills v. Haines,* 20 Fed.Appx. 573, 573–74 (8th Cir. Sept. 26, 2001) (allegation that prison nurse deliberately stabbed prison inmate with a needle because she was angry with him sufficiently stated Eighth Amendment claim). Significantly, unlike the *de minimis* injury resulting from a push or a shove, the resulting injury from a needle prick can subject the injured inmate to such serious and uncurable conditions as *hepatitis* or HIV, as is evident from the fact that Plaintiff was given an HIV/AIDS test following the incident. Furthermore, because Plaintiff's claim against Elliott as alleged in Plaintiff's 12th claim in the original complaint is essentially identical to Plaintiff's ninth claim alleged against Elliott in the Amended Complaint, Judge Telesca's determination that "[t]o the extent that Claim # 12 [of the original complaint] describes the alleged needle assault on plaintiff, it states an excessive force claim and may proceed against defendant Elliott," March 7, 2012 Screening Order at 21–22, is now the law of the case. *See* Discussion, *supra,* at 7.

**\*11** Accordingly, Defendants' Second Motion to Dismiss should be DENIED as to the Eighth Amendment claim against Elliott.

## 7. Dismissal with Prejudice

Case 9:19-cv-00428-BKS-TWD  Document 8  Filed 05/09/19  Page 196 of 220
**Sawyer v. New York State Depat. of Correctional Services, Not Reported in F.Supp.3d...**
2015 WL 6644112

Although not discussed by the parties, the Amended Complaint should be dismissed with prejudice and without leave to file a further amended complaint with regard to Defendants Bradt and Gray. In particular, "a *pro se* complaint 'should not [be] dismiss[ed] without [the Court] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated.' " *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991) (bracketed material in original)). Nevertheless, dismissal may be with prejudice and without leave to amend where " 'the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.' " *Id.* (quoting *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999)). Here, the factual basis alleged in support of the claims asserted in the Amended Complaint against Defendants Bradt and Gray, along with Plaintiff's arguments made in opposition to Defendants' Second Motion to Dismiss seeking the dismissal of such claims, demonstrates the absence of any possibility that Plaintiff, if permitted to file a further amended complaint, could state a plausible claim for relief against any of these Defendants. Accordingly, the claims against Defendants Bradt and Gray should be DISMISSED with prejudice.

## CONCLUSION

Defendants' Second Motion to Dismiss (Doc. No. 23), should be GRANTED in part and DENIED in part;

the Amended Complaint should be DISMISSED with prejudice as against Defendants Bradt, and Gray, but should not be dismissed against Defendant Elliott.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the Plaintiff and the attorneys for the Defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6644112

Footnotes

1   On April 1, 2011, the New York State Department of Correctional Services and Division of Parole merged into one agency entitled the New York State Department of Corrections and Community Supervision, referred to as "DOCCS."

2   Taken from the pleadings and motion papers filed in this action.

3   Plaintiff, in connection with the guilty disposition on the Misbehavior Report, was sentenced to six months confinement in SHU, but served only 60 days.

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6641471

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 197 of 220

2015 WL 6641471
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Trazz SAWYER, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES et al., Defendants.

No. 11–CV–152S(F).
|
Signed Oct. 27, 2015.
|
Filed Oct. 28, 2015.

**Attorneys and Law Firms**

Trazz Sawyer, Attica, NY, pro se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY, for Defendants.

**DECISION AND ORDER**

WILLIAM M. SKRETNY, District Judge.

**I. INTRODUCTION**

*1 Presently before this Court are the parties' objections to the June 30, 2015 Report and Recommendation of the Honorable Leslie G. Foschio, United States Magistrate Judge, on the motion to dismiss of Defendants Bradt, Elliott, and Gray. (Docket Nos. 23, 30, 31, 35.)

The Plaintiff commenced this civil rights action *pro se* pursuant to 42 U.S.C. § 1983 on February 23, 2011. Plaintiff was subsequently directed to file additional documentation in support of his motion to proceed *in forma pauperis,* which he timely filed; however, leave to so proceed was not granted until March 7, 2012. At that time, the Honorable Michael A. Telesca, United States District Judge, dismissed several claims and several defendants from the action with prejudice and directed Plaintiff to file an Amended Complaint to correct several claims by April 12, 2012. If Plaintiff failed to do so, the United States Marshals were directed to serve copies of Plaintiff's original summons, complaint, and Judge Telesca's order

on the remaining Defendants, including Bradt, Elliott, and Gray. (Docket No. 8.)

An Amended Complaint was received on April 20, 2012 and subsequently accepted as timely filed. *See Kalican v. Dzurenda,* 583 F. App'x 21, 23 (2d Cir.2014) (citing *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (pro se prisoner's complaint considered filed when given to prison officials for mailing)); (*see* Docket No. 9 at 25 (Plaintiff's assertion that a copy of the Amended Complaint was given to officials for mailing on April 8, 2012).). Nonetheless, nothing further occurred until March 2014 when Judge Telesca issued an order stating that "[t]he amended complaint has been screened by the Court with respect to the 28 U.S.C. § 1915(e) and 1915A criteria" without elaboration and directing the U.S. Marshals to serve the summons and Amended Complaint. (Docket Nos. 11, 12 (duplicate orders were filed).)

All Defendants except Bradt, Gray, and Elliot were served on June 6, 2014, and a motion to dismiss the complaint was filed on behalf of the served Defendants on August 6, 2014 ("first motion to dismiss"). (Docket Nos. 13, 14.) Plaintiff moved for an order directing the Attorney General's Office to disclose the addresses or whereabouts of Defendants Bradt, Gray, and Elliott on August 18, 2014, and Magistrate Judge Scott, to whom this matter was then referred, directed the Attorney General's Office to confirm whether it would represent these Defendants and, if so, whether service was waived. (Docket Nos. 16, 19.) The matter was then reassigned to Magistrate Judge Foschio. (Docket No. 20.) The Assistant Attorney General confirmed on November 7, 2014, that the Office would be representing Bradt, Gray, and Elliott, waived service on their behalf, and then filed the present motion to dismiss on November 28, 2014. (Docket No. 2123.) In his Report and Recommendation granting the first motion to dismiss, which was subsequently accepted by this Court, Judge Foschio expressly stated that because the motion to dismiss of Bradt, Gray, and Elliott was not yet fully briefed, it would not being considered at that time. (Docket Nos. 26 at 5 n. 2; 27.)

*2 On June 30, 2015, Judge Foschio issued a Report and Recommendation on the present motion to dismiss, recommending that the motion be granted with the exception of Plaintiff's Eighth Amendment claim against Defendant Elliott. (Docket No. 30.)

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...
Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 198 of 220
2015 WL 6641471

# II. DISCUSSION

Pursuant to 28 U.S.C. § 636(b)(1)(C), any party may serve and file written objections to a report and recommendation of a magistrate judge within fourteen days after being served with a copy. Local Rule of Civil Procedure 72(b) further requires that written objections to a magistrate judge's report "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." After *de novo* review of those portions of the report and recommendation to which proper objections are made, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Gardin,* 451 F.Supp.2d 504, 506 (W.D.N.Y.2006). Here, both parties have filed objections to Judge Foschio's June 30, 2015 Report and Recommendation.

## A. Timeliness of Service of Defendants Brandt, Gray, and Elliott

The present Defendants moved to dismiss the complaint pursuant to Rule 4(m) of the Federal Rules of Civil Procedure due to Plaintiff's failure to timely serve the Amended Complaint. Judge Foschio rejected this argument because: (1) he had previously considered and rejected this argument on the first motion to dismiss, and as that recommendation was adopted by this Court, that determination was now the law of the case and applied with equal force to the present Defendants; (2) he was precluded from reconsidering Judge Telesco's March 2014 Decision and Order that directed service on Defendants; and (3) by failing to provide further support for this argument in their reply brief following Plaintiff's opposition on this issue, Defendants effectively conceded this argument. Defendants object to all three conclusions, and continue to assert that dismissal is warranted for the failure to effect timely service.

Initially, this Court agrees with Defendants that the magistrate judge was not compelled to reject the timeliness argument for the reasons stated in the Report and Recommendation. This motion pertains to different Defendants with different facts relevant to service. The law of the case doctrine, in addition to being discretionary, *see Pescatore v. Pan American World Airways,* 97 F.3d 1, 8 (2d Cir.1996), does not control different factual situations or different parties. *See Weslowski v. Zugibe,*–F. Supp.3d —, 2015 WL 1455857, *6 (S.D.N.Y.2015) (collecting cases); *East End Eruv Ass'n, Inc. v. Town of Southampton,* No. 13–4810(AKT), 2014 WL 4826226, 13 (E.D.N.Y. Sept.24, 2014). Further, unlike where a non-movant fails to address an argument raised in a motion, there is no reason here to find that Defendants' failure to address this issue in a discretionary reply amounts to a waiver of this argument. *See generally* Local Rule of Civil Procedure 7(a)(2)(A) (a moving party may, but is not required to, file a reply memorandum).

**\*3** Defendants are also correct that Judge Telesca did not consider whether Plaintiff timely effected service in his March 2014 order. However, Defendants' argument is nonetheless without merit because Plaintiff was proceeding *pro se* and *in forma pauperis.* In order to protect a *pro se* plaintiff from confusion or delay, the time in which that plaintiff must effect service is tolled during the pendency of an *in forma pauperis* application. *See Sidney v. Wilson,* 228 F.R.D. 517, 522–23 (S.D.N.Y.2005); *see generally Toliver v. Sullivan County,* 841 F.2d 41, 42 (2d Cir.1088). Once granted *in forma pauperis* status, Plaintiff was entitled to rely on the U.S. Marshals for service. *See Walker v. Schult,* 717 F.3d 119, 123 n. 6 (2d Cir.2013) (citing *Wright v. Lewis,* 76 F.3d 57, 59 (2d Cir.1996) (once *in forma pauperis* status is granted, the responsibility for service shifts from the plaintiff to the court)). The Marshals were not ordered to do so until the Court conducted its requisite review of the Amended Complaint pursuant to 28 U.S.C. § 1915(e) and § 1915A— a review that was not conducted until March 2014. Thus, the delay here was unfortunately caused by the Court, not Plaintiff. Further, unlike *Terry v. Village of Ossining,* on which Defendants rely, here Plaintiff was not only entitled to rely on the Marshals for service, he also consistently updated the Court on his current address, completed an acknowledgment of service, and timely moved for an order directing the disclosure of the location of Defendants Bradt, Gray, and Elliott. *Cf. Terry,* No. 12 Civ. 5855(ER), 2013 WL 5952834, *5 (S.D.N.Y. Nov.5, 2013) (dismissal of *pro se* complaint warranted where plaintiff was not entitled to rely on the Marshals for service and failed to contact or update the court with his current address). Defendants' motion to dismiss due to Plaintiff's failure to comply with Rule 4(m) is therefore denied.

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 199 of 220

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6641471

## B. Eighth Amendment Claim against Defendant Elliott

Defendants further object to Judge Foschio's conclusion that Plaintiff sufficiently stated an Eighth Amendment violation claim against Defendant Elliott. Plaintiff alleges that on or about April 8, 2008, Defendant Elliott escorted Plaintiff to the shower with Plaintiff handcuffed behind his back. (Am Compl ¶ 65.) As the handcuffs were removed, "Elliott pricked him with a needle or needle-like object." (Am Compl ¶ 65.) After being escorted back to his cell, Plaintiff "once again felt pricked by a needle or needle like object" when the handcuffs were removed, "and found when he examined his hand, a small prick mark that issued blood when squeezed." (Am Compl ¶ 66.) Plaintiff further alleges that he "had to wait months before he could get an HIV/AIDS test (which returned negative), but the wait and the unknown was very stressful and the needle/pin extraction point did hurt, maybe more than it should have because such an outrageous act can affect a person psychologically." (Am Compl ¶ 69.) As a result, Plaintiff seeks compensatory and punitive damages.

**\*4** Initially, this Court agrees with Defendants that dismissal of this claim is not barred by Judge Telesca's earlier decisions. *See Cusamano v. Sobek*, 604 F.Supp.2d 416, 435 n. 29 (N.D.N.Y.2009) (a court's initial screening pursuant to § 1915(e) and/or § 1915A does not preclude a later dismissal of that complaint under Fed.R.Civ.P. 12(b)(6)).

Defendants next object on the ground that Judge Foschio failed to appropriately consider Plaintiff's claim in light of 42 U.S.C. § 1997e(e). This section of the Prison Litigation Reform Act provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." A prisoner plaintiff is therefore precluded from recovering compensatory damages for mental or emotional injury for a constitutional violation, including an Eighth Amendment violation, in the absence of a showing of actual physical injury. *Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir.2002). Although "there is no statutory definition of 'physical injury' as used in section 1997e(e)," the Second Circuit has held that a plaintiff's physical injury must be "more than *de minimis*." *Liner v. Goord*, 196 F.3d 132, 135 (2d Cir.1999) (citing *Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir.1997)).

Here, Plaintiff himself frames his claim as one based on the mental and emotional stress resulting from the alleged incident. (Am Compl ¶¶ 65–69.) Further, although he claims his hand did "hurt" without elaboration, the alleged physical result is merely *de minimus*—indeed, Plaintiff himself was unsure at first if anything in fact happened. Accordingly, Plaintiff's claim for compensatory damages must be dismissed. However, dismissal of the claim in its entirety is not necessarily warranted. Section 1997e(d) does not preclude a plaintiff from seeking non-compensatory relief, including nominal damages, injunctive and declaratory relief, and punitive damages. *Thompson*, 284 F.3d at 418. Because Defendants' argument that dismissal of the claim against Elliott relies solely on the preclusive effect of § 1997e(e) and does not address whether a claim for nominal or punitive damages (which Plaintiff has requested) has been stated, the claim will not be dismissed in its entirety at this time.

## C. Plaintiff's Objection

Plaintiff argues generally that there were sufficient allegations of personal involvement on the behalf of "superiors" and "commanding officers" to state a claim. This argument fails to "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection." Local Rule of Civil Procedure 72(b). Where, as here, only general or conclusory objections to a report and recommendation are made, review for only clear error is appropriate. *See Singh v. N.Y.S. Dep't of Taxation & Finance*, 865 F.Supp.2d 344, 348 (W.D.N.Y.2011). Having so reviewed Judge Foschio's report and recommendation with respect to Plaintiff's claims against Defendants Bradt and Gray, no clear error is found.

## III. CONCLUSION

**\*5** Plaintiff's claim against Defendant Elliott will not be dismissed insofar as it seeks nominal or punitive damages. Defendants' motion to dismiss the Amended Complaint is granted with respect to all other claims.

## IV. ORDERS

Sawyer v. New York State Dept. of Correctional Services, Not Reported in F.Supp.3d...

2015 WL 6641471

IT HEREBY IS ORDERED that the June 30, 2015 Report and Recommendation of Magistrate Judge Foschio (Docket No. 30) is ACCEPTED with respect to his recommendation regarding Plaintiff's claims against Defendants Bradt and Gray and otherwise VACATED;

FURTHER, that Defendants' Objections (Docket No. 31) are GRANTED in part and DENIED in part;

FURTHER, that Plaintiff's Objection (Docket No. 35) is DENIED;

FURTHER, that the motion to dismiss of Defendants Brandt, Gray, and Elliott (Docket No. 23) is GRANTED IN PART and DENIED IN PART as stated above.

FURTHER, that the Clerk of the Court is DIRECTED to terminate Brandt and Gray as defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6641471

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

2017 WL 3913018
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William D. THOMAS, Plaintiff,

v.

L. PINGOTTI; et al., Defendants.
William D. Thomas, Plaintiff,

v.

Polizzi; et al., Defendants.

9:17-CV-0300 (GTS/DEP)
|
9:17-CV-0377 (GTS/ATB)
|
Signed 09/06/2017

**Attorneys and Law Firms**

WILLIAM D. THOMAS, Plaintiff, pro se, 13-A-2123,
Downstate Correctional Facility, Box F, Fishkill, NY
12524.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

## I. INTRODUCTION

**\*1** The Clerk of the Court has sent to the Court for
review two complaints filed pro se by plaintiff William D.
Thomas in the above-captioned actions. [1] Plaintiff, who
is confined at Downstate Correctional Facility, asserts
claims arising out of his confinement at Shawangunk
Correctional Facility ("Shawangunk C.F.") in 2016.
Plaintiff has not paid the filing fee in either action, and
seeks leave to proceed in forma pauperis ("IFP").

## II. Duplicative Actions

A court reviewing a complaint pursuant to 28 U.S.C.
§ 1915(e)(2) and 28 U.S.C. § 1915A may properly
consider whether the claims asserted by the plaintiff are
duplicative of claims asserted in another action. [2] As
the Second Circuit has recognized, "plaintiffs have no
right to maintain two actions on the same subject in
the same court, against the same defendant at the same
time." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138-39 (2d
Cir. 2000). The principles which guide courts addressing

duplicative and repetitive claims rest on considerations
of "(w)ise judicial administration, giving regard to
conservation of judicial resources and comprehensive
disposition of litigation." *Kerotest Mfg. Co. v. C-O-Two
Fire Equip. Co.*, 342 U.S. 180, 183 (1952). The doctrine
is also meant to protect parties from "the vexation of
concurrent litigation over the same subject matter." *Adam
v. Jacob*, 950 F.2d 89, 93 (2d Cir. 1991). Thus, "[c]ourts
generally look to the identity of the parties, legal claims,
factual allegations including temporal circumstances, and
the relief sought to determine if the complaint is repetitive
or malicious." *Hahn v. Tarnow*, No. 06-CV-12814, 2006
WL 2160934, at *3 (E.D. Mich. July 31, 2006).

In managing the litigation in its court, there are several
approaches to the proper disposition of duplicative
actions, including dismissal without prejudice, and
consolidation. *Curtis*, 226 F.3d at 138. The district court
has broad discretion in making this determination, and
the exercise of its power is reviewed by the Court of
Appeals for abuse of discretion. *Id.*; *see also Lopez v.
Ferguson*, 361 Fed.Appx. 225, 226 (2d Cir. 2010) ("We
review a district court's dismissal of claims as duplicative
for abuse of discretion."); *Johnson v. Celotex Corp.*, 899
F.2d 1281, 1284-85 (2d Cir. 1990) ("The trial court has
broad discretion to determine whether consolidation is
appropriate.").

**\*2** The pleading submitted by plaintiff in *Thomas
I* is styled as a "Complaint under [New York] Civil
Service Law Section 75." *See* Dkt. No. 1 at 5. [3]
While nominally directed towards Shawangunk C.F.
Acting Supt. Pingotti, the pleading identifies sixteen
additional corrections and medical staff as "respondents"
and alleges numerous claims of misconduct by those
individuals during plaintiff's confinement at Shawangunk
C.F. in 2016. *Id.* at 5-9. Liberally construed, plaintiff
claims that he has been subjected to adverse actions in
retaliation for his having filed grievances and complaints
(related primarily to his participation in the Sex Offender
Treatment Program ("SOTP")), disciplined without due
process, denied proper and adequate mental health care,
and denied proper investigation of and redress for the
misconduct complained of his grievances.

In *Thomas* II, plaintiff submitted a twenty-five page
complaint utilizing the form civil rights complaint
available to litigants in the Northern District of New
York. *See* Dkt. No. 1 ("Compl."). All seventeen of the

2017 WL 3913018

defendants named in *Thomas* I are defendants in this complaint. *Id.* at 1-7. The complaint in *Thomas* II sets forth, with some additional factual support, the instances of misconduct complained of in *Thomas* I, as well as additional claims and three additional defendants. *Id.* at 9-23.[4] Plaintiff seeks an award of compensatory and punitive damages as well as declaratory and injunctive relief. *Id.* at 24-25.

Upon review of the two pleadings, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist. To the extent that these actions differ in any significant way, the differences arise only from the additional claims and defendants in *Thomas* II. The Court also finds that the pleading in *Thomas* II sets forth plaintiff's claims in a more comprehensive and well-organized manner than does the pleading in *Thomas* I which, as noted, purports to be a state court petition under Civil Service Law Section 75.

Based upon the foregoing, and in order to conserve judicial resources and avoid duplicative litigation, the Court hereby dismisses *Thomas* I without prejudice in favor of *Thomas* II.[5]

### III. IFP STATUS

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[6] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

**\*3** Upon review, the Court finds that plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility, *see* Dkt. No. 10, and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. Dkt. No. 3.

Accordingly, plaintiff's application to proceed with this action IFP is granted.

### IV. SUFFICIENCY OF THE COMPLAINT

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from officers and employees of a governmental entity, the Court must consider the sufficiency of the allegations set forth in his complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[7] Similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both Sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a complaint, the Court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

**\*4** Plaintiff seeks relief in this action pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that Section 1983 "is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). To be held liable for damages in a Section 1983 action, a defendant must have been personally involved in the alleged violation. *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). Thus, to set forth a cognizable claim under Section 1983, a "plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)).

Plaintiff asserts numerous claims for the violation of his rights protected under the First, Eighth, and Fourteenth Amendments to the U.S. Constitution. The sufficiency of those claims, as set forth in the complaint in seven causes of action, is addressed below.

### A. First Cause of Action—Retaliation

To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff.

*Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The Second Circuit has long instructed that because virtually any adverse action taken against a prisoner by a prison official can be characterized as a constitutionally proscribed retaliatory act, courts must examine claims of retaliation with "skepticism and particular care." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes*, 239 F.3d at 491). Analysis of retaliation claims thus requires thoughtful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the factual allegations tending to link the two. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Here, plaintiff alleges that he was retaliated against "for filing grievances and voicing opinion. And filing the 42 U.S.C. 1983 lawsuit." Compl. at 10. [8] Plaintiff identifies the following instances in which defendants took allegedly adverse action against him: C.O. Bertone threatened plaintiff with physical harm if he "continue[d] to make complaints;" C.O. Cutler and C.O. Stefanik wrote false reports against plaintiff "due to plaintiff voicing his opinion, and views;" and C.O. Clayburn issued a false misbehavior report to plaintiff after learning that plaintiff had written several inmate grievances against "fellow employees." *Id.* at 12.

It is well-settled that "verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim." *Rosales v. Kikendall*, 677 F. Supp.2d 643, 648 (W.D.N.Y. 2010) (citing *Cabassa v. Smith*, No. 08 Civ. 480 (LEK/DEP), 2009 WL 1212495, at \*7 (N.D.N.Y. Apr. 30, 2009)); *see Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action."); *Kemp v. LeClaire*, No. 03 Civ. 844, 2007 WL 776416, at \*15 (W.D.N.Y. Mar. 12, 2007) (threats such as "your day is coming," "you'll be sent to your mother in a black box," and "you'll get your black ass kicked" are indistinguishable from those that have been found insufficient to establish a constitutional violation).

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)
2017 WL 3913018

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 204 of 220

 **\*5** Upon review, the Court finds that C.O. Bertone's statement that he would "make something happen" to plaintiff if he continued to make complaints, without more, does not suffice to state a cognizable First Amendment retaliation claim against this defendant.

Plaintiff does not enjoy a protected constitutional right "to be free from false and inaccurate information" in his prison records. The creation of a false report in a prisoner's file is not, on its own, a due process violation. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report"); *Hollman v. Bartlett*, No. 08-CV-1417, 2011 WL 4382191, at \*12 (E.D.N.Y. Aug. 26, 2011) (the placement of a false report in an inmate's file, without more, is not a due process violation). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Here, while plaintiff alleges that C.O. Cutler and C.O. Stefanik created false reports about plaintiff which were retaliatory in nature, plaintiff has not provided any facts regarding the type of records or reports that were created, the manner in which these records were falsified, or how such falsity harmed plaintiff. Upon review, the Court finds that plaintiff has not alleged facts sufficient to plausibly suggest that these defendants took actions against him which were sufficiently "adverse" for purposes of the First Amendment. As a result, plaintiff's claims against C.O. Cutler and C.O. Stefanik do not survive initial review and are dismissed without prejudice. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009) (summary order) (allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal.).

The Court also considered the sufficiency of plaintiff's claim that C.O. Clayburn issued a false misbehavior report in retaliation for grievances plaintiff had filed against other corrections officers. *See* Compl. at 12.[9] "Generally, alleged retaliation motivated by an action the prisoner took which did not personally involve the prison officials is insufficient for a retaliation claim." *Ortiz v. Russo*, No. 13 CIV. 5317, 2015 WL 1427247, at \*11 (S.D.N.Y. Mar. 27, 2015) (citing *Wright v. Goord*, 554

F.3d 255, 274 (2d Cir. 2009) (dismissing a pro se prisoner's claim that he was assaulted by the defendant in retaliation for an earlier letter he wrote which did not name or address defendant)); *see also Guillory v. Ellis*, No. 9:11-CV-0600 (MAD/ATB), 2014 WL 4365274, at \*18 (N.D.N.Y. Aug. 28, 2014) ("it is difficult to establish one defendant's retaliation for complaints against another defendant"); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (plaintiff "failed to provide any basis to believe that [defendant] retaliated for a grievance that she was not personally named in"). Here, because plaintiff has not alleged facts sufficient to plausibly suggest that grievances he wrote against other officers were a "substantial or motivating factor" in C.O. Clayburn's decision to issue the challenged misbehavior report, this claim does not survive initial review.

 **\*6** Based upon the foregoing, plaintiff's retaliation claims against C.O. Bertone, C.O. Cutler, C.O. Stefanik, and C.O. Clayburn set forth in the First Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e) (2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

### B. Second Cause of Action—Equal Protection

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To state a viable Equal Protection claim, a plaintiff generally must allege "purposeful discrimination ... directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). In the alternative, under a "class of one" theory, plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003).

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

Here, plaintiff states that he is an "African American Muslim," and claims that defendants treat him differently from the Caucasian inmates in the SOTP "without a [reason] of doing so." Compl. at 13. More specifically, plaintiff alleges that defendants Piliero-Kinderman, Bode-Cutler, and Snyder (identified as Caucasian female employees assigned to the SOTP) spoke disparagingly to him in an attempt to "dehumanize" him and "strip [him] of his self-esteem;" plaintiff contends that these remarks were racially motivated. *Id.* Plaintiff further claims that he was improperly disciplined by defendant Scaringi (identified as a "Caucasian female American"), who ignored substantial evidence of plaintiff's innocence and found him guilty due to her discriminatory motive. *Id.* at 13, 15 (Scaringi went "against her better judgment, due to the fact that plaintiff is a African American male in a sex-offender program. And Defendant is a Caucasian woman."). With respect to a disciplinary hearing conducted by defendant Polizzi (identified as a Caucasian American male), plaintiff claims that he was improperly found guilty without regard to the evidence "because [he] is an African-American Muslim." *Id.* at 15. [10] As against defendant Acting Supt. Pingotti, plaintiff complains that he improperly reviewed and approved misbehavior reports written against plaintiff by C.O. Cutler, C.O. Clayburn, and C.O. Figuero (not a defendant) and designated Polizzi to conduct the hearings, actions that Acting Supt. Pingotti would not have taken in the case of a "Caucasian prisoner who had a false misbehavior report written against him." *Id.* at 18. Plaintiff further alleges that Acting Supt. Pingotti improperly affirmed the disciplinary findings by defendant Polizzi. *Id.*

**\*7** Plaintiff's complaint does not include any facts plausibly suggesting that similarly situated prisoners were treated differently than he was. Rather, plaintiff merely makes the conclusory assertion that inmates of other races, religions, and gender were treated differently by defendants (or would be treated differently if they found themselves in similar circumstances). Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause. *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008); *see also Coleman v. Rice*, No. 8:14-CV-1469 (MAD/CFH), 2015 WL 401194, at \*7 (N.D.N.Y. Jan. 28, 2015); *Hughes v. Butt*, No. 9:06-CV-1462 (TJM/GHL), 2009 WL 3122952, at \*12 (N.D.N.Y. Sept. 28, 2009).

As a result, plaintiff's Equal Protection claims set forth in the Second Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**C. Third Cause of Action—Free Exercise**
"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). This includes the "right to participate in congregate religious services ... Confinement in keeplock does not deprive prisoners of this right." *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (internal citations omitted); *see also Ford*, 352 F.3d at 597 ("[A] prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock."). [11] However, an inmate's freedom of religion is not absolute, and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford*, 352 F.3d at 588 (citation omitted). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safley*, 482 U.S. 78, 84 (1987). [12]

As alleged in the complaint, defendants Piliero-Kinderman, Bode-Cutler, and Snyder deliberately undertook to deny plaintiff the ability to practice his religion "when they went out of their way to discretely get plaintiff remove[d] from sex-offender treatment program by having false misbehavior reports written on plaintiff." Compl. at 19. [13] Plaintiff also contends that defendant Lt. Gardner made disparaging remarks about plaintiff's religion during the disciplinary hearing he conducted to address these reports. *Id.* At the conclusion of the hearing, Lt. Gardner found plaintiff guilty of misbehavior and sanctioned him with thirty (30) days of keeplock confinement. *Id.* During plaintiff's period of "restrictive confinement," Acting Deputy Supt. of Security ("Acting DSS") Bertone ignored plaintiff's written requests to attend Jum'mah services, and "to attend to break of Ramadan prayer and festival" with his "fellow Muslim[s]." *Id.* at 20-21. [14] Plaintiff identifies these observances as "religious tenets" of his faith. *Id.* at 20.

2017 WL 3913018

**\*8** Upon review, and with due regard for plaintiff's status as a pro se litigant, the Court finds that a response to plaintiff's claim that he was denied free exercise of his religion is required from Acting DSS Bertone. This is not a ruling on the merits and the Court expresses no opinion as to whether this claim can withstand a properly filed dispositive motion.

The Court reaches a different conclusion, however, with respect to the sufficiency of plaintiff's claims against defendants Piliero-Kinderman, Bode-Cutler, Snyder, and Gardner. As to these defendants, because plaintiff has not alleged facts which plausibly suggest that they were personally involved in the determinations made regarding plaintiff's ability to participate in congregate religious services during his period of keeplock confinement, his First Amendment free exercise claims against them set forth in the Third Cause of Action do not survive the Court's initial review and are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

### D. Fourth Cause of Action—Privacy and Failure to Address Grievances

The Supreme Court has recognized that the right to privacy protects against disclosure of personal matters, such as one's medical conditions. *Whalen v. Roe*, 429 U.S. 589, 598-600 (1977); *Doe v. City of N.Y.*, 15 F.3d 264, 267 (2d Cir. 1994). "The privacy interest is at its zenith when the prisoner suffers from an 'unusual' condition, such as HIV or transsexualism, that is 'likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.' " *Shuler v. Brown*, No. 07-CV-0937 (TJM/GHL), 2009 WL 790973, at * 5 (N.D.N.Y. Mar. 23, 2009) (quoting *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999)). However, courts have held that the right of confidentiality does not prohibit the disclosure of an individual's criminal history, including arrest records. *See Paul v. Davis*, 424 U.S. 693, 713 (1976) (finding no constitutional right of confidentiality affected by the publication of the fact that an individual was arrested of shoplifting); *Doe v. Cuomo*, 755 F.3d 105, 114 (2d Cir. 2014) (rejecting claim that reporting and notification requirements of New York's Sex Offender Reporting Act violate plaintiff's right to privacy of personal information); *Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) (holding that "there is no constitutional right to privacy in one's criminal record"

because "arrest and conviction information are matters of public record").

Here, plaintiff alleges that defendant C.O. Cunningham improperly told other inmates in the SHU that plaintiff "is a rapist in the sex-offender program." Compl. at 21. According to plaintiff, C.O. Cunningham intended to "encourage" other inmates to antagonize plaintiff "to see if they could get him to hang himself." *Id.*

Because the constitutional right to privacy does not protect the type of information allegedly disclosed by C.O. Cunningham, this claim does not survive initial review. [15]

**\*9** The Fourth Cause of Action also includes claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna which arise, if at all, from their alleged failure to properly investigate and address plaintiff's complaints and grievances. Compl. at 22. As alleged, Deputy Supt. Taylor-Stewart ignored plaintiff's constant complaints about defendants Piliero-Kinderman, Bode-Cutler, and Snyder. *Id.* Plaintiff also alleges that Supt. Lamanna ignored plaintiff's complaints and improperly denied his grievance. *Id.*

Despite the fact that New York prison inmates are required to exhaust administrative remedies prior to commencing an action complaining of prison conditions, and resort to that grievance process is regarded as protected activity under the First Amendment which insulates inmates against retaliation for engaging in such activity, *see Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996), there is no constitutional right of access to the established inmate grievance program. *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *see also Shell v. Brzezniak*, 365 F. Supp. 2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim").

Based upon the foregoing, plaintiff's allegations that his complaints and grievances were not properly processed, investigated, and responded to does not give rise to

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

cognizable claims for the violation of his Fourteenth Amendment due process rights. As a result, these claims against Deputy Supt. Taylor-Stewart and Supt. Lamanna set forth in the Fourth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 19215A(b)(1).

**E. Fifth Cause of Action—Unlawful SHU Confinement**
Although it is clear that the Constitution "does not mandate comfortable prisons," it does not permit inhumane treatment of those in custody. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) and *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment a plaintiff must show that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834; *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)." "Only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991).

In his Fifth Cause of Action, plaintiff claims that he was "unlawfully confined in the SHU" due to the actions of defendants Piliero-Kinderman, Bode-Cutler, Snyder, Cutler, Stefanik, Clayburn, Cunningham, Gardner, Taylor-Stewart, Pingotti, Scaringi, Polizzi, Denniston, North, and Koba. Compl. at 22. No other facts are alleged.

Generally speaking, the "normal" or "ordinary" restraints imposed on inmates confined in SHU are not unconstitutional. *See Sostre v. McGinnis*, 442 F.2d 178, 192 (2d Cir. 1971) (en banc) ("It is undisputed on this appeal that segregated confinement does not itself violate the Constitution."). [16] Moreover, such confinement is not "abnormal" unless it is "totally without penological justification, grossly disproportionate, or involve[s] the unnecessary and wanton infliction of pain." *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (internal quotation marks and citations omitted). In limited circumstances, the length of the disciplinary detention may itself constitute disproportionate punishment in light of the gravity of the offense. *See Sostre v. McGinnis*,

442 F.2d 178, 190–94 & n.28 (2d Cir. 1971) (length of disciplinary detention [12 months] did not constitute disproportionate punishment considering the gravity of the offense; *Peoples v. Fischer*, No. 11-2694, 2012 WL 1575302, at *9 (S.D.N.Y. May 3, 2012) (denying motion to dismiss claim that disciplinary sentence of thirty-six months SHU confinement for a non-violent rule infraction constituted cruel and unusual punishment), *motion for reconsideration granted in part and denied in part on other grounds*, 898 F. Supp.2d 618, 626 (S.D.N.Y. 2012).

**\*10**  Significantly, plaintiff does not allege that the conditions of his SHU confinement were unduly harsh or in any way "abnormal" or "unusual." Plaintiff has also not disclosed the duration of his confinement. Moreover, plaintiff has failed to allege facts in support of his claim that these fifteen defendants were personally involved in creating the conditions of his SHU confinement that he seeks to complain of.

As a result, the unlawful confinement claim set forth in the Fifth Cause of Action is dismissed without prejudice for failure to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**F. Sixth Cause of Action—Due Process**
In the Sixth Cause of Action, plaintiff sets forth claims against defendants North, Hines, Pearson, and Koba which, liberally construed, assert violations of plaintiff's due process rights. *See* Compl. at 22-23.

As against defendant C.O. North, plaintiff alleges that he tampered with hearing tapes that plaintiff requested, and improperly "coached" Scaringi to find plaintiff guilty at a Tier III hearing held in November 2015. Compl. at 22.

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

Case 9:19-cv-00428-BKS-TWD Document 8 Filed 05/09/19 Page 208 of 220

to the ordinary incidents of prison life.'" *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin. Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000).[17] Thus, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon*, 215 F.3d at 232 n.5), the Second Circuit generally takes the position that confinement in a SHU, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *Colon*, 215 F.3d at 231.

Here, insofar as plaintiff alleges that C.O. North engaged in conduct which resulted in his being denied due process at his disciplinary hearing, this claim does not survive initial review. Even assuming that plaintiff enjoyed a protected liberty interest in the disciplinary hearing conducted by Scaringi (and the Court makes no such finding), there is no basis in the complaint upon which the Court could conclude that C.O. North was personally involved in that wrongdoing for purposes of personal liability under Section 1983.

**\*11** Plaintiff alleges that defendant Hines improperly denied plaintiff's request for documents under the New York Freedom of Information Law ("FOIL"). Compl. at 23.[18] While the exact contours of plaintiff's claim are far from clear, to the extent that he claims that the denial of his FOIL request violated his constitutional rights, that claim is not cognizable in this Section 1983 action. *See Ladeairous v. Attorney Gen. of N.Y.*, 592 Fed.Appx. 47, 48 (2d Cir.), cert. denied sub nom. *Ladeairous v. Schneiderman*, 136 S. Ct. 220 (2015), reh'g denied, 136 S. Ct. 579 (2015) (" '[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.'") (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978)).

As alleged in the complaint, defendant C.O. Pearson confiscated legal materials and grievance records from plaintiff's cell. Compl. at 23. Following this incident, plaintiff "started to have problems obtaining legal research and materials." *Id.*

The Supreme Court has held that even "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). The Second Circuit has recognized that New York provides, "an adequate post deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001) (citing *Love v. Coughlin*, 714 F.2d 207, 208-09 (2d Cir. 1983)).[19] As a result, plaintiff's claims against C.O. Pearson arising from the confiscation of his legal papers are not cognizable in this action.

In his complaint, plaintiff alleges that defendant Koba, identified as the Grievance Supervisor, falsely reported that plaintiff never filed any grievances, and "prevented plaintiff from exhausting his grievances against fellow employees." Compl. at 23. In addition, plaintiff alleges that Koba provided false testimony at plaintiff's disciplinary hearing "to make plaintiff look like a gang member." *Id.*

Upon review, the Court finds that plaintiff's claims against defendant Koba do not survive initial review. As discussed above in Part III(D), an inmate does not enjoy a protected due process interest in accessing the inmate grievance system. As a result, plaintiff's claim that defendant Koba did not properly perform his duties as "Grievance Supervisor" at Shawangunk C.F. is not cognizable in this Section 1983 action. In addition, it is well-settled that "provision of false testimony against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Mitchell v. Senkowski*, 158 Fed.Appx. 346, 349 (2d Cir. 2005) (summary order) (citing *Boddie*, 105 F.3d at 862). Thus, the mere allegation that a defendant has given false testimony at a disciplinary hearing fails to support a section 1983 claim for damages against the witness providing such testimony. *Green v. Greene*, No. 9:07–CV–0351 (GTS/DEP), 2009 WL 5874308, at \*23 (N.D.N.Y. Mar. 30, 2009); *see also Cole v. Fischer*, No. 07 Civ. 11096, 2009 WL 130186, at \*3 (S.D.N.Y. Jan. 15, 2009).

**\*12** Based upon the foregoing, plaintiff's claims against defendants North, Hines, Pearson, and Koba set forth in the Sixth Cause of Action are dismissed without prejudice for failure to state a claim upon which relief may be

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 209 of 220

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

2017 WL 3913018

granted. See 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**G. Seventh Cause of Action—Inadequate Medical Care**
There are two elements to a claim that officials violated a plaintiff's Eighth Amendment right to receive adequate medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). [20]

In his complaint, plaintiff claims that Dr. Parks acted with deliberate indifference to plaintiff's "health and safety when he deny plaintiff proper and helpful medications." Compl. at 23. Plaintiff does not set forth any facts regarding the nature and extent of his medical and/or mental conditions, his efforts to obtain evaluation and treatment, or the basis for his belief that the treatment provided was not "proper and helpful."

Upon review, the Court concludes that the facts alleged in the complaint do not plausibly suggest that Dr. Parks acted with deliberate indifference, was reckless in his treatment of plaintiff, or provided him with treatment that was "inadequate" in a constitutional sense. It is well-settled that an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester County Dept. of Corrections*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). "[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

As a result, plaintiff's medical indifference claim set forth in the Seventh Cause of Action does not survive initial review and is dismissed without prejudice for failure to state a claim. See 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1).

**V. CONCLUSION**
**\*13 WHEREFORE**, it is hereby

**ORDERED** that upon review of the pleadings filed in *Thomas* I and *Thomas* II, the Court finds that there is considerable duplication and repetition of claims and defendants in these two actions, as to which common questions of law and fact exist; because the pleading in *Thomas* II is more complete and because plaintiff has asserted additional claims and named additional defendants in that action, *Thomas* I is hereby **DISMISSED without prejudice** in favor of *Thomas* II; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* I (Dkt. No. 11) is **DENIED as moot**; and it is further

**ORDERED** that plaintiff's IFP application in *Thomas* II (Dkt. No. 10) is **GRANTED**; [21] and it is further

**ORDERED** that the Clerk provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's inmate authorization (Dkt. No. 3), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk provide a copy of plaintiff's inmate authorization (Dkt. No. 3) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that plaintiff's claim that he was denied free exercise of his religion by Acting DSS Bertone set forth in the Third Cause of Action survives initial review and requires a response from this defendant; and it is further

**ORDERED** that plaintiff's remaining claims are **DISMISSED without prejudice** in accordance with 28 U.S.C. § 1915(e)(2)(ii) and 28 U.S.C. § 1915A(b)(1); [22] and it is further

2017 WL 3913018

**ORDERED** that the Clerk shall terminate Polizzi, Pingotti, Lamanna, Taylor-Stewart, Parks, Piliero-Kinderman, Denniston, Koba, Bode-Cutler, Snyder, Pearson, Gardner, Hines, Cunningham, Clayburn, Scaringi, Cutler, Stefanik, and North as defendants in this action; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service of process, the Clerk shall issue a summons and forward it, along with a copy of the complaint, to the United States Marshal for service on defendant Bertone. The Clerk shall forward a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**\*14  ORDERED** that a response to plaintiff's complaint be filed by defendant Bertone or his counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number (No. 9:17-CV-0377), and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 3913018

Footnotes

1    Since March 2017, plaintiff has filed five civil rights actions in this District.

2    The dismissal of an action as duplicative has been found on several occasions to fall within the ambit of the court's power to dismiss a complaint which is frivolous or malicious pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). *See, e.g., Abreu v. Travers,* No. 9:15-CV-0540 (MAD/ATB), 2015 WL 10741194, at \*4 (N.D.N.Y. Sept. 14, 2015) (citing cases), reconsideration denied, No. 9:15-CV-0540 (MAD/ATB), 2016 WL 1717204 (N.D.N.Y. Apr. 28, 2016); *see also Denton v. Hernandez,* 504 U.S. 25, 30 (1992) (recognizing Congress's concern that "a litigant whose filing fees and court costs are assumed by the public, unlike a paying litigant, lacks an economic incentive to refrain from filing frivolous, malicious, or repetitive lawsuits") (citation omitted).

3    Section 75 provides for the availability of a hearing upon stated charges prior to dismissal of certain government employees in New York. *See Russell v. Hodges,* 470 F.2d 212, 215 (2d Cir. 1972). Civil Service Law Section 75 does not afford plaintiff any basis for relief in this action; in light of plaintiff's pro se status the Court has liberally construed the pleading as seeking redress pursuant to 42 U.S.C. § 1983 ("Section 1983").

4    The additional defendants are Shawangunk C.F. Supt. Lamanna, Shawangunk C.F. C.O. Cunningham, and Shawangunk C.F. C.O. North. *Thomas* II, Compl. at 2, 6-7.

5    In light of the dismissal of *Thomas* I, plaintiff's IFP application in that case, *see* Dkt. No. 11, is denied as moot. Except as specifically noted, all further references in this Decision and Order to the docket shall be to *Thomas* II.

6    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. Based upon that review, it does not appear that plaintiff has accumulated three "strikes" for purposes of 28 U.S.C. § 1915(g).

7    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

8    No other facts are alleged regarding the timing or subject matter of plaintiff's complaints and grievances.

Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)

Case 9:19-cv-00428-BKS-TWD    Document 8    Filed 05/09/19    Page 211 of 220

2017 WL 3913018

9    Plaintiff's claim is asserted in wholly conclusory terms; no facts are provided regarding the date(s) of these grievances, the officers against whom the grievances were filed, or the nature of plaintiff's complaints.

10   The hearing was convened to consider an inmate misbehavior report written by C.O. Clayburn. Compl. at 16.

11   As the Second Circuit noted in *Ford*, DOCCS Directive 4202 "sets out prison officials' obligations in accommodating prisoners' religious practices." *Ford*, 352 F.3d at 586. Part X of Directive 4202 provides that "[u]pon commencement of keeplock or confinement status, an inmate may submit a written request to attend regularly scheduled congregate religious services;" such requests are to be directed to (and decided by) the Deputy Superintendent for Security.

12   This framework is one of reasonableness and is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349. "It has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a 'prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.' " *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)). At this early stage of the action, this Court applies the traditional formulation that, to prevail on a First Amendment claim, an inmate must show that he has a sincerely held religious belief, that it was substantially burdened, and that defendants' conduct was not reasonably related to some legitimate penological interest. *See Holland*, 758 F.3d at 221; *Salahuddin*, 467 F.3d at 274-75.

13   As noted, plaintiff states that he is an "African American Muslim." Compl. at 13.

14   Plaintiff does not contend that he was prohibited or prevented from praying or otherwise practicing his religion in his cell during the period of keeplock confinement.

15   In light of plaintiff's pro se status, the Court also considered whether plaintiff has plausibly alleged that C.O. Cunningham intentionally exposed plaintiff to "a substantial risk to his safety" in violation of his Eighth Amendment rights when he made comments to other inmates about plaintiff's criminal history, and concludes that he has not. Plaintiff may pursue such a claim in a properly filed amended complaint.

16   "Under the 'normal conditions of SHU confinement in New York [state prison],' the prisoner is: placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors [are] permitted, but the frequency and duration [is] less than in general population. The number of books allowed in the cell [is] also limited." *Palmer v. Richards*, 364 F.3d 60, 66 n.3 (2d Cir. 2004) (citation omitted).

17   For example, segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. *Sandin*, 515 U.S. at 485-86. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

18   As alleged, plaintiff's request was denied on the ground that it was not timely. Compl. at 23.

19   The confiscation of an inmate's legal papers related to a legitimate, non-frivolous legal proceeding can give rise to a claim under the First Amendment for interference with access to the courts, provided that the inmate can establish that he or she has suffered prejudice as a result of the actions of corrections officials in the pursuit of his or her legal claims. *See Pacheco v. Pataki*, No. 9:07-CV-850 (FJS/GHL), 2010 WL 3635673, at *3 (N.D.N.Y. Sept. 9, 2010) ("A prisoner has a constitutional right of access to the courts, which is infringed when prison officials actively interfere with a prisoner's preparation of legal documents.... [f]or the claim of denial of access to the courts to be successful, a plaintiff must allege an actual injury."). Here, because plaintiff does not claim and there are no facts alleged in the complaint which even suggest, that the problems he experienced with the law library resulted in "actual injury," the complaint does not state a cognizable access to the courts claim.

20   "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970)).

21   Although his in forma pauperis application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

22   Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must be a complete pleading and must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**Thomas v. Pingotti, Not Reported in Fed. Supp. (2017)**

2017 WL 3913018

---

**End of Document**                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 624081
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jason R. WHITE, Plaintiff,

v.

Brian FISCHER, Commissioner, Dept.
of Correctional Services; Theresa A.
Knapp–David, Director, Classification and
Movement; and R. Woods, Superintendent,
Upstate Correctional Facility, Defendants.

No. 9:09–CV–240.
|
Feb. 18, 2010.

**Attorneys and Law Firms**

Jason R. White, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Brian J. O'Donnell, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jason R. White, commenced this civil rights
action in February 2009, pursuant to 42 U.S.C. § 1983.
By Report–Recommendation dated January 25, 2009, the
Honorable David E. Peebles, United States Magistrate
Judge, recommended that defendant's motion to dismiss
(Dkt. No. 10) be granted, and that plaintiff's complaint
in this action be dismissed without leave to replead. No
objections to the Report–Recommendation have been
filed.

Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Peebles, the
Report–Recommendation is accepted and adopted in all
respects. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 10) is
GRANTED;

2. Plaintiff's complaint in this action is DISMISSED
without leave to replead; and

3. The Clerk is directed to file judgment accordingly and
close the file.

IT IS SO ORDERED.

JASON R. WHITE,

Plaintiff,

-v.-

BRIAN FISCHER, THERESA A. KNAPP–DAVID,
and R. WOODS,

Defendants.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Jason R. White, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. §
1983, alleging deprivation of his civil rights. In his
complaint, plaintiff asserts that his transfer into special
housing unit ("SHU") disciplinary confinement at the
Upstate Correctional Facility, to serve what was originally
intended to be a three-month disciplinary sentence of less
restrictive keeplock confinement imposed while at another
facility, represented a deprivation of a liberty interest
without the requisite procedural due process. As relief
for the violation, plaintiff's complaint seeks an award of
compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have
moved seeking its dismissal for failure to state a cause
of action upon which relief may be granted. In their
motion, defendants argue that plaintiff's allegations do
not demonstrate the existence of a meritorious due process
claim since, at best, it implicates a failure of prison officials
to comply with governing regulations regarding transfers
into an SHU unit, a matter not of constitutional concern,
noting further that plaintiff has no constitutional right
to be designated to a particular correctional facility or

to a desired security classification. Defendants also seek dismissal of plaintiff's claims against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

For the reasons set forth below, I find that White's complaint fails to set forth a plausible due process violation and that defendant Fischer is also entitled to dismissal of the claims against him based upon the lack of allegations showing of his personal involvement in the conduct allegedly giving rise to plaintiff's claims. I further recommend a finding that, even if plaintiff were able to plead a cognizable due process cause of action, defendants Knapp–David and Woods nonetheless should be granted qualified immunity from suit in this instance.

I. *BACKGROUND* [1]

**\*2** Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and later to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id., § 6.*

On March 28, 2007, while confined at Auburn, plaintiff was found guilty following a Tier I II disciplinary hearing of engaging in violent conduct and refusing a direct order, in violation of disciplinary rules 104.11 and 106.10, respectively. [2] *See* Plaintiff's Memorandum (Dkt. No. 1–1) Exh. A. [3] As a result of that determination plaintiff was sentenced to serve three months of keeplock confinement, with a corresponding loss of package, commissary, and telephone privileges. *See id.*

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 13, 2007. Complaint (Dkt. No. 1) § 6. At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence. [4] *Id.*

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU

at Upstate was not authorized by DOCS directives. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. C. The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC"). Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff appealed the denial to defendant Woods, the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007. Complaint (Dkt. No. 1) § 6 at p. 4B. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff's further appeal of the matter to the DOCS Central Office Review Committee ("CORC") was likewise unsuccessful. *Id.* Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS Commissioner Brian Fischer, complaining of the SHU designation. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. F. That letter was referred by Commissioner Fischer to defendant Theresa A. Knapp–David, the DOCS Director of Classification and Movement. Complaint (Dkt. No. 1) § 6 at pp. 4B–4C. In response, defendant Knapp–David wrote to the plaintiff on May 7, 2007, advising that his SHU assignment was in accordance with established DOCS procedures. Plaintiff's Memorandum at (Dkt. No. 1.1) Exh. G.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2009, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Commissioner Fischer; Director Knapp–David; and Upstate Superintendent R. Woods. Complaint (Dkt. No. 1) § 3. Plaintiff's complaint asserts a single cause of action for deprivation of procedural due process. *Id., § 7.*

**\*3** Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought. Dkt. No. 10. In their motion defendants argue, *inter alia,* that plaintiff's complaint 1) does not implicate a cognizable due process violation, 2) plaintiff's complaint fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity. [5] Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the

issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* ––– U.S. ––––, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974). When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)).

#### B. *Procedural Due Process*

**\*4** In their motion, defendants assert that because plaintiff's due process claim rests on alleged violations of DOCS regulations, his complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Inmates' liberty interests may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983). Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in ... an unexpected manner." *Arce,* 139 F.3d at 333 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction. Instead, he argues that his due process rights were abridged after the sanction was imposed when, in violation of DOCS Directive No. 4933, [6] he was transferred from keeplock confinement at Auburn to an SHU cell at Upstate, and as a result required to endure a more restrictive confinement. Unfortunately for plaintiff, neither the Due Process Clause nor state statute or regulation give rise to a liberty interest in these circumstances.

Preliminarily, it is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03–CV01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) [7] (citing *Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

**\*5** Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitutional rights sufficient to give rise to a due process claim. *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009). A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lansberg,* No. 9:06–CV–1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe, M.J.). Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions, addressing the same issues raised by the plaintiff in this case, this court has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest. *McEachin v. Goord,* No. 9:06–CV–1192, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence); *Halloway,* 2007 WL 2789499 (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility); *Carlisle v. Goord,* No. 9:03–CV–296, 2007 WL 2769566, at *2 n. 1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding

the conversion."); and, *Chavis v. Kienert,* 9:03–CV–0039, 2005 WL 2452150, at *9–10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest). *See also, Holmes v. Grant,* No. 03–Civ. 3426, 2006 WL 851753, at *18–19 (S.D.N.Y. mar. 31, 2006 (dismissing claim plaintiff's claim that disciplinary sentence was improperly converted from keeplock sentence to SHU). These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS ... possesses sole discretion to determine 'where a [state] inmate will be housed.' " *Halloway,* 2007 WL 2789499, at *5 (quoting *Grullon v. Reid,* No. 97 CIV. 7616, 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999)) (other citations omitted). These cases are indistinguishable from the case presently before the court.

**\*6** Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permitt[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities ...." *McEachin,* 2008 WL 1788440, at *4; *see also, Halloway,* 2007 WL 2789499, at * 5 ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same ... limitations.") and *Holmes,* 2006 WL 851753, at * 19 ("Section 301.6 ... relat[es] to keeplock admissions and authorizes placement of inmates in SHU 'at a medium or minimum security correctional facility or *Upstate Correctional Facility* ... for confinement pursuant to disposition of a disciplinary (Tier II) or superintendent's (Tier II hearing.' ") (emphasis in original).

In view of the foregoing, it is clear that plaintiff's transfer from Auburn, where he was keeplocked, to SHU confinement at Upstate does not implicate a liberty interest arising out of either Due Process Clause, or state statute or regulation. According to plaintiff's complaint, he was sentenced to keeplock after a Tier III disciplinary hearing; he does not allege that he was denied due process in connection with that hearing. The Tier II I hearing that he was provided was all that was required by the constitution before he was sentenced to disciplinary confinement. *Holmes,* 2006 WL 851753, at *19. Plaintiff

Case 9:19-cv-00428-BKS-TWD   Document 8   Filed 05/09/19   Page 217 of 220

was entitled to no further procedure at the time of transfer to Upstate, and therefore cannot show that he was deprived of a protected liberty interest without due process of law.[8] *Id.* Accordingly, I recommend that plaintiff's complaint be dismissed for failure to state a cause of action.

### C. *Personal Involvement*

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions as the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v.. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the

wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937.; *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

#### 1. *Commissioner Fischer*

*7 Aside from allegations centering upon his role as the DOCS Commissioner, which are clearly insufficient in and of themselves to establish his liability, plaintiff's claims against defendant Fischer appear to revolve around the letter written by him to the Commissioner on or about April 23, 2007, complaining of his SHU confinement at Upstate. That letter, it appears from the limited materials now before the court, was referred to defendant Knapp–David for response. It is well established that when the Commissioner receives a letter and forwards it on to another individual for investigation and a response, his or her involvement in the constitutional violation cannot be predicated solely upon those circumstances. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Rivera v. Fischer,* No. 08–CV–6505L, 2009 WL 2981876, at *2 (W.D.N.Y. Sept. 18, 2009). I therefore recommend dismissal of plaintiff's claims against Commissioner Fischer on the basis of lack of his personal involvement.

#### 2. *Superintendent Woods*

Plaintiff's claims against Superintendent Woods stand on slightly different footing. It is alleged that Superintendent Woods processed and affirmed the determination of the Upstate IGRC denying plaintiff's grievance regarding the relevant occurrences. His review of plaintiff's grievance arguably placed Superintendent Woods on notice of a constitutional violation, which was ongoing, at a time when he was potentially positioned to end the violation. On that basis I conclude that plaintiff has sufficiently alleged Superintendent Woods' personal involvement in the violation alleged to withstand defendants' dismissal motion. *See Charles v. New York State Dept. of Corr. Services,* No. 9:07–CV–1274, 2009 WL 890548, at *5–9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J.).

### 3. *Director Knapp–David*

Plaintiff's complaint alleges that in her position as the DOCS Director of Classification and Movement, defendant Knapp–David would have reviewed and approved his transfer from Auburn into Upstate. That allegation is buttressed by both her position with the DOCS and the fact that plaintiff's letter regarding the matter was referred to defendant Knapp–David for response explaining why the transfer was proper under DOCS regulations. On this basis, I conclude that plaintiff has stated a plausible claim against defendant Knapp–David and her personal involvement in the constitutional deprivations alleged.

### D. *Qualified Immunity*

In their motion, defendants also assert entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

**\*8** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[9] *Kelsey,* 567 F.3d at 61, "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d

415, 430 n. 9 (citing *Saucier* ).[10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently concluded in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[11] *Pearson,* 555 U.S. ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official

would have understood that his or her acts were unlawful.

**\*9** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v.. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation. Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp–David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer. Accordingly, as an additional basis for dismissal, I recommend that both defendants Woods and Knapp–David be granted qualified immunity from suit.

IV. *SUMMARY AND RECOMMENDATION*
At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from

keeplock confinement at Auburn into an SHU cell at Upstate. Since such a claim, it is well established in this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief may be granted. While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp–David and R. Woods. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10) be GRANTED, and that plaintiff's complaint in this action be DISMISSED, without leave to replead; and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*10** It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 624081

Footnotes

1    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). I have also considered the exhibits attached to

plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

2      The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3      Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his ... memorandum." *Rivera v. Selsky,* No. 9:05–CV–0967, 2007 WL 956998, at *1 n. 2 (N.D.N.Y. Jan. 5, 2007) (quoting *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)).

4      Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

5      Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion. Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

6      Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for various reasons, which can include confinement pursuant to a Tier II or III hearing disposition. Plaintiff asserts that because he was transferred from Auburn, a maximum security facility, into an SHU unit, that section does not apply. Interestingly, a prior version of DOCS Directive No. 4933 provided, in relevant part, that

> [a]n inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplock inmate in that facility.

*Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (quoting prior version of 7 NYCRR § 301.6(h)).

7      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

8      Plaintiff alleges a litany of differences between the conditions experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for example, that with regard to visits, he was required to travel to and from them in handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt.1–1) at pp. 11–12. As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life". *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300. "[T] fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated...." *Halloway,* 2007 WL 2789499, at *7 (quoting *Meachum v. Fano,* 427 U.S. 215, 225 (1976). Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation. *Carlisle,* 2007 WL 2769566, at *3.

9      If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. *Kelsey,* 567 F.3d at 61 (quoting *Saucier* ).

10     In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433 n. 11 (citation omitted).

11     Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.